Marquiz Law Office
Professional Corporation

3088 Via Flaminia Court
Henderson, NV 89052
Phone: (702) 263-5533
Fax: (702) 263-5532
Craig A. Marquiz, Esq.
NV Bar #7437
MarquizLaw@cox.net

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| TODD C. ENGEL, | Case No.: |
| Plaintiff, | |
| v. | **COMPLAINT** |
| UNITED STATES OF AMERICA; DOES 1 through 100; and ROES 1 through 100, inclusive, | |
| Defendants. | |

Plaintiff Todd C. Engel, by and through his counsel of record, Craig A. Marquiz, Esq. of the Marquiz Law Office, P.C., and for his claims against Defendant the United States of America ("UNITED STATES"), avers and alleges as follows:

### JURISDICTION & VENUE

1.      This Court possesses original subject matter jurisdiction over Plaintiff's affirmative claims for relief pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), including, without limitation, exclusive jurisdiction of Plaintiff's 28 U.S.C. § 1346 Federal Tort Claims Act ("FTCA") claims against the United States due to the negligent, wrongful acts and/or omissions of several federal employees who, while acting in the course and scope of their employment with their respective federal agencies, caused acts and events to occur within this forum under circumstances where the United States, if a private person, would be liable to Plaintiff as detailed in 28 U.S.C. § 2674 and the laws of the State of Nevada where the Defendants' acts or omissions occurred.

1    2.    Venue of this matter is properly before this Court pursuant to 28 U.S.C. § 1391

2  as the underlying actions and corresponding damages occurred within this District and the United

3  States is a named Defendant.

4                                      **PARTIES**

5    3.    Plaintiff Todd C. Engel ("Engel") is, and at all times was, an Idaho domiciliary

6  and citizen of the United States who was wrongfully prosecuted and convicted due to an

7  egregious, fabricated and sham proceeding advanced by the UNITED STATES and its employees

8  in the United States District Court for the District of Nevada in *United States v. Bundy et al.*,

9  Case No. 2:16-cr-00046-GMN-PAL ("Underlying Action").[1]  Notably, in the Underlying Action,

10 the UNITED STATES spent hundreds of millions of dollars in a multi-state effort to falsely

11 convict Plaintiff Engel, among others, of fabricated crimes purportedly dating back to 2014 and,

12 to that end, forced Plaintiff to wrongfully endure fifty-four (54) months of incarceration and

13 monitoring, mostly at a sweltering federal-contractor prison in Pahrump, Nevada and at Lompoc

14 Penitentiary in Lompoc, California.  During that time, Plaintiff Engel suffered severe emotional,

15 physical, mental, occupational and financial distress – damages and injuries which continue to

16 this day.

17

18 _____

19      [1]     In the Underlying Action, nineteen (19) Bundy defendants, including Plaintiff

20 Engel were separated into three (3) distinct trial groups; namely, the "Tier 1" (the alleged
   "leadership" defendants); "Tier 2" (the claimed "mid-level leadership" defendants); and "Tier 3"

21 (the alleged "gunmen") groups.  Due to prosecutorial misconduct, including, without limitation,
   the intentional suppression of exculpatory evidence confirming, among other things, the

22 innocence of Plaintiff, along with the government's knowing and intentional use of fabricated
   evidence to secure an indictment against him, the first and only trial of the Tier 1 defendants was

23 dismissed in January 2018.  Shortly thereafter, all charges against the Tier 2 group were
   dismissed based upon the United States own motion to dismiss their Superseding Indictments

24 with prejudice.  From February 6, 2017 through April 24, 2017, however, Plaintiff Engel was
   forced to endure a trial as part of the UNITED STATES Tier 3 proceeding.  As noted below,

25 Plaintiff Engel was wrongfully convicted on two charges that were subsequently vacated by the
   U.S. Ninth Circuit Court of Appeals due to the egregious violation of Plaintiff's Sixth

26 Amendment rights.  Although the Judgment of the District Court was vacated, the matter was
   remanded for further proceedings / re-trial.  The UNITED STATES, however, recognizing the

27 adverse implications associated with their dismissal of the Tier 1 and Tier 2 matters, voluntarily
   moved to dismiss all further proceedings against Plaintiff Engel, and on September 10, 2020,

28 Plaintiff Engel was released from custody.

4.      Defendant UNITED STATES is the federal government and, through its various agencies (e.g., the DOJ, FBI, DOI and BLM, described more specifically below) and employees (i.e., Assistant United States Attorneys Nadia Ahmed, Steven Myhre and Daniel Bogden; FBI Special Agent Joel Willis; and BLM Officers Daniel Love, Rand Stover, Mark Brunk and Kent Kleman) - each of whom, for purposes of Plaintiff's Federal Tort Claims Act ("FTCA") claims, was acting within her/his official capacity and within the scope and course of her/his employment with the applicable federal agency – caused acts and events to occur within this forum from which Plaintiff's claims arose.

A.      The DOJ is, and at all material times was, an Executive Department and agency of Defendant UNITED STATES; responsible for the enforcement of law and the administration of justice within the United States and doing business in this District; the administrator of several law enforcement agencies, including, without limitation, the FBI; and the employer of Assistant United States Attorneys ("AUSAs") Nadia Ahmed, Steven Myhre and Daniel Bogden (with Messrs. Myhre and Bogden, at certain times, each serving as the acting U.S. Attorney for the District of Nevada).

B.      The FBI is, and at all material times was, the investigative arm of Defendant UNITED STATES and DOJ; doing business in this District; and the employer of Special Agent Joel Willis.

C.      The DOI is, and at all material times was, an Executive Department and agency of Defendant UNITED STATES; responsible for the management and conservation of federal lands and natural resources through the BLM (the employer of Special Agent in Charge of the BLM's Gold Butte Cattle Impoundment Operation ("SAC") Daniel P. Love, and Officers Rand Stover, Mark Brunk and Kent Kleman) with both agencies doing business in this District.

5.      UNITED STATES employees Ahmed, Myhre, Bogden, Willis, Love, Stover, Brunk and Kleman (each of whom caused acts and events to occur within this forum while acting in the scope and course of her/his employment with, and official capacities for, her/his respective federal agencies) shall hereinafter collectively be referred to as the "GOVERNMENT EMPLOYEES."

6.      Upon information and belief, Defendants identified as DOES 1 through 100 and ROES 1 through 100, whether individual, corporate, associate, governmental or otherwise, caused acts and events to occur within this forum from which Plaintiff's claims arose.  The true names and capacities of these parties is not currently known by Plaintiff, and once such identities become known, Plaintiff will seek leave of Court to amend his Complaint accordingly.

## STATEMENT OF THE CASE

7.      Plaintiff fully incorporates herein by reference all allegations contained in paragraphs 1 through 6 of this Complaint.

8.      In the early 1850's (many years before Nevada as an unincorporated territory of the United States was admitted to the Union on October 31, 1864), ancestors of Cliven Bundy (a Mesquite, Nevada cattle rancher) migrated to this territory and the Gold Butte area in County, Nevada, ultimately securing deeds from the State of Nevada to land all along the Gold Butte region.

9.      Upon that land, the Bundy family formed the Bundy Ranch as a living testimony of their family history, work ethic, pride and patriotism - a legacy which serves as an integral part of our American history and the development of the Great Basin region throughout the Western United States.

10.      Over the generations, the Bundy family has invested their blood, sweat, tears and considerable labor, materials and expense to improve the Bundy Ranch, including, without limitation, developing numerous artesian springs / aquifers on the Gold Butte mountain range, and securing title from the State of Nevada to the accompanying water rights.

11.      Those springs, in turn, have served as a life force for the Bundy family's cattle that were lawfully grazing on the Bundy Ranch and its surrounding lands.

12.      Upon information and belief, as part of an egregious plan to eliminate ranching operations within the region, divest or otherwise acquire the private water rights held by those ranchers, including, without limitation, the Bundy family, and to sell-off or otherwise lease those rights for commercial development or other land-use purposes, the DOI / BLM sought to wage

economic and financial warfare against the ranchers by imposing restrictive grazing permits and fees, and limiting the number of cattle that could graze upon those lands.

13.   To that end, in 1998, the UNITED STATES through the DOJ and AUSA's Ahmed and Bogden initiated a civil suit against Cliven Bundy in the United States District Court for the District of Nevada, Case No. 2:98-cv-00531, seeking monetary damages for his refusal to obtain BLM grazing permits and pay the corresponding fees.  That action, *United States v. Cliven Bundy*, resulted in a $1 million judgment in favor of the UNITED STATES - a majority of which constituted fines, penalties and interest.

14.   Armed with that judgment, the GOVERNMENT EMPLOYEES conspired together and orchestrated a fraudulent scheme to entice Cliven Bundy and his supporters, including, without limitation, Plaintiff Engel into an armed confrontation in April 2014 stemming from, among other things: the rounding-up and seizure of certain Bundy Ranch cattle, and staging of same in Bunkerville, Nevada; the egregious execution of other cattle from helicopters circling the Bundy Ranch and surrounding Gold Butte area; and their unauthorized destruction of various Bundy family spring sites.

15.   The round-up operation was intentionally and deliberately carried out, upon information and belief, at the specific direction of GOVERNMENT EMPLOYEES Ahmed, Myhre, Bogden, Love, Stover, Brunk and Kleman in a brutal, violent and aggressive manner.

16.   Notably, upon information and belief, BLM SAC Love and Officer Stover determined that violent, aggressive, excessive and authoritarian tactics would force Cliven Bundy and his supporters (including Plaintiff Engel) to react or otherwise respond physically, and thereby "justify" the GOVERNMENT EMPLOYEES' planned "use of force in the Cattle Impoundment Operation.

17.   To that end, a whistleblower memorandum authored by BLM Special Agent Larry Wooten in November 2017 expressly documented and memorialized BLM SAC Love's stated intention to violently kick Cliven Bundy in the mouth as other BLM agents arrested him and took him to the ground.

1    18.    The GOVERNMENT EMPLOYEES' Cattle Impoundment Operation and

2  resulting "standoff" proved to be an absolute disaster for the UNITED STATES; notably,

3  hundreds of protestors, including, without limitation, Plaintiff Engel, came out to support the

4  Bundy family, express their anger for the federal government's abuse of power, its

5  usurpation of State's rights and the unconstitutional taking and destruction of private property in

6  violation of law.

7    19.    Notably, on April 6, 2014, Plaintiff Engel, while watching FOX News (national),

8  became concerned when he observed a news report detailing the existence of helicopters and

9  heavily-armed federal BLM officers around a cattle-rancher's property in Mesquite, Nevada.

10  Immediately thereafter, Plaintiff Engel began monitoring social media and other news outlets to

11  gain additional information as to what was taking place and why.  In the course of that

12  information-gathering process, Plaintiff Engel reviewed: (a) a video detailing Dave Bundy's

13  arrest by federal law enforcement officers after Dave Bundy lawfully captured photographs of

14  federal sniper teams located on a hillside near the Bundy Ranch; (b) a video detailing the

15  throwing / body-slamming of a 60-year old woman (Margaret Houston) to the ground by federal

16  law enforcement officers from the BLM in the same general area; (c) federal law enforcement

17  officers release of an attack dog and their assault upon the cattle rancher's son (Ammon Bundy),

18  including, without limitation, their tasing of him; and (d) a news agency's interview of Cliven

19  Bundy wherein Mr. Bundy described that the Bundy Ranch was surrounded by federal snipers.

20    20.    Based upon the foregoing, Plaintiff Engel was concerned that the situation

21  brewing in Nevada would rapidly escalate to another Ruby Ridge incident and, desirous of

22  showing his support for the Bundy family and to hopefully de-escalate the matter, made the

23  decision to travel from Idaho to Bunkerville, Nevada on April 10, 2014.

24    21.    Plaintiff Engel arrived in Bunkerville, Nevada on the morning of April 12, 2014

25  and, upon his arrival, learned that Cliven Bundy and others had gathered at a stage to protest the

26  Government's taking of the Bundy Family's cattle.  After listening to Cliven Bundy, Ammon

27  Bundy and Clark County Sheriff Doug Gillespie speak, Plaintiff Engel learned that the State of

28  Nevada had intervened and directed the BLM to stand-down on their Cattle Impoundment

1  Operation.  Notably, as a result, the BLM would be leaving the area, removing their assets and

2  that the Bundy Family's cattle were going to be released.

3      22.     Based upon that information, the crowd that had assembled, including, without

4  limitation, Plaintiff Engel, all traveled to the Toquop Wash to observe the release of the Bundy

5  Family's cattle from the BLM impoundment area.  Upon his arrival at the Toquop Wash parking

6  area, however, Plaintiff Engel learned from another protestor that the Government had not yet

7  dispersed and that there were federal law enforcement officers aiming assault weapons at

8  protestors that had gathered under the Toquop Wash bridge.  Plaintiff Engel, and dozens of other

9  people, immediately walked to the top of the bridge and, at that time, Plaintiff observed federal

10  officers pointing high-powered assault rifles at him and others on and underneath the bridge.

11      23.     Approximately thirteen (13) minutes later, Plaintiff Engel moved away from the

12  bridge toward the Toquop Wash parking area to locate State or local law enforcement officers

13  who might be able to render assistance.  Ultimately, Plaintiff Engel encountered Nevada

14  Highway Patrol Sergeant Shannon Serena and Trooper Clay Madsen and asked for their

15  assistance in de-escalating the matter.  Notably, Plaintiff Engel accompanied these two State law

16  enforcement officers back to the Toquop Wash bridge and identified where he observed federal

17  officers pointing the high-powered sniper and assault rifles at him and others on and under the

18  bridge.  Sergeant Serena immediately telephoned the Las Vegas Metropolitan Police Department

19  and spoke with a high-ranking Officer who was already on-scene.  Upon information and belief,

20  that same LVMPD Officer approached several federal law enforcement officers and directed that

21  they immediately lower their rifles and holster their weapons.  The federal officers complied and,

22  shortly thereafter, all federal officers dispersed and left the scene.

23      24.     Although Plaintiff Engel did not engage in any wrongful conduct (and, in fact,

24  was deemed by Sergeant Serena to have been helpful in de-escalating the situation according to

25  Sergeant Serena's trial testimony), Plaintiff Engel, nevertheless, was:  wrongfully arrested,

26  detained, imprisoned and in-custody for over four and one-half (4 ½) years (i.e., 54 months and

27  1 week), in federally-contracted prisons, including, without limitation, a prison in Pahrump,

28  Nevada and Lompoc Penitentiary in Lompoc, California (i.e., before being released from custody

7

based upon the UNITED STATES' motion to dismiss his case. Notably, the UNITED STATES decision, upon information and belief, was based, in part, upon: (a) the Ninth Circuit Court of Appeal's determination that Plaintiff Engel was wrongfully convicted on two criminal counts (i.e., obstruction of justice under 18 U.S.C. § 1503; and Interstate Travel in Aid of Extortion under 18 USC § 1952) in violation of his Sixth Amendment right to self-representation; and (b) the judicially-determined wrongdoings, including, without limitation, prosecutorial misconduct, the UNITED STATES' knowing and intentional use of fabricated evidence to wrongfully arrest, detain, convict and imprison Plaintiff, and its knowing and intentional failure to disclose extensive exculpatory evidence memorializing same). During that time, Plaintiff Engel was wrongfully separated from his family, friends and loved ones and forced to endure the UNITED STATES rogue prosecution based upon on fabricated charges for crimes he did not commit. Further, prior to his arrest, Plaintiff Engel was subjected to "Mandatory Security Screening" each time he sought to board a commercial flight and, since that time, has been precluded from purchasing firearms based upon the GOVERNMENT EMPLOYEES' designation of him as a "domestic terrorist."

25.     Notably, Plaintiff Engel was falsely indicted in the Underlying Action on eleven (11) felony counts, including, without limitation, conspiracy, conspiracy to impede federal officers, assaulting, threatening, extorting, and obstructing federal officers, and four (4) counts of using firearms in crimes of violence resulting from a "standoff" with agents of the BLM and other federal agencies near Bunkerville, Nevada in connection with the UNITED STATES' Cattle Impoundment Operation.

**GOVERNMENT EMPLOYEES' Official Capacity Conduct Performed While Acting in the Scope and Course of Their Employment**

26.     Plaintiff fully incorporates herein by this reference all allegations contained in paragraphs 1 through 25 of this Complaint.

27.     A March 27, 2014 e-mail authored by a BLM agent (whose name was redacted in court documents from the Underlying Action) to Sal Lauro, BLM Director of the Office of Law Enforcement & Security ("OLES"), and Amy Lueders, BLM's Nevada State Director, confirmed that the U.S. Attorneys Office (led by AUSA Bogden in 2014) was "attempting to direct [the]

law enforcement efforts" and was actually planning and staging the events well before the rogue criminal prosecution commenced.  Namely:

> [a]s for the rest of the operational guidance, it appears the NV USA is *directing tactical decisions*, something I've never seen in 19 years of law enforcement....[I]'m in a unique situation in which I must work with a prosecution agency that is attempt[ing] to *direct my enforcement efforts*. (Emphasis Added).

28.      GOVERNMENT EMPLOYEES Ahmed, Myhre, Bogden, Love, Brunk, Stover, Kleman and Willis "knew or reasonably should have known that the action[s] [they] took within [their] sphere of official responsibility would violate the constitutional rights of the [PLAINTIFF], or [because they] took the action[s] with ... malicious intent[] to cause a deprivation of constitutional rights or other injury."

29.      Under the direction, guidance and control of AUSA's Ahmed, Myhre and Bogden, BLM SAC Love, Officers Stover, Brunk, Kleman and others carefully prepared and fabricated evidence throughout the investigation stage of the Underlying Action, and knowingly, intentionally and willfully concealed exculpatory evidence regarding Plaintiff's innocence and the outrageous, unlawful and unconstitutional aspects of the UNITED STATES conduct related thereto.

30.      For example, GOVERNMENT EMPLOYEES Willis, Love, Brunk, Stover and Kleman along with other agents and officers of the FBI and BLM, intentionally and systematically fabricated, shaped and "clarified" evidence and testimony, altered records, withheld evidence, and gave false testimony so that the UNITED STATES could falsely accuse, obtain grand jury indictments against, detain, prosecute and convict Plaintiff of crimes he did not commit.

31.      In the days following the April 12, 2014 "standoff" and cattle release, many GOVERNMENT EMPLOYEE witnesses authored reports and gave interviews.  Notably, Officer Brunk reported that, on April 6, 2014, he witnessed Dave Bundy's false arrest from a hilltop where Officer Brunk "was acting as a spotter/observer for a BLM sniper."  Nearly a year later, on February 24, 2015, Agent Willis attempted to "correct" Officer Brunk's prior statement by having Officer Brunk "clarify" that he "never acted as a spotter/observer for a BLM sniper, nor

1  did he ever tell the FBI [that] he acted as a spotter/observer for a BLM sniper during his original
2  interview."

3      32.    Upon information and belief, Agent Willis attempted to "correct" the record and
4  his subsequent testimony to protect himself and AUSA's Ahmed, Myhre and Bogden from
5  prosecution for providing or otherwise suborning contrary, perjured testimony before the Grand
6  Jury, and to assist the GOVERNMENT EMPLOYEES in furtherance of their unlawful
7  conspiracy.  Upon information and belief, Agent Willis's clandestine attempt to "clarify" the
8  statement of an employee of another federal agency (the BLM) was performed at the direction of
9  AUSA's Ahmed, Myhre and Bogden.  In this regard, AUSA's Ahmed, Myhre, Bogden and
10  Agent Willis each knew that Officer Brunk's prior witness statement was true and correct and, to
11  conceal that truth and shroud their own misconduct, they falsified evidence and withheld
12  exculpatory evidence to ensure that the GOVERNMENT EMPLOYEES' "version of events"
13  matched the fabricated record that AUSA's Ahmed, Myhre, Bogden and Agent Willis had
14  presented to the Grand Jury to secure rogue indictments against Plaintiff.  Not only did AUSA's
15  Ahmed, Myhre, Bogden and Agent Willis falsely inform the Grand Jury that the UNITED
16  STATES did not deploy snipers in 2014, these same GOVERNMENT EMPLOYEES later
17  drafted the indictments to wrongly accuse the Bundy defendants, including Plaintiff, of falsely
18  alleging that there were.

19      33.    In furtherance of the GOVERNMENT EMPLOYEES' fabricated scheme, BLM
20  SAC Love cloaked the BLM Cattle Impoundment Operation as merely an effort to enforce a
21  2013 civil court order obtained by AUSA's Ahmed and Bogden.  In reality, however, the primary
22  purpose behind the 2014 Cattle Impoundment Operation was to frame and entrap Cliven Bundy
23  and other supporters, including Plaintiff Engel, to react or otherwise physically respond to the
24  GOVERNMENT EMPLOYEES' violent, aggressive, excessive and authoritarian tactics, and
25  thereby, "justify" the GOVERNMENT EMPLOYEES' planned "use of force" and their
26  fabrication of criminal charges against them.

27      34.    To that end, the GOVERNMENT EMPLOYEES staged a confrontation between
28  the Bundys and BLM "contract cowboys" during a local television news interview on March 28,

10

2014.  Notably, BLM SAC Love and Officer Stover coordinated, timed and orchestrated the arrival of the BLM-hired "contract cowboys" and their corresponding equipment to coincide with a pre-arranged television interview between Cliven Bundy and his sons with KLAS Channel 8 News at that same location (an interview, upon information and belief, that was surreptitiously arranged by BLM SAC Love and Officer Stover).

35.    BLM SAC Love and Officer Stover secretly filmed the encounter between the Bundys and the BLM's "contract cowboys" with the intent of provoking violence and/or hostilities between them – conduct which, in turn, would prompt law enforcement intervention and the planned arrests of Cliven Bundy and his supporters.  The Bundys and their supporters, however, did not respond to the BLM's "contract cowboys" provocation and, instead, peacefully photographed the "contract cowboys" to memorialize the incident and the egregious attempt by the GOVERNMENT EMPLOYEES to entrap or otherwise provoke the Bundys into a violent response.

36.    Notwithstanding the foregoing, the UNITED STATES would later use video from this March 28, 2014 BLM "contract cowboy" incident to intentionally mislead a federal grand jury into issuing indictments, essentially spinning this incident as an example of the Bundys' provocation of the BLM, including their violent response to the BLM's Cattle Impoundment Operation and its "stand-off" area near the Toquop Wash and Interstate-15 in Clark County, Nevada.

37.    Moreover, during their investigative efforts in 2013 and leading up to the March and April 2014 incidents, DOJ representatives, including, without limitation, AUSA's Ahmed, Myhre and Bogden, upon information and belief, knowingly, intentionally and willfully modified, revised and supplemented the operational plan proposed by BLM SAC Love and Officer Stover to ensure that the final Cattle Impoundment Operation would, among other things: outrage the ranching community, especially the Bundy family and their supporters, including Plaintiff Engel; provoke a confrontation between them; and entrap the Bundy family and their supporters, including, without limitation, Plaintiff Engel, into responding with physical acts of violence that would justify the GOVERNMENT EMPLOYEES' arrest, detainment and

incarceration of Cliven Bundy and other Bundy family supporters, including, without limitation, Plaintiff Engel and the other Tier 2 and Tier 3 supporters.

38.     Pursuant to that scheme, the GOVERNMENT EMPLOYEES closed to the public nearly six hundred thousand (600,000) acres of land in the Gold Butte and Overton Arm areas, and purposefully forced all those who wanted to challenge the UNITED STATES actions to do so at one of two small dirt parcels adjacent to highways in the Bunkerville area known as "First Amendment Zones."  Notably, these two areas, located a considerable distance away from the BLM's Cattle Impoundment Operation and orchestrated "staging area," were, upon information and belief, purposefully selected by AUSA'S Ahmed, Myhre and Bogden, BLM SAC Love, Officers Stover and Brunk, among others, to maximize the impairment of any protestor's First Amendment rights, including, without limitation, the Bundy Family members, their supporters and Plaintiff Engel, and incite those who would protest against the UNITED STATES rogue operation and unconstitutional conduct (e.g., the purposeful destruction of the Bundy family's spring sites/artesian wells and accompanying water rights), into a physical altercation.

39.     In particular, the GOVERNMENT EMPLOYEES' egregious plan, orchestrated by AUSA's Ahmed, Myhre and Bogden, BLM SAC Love, Officers Stover and Brunk, among others:  seized cattle belonging to Cliven Bundy and the Bundy Ranch; visibly transported same to the BLM's "staging area;" demonstrably shot several other cattle from helicopters circling the Bundy Ranch and surrounding areas; and, after having destroyed several thousands of dollars worth of the Bundy family's water right improvements and artesian springs / aquifers, purposefully paraded a convoy of DOI / BLM vehicles and other construction demolition equipment before the Bundys, the Tier 2 Plaintiffs and their supporters to provoke them into resisting or otherwise defying the GOVERNMENT EMPLOYEES' efforts.

40.     In furtherance of that same scheme, the GOVERNMENT EMPLOYEES, and others at their direction and control, later brutally arrested, assaulted, beat and kicked Dave Bundy (Cliven Bundy's son), as AUSA's Ahmed, Myhre and Bogden, BLM SAC Love, Officers Stover and Brunk, among others, had planned.

41.     Plaintiff Engel became aware of the GOVERNMENT EMPLOYEES' egregious conduct on the nightly news from his home in Idaho and on social media outlets that had published content regarding the GOVERNMENT EMPLOYEES' violation of multiple constitutional rights of American citizens and the physical violence inflicted upon Dave Bundy.

42.     Throughout that entire investigative / pre-judicial process, AUSA's Ahmed, Myhre and Bogden, BLM SAC Love, Officers Stover and Brunk, among others, purposefully, intentionally and knowingly sought to infringe upon various well-known and clearly understood federal and state constitutional rights for the calculated and orchestrated purpose to entrap the Bundys and their supporters, including, without limitation, Plaintiff Engel, and instigate them into physically or violently responding to the GOVERNMENT EMPLOYEES' egregious actions and interference with those rights.

43.     Although the GOVERNMENT EMPLOYEES collectively knew that their concocted charges were false, they, nevertheless, deceptively attempted to strong-arm Plaintiff Engel into accepting a plea (knowing that any such agreement could be used against all of the the other named Bundy defendants in the Underlying Action).  In this regard, the GOVERNMENT EMPLOYEES, at the direction of AUSA's Ahmed, Myhre and Bogden, advised Plaintiff, among other things, that:  a conviction against him on all counts would impose mandatory minimum life sentences which would separate him from his friends, family and loved ones for many years – an outcome that could be avoided if he simply pled guilty to one or more of the bogus conspiracy charges and accepted a plea of 10 years in jail, rather than spending the rest of his life behind bars.

44.     The GOVERNMENT EMPLOYEES, at the direction of AUSA's Ahmed, Myhre and Bogden, directed that informants be planted along side Plaintiff Engel during his incarceration and that other inmates housed with him surreptitiously be offered the immediate release from custody if those inmates would testify falsely against Plaintiff Engel and the other Bundy defendants regarding the GOVERNMENT EMPLOYEES' concocted criminal charges.

45.     The GOVERNMENT EMPLOYEES, at the direction of AUSA's Ahmed, Myhre and Bogden, also prepared, instructed, and directed others to prepare fabricated investigative

1  documents for those inmates to sign, thus manufacturing false evidence that would be used in

2  their rogue prosecution against Plaintiff Engel in violation of law and Plaintiff's constitutional

3  and due process rights.

4  **The State of Nevada's Intervention & De-Escalation Efforts**

5      46.    Recognizing that the unlawful and unconstitutional powder-keg lit by the

6  GOVERNMENT EMPLOYEES was rapidly escalating out of control, Nevada's former

7  Governor (Brian Sandoval), former Clark County Sheriff (Doug Gillespie) and Assistant Clark

8  County Sheriff (Joe Lombardo) intervened to de-escalate the matter.

9      47.    Notably, in the midst of increasing political pressure and public outrage over the

10 GOVERNMENT EMPLOYEES' egregious conduct, the former Nevada Governor, Clark County

11 Sheriff and Assistant Sheriff took control of the scene and, through Assistant Clark County

12 Sheriff Joe Lombardo issued orders directing the BLM and GOVERNMENT EMPLOYEES to

13 wind-down their operation and to release the Bundy family's cows from the cattle pen.

14     48.    AUSA Bodgen and BLM SAC Love, recognizing that the GOVERNMENT

15 EMPLOYEES' unlawful and unconstitutional conduct had failed to produce the planned result,

16 implemented those orders and directed federal and state officers to ensure that "a Bundy," if not

17 Cliven Bundy himself, would pull the pins from the cattle pens so that the DOJ could use that

18 affirmative act to establish the GOVERNMENT EMPLOYEES' fabricated theories of criminal

19 conspiracy, extortion, armed robbery, among other false claims, against the Bundy defendants,

20 including, without limitation, Plaintiff Engel.

21     49.    In accordance with the State orders and at the direction of the GOVERNMENT

22 EMPLOYEES, Margaret Houston, a sister of Cliven Bundy, ultimately "pulled the pin" on the

23 cattle pen and released the cattle.  AUSA's Ahmed, Myhre and Bogden, in turn, used that

24 physical act to support the GOVERNMENT EMPLOYEES' rogue prosecution of the Bundy

25 defendants, including, without limitation, Plaintiff Engel.

26 **Defendant's Longbow Productions Scam**

27     50.    In furtherance of the GOVERNMENT EMPLOYEES' scheme to wrongfully

28 prosecute the Bundy defendants, including Plaintiff Engel, and to manufacture evidence in

support of the fabricated claims against him, AUSA's Ahmed, Myhre, Bogden and Agent Willis concocted a scheme to deceive the Bundys and their supporters, including, without limitation, Plaintiff Engel, into making incriminating statements or confessions through UNITED STATES unprecedented undercover FBI operation named "Longbow Productions."

51.     Notably, AUSA's Ahmed, Myhre, Bogden and Agent Willis, among others, directed hundreds of thousands of taxpayer dollars into an operation in which masqueraded FBI undercover agents falsely posed as a film crew making a documentary of the 2014 "standoff."

52.     Upon information and belief, AUSA's Ahmed, Myhre, Bogden and Agent Willis directed the FBI undercover agents to entice Plaintiff Engel, along with the other to-be-named Bundy defendants, with alcohol, money and other goods and favors to exaggerate their respective involvement in the GOVERNMENT EMPLOYEES' orchestrated "standoff" or to otherwise misstate, exaggerate or falsely hype the event itself, so that the UNITED STATES could increase the likelihood of securing convictions in rogue criminal proceedings that the GOVERNMENT EMPLOYEES would ultimately initiate.

53.     To that end, AUSA's Ahmed, Myhre, Bogden and Agent Willis, among others, successfully deceived various Bundy family members and supporters into participating in the "staged" interviews – interviews in which the undercover FBI agents, at said GOVERNMENT EMPLOYEES' prodding, asked leading questions, with the answers later being selectively edited and later used by the GOVERNMENT EMPLOYEES in the Underlying Action.

**Subornation of Perjury & Falsehoods to the Grand Jury**

54.     The fact that AUSA Bogden had scripted and directed the filming of a video depicting "a Bundy" removing a pin from the cattle pen at the UNITED STATES Cattle Impoundment Operation became problematic for AUSA's Ahmed, Myhre and Bogden when they sought to obtain a grand jury indictment against the Bundy defendants, including Plaintiff Engel, the following year.

55.     Since AUSA Bogden stepped out of his role as prosecutor and assumed the role of investigator (one who directed, supervised and led law enforcement personnel in the filming of

that incident), he was a material witness thereto - one who was never cross-examined or otherwise testified regarding that unprotected, unprivileged conduct.

56.   Notably, during the October 14, 2015 Grand Jury proceedings, AUSA Myhre purposefully avoided a Grand Juror's question directed at the UNITED STATES involvement in the pin removal act and purposefully proffered evasive testimony to avert BLM SAC Love from disclosing the truth regarding that incident.  In particular:

**MYHRE**:   But you never received any order to release the cattle?

**LOVE**:   No sir, did not.

An unknown grand juror asked Love to clarify his statements indicating that Dave Bundy and Ryan Bundy *"did release the cattle" "but on your [Love's] authority, is that correct?"* Love responded *"No I did not give them the authority to release the cattle."* The Grand juror followed up: *"No but I'm just saying it's on your authority you had them release the cattle . . . ."*

At that point Myhre <u>interrupted the proceedings</u>, <u>stopped</u> Love from answering and began to <u>testify</u> himself by asking leading questions.

**MYHRE**:   "But your decision wasn't to release the cattle, your decision was to abandon the ICP, Incident Command Post is that correct?"

**LOVE:**   That is correct and then to turn over – obviously by abandoning the cattle are left there in the pen and I was thereby leaving the cattle and then admonishing and explaining to the Bundys that should they so choose to release those cattle they would be doing so under potential violation of federal law with recourse."

**MYHRE**:   "So in essence you were not giving them permission to release the cattle? You are saying we're leaving and that if you release the cattle it's in violation of federal law."

57.   Throughout 2015 and 2016, AUSA's Ahmed, Myhre and Bogden, Agent Willis, BLM SAC Love, and Officers Stover and Brunk deliberately, maliciously and intentionally mislead the Grand Jury so that they could falsely obtain an indictment against Plaintiff Engel.

58.   On September 16, 2015, AUSA Ahmed knowingly, intentionally and willfully elicited false and misleading testimony from Officer Stover before the Grand Jury regarding the BLM's threat assessments of Plaintiff Engel and the other Bundy defendants, and their propensity for engaging in potential acts of violence.  AUSA Ahmed and Officer Stover, well-aware that the BLM assessments actually established that the Bundys and Plaintiff Engel would

<u>not</u> engage in potential acts of violence, elicited and provided false testimony claiming that the Bundy's and Plaintiff Engel would, in fact, respond with potential acts of violence.

59.     At that same time, AUSA Ahmed and Stover also knowingly, intentionally and willfully elicited and provided false and misleading testimony regarding the UNITED STATES use of snipers.  Despite the fact that numerous federal agents / snipers were located on hillsides around the Bundy Ranch and Cattle Impoundment Operation's "staging area" in April 2014 pursuant to the GOVERNMENT EMPLOYEES' scheme, AUSA Ahmed and Officer Stover egregiously claimed that the operational plan <u>did not</u> include the use of snipers, and the purported use of snipers was merely a story concocted by the Bundy's and their supporters, including Plaintiff Engel.

60.     AUSA Ahmed and Officer Stover also materially misled the Grand Jury regarding the GOVERNMENT EMPLOYEES' First Amendment Zones imposed on the Bundy family, and their supporters, including, without limitation, Plaintiff Engel, in March and April 2014.

61.     As noted above, the GOVERNMENT EMPLOYEES closed to the public nearly six hundred thousand (600,000) acres of land in the Gold Butte and Overton Arm areas and, in so doing, imposed the single largest infringement on free speech in American history (measured geographically).

62.     Hundreds of Americans, including, without limitation, Plaintiff Engel, traveled to the Bunkerville, Nevada area to protest the GOVERNMENT EMPLOYEES' impairment of the Bundy family's First Amendment right to free speech and the expression of their religious freedoms – restrictions which were also denounced by numerous public officials who readily acknowledged the unconstitutionality of same.

63.     Consequently, AUSA Ahmed and Officer Stover knew that in order for the Grand Jury to indict the demonstrators (persons who merely came to protest the GOVERNMENT EMPLOYEES' egregious conduct, support the Bundy family and exercise their own constitutionally-protected free speech rights), they had to knowingly, intentionally and willfully mislead the Grand Jury regarding same.

64.    To that end, on September 16, 2015, AUSA Ahmed and Officer Stover knowingly, intentionally and willfully misled the Grand Jury into believing the following:

> **AHMED:**    Did the operation plan consider having designated areas in the operation area <u>for people who wanted to view</u> the governments activities or the impound operation itself?"
>
> **STOVER:**    "It did."
>
> **AHMED:**    "And were those areas actually what would come to be known as the First Amendment zones or First Amendment areas?"
>
> **STOVER:**    "Correct. . . . It included those areas <u>not to dictate</u> to people where they could express their First Amendment rights but it allowed an area that was safe for the public to go to and get them in <u>as close proximity as possible</u> to the closed operational area so they would have chance to <u>if they wanted to view some of the gather operations</u>?"
>
> **AHMED:**    "Is this setting up of areas <u>as close as possible</u> to where the operation activities are taking place, is that something that the BLM includes regularly in its gathering operations?"
>
> **STOVER:**    "Sure. . . ."

65.    Notably, however, AUSA Ahmed and Officer Stover knew that the First Amendment Zones:  (1) <u>were mandatory</u> (i.e., federal officers told protesters that they must go to the designated First Amendment Zones); (2) offered <u>no view whatsoever of any Cattle Impound Operations</u>; (3) were located <u>miles away from those operations</u>; and (4) were actually patrolled, monitored and watched over by armed government agents.

66.    Tellingly, during the first trial of the Tier 3 matter, Officer Stover admitted on cross examination that the GOVERNMENT EMPLOYEES' First Amendment Zones "were not areas that were appropriate" for citizens to exercise their First Amendment rights.

**Defendant's Rogue Indictment**

67.    On March 2, 2016, after several months of presenting fabricated, misleading and perjured evidence and testimony to the Grand Jury, AUSA's Ahmed, Myhre and Bogden, BLM SAC Love, Officers Stover and Brunk, and Agent Willis obtained an indictment against Plaintiff Engel – evidence which these GOVERNMENT EMPLOYEES knew was false and directly contradicted by exculpatory evidence which said representatives knowingly, intentionally and

willfully withheld from the Grand Jury, and the Bundy defendants, including, without limitation, Plaintiff Engel, and their counsel.

68.     That same day, AUSA's Ahmed, Myhre and Bogden, and Agent Willis egregiously sought the issuance of an arrest warrant for Plaintiff Engel, knowing that there was absolutely no probable cause whatsoever to support any such arrest.

69.     To that end, AUSA's Ahmed, Myhre and Bogden, and Agent Willis withheld exculpatory evidence from the judicial officer that issued the warrants, and knowingly used false, fabricated and manufactured evidence to secure same.

70.     On March 3, 2016, Plaintiff Engel was unlawfully arrested and taken into custody.

71.     Shortly thereafter, the GOVERNMENT EMPLOYEES filed their indictment against him and, although the indictment measured sixty (60) pages in length and accused 19 men of 16 separate criminal counts (notably, 11 for Plaintiff Engel), the indictment was silent as to any basis or probable cause to detain, arrest or otherwise prosecute Plaintiff Engel for any of those alleged crimes.

72.     Notably, Plaintiff Engel's actual conduct (i.e., lawfully protesting the Government's egregious actions) was deceptively described by the GOVERNMENT EMPLOYEES in their rogue indictment as threatening, assaulting and extorting federal officers, obstructing justice, and conspiring to violate federal laws or impede federal officers.

73.     Further, after the indictment was filed in the Underlying Action, AUSA's Ahmed, Myhre and Bogden, Agent Willis, BLM SAC Love, and Officers Stover, Brunk and Kleman conspired with one another to conceal, among other evidence, the BLM threat assessments, the GOVERNMENT EMPLOYEES' use of snipers and other exculpatory evidence from Plaintiff Engel, and all of the Bundy defendants, in the Underlying Action.

74.     The indictment also falsely claimed that the Bundy defendants in the Tier 1 proceeding "caused images of DAVE BUNDY's arrest to be broadcasted ... combining them with false, intentionally misleading and deceptive statements 'to the effect' [that the] BLM

1  supposedly employed snipers ... used excessive force ... and arrested Bundy for exercising his

2  First Amendment rights."

3       75.    During an evidentiary hearing of the Tier 1 trial, it was irrefutably established

4  that the BLM did, in fact, employ snipers and use excessive force.

5       76.    Those same facts, in conjunction with the United States' intentional withholding

6  of exculpatory evidence (*Brady* disclosures and materials) and prosecutorial misconduct

7  prompted Chief Judge Navarro to dismiss the United States case against the Tier 1 defendants.

8       77.    The indictment also baldly asserted that Plaintiff Engel had used firearms in

9  several serious crimes of violence.  While it is true that Plaintiff Engel was lawfully in

10  possession of a rifle at certain times on April 12, 2014, his possession thereof was in full

11  accordance with his Second Amendment right to bear arms and, at all times, was maintained in

12  a safe, proper and lawful manner – at no time did he display, use, or threaten to use his firearm,

13  nor commit any crime, let alone a crime of violence.

14  **False Allegations Against Engel**

15       78.    The rogue indictment against Plaintiff Engel simply alleged that he "was a

16  resident of Idaho who traveled to Nevada with the intent to commit the crimes set forth" therein,

17  and accused him of being a "gunman who threatened, impeded, intimidated, interfered with,

18  assaulted and extorted federal law enforcement officers while in the performance of their

19  duties."

20       79.    At no time, however, did the UNITED STATES possess probable cause to arrest,

21  detain or otherwise prosecute Plaintiff Engel.

22       80.    Moreover, the GOVERNMENT EMPLOYEES knew that each and every

23  material accusation set forth in the Indictment against Plaintiff Engel was inaccurate, false and

24  intentionally misleading.

25  **The GOVERNMENT EMPLOYEES' Wrongful Concealment of Threat Assessments &**
   **Other Misrepresentations to Federal & Magistrate Judges**

26

27       81.    In furtherance of GOVERNMENT EMPLOYEES' conspiracy to keep Plaintiff

28  Engel falsely imprisoned (i.e., so that his release from custody could be used as a potential

   bargaining chip in securing a negotiated plea arrangement from one of the Tier 1 defendants,

most notably, Cliven Bundy), AUSA's Ahmed, Myhre and Bogden argued to the Court that the Plaintiff Engel and the other Bundy defendants were the most dangerous, violent criminals in the history of Nevada.

82.     AUSA's Ahmed, Myhre and Bogden made these egregious statements knowing, among other things, that:  (a) according to their own internal (i.e., DOJ / U.S. Attorney's Office) threat assessments, neither Plaintiff Engel nor any of the Bundy defendants were dangerous or violent, nor did they otherwise pose any risk of being same; (b) their false statements would enable the UNITED STATES to wrongfully detain Plaintiff Engel, preclude him from being released on bail, and deny him a speedy trial; and (c) their falsehoods would deprive Plaintiff Engel of various federal and state constitutional rights.

83.     AUSA's Ahmed, Myhre and Bogden also materially misled the Court regarding evidence which undermined the UNITED STATES false portrayal of Plaintiff Engel and the lengths to which the he would purportedly go in defiance of the actions taken by the UNITED STATES.

84.     AUSA's Ahmed, Myhre and Bogden, in furtherance of the GOVERNMENT EMPLOYEES' conspiracy, also knowingly, intentionally and willfully misled the Court on multiple occasions, regarding the FBI's involvement in this matter – egregiously representing that the FBI was not involved, and that their claimed involvement by the Bundy defendants, including, without limitation, Plaintiff Engel, was complete "fiction" on their part and true "urban folklore."

85.     In reality, however, AUSA's Ahmed, Myhre and Bogden knew, among other things, that the FBI was actively involved and, among other things:  had engaged in an extensive surveillance and reconnaissance effort which included, without limitation, the Bundy defendants and, upon information and belief, Plaintiff Engel, their respective properties and the aforementioned First Amendment zones; conducted around-the-clock monitoring of those areas from an FBI Command Center which, upon information and belief, enabled real-time viewing of same by agency department officials located in Washington, D.C.; and had extensive exculpatory photographic and video-surveillance documentation – none of which was ever

produced, disclosed or otherwise identified by the GOVERNMENT EMPLOYEES and, in fact, was knowingly, intentionally and willfully concealed by them in furtherance of their conspiracy – the existence of which was revealed for the first time during trial proceedings involving the Tier 3 group).

**The Unraveling of the GOVERNMENT EMPLOYEES' Conspiracy**

86.     In early February 2017, during the first trial of the Tier 3 defendants,[2] a BLM Case Agent assigned to assist BLM SAC Love and a material witness for the UNITED STATES (i.e., BLM Special Agent Larry Wooten) noticed that the defense lawyers were not cross-examining government witnesses with expected questions arising from exculpatory evidence which Mr. Wooten had provided to the UNITED STATES and AUSA's Ahmed, Myhre and Bogden.

87.     On February 16, 2017, Mr. Wooten confronted AUSA's Ahmed, Myhre and Bogden regarding this issue, whether the UNITED STATES had properly disclosed the exculpatory evidence and other suspected *Brady* violations.

88.     Fearing that BLM Special Agent Wooten would reveal the nature and extent of the GOVERNMENT EMPLOYEES' conspiracy and its unlawful/unconstitutional conduct, AUSA Myhre retaliated by abruptly removing Mr. Wooten from the prosecution team and any further involvement in the case.

89.     To that end, on February 18, 2017, AUSA Myhre directed that Mr. Wooten's office be raided and ordered that all of Mr. Wooten's papers and electronic files related to the Underlying Action be seized by Mr. Wooten's immediate supervisor, Officer Kleman, who knowingly, intentionally and willfully failed to record or otherwise document those materials which he removed from Mr. Wooten's office - material which, to this day, has never been identified, disclosed or otherwise produced.

90.     Upon information and belief, when Mr. Wooten learned of the unauthorized search of his office and the seizure of all of his case files from the Underlying Action, he

---

[2]     The Tier 3 group consisted of Eric Parker, Scott Drexler, Greg Burleson, Steve Stewart, Rick Lovelein and Plaintiff Todd Engel.

22

complained of same to his superiors and, at that time, was threatened and warned by Myhre-directed BLM officers to keep his mouth shut about the prosecutorial misconduct in the case.

91.     After conferring with a DOI/BLM Ethics Official, the U.S. Office of Special Counsel ("OSC"), the BLM Office of Law Enforcement & Security Director (Salvatore Lauro) and the DOJ Office of Professional Responsibility ("OPR") – each of whom ignored Mr. Wooten's concerns and sought to distance themselves from same – Mr. Wooten submitted a whistleblower complaint to the DOJ Associate Deputy Attorney General and National Criminal Discovery Coordinator (Andrew D. Goldsmith) to expose the GOVERNMENT EMPLOYEES' egregious conduct, including, without limitation, the non-disclosure of exculpatory evidence and other *Brady* violations.

92.     Specifically, in a document entitled "Disclosure and Complaint Narrative in Regard to Bureau of Land Management Law Enforcement Supervisory Misconduct and Associated Cover-ups as well as Potential Unethical Actions, Malfeasance and Misfeasance by United States Attorney's Office Prosecutors from the District of Nevada, (Las Vegas) in Reference to the Cliven Bundy Investigation," (hereinafter "Whistleblower Complaint"), Mr. Wooten exposed the GOVERNMENT EMPLOYEES' conspiracy and its unlawful, unconstitutional conduct.

93.     Notably, Mr. Wooten revealed, among other things, that:

A.     There was a "widespread pattern of bad judgment, lack of discipline, incredible bias, unprofessionalism and misconduct, as well as likely policy, ethical, and legal violations among senior and supervisory staff at the BLM's Office of Law Enforcement and Security."

B.     The "issues amongst law enforcement supervisors in our agency made a mockery of our position of special trust and confidence, portrayed extreme unprofessional bias, adversely affected our agency's mission and likely the trial regarding Cliven Bundy and his alleged co-conspirators and ignored the letter and intent of the law."

C.     "The issues [he] uncovered ... also likely put [the DOI / BLM] and specific law enforcement supervisors in potential legal, civil, and administrative jeopardy."

D.    This was "the largest and most expansive and important investigation ever within the Department of Interior."

E.    BLM SAC Love "specifically took on assignments that were potentially questionable and damaging (such as document shredding, research, discovery email search documentation and as the affiant for the Dave Bundy iPad Search Warrant) ... [Mr. Wooten felt like SAC Love] wanted to steer the investigation away from misconduct discovery ..."

F.    "The misconduct caused considerable disruption in our workplace, was discriminatory, harassing and showed clear prejudice against the defendants, their supporters and Mormons."

G.    "Oftentimes this misconduct centered on being sexually inappropriate, profanity, appearance/body shaming and likely violated privacy and civil rights."

H.    There were "potentially captured comments in which [DOI / BLM] law enforcement officers allegedly bragged about roughing up Dave Bundy, grinding his face into the ground, and Dave Bundy having little bits of gravel stuck to his face" as a result of his unlawful arrest.

I.    "On two occasions, [Mr. Wooten] overheard [BLM SAC Love] tell [another DOI / BLM assistant special agent in charge] that another/other BLM employee(s) and potential trial witnesses didn't properly turn in the required discovery material (likely exculpatory evidence.)"

J.    BLM SAC Love "even instigated the unprofessional monitoring of jail calls between defendants .., without prosecutor or FBI consent, for the apparent purpose of making fun of post-arrest telephone calls ...."

K.    BLM SAC Love sought "to command the most intrusive, oppressive, large scale, and militaristic trespass cattle impound possible.  Additionally, this investigation also indicated excessive use of force, civil rights and policy violations.

L.    BLM SAC Love was not regularly updating the U.S. Attorney's Office "on substantive and exculpatory case findings and unacceptable bias indications" and, as such, [Mr. Wooten] personally informed ... Acting United States Attorney Steven Myhre and

1   Assistant United States Attorney (AUSA) Nadia Ahmed, as well as Federal Bureau of

2   Investigation (FBI) Special Agent Joel Willis by telephone of these issues."

3          M.      For example, Mr. Wooten advised AUSA Myhre that when Plaintiff Dave

4   Bundy was arrested "on April 6, 2014, the BLM, ... the BLM SAC and others were told not to

5   make any arrests" (i.e., they had no arrest authority) and that BLM SAC Love made exculpatory

6   statements that would need to be disclosed to the defense team including, without limitation,

7   "Go out there and kick Cliven Bundy in the mouth (or teeth) and take his cattle" and BLM SAC

8   Love's directive to DOI / BLM officers "to get the troops fired up to go get those cows and not

9   take any crap from anyone" – statements which AUSA Myhre acknowledged would need to be

10  disclosed but never were.

11         N.      On February 18, 2017, when Mr. Wooten "was removed from [his]

12  position, ... [BLM SAC Love] conducted a search of [Mr. Wooten's] individually occupied

13  secured office and secured safe within that office.  During that search, ... [BLM SAC Love]

14  without notification or permission seized the Cliven Bundy/Gold Butte Nevada Investigative

15  'hard copy' Case File, notes (to include specific notes on issues [Mr. Wooten] uncovered during

16  the 2014 Gold Butte Nevada Trespass Cattle Impound and 'lessons learned') and several

17  computer hard drives that contained case material, collected emails, text messages, instant

18  messages, and other information."

19         O.      Following this seizure outside of [Mr. Wooten's] presence and without

20  [his] permission, [BLM SAC Love] didn't provide any property receipt documentation

21  (DI-105/Form 9260-43) or other chain of custody documentation (reasonably needed for trial)

22  on what was seized."

23         P.      Mr. Wooten "was also aggressively questioned [by BLM SAC Love]

24  about who [Mr. Wooten] had told about the case related issues and other severe issues

25  uncovered in reference to the case and [BLM SAC Love]."

26         Q.      Mr. Wooten also notes that he was "convinced that [he] was removed to

27  prevent the ethical and proper further disclosure of severe misconduct, failure to correct and

28

report, and cover-ups ...." including, without limitation, "civil rights violations and excessive use of force."

R.    To that end, Mr. Wooten identified "the loss/destruction of, or purposeful non-recording of key evidentiary items (Unknown Items 1 & 2, Video/Audio, April 6, 2014, April 9, 2014, April 12, 2014 - the most important and critical times in the operation)."[3] Tellingly, Mr. Wooten concluded that he "believe[d] these issues would shock the conscious of the public and greatly embarrass [the BLM] if they were disclosed."

94.    By October 2017, trial of the Tier 1 Bundy defendants[4] was nearing commencement and defense lawyers in that action expressed concerns to the Court regarding missing documents and other evidence that had not been produced or otherwise disclosed by the UNITED STATES and AUSA's Ahmed, Myhre and Bogden, but were known to exist.

95.    In response, Chief District Court Judge Navarro held an evidentiary hearing and, at that hearing, numerous *Brady* violations were discovered, including, without limitation, extensive exculpatory evidence regarding the Bundy defendants, including, without limitation, Plaintiff Engel, that had been knowingly, intentionally and willfully withheld by the UNITED STATES and AUSA's Ahmed, Myhre and Bogden.

96.    In this regard, as the January 8, 2018 Hearing Transcript ("Transcript") from the Tier 1 Motion to Dismiss Hearing unequivocally reveals, Chief Judge Navarro expressly held, among other things, that:

A.    "A district court may dismiss an Indictment on the ground of outrageous government conduct if the conduct amounts to [a] due process violation." Transcript at 8:18-21 (*quoting United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1991)).

---

[3]    In a subsequent e-mail from Mr. Wooten to (now former) DOJ Office of the Inspector General Attorney Mark Masling (who was tasked with investigating this matter *after* the Underlying Action was dismissed), Mr. Wooten noted that there was a "dumpster of shredded BLM documents."

[4]    The Tier 1 group consisted of Cliven Bundy, his sons Ryan Bundy and Ammon Bundy, and Ryan Payne.

B.     "To violate due process, governmental conduct must be ... 'so grossly shocking and so outrageous as to violate the universal sense of justice.'" Transcript at 9:01-05 (*quoting United States v. Restrepo*, 930 F.2d 705 (1991); *United States v. Ramirez*, 710 F.2d 535 (9th Cir. 1983)).

C.     "Outrageous government conduct occurs when the actions of law enforcement officers or informants are so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." Transcript at 9:09-16 (*quoting United States v. Archie*, 2016 WL 475234 (D.Nev. 2016), *cert denied*, 2019 WL 5152784 (9th Cir. 2019); *United States v. Black*, 733 F.3d 294 (9th Cir. 2013); *United States v. Russell*, 411 U.S. 423 (1973)).

D.     "[D]ismissal under this 'extremely high' standard is appropriate only in 'extreme cases in which the government's conduct violates fundamental fairness.'"Transcript at 9:17-21 (*quoting U.S. v Pedrin*, 797 F.3d 792 (9th Cir. 2015); *United States v. Smith*, 924 F.2d 889 (9th Cir. 1991)).

E.     "So, when reviewing a claim alleging that the Indictment should be dismissed because the government's conduct was outrageous, evidence is viewed in the light most favorable to the government." Transcript at 9:22 to 10:01 (*citing United States v. Gurolla*, 333 F.3d 944 (9th Cir. 2003)).

F.     "The concept of outrageous government conduct focuses on the government's actions." Transcript at 10:02–3 *(citing United States v. Restrepo*, 930 F.2d 705 (1991)).

G.     "Here in this case, both the prosecution and the investigative agencies are equally responsible for the failure to produce *Brady* materials to the defense." Transcript at 10:04-06.

H.     The Court finds the prosecution's representations that it was unaware of the materiality of the *Brady* evidence is grossly shocking." Transcript at 10:13-15.

I.     "[T]he government was well aware that theories of self-defense, provocation and intimidation might become relevant if the defense could provide a sufficient

offer of proof to the Court.  However, the prosecution denied the defense its opportunity to provide favorable evidence to support their theories as a result of the government's withholding of evidence and this amounts to a *Brady* violation." Transcript at 10:22 to 11:11.

J.    "[T]he prosecutor has a duty to learn of favorable evidence known to other government agents, including the police, if those persons were involved in the investigation or prosecution of the case." Transcript at 11:07–11 (*citing Kyles v. Whitley*, 514 U.S. 419 (1995).

K.    "Clearly, the FBI was involved in the prosecution of this case." Transcript at 11:12.

L.    "Based on the prosecution's failure to look for evidence outside of that provided by the FBI and the FBI's failure to provide evidence that is potentially exculpatory to the prosecution for discovery purposes, the Court finds that a universal sense of justice has been violated." Transcript at 11:13–17.

M.    Alternatively, a district court may exercise its supervisory powers in three different enumerated ways:  Number one, 'to remedy unconstitutional or statutory violation[s]'; number two, 'to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury'; or number three, 'to deter future illegal conduct." Transcript at 11:24 to 12:06 (quoting *United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1991)).

N.    "In *United States vs. W.R. Grace*," 504 F.3d 745 (9th Cir. 2007) "the Ninth Circuit clarified that the exercise of the Court's inherent powers is not limited to these three grounds enumerated in *Simpson* ...." Transcript at 11:24 to 12:07-10.

O.    "'Dismissal is appropriate when the investigatory or prosecutorial process has violated a federal Constitution or statutory right and no lesser remedial action is available.'" Transcript at 12:11-14 (*quoting U.S. v. Barrera-Moreno*, 951 F.2d 1089 (9th Cir. 1991)).

P.    "The Ninth Circuit has recognized that exercise of a supervisory power is an appropriate means of policing ethical misconduct by prosecutors." Transcript at 11:15-18 (*citing U.S. v. Lopez*, 4 F.3d 1455 (9th Cir. 1993)).

Q.      "So 'dismissal under the Court's supervisory powers for prosecutorial misconduct requires both: 'Number one, flagrant misbehavior, and number two, substantial prejudice.'" Transcript at 12:19-23 (*quoting United States v. Kearns*, 5 F.3d 1251 (9th Cir. 1993)).

R.      "Neither accidental nor mere negligent governmental conduct is sufficient.  The idea of prejudice entails that the government's conduct had at least some impact on the verdict and thus rounded to the defendant's prejudice." Transcript at 12:24 to 13:02.

S.      "In Order for the Court to dismiss an Indictment under the supervisory powers, the Court must find that there has been flagrant prosecutorial misconduct, substantial prejudice to the defendants, and that no lesser remedial action is available." Transcript at 13:03-06.

T.      "So the Court looks to *Chapman*, *U.S. v. Chapman*." [524 F.3d 1073 (9th Cir. 2008)] ... The district court in *Chapman* found that the 'Assistant U.S. Attorney acted flagrantly, willfully and in bad faith' and that he had made 'affirmative misrepresentations to the Court,' and that the defendants would be prejudiced by a new trial and that no lesser standard would adequately remedy the harm done after reviewing the totality of the proceedings before it." Transcript at 14:8, 14:12-18.

U.      "The Ninth Circuit held that the *Chapman* court did not abuse its discretion by dismissing the Indictment pursuant to its supervisory powers." Transcript at 14:10-21.

V.      "'The prosecutor has a 'sworn duty' to assure that the defendant has a fair and impartial trial.  His interest in a particular case is not necessarily to win, but to do justice.'" Transcript at 15:14-17 (*quoting U.S. v. Chapman*." 524 F.3d 1073 (9th Cir. 2008)).

W.      "[T]he fact that the prosecution failed to look beyond the files provided by the FBI is not mere negligence; it is a reckless disregard for its Constitution[al] obligations to learn and seek out favorable evidence.  The prosecution's reliance on the FBI to provide the required information *amounted to an intentional abdication of its responsibility*." Transcript at 16:11-16 (Emphasis Added).

1         X.     "Thus, the Court does find that there has been flagrant prosecutorial

2  misconduct in this case ...." Transcript at 19:09-10.[5]

3         Y.     "The Court is troubled by the prosecution's failure to look beyond the

4  FBI file that was provided and construes the *Brady* violations in concert as a reckless disregard

5  of its discovery obligations.  The government's recklessness and the prejudice the defendants

6  will suffer as a result of a retrial warrant the extreme measure of dismissing the Indictment

7  because no lesser sanction would adequately ... deter future investigatory and prosecutorial

8  misconduct." Transcript at 20:14-21.

9         Z.     "[The government's] conduct has caused the integrity of a future trial and

10  any resulting conviction to be even more questionable.  Both the defense and the community

11  possess the right to expect a fair process with a reliable conclusion.  Therefore, it is the Court's

12  position that none of the alternative sanctions available are as certain to impress the government

13  with the Court's resoluteness in holding prosecutors and their investigative agencies to the

14  ethical standards which regulate the legal profession as a whole." Transcript at 20:23 to 21:07.

15         AA.    "***The Court finds that the government's conduct in this case was indeed***

16  ***outrageous, amounting to a due process violation***, and that a new trial is not an adequate

17  sanction for this due process violation." Transcript at 21:08-11 (Emphasis Added).

18         BB.    "Even if the government's conduct did not rise to the level of a due

19  process violation, the Court would nonetheless dismiss under its supervisory powers because

20  there has been flagrant misconduct, substantial prejudice, and no lesser remedy is sufficient ...

21  Number one, to properly remedy the constitutional violation; number two, to protect judicial

22  integrity by ensuring that a conviction rests only on appropriate considerations validly before a

23  jury; and number three, to deter future illegal conduct." Transcript at 21:12-16, 21:20-24.

24

25

---

26      [5]     With regard to the prejudice resulting from the government's recent production of
BLM Officer Wooten's Whistleblower Complaint, Judge Navarro was troubled by his "abrupt

27  removal ... in February 2017, allegedly by the prosecution because he complained of Special
Agent in Charge Dan Love's misconduct, the investigating law enforcement officer's bias, the

28  government's bias, and the failure to disclose exculpatory evidence." Transcript at 19:23 to
20:05.

97.     On the heels of the GOVERNMENT EMPLOYEES' conspiracy being exposed and the lead case of the consolidated matter being dismissed, the UNITED STATES, on February 7, 2018 voluntarily moved to dismiss, with prejudice, their fabricated criminal charges against the Tier 2 Defendants.

98.     Plaintiff Engel subsequently appealed his conviction, claiming, among other things, that because his Sixth Amendment rights were violated, his conviction was improper as a matter of law.  On August 6, 2020, the Ninth Circuit Court of Appeals agreed, holding that his Sixth Amendment right to self-representation had been violated and, as a result, vacated his conviction and remanded the matter for a new trial.

99.     The GOVERNMENT EMPLOYEES, in light of their flagrant prosecutorial misconduct, their reckless disregard for their Constitutional obligations and numerous *Brady* violations, moved to dismiss the Government's claims against Plaintiff Engel on September 8, 2020.  The District Court granted the GOVERNMENT EMPLOYEES' Unopposed Motion to Dismiss that same day and/on September 10, 2020, Plaintiff Engel was released from custody.

100.    Notably, the GOVERNMENT EMPLOYEES' fabricated charges against Plaintiff Engel directly, proximately and foreseeably caused, among other things: (a) the false arrest of Plaintiff; (b) the wrongful denial of bail; (c) the unlawful detainment, imprisonment and monitoring of Plaintiff Engel; (d) the egregious separation of Plaintiff Engel from his family, friends and loved ones; (e) ongoing stress and mental, physical and emotional anguish which Plaintiff Engel continues to experience; (f) the inability for Plaintiff Engel to freely practice his faith and attend weekly worship services / other church events; (g) financial, occupational and reputational harm as a result of the GOVERNMENT EMPLOYEES' egregious branding and characterization of Plaintiff in the media as a "domestic terrorist;" (h) the loss of gainful employment, including, without limitation, future impairment for Plaintiff's chosen profession; (I) harassment and embarrassment resulting from the GOVERNMENT EMPLOYEES' placement and continued maintenance of him on the mandatory screening processes before being allowed to fly which results in improper detainment, interrogation, delays and other travel restrictions when he attempts to fly

commercially; and (j) interference with Plaintiff Engel's right to lawfully acquire and bear arms

due to the GOVERNMENT EMPLOYEES' placement of Plaintiff on secret lists which

disqualifies and precludes him from purchasing firearms.

**The UNITED STATES' Constitutional & Statutory Violations**

101.    Plaintiff fully incorporates herein by this reference all allegations contained in

paragraphs 1 through 100 of this Complaint.

102.    As a direct, proximate and foreseeable cause of the GOVERNMENT

EMPLOYEES' conspiracy (one that involved multiple egregious acts performed by these duly

authorized representatives in their official capacity; that is, within the scope and course of their

employment of their respective federal agencies, and performed in furtherance of that

conspiracy), along with other independent, unprivileged acts performed by AUSA's Ahmed,

Myhre and Bogden, BLM SAC Love, Officers Stover, Brunk and Kleman, and Agent Willis,

Plaintiff Engel's rights were knowingly, intentionally and willfully violated, infringed and

impaired, including, without limitation:

A.    Plaintiff's right to assemble, exercise free speech and lawfully protest

against the UNITED STATES egregious conduct and its wrongful curtailment of his rights by

the GOVERNMENT EMPLOYEES in contravention of the First Amendment to the United

States Constitution; Article 1, Sections 1 (Inalienable Rights), 9 (Liberty of Speech) and

10 (Right to Assemble & Petition) of the Nevada Constitution; and Nevada Revised Statute

("NRS") 41.637's protection of good faith communications in furtherance of Plaintiff's right to

petition or the right to free speech in direct connection with an issue of public concern,

including any "[c]ommunication made in direct connection with an issue of public interest in a

place open to the public or in a public forum."

B.    Plaintiff's right to lawfully purchase, keep and bear arms as provided for

in the Second Amendment to the United States Constitution; Article 1, Section 11 (Right to

Keep & Bear Arms; Civil Power Supreme) of the Nevada Constitution; and NRS 244.364 which

vests control over the regulation of, and policies concerning, firearms, firearm accessories and

1  ammunition with the Nevada State Legislature, including, without limitation, the regulation of

2  transfers, sales and purchases of same;

3          C.      The UNITED STATES' fabricated indictment, unlawful arrest, rogue

4  detainment, preclusion of bail, false imprisonment and malicious prosecution   (i.e., without

5  probable cause or due process of law) deprived Plaintiff of his life, liberty and property rights,

6  and constituted cruel and unusual punishment in contravention of the Fourth, Fifth and Eighth

7  Amendments to the United States Constitution; Article 1, Section 1 (Inalienable Rights),

8  Section 6 (Excessive Bail & Fines), Section 8 (Rights of Accused in Criminal Prosecutions) and

9  Section 18 (Unreasonable Seizure & Search; Issuance of Warrants) of the Nevada Constitution;

10  NRS 199.310 (Malicious Prosecution) and NRS 200.460 (False Imprisonment).

11          D.      The GOVERNMENT EMPLOYEES' abhorrent and outrageous conduct

12  – conduct which irrefutably shocks the conscious – egregiously deprived Plaintiff of his life,

13  liberty and property rights in contravention of substantive and procedural due process rights;

14  rights guaranteed to them by the Fifth Amendment of the United States Constitution and Article

15  1, Section 8 of the Nevada Constitution.

16          E.      The UNITED STATES' egregious placement and maintenance of

17  Plaintiff on the "Prohibited Persons List" for purchasing or otherwise acquiring a weapon

18  governed by the Gun Control Act, 18 U.S.C. 922(g) based upon fabricated evidence and the

19  GOVERNMENT EMPLOYEES' egregious branding and characterization of him as a "domestic

20  terrorist" without notice or an opportunity to be heard also violates Plaintiff's substantive and

21  procedural due process rights in violation of the Second Amendment to the United States

22  Constitution and Article 1, Section 11 (Right to Keep & Bear Arms) of the Nevada Constitution.

23  Notably, the Prohibited Persons List only applies to persons:

24      •       Convicted in any court of a crime punishable by imprisonment for a term
                exceeding one year;

25      •       who is a fugitive from justice;

26      •       who is an unlawful user of or addicted to any controlled substance (as defined in
                section 102 of the Controlled Substances Act, codified at 21 U.S.C. § 892);

27

28      •       who has been adjudicated as a mental defective or has been committed to any
                mental institution;

33

- who is an illegal alien;

- who has been discharged from the Armed Forces under dishonorable conditions;

- who has renounced his or her United States citizenship;

- who is subject to a court order restraining the person from harassing, stalking, or threatening an intimate partner or child of the intimate partner; or

- who has been convicted of a misdemeanor crime of domestic violence.

None of the aforementioned prohibitions, however, apply to Plaintiff and, as such, the GOVERNMENT EMPLOYEES' placement and continued maintenance of Plaintiff Engel on this Prohibited Persons List is, and remains, unconstitutional.

      F.     The UNITED STATES' unlawful arrest, detainment and incarceration of Plaintiff also precluded him from freely practicing his faith and attending weekly worship services / other church events in violation of the First and Eighth Amendments to the United States Constitution, and Article 1, Section 4 (Liberty of Conscience) and Section 6 (Cruel & Unusual Punishment) of the Nevada Constitution.

**Exhaustion of Administrative Remedies**

      103.    Plaintiff fully incorporates herein by this reference all allegations contained in paragraphs 1 through 102 of this Complaint.

      104.    Pursuant to 28 U.S.C. § 1346(b), Plaintiff timely and properly submitted a Claim for Damage, Injury or Death to the UNITED STATES and its requisite agencies (i.e., the FBI, DOI / BLM and the DOJ on or about August 28, 2021, including, without limitation, an administrative demand package to the U.S. Department of Justice, Civil Division, Torts Branch, Federal Tort Claims Act Section ("FTCA Section") which was received by the U.S. Department of Justice on September 8, 2021.

      105.    Since the FTCA Section did not act within six (6) months (i.e., by March 7, 2022) , its failure to issue a decision is treated as a final decision, enabling Plaintiff here to proceed with his claims against the UNITED STATES as of that date. *See* 28 U.S.C. § 2675(a).

      106.    Plaintiff, therefore, has fully satisfied and exhausted his administrative obligations to present his FTCA claims to the Court and, as such, his FTCA Claims are properly

1  before this Court, this Court possesses exclusive subject matter jurisdiction over same, and they

2  are ripe for adjudication.

3  **FIRST CLAIM FOR RELIEF**
   **(Federal Tort Claims Act Claims - 28 U.S.C. § 2671 *et seq.*)**

4  (UNITED STATES)

5       107.    Plaintiff fully incorporates herein by reference all allegations contained in

6  paragraphs 1 through 106 of this Complaint.

7       108.    Pursuant to 28 U.S.C. § 1346(b), "federal district courts have jurisdiction over a

8  certain category of claims for which the [UNITED STATES] has waived its sovereign immunity

9  and 'render[ed]' itself liable," including, without limitation, "'claims that are:  [1] against the

10 United States, [2] for money damages, ... [3] for injury or loss of property, or personal injury or

11 death [4] caused by the negligent or wrongful act or omission of any employee of the

12 Government [5] while acting within the scope of his office or employment, [6] under

13 circumstances where the United States, if a private person, would be liable to the

14 claimant in accordance with the law of the place where the act or omission occurred.'" *F.D.I.C.*

15 *v. Meyer*, 510 U.S. 471, 477 (1994) (quoting 28 U.S.C. § 1346(b)).

16      109.    "A claim comes within this jurisdictional grant – and thus is 'cognizable' under

17 § 1346(b) – if it is actionable under § 1346(b).  And a claim is actionable under § 1346(b) if it

18 alleges the six elements outlined above." *Id.* (*citing Loeffler v. Frank*, 486 U.S. 549 (1988)

19      110.    The Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.,* is the

20 exclusive remedy for tort actions against a Federal agency (28 U.S.C. § 2679(a)) and against

21 Federal employees who commit torts while acting within the scope and course of their

22 employment (28 U.S.C. § 2679(b)(1)).

23      111.    As set forth above, the GOVERNMENT EMPLOYEES engaged in certain

24 tortious acts in their official capacities.

25      112.    With regard to the GOVERNMENT EMPLOYEES' tortious conduct that was

26 performed while they were "acting within the scope of [their official] office[s] or employment at

27 the time of the incident out of which the [Plaintiff's] claim[s] arose," the UNITED STATES is

28

35

1  solely liable for that conduct as mandated by 28 U.S.C. § 2679(d)(2)) and the Federal

2  Employees Liability Reform & Tort Compensation Act of 1988 ("Westfall Act").

3      113.    Similarly, Plaintiff's exclusive remedy for his tort-based claims against the

4  GOVERNMENT EMPLOYEES' employers (i.e., the DOJ, DOI, BLM and FBI) is the UNITED

5  STATES (28 U.S.C. § 2679(a)).

6      114.    To that end, 28 U.S.C. § 2680(h) expressly provides that the UNITED STATES

7  is also liable for certain intentional torts that are based on the "acts or omissions" of an

8  "investigative or law enforcement officer" and include "[a]ny claim arising out of ... false

9  imprisonment, false arrest, [and] malicious prosecution ...." *Millbrook v. U.S.*, 569 U.S. 50, 52

10 (2013) (*citing* 28 U.S.C. § 2680(h); *see also Levin v. United States*, 568 U.S. 503 (2013)).

11     115.    Here, Plaintiff has valid State-law tort claims arising out of, related to and

12 connected with the GOVERNMENT EMPLOYEES' tortious conduct that was performed in

13 their official capacity and during the scope and course of their employment with the DOJ, DOI /

14 BLM and FBI, including, without limitation, the following claims:

15                      A.    <u>False Arrest</u>

16                      In Nevada, to establish false arrest, 'a plaintiff must show the defendant

17 instigated or effected an unlawful arrest." *Jones v. Las Vegas Metropolitan Police Dept.*, 2011

18 WL 13305450 at *3 (D.Nev. 2011) (*quoting Nau v. Sellman*, 757 P.2d 358, 260 (Nev. 1988)).

19 To that end, Plaintiff affirmatively alleges that the GOVERNMENT EMPLOYEES' fabricated

20 evidence, suborned and provided perjurious testimony, and egregiously withheld and destroyed

21 exculpatory evidence so that they could erroneously secure Grand Jury Indictments upon which

22 the false arrest warrant was issued against Plaintiff.  Plaintiff further alleges that, as a direct,

23 proximate and foreseeable cause of the GOVERNMENT EMPLOYEES' tortious acts related to

24 the instigation or effectuation of the unlawful arrest of Plaintiff (i.e., those acts performed in

25 their official capacity, scope and employment with the DOJ, DOI / BLM and FBI), the UNITED

26 STATES is, and remains, liable therefor.

27

28

1           B.    False Imprisonment

2                 In Nevada, "[f]alse imprisonment is an unlawful violation of the personal

3    liberty of another, and consists in confinement or detention without legal sufficient authority."

4    NRS 200.460.  "To establish false imprisonment of which false arrest is an integral part, it is ...

5    necessary to prove that the person be restrained of his liberty under probable imminence of force

6    without any legal cause or justification." *Jones*, 2011 WL 13305450 at *3 (*quoting Hernandez*

7    *v. City of Reno*, 634 P.2d 668, 671 (Nev. 1981).  "Thus, 'an actor is subject to liability to

8    another for false imprisonment 'if (a) he acts intending to confine the other ... within the

9    boundaries fixed by the actor, and (b) his act directly or indirectly results in a confinement of the

10   other, and (c) the other is conscious of the confinement or is harmed by it.'" *Id.* (*quoting*

11   Restatement (Second) of Torts § 35 (1965)).  Plaintiff, here, affirmatively alleges that he was

12   unlawfully detained, imprisoned and in-custody by the UNITED STATES for fifty-four (54)

13   months, at a sweltering federal-contractor prison in Pahrump, Nevada and at Lompoc

14   Penitentiary in Lompoc, California.  Plaintiff further alleges that, as a direct, proximate and

15   foreseeable cause of those tortious acts related to his unlawful incarceration (i.e., acts performed

16   by the GOVERNMENT EMPLOYEES in their official capacity, scope and employment with

17   the DOJ, DOI / BLM and FBI), those acts:  (a) were performed with the intention of confining

18   the Plaintiff to prison; (b) they directly or indirectly resulted in the Plaintiff's confinement; and

19   (c) Plaintiff was conscious of that unlawful confinement.  As a result, the UNITED STATES is,

20   and remains, liable therefor.

21          C.    Malicious Prosecution

22                In Nevada, "[a] person who maliciously and without probable cause

23   therefor, causes or attempts to cause another person to be arrested or proceeded against for any

24   crime of which that person is innocent" is liable for malicious prosecution. NRS 199.310.  In

25   this regard, to state a claim for malicious prosecution under Nevada law, a Plaintiff must allege:

26   "(1) that the defendant lacked probable cause to initiate a prosecution; (2) malice; (3) the prior

27   criminal proceedings were terminated in his favor; and (4) Plaintiff suffered damages."

28   *Anderson v. United States*, 2019 WL 6357256 at *2 (D.Nev. 2019) (*quoting LaMantia v. Redisi*,

37

1    118 Nev. 27, 30, 38 P.3d 877, 879 (Nev. 2002)).  Plaintiff, here, affirmatively alleges that the

2    GOVERNMENT EMPLOYEES' fabrication of evidence, elicitation and providing of perjurious

3    testimony, along with the egregious withholding and destruction of exculpatory evidence so that

4    they could wrongfully secure a Grand Jury Indictment and arrest warrant against Plaintiff

5    establishes the absence of probable cause, along with the malicious intent of said

6    GOVERNMENT EMPLOYEES' conduct.  Plaintiff further alleges that the UNITED STATES'

7    dismissal, with prejudice, of all charges against him unequivocally establishes that the

8    Underlying Action was terminated in Plaintiff's favor.  Moreover, as detailed below, Plaintiff

9    sustained damages as a direct, proximate and foreseeable cause of the aforementioned tortious

10   conduct.

11              D.       Intentional Infliction of Emotional Distress

12                       In *Sheehan v. U.S.*, 896 F.2d 1168, 1172 (9th Cir. 1990), the Ninth

13   Circuit Court of Appeals expressly recognized the appropriateness of an intentional infliction of

14   emotional distress claim in FTCA actions.  To that end, in Nevada, "[t]he elements of a cause of

15   action for intentional infliction of emotional distress are '(1) extreme and outrageous conduct

16   with either the intention of, or reckless disregard for, causing emotional distress, (2) the

17   plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate

18   causation.'" *Dillard Dept. Stores, Inc. v. Beckwith*, 115 Nev. 372, 378, 989 P.2d 882, 886 (Nev.

19   1999).  Plaintiff here affirmatively alleges that the GOVERNMENT EMPLOYEES' conduct

20   (i.e., for those acts performed in their official capacity, scope and employment with the DOJ,

21   DOI / BLM and FBI) was: (1) extreme and outrageous and accomplished with the intent, or

22   reckless disregard for, causing Plaintiff emotional distress; (2) the Plaintiff, in fact, has suffered,

23   and continues to suffer from, severe and extreme emotional distress; which (3) was actually or

24   proximately caused.  As a result, the UNITED STATES is, and remains, liable for Plaintiff's

25   damages (discussed below).

26              E.       Theft / Conversion

27                       Conversion is "a distinct act of dominion wrongfully exerted over

28   another's personal property in denial of, or inconsistent with his title or rights therein or in

                                                     38

derogation, exclusion or defiance of such title or rights." *Wantz v. Redfield*, 74 Nev. 196, 198, 326 P.2d 413, 414 (1958).  Conversion is an act of general intent, which does not require wrongful intent and is not excused by care, good faith, or lack of knowledge. *Evans v . Dean Witter Reynolds, Inc.*, 116 Nev. 598, 606, 5 P.3d 1043, 1048 (2000).  Upon information and belief, an FBI confidential informant and/or federal agent befriended Mr. Engel during the two years after the Toquop Wash incident and prior to his arrest.  Following Mr. Engel's arrest, the confidential informant / federal agent entered onto Mr. Engel's property (without permission) and removed various items of Mr. Engel's personal property with the government's knowledge and/or consent, including, without limitation: (1) his 2007 Dodge Ram 3500 customized pick-up truck; (2) his Suzuki 750 ATV;  (3) a Yamaha customized motorcycle; (4) a metal detector; (5) various rifles and firearms; (6) ammunition;  (7) rifle scopes; (8) laser guides / sites; and (9) over $30,000 in silver coins. In aggregate, Mr. Engel has sustained $200,000 in property damages related to the theft of his property.

116.    Pursuant to 28 U.S.C. § 1346(b), Plaintiff has timely and properly submitted a Claim for Damage, Injury or Death to the UNITED STATES and its requisite agencies; more than six (6) months have elapsed since the DOJ acknowledged its receipt of that demand package, rendering said claims denied pursuant to 28 U.S.C. §2675(a)' and as such, Plaintiff has fully satisfied and exhausted his administrative obligations to present his FTCA claims to the Court.

**WHEREFORE**, Plaintiff is entitled to judgment against the UNITED STATES for the following relief:

A.    Monetary damages in an amount to be proven at trial;

B.    Attorneys' fees and costs;

C.    Pre-judgment and post-judgment interest pursuant to law;

D.    For hedonic damages in favor of the Plaintiff for the impairment of his future employment opportunities;

E.    Compensatory damages arising out of, related to or connected with the reputational harm of being branded a "domestic terrorist;"

1       F.      All such other and further relief as the Court may deem just and equitable,

2  including, without limitation, post-judgment attorneys' fees and costs.

4      RESPECTFULLY SUBMITTED this 30<u>th</u> day of June, 2022.

Marquiz Law Office
Professional Corporation

By: /s/ Craig A. Marquiz, Esq.
Craig A. Marquiz, Esq.
3088 Via Flaminia Court
Henderson, NV 89052
Counsel for Plaintiff