MERRICK GARLAND
United States Attorney General

NEIL SINGH
Arizona State Bar No. 021327
BROCK HEATHCOTTE
Arizona State Bar No. 014466
Special Assistant U.S. Attorneys
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4449
Telephone: (602) 514-7500
Facsimile: (602) 514-7693
Neil.Singh@usdoj.gov
Brock.Heathcotte@usdoj.gov
*Attorneys for Defendant United States*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| Todd C. Engel,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>United States of America, *et al.,*<br><br>　　　　　　　Defendants. | No. 2:22-cv-01040-WQH-EJY<br><br>**MOTION TO DISMISS** |

　　　　Defendant United States of America respectfully moves to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, and 12(b)(6) for failure to state a claim. This motion is based on the following memorandum of points and authorities and all matters of record.

Respectfully submitted on November 21, 2022.

MERRICK GARLAND
United States Attorney General

*s/ Neil Singh*
NEIL SINGH
BROCK HEATHCOTTE
Special Assistant United States Attorneys, Acting Under Authority Conferred by 28 U.S.C. § 515
*Attorneys for Defendant United States*

# MEMORANDUM OF POINTS AND AUTHORITIES

This lawsuit arises from the arrest, prosecution, and conviction (later vacated) of Plaintiff Todd Engel, who sues the United States under the Federal Tort Claims Act ("FTCA"). Plaintiff asserts five causes of action arising under state tort law: false arrest, false imprisonment, malicious prosecution, intentional infliction of emotional distress ("IIED"), and "theft/conversion."

To assist the Court in organizing its analysis on this motion, Defendant notes that this action is related to another action involving the same facts, same lawyers, the same defendant, and almost the same legal issues. *O'Shaughnessy v. United States, et al.*, 2:22-cv-01039-WQH-EJY (D. Nev.). The *O'Shaughnessy* action asserts virtually identical claims against the United States, but on behalf of differently-situated plaintiffs. The *O'Shaughnessy* plaintiffs are 17 in number, of whom 15 are family members of Cliven Bundy, whereas this action is asserted on behalf of only Todd Engel, who is not a member of the Bundy family. In addition, this action asserts a claim for theft/conversion, which is not asserted and not relevant to the *O'Shaughnessy* action. The United States now asserts in this motion, as well as its simultaneously filed motion to dismiss in *O'Shaughnessy*, mostly identical defenses and arguments. However, the nature of the 17-plaintiff *O'Shaughnessy* action presents a different organizational challenge in structuring the Court's analysis than the nature of this action. Therefore, the structure and organization of this motion differs from the *O'Shaughnessy* motion to dismiss. The merits of the arguments in each motion ultimately seek to mirror each other.

In this action, Plaintiff's claims for false arrest, false imprisonment, malicious prosecution, and IIED fail under Rule 12(b)(6) because he fails to allege a lack of probable cause and fails to articulate even a single false statement that was material to his prosecution. Further, any FTCA claims based on the conduct of Assistant United States Attorneys are statutorily barred and subject to sovereign immunity. As for his theft/conversion claim, this Court lacks subject matter jurisdiction

over it under Rule 12(b)(1), because (a) the United States has sovereign immunity against the intentional torts of misrepresentation and deceit, and (b) the claim is time-barred.

### I.     Standard of Review On a Jurisdictional Challenge.

The United States asserts a lack of jurisdiction here on a factual basis, not solely a facial one. "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). The Court may dismiss an action under Rule 12(b)(1) if the complaint does not allege facts sufficient to establish subject matter jurisdiction on its face or, even if the complaint asserts grounds for jurisdiction on its face, the evidence does not support a finding of jurisdiction. *Thornhill Publishing Co. v. Gen. Tel. & Elec. Corp.,* 594 F.2d 730, 733 (9th Cir. 1979). A facial attack "asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039. A factual challenge allows the court to look beyond the complaint without "presum[ing] the truthfulness of the plaintiffs' allegations." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). The Court can hear evidence outside the pleadings and resolve factual disputes, if necessary, without treating the motion as one for summary judgment. *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009); *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1997).

"Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence," and the plaintiff's allegations carry no presumption of truthfulness. *Robinson*, 586 F.3d at 685. Whether a facial or factual attack, because "[f]ederal courts . . . have only that power that is authorized by Article III of the Constitution and the statutes enacted by Congress," *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986) (citation omitted), the court presumes the action lies outside its limited jurisdiction, and the burden is on the party asserting jurisdiction to establish that it exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

## II. Factual Background.

Plaintiff, an Idaho resident, alleges that he was wrongfully prosecuted and convicted on the basis of an "egregious, fabricated and sham proceeding" by the United States in a criminal action. ECF No. 1, ¶ 3. These labels are high on rhetoric, however, and low on factual specificity.

### A. Bundy's Meritless Legal Argument Regarding Federal Lands.

In 2014, Plaintiff watched television coverage of an incident unfolding in Nevada involving federal agents and the ranching activities of the family of Cliven Bundy. *Id.*, ¶ 19. Leading up to this coverage by news stations and social media outlets was a years-long dispute between certain members of the Bundy family and the United States Bureau of Land Management ("BLM"). The fundamental premise of the dispute was a set of nonsensical legal theories advanced by Cliven Bundy in his pro se court filings, including the theory that lands[1] owned by the United States were in fact owned by the State of Nevada, by virtue of a state statute passed by the Nevada legislature in 1979. Exhibit. 1 at 4-5 (*United States v. Bundy*, ECF No. 28 at 4-5, 2:12-cv-00804-LDG (Jan. 11, 2013 D. Nev.) ("Nevada Appropriated the Public Lands in 1979").

The United States acquired the lands Bundy claimed belonged to the State of Nevada in the Treaty of Guadalupe Hidalgo, 9 Stat. 922 (U.S. Treaty 1848). *See also Sparrow v. Strong*, 70 U.S. 97, 104 (1865) ("The Territory, of which Nevada is part, was acquired by treaty."); *United States v. Gardner*, 107 F.3d 1314, 1318 (9th Cir. 1997) (reaffirming that the United States has held title to the unappropriated public lands in Nevada since Mexico ceded the land to the United States in 1848 and that the United States may regulate grazing on those lands because it owns title to those lands). When Nevada became a state in 1864, the United States required it to include a

---

[1] Exhibit 11 is a map of the subject property prepared by the United States in 2012. The broader geographic location can be viewed using this link (GPS coordinates 36.760437, -114.130427).

- 5 -

provision in its state constitution that expressly disclaimed any state ownership of the public lands in question. *Gardner*, 107 F.3d at 1319 (quoting Nevada Statehood Act of March 21, 1864, 13 Stat. 30, 31 § 4). The lands claimed by Bundy to be state property are undisputedly federal property.

Bundy has been flaunting the federal government's ability to govern federal land use since at least 1993, when he ceased paying grazing fees to the BLM. In 1998, the federal government ordered livestock grazing to cease altogether in the subject area. When Bundy refused to stop his grazing activity, the United States obtained a permanent injunction against him. Exhibit 2 (*United States v. Bundy*, CV-S-98-531-JBR (RJJ) (D. Nev. Nov. 3, 1998)). Bundy ignored the injunction, so the United States obtained an order to enforce the injunction. *United States v. Bundy*, Dkt. 45, 46, CV-S-98-531-JBR (D. Nev. Sept. 17, 1999). Bundy ignored this order as well. In 2013, this Court again rejected Bundy's arguments and issued another permanent injunction requiring Bundy to remove hundreds of cattle from federal lands that were trespass grazing. Exhibit 3 (*United States v. Bundy*, ECF No. 35, 2:12-cv-0804-LDG-GWF (D. Nev. July 9, 2013)). Further, the Court explicitly ordered that the United States was "entitled to seize and remove to impound any of Bundy's cattle[.]" *Id.*

**B. Bundy's Social Media Campaign and Plaintiff's Participation in the Armed Standoff.**

Ignoring the court orders, in 2014 Bundy and his supporters organized an armed standoff in defiance of the BLM's lawfully sanctioned actions to impound the cattle. This standoff featured hundreds of armed members of various extremist groups, who had been told by Bundy that BLM and other federal employees were violating the rights of cattle ranchers. Individuals carrying weapons arrived from all over the country because of a social media campaign carried out by members of the Bundy family using Facebook and other platforms that were popular in 2014.

BLM and other government employees were put in fear for their lives and forced to abandon the cattle impoundment operation. BLM initiated the operation on April 6, 2014, but its law enforcement agents became increasingly concerned as the crowd attracted by the Bundy family's social media campaign grew in numbers. While Plaintiff conveniently characterizes himself now as a "protester" (ECF No. 1, ¶¶ 18, 21, 38, 62, 63, 72), in fact, he suited himself in military attire and armed himself with a weapon in preparation for what he called war. A few days prior to his departure for Nevada, Plaintiff posted on Facebook that "[i]f they want war, let it begin here. Oiling bolt. Loading magazines." Exhibit 4 at 68 (Criminal ECF[2] No. 1820, Trial Transcript at 68). In a second post the next day, he wrote in part, "the war is actually begun," and "give me liberty or give me death."[3] *Id*. at 68-69. A few days later, on April 11, 2014, Plaintiff drove from his home in Idaho to Bunkerville, Nevada, armed with a firearm. *Id.* at 103-04.

That same day, uncontested trial testimony reflects that the BLM and FBI participated in a joint teleconference to discuss the threat posed by the growing crowd. A senior FBI official provided the FBI's assessment of the threat and risk scenarios and warned the BLM that there was a "significant risk of [a] violent encounter" if the BLM continued with the cattle operation. At the conclusion of this April 11th teleconference, the BLM made a decision to "conclude operations and stop gathering cattle." Exhibit 5 at 40 (Criminal ECF No. 1785 at 40).[4]

---

[2] Defendant will use "Criminal ECF" to refer to this Court's docket in the criminal proceedings for *United States v. Bundy, et al.*, 2:16-cr-00046-GMN (D. Nev.).

[3] Plaintiff was apparently quoting Patrick Henry's speech from March 23, 1775. Prosecutors used Plaintiff's quote from this speech at trial to show that his intentions were to violently confront federal employees.

[4] Plaintiff contradicts this sworn trial testimony by claiming in his Complaint that "the State of Nevada had intervened and directed the BLM to stand-down" on the operation. ECF No. 1, ¶ 21. The United States is unaware of any evidence that the State of Nevada did so. Plaintiff is not entitled to an assumption of truth for purposes of Rule 12(b)(1).

This decision did not quell the mass gathering of armed individuals, including Plaintiff. Indeed, Plaintiff openly admits in the Complaint that he *knew* the BLM was attempting to abandon the impoundment operation immediately upon his arrival in Bunkerville "on the morning of April 12, 2014 . . ." ECF No. 1, ¶ 21. Despite knowing that the BLM was attempting to leave the area, Plaintiff stayed, continued to brandish his firearm, and continued to participate in this mass gathering of armed individuals that put federal employees in fear for their lives. His armed presence in Bunkerville was not difficult for prosecutors to prove, given that Plaintiff appeared in multiple photographs, including the one below, which was taken by the *Las Vegas Sun* on April 13, 2014:[5]



**C.  Engel's Arrest and Subsequent Conviction.**

On March 2, 2016, the United States Attorney's Office for the District of Nevada indicted Plaintiff and 18 other individuals for various crimes related to the armed gathering. Plaintiff was

---

[5] Photograph by Steve Marcus, *Future Uncertain in Bundy-BLM Dispute*, Las Vegas Sun, Apr. 13, 2014. The Sun's caption states, "Todd Engel, a volunteer from North Idaho who is supporting the Bundy family, returns to a campsite after a patrol near Bunkerville Sunday, April 13, 2014." (link) (accessed Oct. 23, 2022). Defendant attaches a complete copy of the Las Vegas Sun photograph series as Exhibit 6.

- 8 -

arrested on March 3, 2016. ECF No. 93, *United States v. Bundy, et al.*, 2:16-cr-00046-GMN (D. Nev. March 7, 2016). Trial commenced in February of 2017. Plaintiff opted to represent himself in the trial, which the Court permitted subject to stand-by counsel, John George, assisting him. In Plaintiff's closing argument, he made no allegations of fabrication, false testimony, or false or mistaken identity. Exhibit 7 at 213-228 (Criminal ECF No. 2002 at 213-228). Rather, Plaintiff admitted that he was indeed present in Nevada during the cattle impoundment situation, while armed with a weapon. "It's true, I was carrying a rifle that day," he told the jury. *Id.* at 223. He admitted that he "threw a couple guns in" his pickup truck on the day he left Idaho to travel to Nevada. *Id.* at 216.

Plaintiff's defense in his criminal trial was not that the government had deceived the jury—as he now alleges in this civil lawsuit—but rather that he did not have any intention to free the cattle because he did not own any cows and was not a cowboy. *Id.* at 227 ("I'm not a cowboy or – what am I going to do with cows?"). Plaintiff claimed that state and county law enforcement "patted [him] on the back" because he was supposedly trying to deescalate the armed confrontation—the very armed confrontation he had helped create. *Id.* at 223. He even took credit for the lack of bloodshed, stating, "I like to think that I had a part in that, helping it end peaceful." *Id.* at 224. The jury did not accept Plaintiff's defenses wholesale, and after carefully parsing the multiple charges found him guilty of two: obstruction of justice, and interstate travel to commit extortion. Exhibit 8 (Criminal ECF No. 27).

At Plaintiff's sentencing hearing on July 19, 2018, he did not argue or even suggest that his convictions were based on fabrications or false testimony. He admitted that he had "made some serious mistakes," while pleading to the Court that he had "good intentions" but had somehow "let [myself] get away from me" because of "the emotion" and "the hype of it all."

Exhibit 9 at 76 (Criminal ECF No. 3347 at 76).  As to his social media posts, such as his "liberty or death" quote and his threat to oil his bolt and show up for war, he stated, "I know my Facebook posts are ridiculous and I shouldn't have never [sic] wrote those, and I'm sorry for it."  *Id.*  In addition, he apologized to law enforcement.  *Id.*

Plaintiff was sentenced to 10 years imprisonment.  *Id.* at 87:04.

### D. <u>Appellate Outcome.</u>

Plaintiff appealed his conviction to the Ninth Circuit.  After oral argument, the appellate panel concluded that the district court erred when it temporarily disallowed Plaintiff from cross-examining witnesses as a pro se during the trial.  *United States v. Engel*, 968 F.3d 1046 (9th Cir. 2020).  The Court of Appeals vacated Plaintiff's conviction and remanded for a new trial.  *Id.* at 1052.  On remand, the U.S. Attorney's Office exercised its prosecutorial discretion and elected not to re-try Plaintiff.  The U.S. Attorney's Office moved to dismiss the indictment against Plaintiff on September 8, 2020, which the Court granted the next day.  In total, Plaintiff states that he was incarcerated for four and a half years.  ECF No. 1, ¶ 24.

### E. <u>Plaintiff's Theft Claim.</u>

On pages 38-39 of Plaintiff's Complaint, he asserts a claim for "Theft/Conversion" based on the actions of "an FBI confidential informant and/or federal agent . . ."  ECF No. 1 at 38-39.  At the outset, as a matter of policy, the United States can neither confirm nor deny the existence of any person who may have acted as a confidential informant.  This motion and subsequent briefing should not be read as an admission of such.  Federal law exempts the Government from having to publicly confirm or deny the fact of a potential confidential informant, as long as the Government has acted consistently to avoid such a disclosure in public records.  *Pickard v. Dept. of Justice*, 653 F.3d 782, 785-86 (9th Cir. 2011).  Since Plaintiff's bare allegations plainly reflect

that his theft/conversion claim is both time-barred and subject to the FTCA's exception for intentional torts, the Court need not delve into the potential fact disputes posed by this claim.

Plaintiff's factual allegations supporting this claim are that an informant or agent "befriended" Plaintiff "during the two years after the Toquop Wash incident and prior to his arrest." ECF No. 1 at 39. Plaintiff alleges that this informant/agent "removed" various items of Plaintiff's personal property in the time period "[f]ollowing Mr. Engel's arrest." *Id.* Plaintiff's arrest occurred on March 3, 2016. *Id.*, ¶ 70. Plaintiff's theory is that this informant/agent stole a 2007 Dodge Ram pickup truck, an ATV, a motorcycle, various weapons, a silver coin collection, and other items that in total were worth $200,000. *Id.* at 39.

### III.  Law and Argument

#### A.  The arrest-based claims fail to properly allege a lack of probable cause.

Plaintiff asserts FTCA claims for false arrest, false imprisonment, and malicious prosecution on pages 36-38 of the Complaint. Under the FTCA, 28 U.S.C. § 2671 *et seq.*, Congress waived the sovereign immunity of the United States for actions in tort, vesting federal district courts "with exclusive jurisdiction over suits arising from the negligence of Government employees." *Jerves v. United States*, 966 F.2d 517, 518 (9th Cir. 1992). State substantive law applies in suits brought under the FTCA. *Bennett v. United States*, 44 F.4th 929, 933 (9th Cir. 2022). As such, these claims are governed by Nevada state law.

While the legal elements of false arrest, false imprisonment, and malicious prosecution may differ in a variety of ways, they have one element in common: the plaintiff must demonstrate a lack of probable cause. Nevada courts define the tort of false imprisonment as one where a person has been "restrained of his liberty… without any legal cause or justification." *Hernandez v. City of Reno*, 634 P.2d 668, 671 (Nev. 1981). They have treated the tort of false arrest as closely

related if not intertwined with the tort of false imprisonment. *Fox v. State ex rel. its Dep't of Corr.*, 373 P.3d 915 (Nev. 2011) (using definition of false imprisonment to explain the outcome of a false arrest analysis). The tort of malicious prosecution contains four elements: (1) want of probable cause to initiate the prior criminal proceeding, (2) malice, (3) termination of the prior criminal proceedings, and (4) damage. *LaMantia v. Redisi*, 38 P.3d 877, 879 (Nev. 2002).

Plaintiff fails the *Iqbal* standard in articulating a lack of probable cause. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Nowhere in his 116-paragraph, 40-page complaint does he assert the plausible factual scenario for the Government lacking probable cause that he brandished an assault rifle, adorned himself with camouflaged military attire, and drove to Nevada with the intention of putting federal employees in fear for their lives. For example, one of Plaintiff's indicted crimes was Interstate Travel in Aid of Extortion, in violation of 18 U.S.C. § 1952. Exhibit 10 (Criminal ECF No. 27 at 52-53). The elements of this crime are (1) interstate commerce or use of an interstate facility, (2) with intent to promote an unlawful activity, and (3) a subsequent overt act in furtherance of that unlawful activity. *United States v. Tavelman*, 650 F.2d 1133, 1138 (9th Cir. 1981). The Government alleged that Plaintiff both traveled in interstate commerce and used the Internet, meeting the first element. Exhibit 10 at 54 (Criminal ECF No. 27 at 54). It next alleged that Plaintiff intended to commit extortion in violation of both federal and Nevada state law. *Id.* The intended extortion was the use of his firearm to intimidate and scare federal employees into surrendering the cattle impoundment operation. As to the third element, the Government alleged that Plaintiff committed a subsequent overt act in furtherance of the extortion.

In his closing argument at trial, Plaintiff admitted that he drove from Idaho to Nevada, and he was photographed at the scene of the BLM's operation while carrying his firearm and dressed in military attire. Exh. 6 at 17. His intent in doing so was clear from his social media posts, in

which he likened himself to Patrick Henry declaring war and informed his Facebook friends that he was oiling the bolt of his gun. He does not now dispute that he implemented that intent through action, by making a public display of his weapon at the scene of the cattle impoundment. His legal theory for why probable cause was missing is, in fact, impossible to discern from reviewing the Complaint. Rule 8 prohibits "bare assertions" that amount to "nothing more than a formulaic recitation of the elements" of a legal claim. *Iqbal*, 556 U.S. at 681. The "bald allegation of impermissible motive" on the Government's part, moreover, is "conclusory and is therefore not entitled to an assumption of truth." *Moss v. U.S. Secret Service*, 572 F.3d 962, 970 (9th Cir. 2009) (applying *Iqbal*).

In the same vein, Plaintiff's numerous accusations that various federal employees lied, whether they were FBI agents, BLM agents, or AUSAs from the District of Nevada, fail to inform the Court how they tie in to the specific charges against Plaintiff. Plaintiff uses the word "fabricated" in the Complaint approximately 19 times, referring variously to a fabricated proceeding (¶ 2), fabricated crimes (¶ 2), fabricated evidence (footnote 1), fabricated charges (¶ 24), a fabricated record (¶ 32), a fabricated scheme (¶ 33), fabricated investigative documents (¶ 45), fabricated theories (¶ 48), fabricated claims (¶ 50), and a fabricated indictment (¶ 102(C)). At no point does he articulate how the evidence that he was photographed at the cattle impoundment area with his gun was in any way "fabricated," nor does he even attempt to explain why his own closing argument should be construed as anything other than a confession that he drove from Idaho to Nevada to commit the crime of extortion against BLM employees.

Much like the plaintiffs' Complaint in the *O'Shaughnessy* action, Plaintiff here sweepingly and broadly references *Brady* violations that the Court through Judge Navarro conducted a hearing about. ECF No. 1 at pp. 30-31. While the *O'Shaughnessy* allegations are meritless for reasons

stated in Defendant's motion in that action, in this action Plaintiff makes even less of an effort to connect Grand Jury and *Brady* issues to the criminal charges filed against Plaintiff. The Court's hearing on *Brady* issues occurred on January 8, 2018. ECF No. 1 at ¶ 95. This was nine months after Plaintiff Engel was convicted by the jury in April, 2017. Exhibit 8 (Criminal ECF No. 27). The hearing did not concern Plaintiff, Plaintiff was not present for it, and nor did he present any arguments at that hearing. Criminal ECF No. 3122. Nor did Plaintiff present the same legal defenses in his trial that some of the Bundy defendants did at theirs, which included a self-defense theory. Ultimately, the lack of relevance of *Brady* arguments to Plaintiff's criminal convictions is reflected by the holding of the Ninth Circuit, which reversed Plaintiff's conviction on the purely procedural ground that his right as a pro se to cross examine witnesses was violated. *Engel*, 968 F.3d at 1051.

Probable cause existed to arrest, charge, and prosecute Plaintiff. His FTCA claims for false arrest, false imprisonment, and malicious prosecution fail to state a claim and should be dismissed.

### B. **Engel's FTCA claims based on AUSA actions are barred.**

Plaintiff's claims for false arrest, false imprisonment, and malicious prosecution based on any actions by federal prosecutors are statutorily barred. These three torts are expressly permitted by the FTCA to be prosecuted against the United States if, and only if, they were committed by an "investigative or law enforcement officer." 28 U.S.C. § 2680(h). An investigative or law enforcement officer, in turn, is defined as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.* Federal prosecutors "do not qualify as 'investigative or law enforcement officer[s]' within the meaning of 28 U.S.C. § 2680(h) as they are not empowered to execute searches, seize evidence, or make arrests." *Bonilla v. United States*, 652 Fed. Appx. 885, 890 (11th Cir. 2016) (citing 28

U.S.C. § 547 (establishing duties of United States Attorneys)); *see also Moore v. United States*, 213 F.3d 705, 710 (D.C. Cir. 2000).

Plaintiff specifically names the Assistant United States Attorneys whom he accuses of engaging in tortious conduct to support his FTCA theories: AUSAs Nadia Ahmed, Steven Myhre, and Daniel Bogden. ECF No. 1, ¶ 4. He mentions Ahmed 54 times in the Complaint, Myhre 52 times, and Bogden 46 times. All of Plaintiff's claims relying on the conduct of these individuals are barred. If any portion of Plaintiff's claim survives this motion, Defendant moves the Court to order that Plaintiff must amend the Complaint in a manner permitting Defendant to understand which of the surviving factual and legal theories are based solely on the action of law enforcement officers.

### C. **Engel's claim for intentional infliction of emotional distress fails.**

Plaintiff's IIED claim fails for the same reasons that his arrest-based claims fail: he fails to specifically point to a lack of probable cause. As a result, he cannot prove causation. A plain reading of the IIED claim as stated in the Complaint reveals that it is simply an attempt to piggyback on the arrest-based claims. ECF No. 1 at 38. Plaintiff refers only to the "conduct" of unnamed "government employees," without any specificity. *Id.* Presumably, Plaintiff is asserting an IIED claim based simply on factual allegations regarding his theory that he was falsely arrested, falsely imprisoned, and maliciously prosecuted. Since he fails to identify a lack of probable cause or any intentional lies that were material to his arrest in the arrest-based legal claims, he fails to properly allege causation for purposes of his IIED claim.

Under Nevada law, an IIED claim must include allegations of the following elements: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress; (2) severe or extreme emotional distress suffered by the plaintiff; and (3) actual

or proximate causation." *Jordan v. State ex rel. Dep't of Motor Vehicles & Pub. Safety*, 110 P.3d 30, 52 (Nev. 2005), *abrogated on separate grounds by Buzz Stew, LLC v. City of N. Las Vegas*, 181 P.3d 670 (Nev. 2008). "Again," the Nevada Supreme Court has emphasized, "the plaintiff's complaint must specifically allege intent." *Jordan*, 110 P.3d at 52. Applied to Plaintiff's facts, the only reading of his Complaint is that he believes that FBI employees, BLM employees, or AUSAs engaged in unspecified "fabrications" and these fabrications automatically support a legal claim for "extreme and outrageous conduct" for purposes of Nevada tort law. Plaintiff has never specified what these fabrications are or how they would have changed the outcome of his being arrested and imprisoned. In other words, he was going to be arrested, incarcerated, and prosecuted based on the obvious facts of his violent intimidation and extortion of Federal agents regardless of any allegedly extreme and outrageous behavior.

Consequently, his IIED claim fails as a matter of law.

### D. **Engel's theft/conversion claim is barred by the FTCA.**

In the Complaint, Plaintiff references an "FBI confidential informant and/or federal agent" who allegedly befriended him. ECF No. 1 at 39. He then asserts that this informant or agent "removed" $200,000 worth of property from Plaintiff's home, which was done "with the government's knowledge and consent." *Id.* This theory fails as a matter of law for two reasons.

First, acts of misrepresentation and deceit are statutorily barred by the FTCA. 28 U.S.C. § 2680(h) (barring on sovereign immunity grounds claims "arising out of … misrepresentation [or] deceit.") Thus, "claims against the United States for fraud or misrepresentation by a federal officer are absolutely barred." *Kim v. United States*, 940 F.3d 484, 492 (9th Cir. 2019) (quotation omitted). This includes "misrepresentations made willfully [or] negligently." *Esquivel v. United States*, 21 F.4th 565, 577 (9th Cir. 2021) (brackets in original) (quoting *Snyder & Assocs.*

*Acquisitions LLC v. United States*, 859 F.3d 1152, 1160 (9th Cir. 2017)). Thus, to the extent Plaintiff seeks to pursue a claim that some federal agent stole, defrauded, or engaged in an act of conversion, that claim is statutorily barred.

Second, any claims arising out of the apparent fraud scheme that Plaintiff believes he was the victim of appear to be time-barred. Plaintiff alleges that the informant/agent defrauded him in the period after Plaintiff's arrest. ECF No. 1 at 39. The arrest occurred on March 3, 2016. Crim. ECF No. 93, *United States v. Bundy, et al.*, 2:16-cr-00046-GMN (D. Nev. March 7, 2016). If the fraud scheme occurred in 2016, Plaintiff had until 2018 to submit an administrative tort claim for purposes of the FTCA, under its two-year time limitation. 28 U.S.C. § 2401. This time requirement is jurisdictional and "must be interpreted strictly." *Vacek v. U.S. Postal Service*, 447 F.3d 1248, 1250 (9th Cir. 2006). Further, Plaintiff holds the burden of proof to prove jurisdiction. *Robinson*, 586 F.3d at 685. Thus, in addition to his claims being barred by the FTCA prohibition on claims for misrepresentation and deceit, they are also time-barred.

## **CONCLUSION**

For the reasons stated, the United States respectfully moves the Court for dismissal of Plaintiff's action as a matter of law.

Respectfully submitted on November 21, 2022.

    MERRICK GARLAND
    United States Attorney General

    *s/ Neil Singh*
    NEIL SINGH
    BROCK HEATHCOTTE
    Special Assistant United States Attorneys, Acting
    Under Authority Conferred by 28 U.S.C. § 515
    *Attorneys for Defendant United States*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

Craig A. Marquiz
Marquiz Law Office, P.C.
3088 Via Flaminia Court
Henderson, NV 89052
(702) 263-5533
Fax: (702) 263-5532
Email: marquizlaw@cox.net

*s/ Irene Millsaps*
United States Attorney's Office