# Exhibit 4

1          You do solemnly swear that the testimony you shall

2    give in the cause now before this Court shall be the truth, the

3    whole truth, and nothing but the truth, so help you God?

4          THE WITNESS:  I do.

5          COURTROOM ADMINISTRATOR:  Have a seat.

6          Please state and spell your full name for the record.

7          THE WITNESS:  Joel Willis, J-o-e-l-W-i-l-l-i-s.

8          MR. MYHRE:  Thank you, Your Honor.

9

10              DIRECT EXAMINATION OF JOEL WILLIS

11   BY MR. MYHRE:

12   Q.   Good morning, Agent Willis.

13   A.   Good morning.

14   Q.   You are currently a special agent with the FBI; is that

15   correct?

16   A.   Yes.

17   Q.   Where are you -- where are you currently assigned?

18   A.   The FBI Las Vegas Field Office.

19   Q.   When did you first join the FBI?

20   A.   In January of 2004.

21   Q.   Were you assigned to an office other than Las Vegas?

22   A.   Yes.  In May of 2004, I was assigned to the Newark,

23   New Jersey Field Office.

24   Q.   When did you make your move to Las Vegas?

25   A.   In November of 2009.

61

1    Q.   Have you been assigned as the case agent to the events

2    arising out of Bunkerville, Nevada, on April 12th, 2014?

3    A.   Yes.

4    Q.   If you could just describe generally for the jury what the

5    duties of a case agent are.

6    A.   I oversee all areas of the investigation, including

7    evidence collection, interviews, and documentation.

8    Q.   And when were you first assigned as the case agent?

9    A.   In -- I became a case agent on this case in May of 2014.

10   Q.   So after the events of April 12th?

11   A.   Yes.

12   Q.   Would you describe briefly for us your training as an FBI

13   agent.

14   A.   I attended a 17-week new agent training in Quantico,

15   Virginia before being assigned to the Newark Field Office.

16   Since then, I've attended numerous off-site training courses,

17   including those having to do with social media exploitation

18   and, you know, numerous on-the-job trainings that I've done

19   here and in Newark, New Jersey.

20   Q.   Now I want to take you more -- drill down more to your

21   specific assignments with respect to this case.

22        During the course of your assignment to this case,

23   did you do online searches for social media relating to the

24   Bundy ranch event?

25   A.   Yes.

Case 2:22-cv-01040-WQH-EJY  Document 19-5  Filed 11/21/22  Page 4 of 86
Case 2:16-cr-00046-GMN-PAL  Document 1825  Filed 04/04/17  Page 62 of 296

62

1  Q.   And give us a sense of how many hours during the course of

2  the investigation you spent doing that.

3  A.   Hundreds of hours.

4  Q.   You're familiar with the term "open source"?

5  A.   Yes.

6  Q.   Could you explain for the jury, please, what "open source"

7  means.

8  A.   "Open source" generally means something that is open to

9  the public, something that you'd be able to go on, news

10 broadcasts, things that are publicly available through the

11 Internet that we would observe.

12 Q.   And, during the course of the investigation, did you have

13 a -- the occasion to obtain a search warrant related to

14 Todd Engel?

15 A.   Yes.

16 Q.   And was that search warrant related to his Facebook

17 account?

18 A.   Yes.

19 Q.   Now, before obtaining the search warrant, did you view

20 Mr. Engel's Facebook account?

21 A.   Yes, I did.

22 Q.   And you viewed -- and these were the public postings, if

23 you will?

24 A.   Yes.

25 Q.   When you viewed these, you viewed them where?

63

1    A.   On a computer -- log in to a computer or get on a

2    computer, go to a browser, Facebook.com, and Todd Engel's

3    public Facebook page.

4    Q.   And, when you looked at the public Facebook page, can you

5    describe generally what you would see?

6    A.   I would see pictures about Todd Engel, things about his

7    life, videos that Todd Engel had posted of himself and of other

8    things; things about events in his life, a lot of stuff about

9    him building his cabin and being at his cabin; things like

10   that.

11   Q.   When you say "video," this would include images as well as

12   sounds?

13   A.   Yes.

14   Q.   Did you become familiar with his voice as well?

15   A.   Yes.

16   Q.   When you obtained the search warrant, did you serve it on

17   Facebook?

18   A.   Yes.

19   Q.   What did you obtain back from Facebook?

20   A.   I obtained approximately a 2,000-page responsive document,

21   official business record from Facebook, and it included general

22   activity; profile information, including Todd Engel's Facebook

23   ID to -- on the first page of the warrant return.

24   Q.   So, with respect to the first page, were there -- was

25   there identifying information with respect to Mr. Engel?

Case 2:22-cv-01040-WQH-EJY  Document 19-5  Filed 11/21/22  Page 6 of 86
Case 2:16-cr-00046-GMN-PAL  Document 1825  Filed 04/04/17  Page 6 of 296

64

1    A.    Yes.

2    Q.    Did you also receive, at some point in time, a letter of

3    authenticity from Facebook?

4    A.    Yes, I did.

5            MR. MYHRE:  Your Honor, if we may publish to the

6    witness and the Court and counsel Exhibit 351, Page 10.

7            THE COURT:  Yes, you may.

8    BY MR. MYHRE:

9    Q.    Do you see what's been marked as 351-10 there,

10   Agent Willis?

11   A.    Yes, I do.

12   Q.    And what is that?

13   A.    That is a letter of authenticity for the Facebook account

14   of Todd Engel.

15   Q.    And that relates to the documents that you received back

16   from Facebook?

17   A.    Yes.

18   Q.    Thank you.

19           MR. MYHRE:  Your Honor, we offer 351.

20           THE COURT:  Any objection to 351?

21           MR. TANASI:  Same continuing objection regarding

22   Facebook from Stewart, Your Honor.

23           MR. MARCHESE:  Parker joins.

24           MR. LEVENTHAL:  Mr. Drexler joins.  Same.

25           PRO SE ENGEL:  Engel Jones.

Case 2:22-cv-01040-WQH-EJY Document 195 Filed 11/21/22 Page 7 of 86
Case 2:16-cr-00046-GMN-PAL Document 1825 Filed 04/04/17 Page 65 of 296

65

 1            MR. PEREZ:  Lovelien joins.

 2            MR. JACKSON:  Burleson joins.

 3            THE COURT:  All right.  Same ruling as before.

 4            Exhibit 351, Certificate of Authenticity, is

 5     admitted.

 6         (Government Exhibit 351 received.)

 7            MR. MYHRE:  Thank you, Your Honor.

 8     BY MR. MYHRE:

 9     Q.   So, when you received these documents, then did you

10     conduct a search of the documents for documents that were

11     responsive to the search warrant?

12     A.   Yes, I did.

13     Q.   And did you do that yourself or did you supervise it or a

14     combination of both?

15     A.   A combination of both.

16            MR. MYHRE:  Now I'd like to, if I may, Your Honor,

17     publish to the Court, counsel, and the witness Exhibit 299.

18            THE COURT:  Yes, you may.

19     BY MR. MYHRE:

20     Q.   And, Agent, there's also a paper copy of 299 -- off to

21     your left-hand side on the -- right on the desk there in front

22     of you.

23     A.   Oh.  I'm sorry.

24     Q.   And do you -- you have that in front of you now; correct?

25     A.   Yes, I do.

66

1    Q.   And what is that?

2    A.   This is a mini-feed record from the Facebook-responsive

3    documents for the search warrant of Todd Engel.

4    Q.   And this particular exhibit is one page; correct?

5    A.   Yes.

6    Q.   And at the top it says "Facebook Business Record, Page

7    200"?

8    A.   Yes, it does.

9    Q.   And there are a couple of messages contained in this

10   document; is that correct?

11   A.   Yes.

12   Q.   And do they generally relate to the events of Bundy ranch

13   of April 12th, 2014?

14            MR. JACKSON:  I object to him leading.

15            MR. MYHRE:  Just foundational, Your Honor.

16            THE COURT:  Overruled.  He may answer the question.

17            THE WITNESS:  Yes, they do.

18            MR. MYHRE:  Your Honor, we offer Exhibit --

19   Government Exhibit 299.

20            THE COURT:  Any other objection to Exhibit 299 other

21   than has been previously ruled?

22            MR. TANASI:  Your Honor, with respect to the Facebook

23   post, I'd also add hearsay just to make sure that one was

24   lumped into the continuing objection.

25            THE COURT:  All right.

Case 2:22-cv-01040-WQH-EJY Document 19-5 Filed 11/21/22 Page 9 of 86
Case 2:16-cr-00046-GMN-PAL Document 1825 Filed 01/03/17 Page 9 of 256

67

1        MR. JACKSON:  I would join in that objection and

2   relevance as to my client.

3        MR. PEREZ:  Lovelien joins with Mr. Jackson.

4        MR. MARCHESE:  Parker joins.

5        MR. LEVENTHAL:  Mr. Drexler joins.

6        PRO SE ENGEL:  Engel joins.

7        THE COURT:  All right.  Same ruling as before.

8        Exhibit 299 will be admitted.

9      (Government Exhibit 299 received.)

10       MR. MYHRE:  And may we publish, Your Honor?

11       THE COURT:  Yes, you may.

12   BY MR. MYHRE:

13   Q.   Agent Willis, to your right now on the monitor, you'll see

14   the exhibit.

15        Is this in chronological or reverse chronological

16   order in terms of the messages here?

17   A.   Reverse chronological.

18   Q.   Okay.  So, starting from the bottom, when was that post

19   there made?

20   A.   This post is made at approximately 7:12 a.m. on 4 -- April

21   4 -- I'm sorry -- April 8th, 2014.

22   Q.   Now, could you explain the entry where it says "story."

23   A.   This is describing what the action or the activity was of

24   Todd Engel on -- or for that Facebook post.

25   Q.   So, the document we're looking at now, is this what was

68

1   publicly viewed or not publicly viewed?

2   A.    This is something that was publicly viewed or publicly

3   viewable.

4   Q.    Would it have been viewable on his Facebook page or

5   somebody else's Facebook page?

6   A.    This was available on someone else's Facebook page.  He is

7   commenting on a post made by someone else.

8   Q.    And, if you would, read the message there, please.

9   A.    "Must watch.  They've taken his cattle and then they took

10  his son.  If they want war, let it begin here.  Oiling bolt.

11  Loading magazines."

12  Q.    And the next entry above that was made when?

13  A.    That entry was made at 12 -- approximately 12:54 p.m. on

14  April 9th, 2014.

15  Q.    And read the line below there, please.

16  A.    "Todd Engel shared Nation in Distress' photo."

17  Q.    And what is Nation in Distress?

18  A.    It is a Facebook page.

19  Q.    And is there a message below the story line?

20  A.    Yes.

21  Q.    And what does that message read?

22  A.    "It is in vain, sir, to extenuate the matter.  Gentlemen

23  may cry.  Peace.  Peace squared, but there is no peace.  The

24  war is actually begun.  The next gale that sweeps from the

25  north will bring to our ears the clash of resounding arms.  Our

 1  brethren are already in the field why we stand here idle.  What

 2  is it that gentlemen wish?  What would they have?  Is life so

 3  dear or peace so sweet as to be purchased at the price of

 4  chains and slavery?  Forbid it, Almighty God.  I know not what

 5  course others may take but as far -- but, as for me, give me

 6  liberty or give me death."

 7  Q.   Now, this message, was this message available publicly?

 8  A.   Yes, it was.

 9  Q.   And would it have been on his Facebook page or another

10  Facebook page?

11  A.   This was also -- this was on Nation in Distress' Facebook

12  page.  He's commenting to one of their posts.

13  Q.   Now, have you been able to locate that comment on the

14  Nation in Distress web page?

15  A.   Yes.

16  Q.   Or -- excuse me -- Facebook page?

17  A.   Yes.

18           MR. MYHRE:  If I may call up, Your Honor, for the

19  Court and counsel and the witness, Exhibit 455.

20           THE COURT:  Yes.

21  BY MR. MYHRE:

22  Q.   Do you see 455, Agent Willis?

23  A.   Yes, I do.

24  Q.   And what is that?

25  A.   This is a screenshot of Nation in Distress' Facebook page.

1    Q.   Where did that screenshot come from?

2    A.   This came from Facebook, Facebook.com.

3    Q.   How was it obtained?

4    A.   It was searched for.  The search terms were just in

5    Facebook, "Nation in Distress," "Gillespie," and "shame," and

6    those are -- and it came up as a search result and then it was

7    captured off of Facebook.

8    Q.   And did you capture that?

9    A.   Yes, I did.

10   Q.   Moving down to Page 2 of that page -- that exhibit.

11   Excuse me.  And do you see the post that is reflected in

12   Exhibit 299 anywhere there?

13   A.   Yes.

14   Q.   Is that also from the same face -- Nation in Distress

15   Facebook page?

16   A.   Yes.  This was observable below that post and in the

17   comment section.

18             MR. MYHRE:  Your Honor, we offer Exhibit 455.

19             THE COURT:  Any other objection to Exhibit 455 not

20   already addressed by the Court?

21             MR. TANASI:  None additional from Stewart,

22   Your Honor.

23             MR. MARCHESE:  None from Parker.

24             MR. LEVENTHAL:  No, Your Honor.

25             PRO SE ENGEL:  No, Your Honor.

71

```
 1              MR. PEREZ:  None from Lovelien.

 2              MR. JACKSON:  No, Your Honor.

 3              THE COURT:  Thank you.

 4              All right.  Exhibit 455 will be admitted.

 5         (Government Exhibit 455 received.)

 6              MR. MYHRE:  And may we publish, Your Honor?

 7              THE COURT:  Yes, you may.

 8    BY MR. MYHRE:

 9    Q.   So, turning to Page 1 there now, Agent Willis, of Exhibit

10    455, would you read the entry from the very top, please.

11    A.   Yes.

12              "Share" -- I'm sorry.  "Share this.  Get the word

13    out.  Please call Clark County Sheriff Gillespie and tell him

14    shame on him for not protecting Bundy's ranch; that he works

15    for the people, not Washington, D.C., 702-828-3231.  Article

16    and link in the comments below."

17    Q.   And does an image appear below that comment?

18    A.   Yes, it does.

19    Q.   What is depicted in that image based on your knowledge in

20    the investigation -- of the investigation?  Excuse me.

21    A.   That is an image of the staging area, rally site on State

22    Route 170 in Bunkerville.

23    Q.   Are there words written in -- embedded in that image?

24    Excuse me.

25    A.   Yes, there is.
```

HEATHER K. NEWMAN, FOCR, RPR, CCR 774     (702)471-0002

72

1    Q.   And what are those words?

2    A.   "Operation Mutual Aid.  Malitias mobilized to Bundy ranch

3    in Nevada."

4    Q.   And do you have an understanding of what Operation Mutual

5    Aid is based on your investigation?

6    A.   Yes, I do.

7    Q.   And who is affiliated with Operation Mutual Aid?

8    A.   Ryan Payne and Jerry Bruckhart.

9    Q.   Now the page -- these words that you've just read and the

10   image you just described for us, would this have been available

11   for viewing by Mr. Engel?

12   A.   Yes.

13   Q.   Now scrolling down to the second page.

14        And is this that comment that you just read from

15   Exhibit 299?

16   A.   Yes, it is.

17   Q.   And is there any response to that comment?

18   A.   Yes.

19   Q.   And what is that?

20   A.   A Facebook account holder, Todd Styles, comments "Amen."

21        MR. MYHRE:  You want to bring that down.

22        If I could ask permission to provide to the witness,

23   the Court, and counsel, Exhibit 298.

24        THE COURT:  Yes, you may.

25   BY MR. MYHRE:

1   Q.   And do you see Exhibit 298, Agent Willis?

2   A.   Yes, I do.

3   Q.   Is this a two-page document?

4   A.   Yes, it is.

5   Q.   What does this purport to be?

6   A.   This is, again, mini -- excuse me -- Facebook business

7   records of Todd Engel's mini-feed.

8   Q.   And I believe you've touched on it before, but could you

9   just expand a little bit for us.  What do you -- what is a

10  mini-feed?

11  A.   It's just another way that Facebook organizes some type of

12  activity on your Facebook account.  A mini-feed, as "mini"

13  typically appears on, like, the top right of your Facebook page

14  and just documents activity made to your account.

15  Q.   And the activity documented in this two-page document,

16  does it relate to events from April 12th, 2014, and before?

17  A.   Yes.

18  Q.   Are they -- do they purport to be entries made by the

19  account holder for this Facebook account, Todd Engel?

20  A.   Yes.

21          MR. MYHRE:  Your Honor, we offer Exhibit 298.

22          THE COURT:  Any objection to Exhibit 298 other than

23  what's been previously addressed by the Court?

24          MR. TANASI:  Nothing additional from Stewart,

25  Your Honor.

74

1          MR. MARCHESE:  None from Parker.

2          MR. LEVENTHAL:  Not on behalf of Mr. Drexler.

3          PRO SE ENGEL:  None from Engel.

4          MR. PEREZ:  None from Lovelien.

5          MR. JACKSON:  Nothing additional.

6          THE COURT:  All right.  Exhibit 298 will be admitted.

7      (Government Exhibit 298 received.)

8          MR. MYHRE:  And may we publish, Your Honor?

9          THE COURT:  Yes, you may.

10          MR. MYHRE:  Thank you, Your Honor.

11   BY MR. MYHRE:

12   Q.   And, Agent Willis, does this document also work in reverse

13   chronological order?

14   A.   Yes, it does.

15   Q.   So turning to Page 2 first, then, from the bottom.  What

16   is that entry reflected at -- in the bottom entry?

17   A.   On --

18   Q.   Well, let's start with this.  What is the date and time of

19   that first entry?

20   A.   Okay.  This was made at approximately 4:57 p.m. on April

21   11th, 2014.

22   Q.   And what activity is being reflected there in the story

23   line?

24   A.   Todd Engel shared a link.

25   Q.   Do you know what that link was or is?

HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)471-0002

75

1  A.   No.

2  Q.   It was not reflected in the documents returned by

3  Facebook?

4  A.   No.

5  Q.   Is there a message there?

6  A.   Yes, it is -- yes, there is.

7  Q.   And who would have authored that message?

8  A.   Todd Engel.

9  Q.   And would you read it to us, please.

10  A.   "Strength in numbers."

11  Q.   Moving to the next entry up.

12       Date and time, please.

13  A.   This entry would have been made at 11:18 a.m. on April 12,

14  2014.

15  Q.   Okay.  And you're getting the --

16  A.   Sorry.  Correction.  Sorry.  9:18 a.m. on April 12th,

17  2014.

18  Q.   And you're coming up with the time how?

19  A.   This is that Universal Time Code.  So, for local time,

20  currently here in Nevada, you would subtract seven hours.

21  Q.   So you're basing the times that you're testifying to based

22  on local Nevada time?

23  A.   Yes.

24  Q.   And what is the activity reflected here?

25  A.   It says, "Todd Engel added a new video."

1   Q.   And I take it you do not know what that video was?

2   A.   I do not.

3   Q.   What is the message?

4   A.   "2,000 people on scene.  Prayer and pledge has occurred."

5   Q.   And the next entry up also shows adding a new video?

6   A.   Yes, it does.

7   Q.   And the entry above that, is there -- what is the date and

8   time for that entry, please?

9   A.   That entry was made at 9:52 a.m. on April 12, 2014.

10  "Todd" -- I'm sorry.

11  Q.   No.  Go ahead.  What activity is reflected there?

12  A.   Todd Engel added a new video.

13  Q.   What is the message?

14  A.   "Sheriff has been given one hour to disarm BLM."

15  Q.   And the next entry above that, what is the time of that

16  entry?

17  A.   The time is approximately 9:56 a.m. on April 12th, 2014.

18  Q.   And what is the activity reflected there?

19  A.   Todd Engel added a new video.

20  Q.   And what is the message?

21  A.   "Praise God."

22  Q.   Now, based on your knowledge of the investigation, how do

23  these times correlate with respect to -- let me strike that.

24        Let me start first.  Based on your knowledge of the

25  investigation and the investigation that you've conducted, have

1    you been able to ascertain a time that Cliven Bundy met with

2    Sheriff Gillespie on the stage in Bunkerville on April 12,

3    2014?

4    A.   Yes.

5    Q.   What was that time?

6    A.   Approximately 9:30 a.m.  9:00 to 9:30 a.m.

7    Q.   And were you able to ascertain a time when Mr. Bundy made

8    a speech where he said words to the effect of "go get my

9    cattle"?

10   A.   Yes.

11   Q.   And approximately when was that made?

12   A.   That was just before 11:00 a.m.  About 10:58 a.m. or

13   approximately.

14   Q.   And where do these posts relate with respect to those two

15   events?

16   A.   These would have taken place in between those two events.

17   Q.   So these -- these messages here would have occurred

18   between the time that Mr. Bundy spoke -- Cliven Bundy spoke

19   with the sheriff on the stage and the time he asked for

20   people -- told people to get his cattle?

21   A.   Yes.

22   Q.   Moving up to the next entry.  What is the time of that

23   entry?

24   A.   At approximately 11:05 a.m. on April 12, 2014.

25   Q.   And what is the activity listed there?

78

1    A.   Todd Engel updated his status.

2    Q.   Now, what does it mean to update status?

3    A.   When you log on to a Facebook page, your personal wall or

4    timeline, there's a box at the top of the page that says that

5    you can, you know, put something that's updating your status.

6    You can type in text there and post it to your wall.

7    Q.   So this -- the message that we're about to address here

8    would have been posted to his wall?

9    A.   Yes.

10   Q.   And would that -- and that depends on the privacy

11   settings, but that's viewable by anybody?

12   A.   Yeah.  Depending on his privacy settings.

13   Q.   And if you would read the message there, please.

14   A.   "Heading out to block freeway and take cows back."

15   Q.   And when did this message occur in relation to Mr. Cliven

16   Bundy's speech to get the cattle?

17   A.   Minutes after Cliven Bundy's speech to get the cattle.

18   Q.   Is there another entry above that?

19   A.   Yes, there is.

20   Q.   What is the time for that?

21   A.   At 11:17 a.m. on April 12, 2014.

22   Q.   So that's about 12 minutes later?

23   A.   Yes.

24   Q.   And what is the activity?

25   A.   Todd Engel added a new video.

HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)471-0002

79

1   Q.   And when you say "added a video," do you know what the

2   video was?

3   A.   I do not.

4   Q.   Do you know where the video would have -- would the video

5   have appeared on his Facebook page?

6   A.   Yes, it would have.

7   Q.   And was there a message associated with that video?

8   A.   Yes, there was.

9   Q.   And what is the message?

10  A.   "Leaving now to shut down the freeway" -- I'm sorry.

11  "Leaving now to shut the freeway down by force of arms."

12  Q.   And is there another entry above that and after this in

13  time?

14  A.   Yes.

15  Q.   When was this entry made?

16  A.   At 12:04 p.m.

17  Q.   On?

18  A.   I'm sorry.  On April 12th, 2014.

19  Q.   And what is the activity listed here?

20  A.   Todd Engel added a new video.

21  Q.   Now, through your investigation, as well as your

22  information that you've gleaned from the investigation,

23  approximately what time did the horses come through underneath

24  the northbound bridge and form a line across the bottom of the

25  wash?

1   A.   At approximately 11:58 a.m.

2   Q.   Was this message before or after that, at least according

3   to the times indicated in this exhibit?

4   A.   After.

5   Q.   And what is the message?

6   A.   "Armed standoff."

7   Q.   Now, is it possible to post messages such as this, and

8   those that we've read, when you're not sitting in front of a

9   computer?

10  A.   Yes, there -- yes, it is.

11  Q.   How -- how could they be posted?

12  A.   On a smartphone, a mobile phone.

13  Q.   Can -- just in general terms, someone can access a

14  Facebook page from a smartphone?

15  A.   Yes.

16  Q.   If you could turn to the first page, please.

17           And starting with the entry at the bottom of that

18  page, is this entry later in time than the entry we just read?

19  A.   Yes.

20  Q.   And what time is reflected under the -- on the timeline?

21  A.   At approximately 4:01 p.m. on April 12th, 2014.

22  Q.   And that would be, again, local Nevada time; correct?

23  A.   Yes.

24  Q.   Do you recall, based upon your investigation and your

25  knowledge of the investigation, approximately what time the

81

1   cattle were released?

2   A.   Approximately 2:30 to 2:45 p.m. local time.

3   Q.   Approximately what time did the BLM leave the ICP?

4           MR. LEVENTHAL:  Objection.  Leading and foundation.

5           MR. MYHRE:  I just asked him what time.

6           THE COURT:  Overruled.  He just asked what time.  He

7   can answer the question if he knows.

8           THE WITNESS:  Approximately 2:00 p.m.

9   BY MR. MYHRE:

10  Q.   So did this entry occur before or after those events?

11  A.   After.

12  Q.   And what is the activity reflected here?

13  A.   Todd Engel updated his status.

14  Q.   And what is the message?

15  A.   "BLM lost and has backed down due to overwhelming force of

16  the people and our arms.  We win.  Cattle being released as we

17  speak.  If they don't, trouble will start" -- "again."  It

18  continues onto the next page.  I'm sorry.

19  Q.   Yes.  It continues onto Page 2.

20  A.   "If they don't, trouble will start again.  It was very,

21  very close to an exchange of gunfire.  We rushed their

22  barricades with armed people and cowboys on horseback.  Crazy."

23  Q.   Now, is there an entry later in time that is above this

24  entry?

25  A.   Yes.

82

1    Q.   When was this entry made?

2    A.   This entry was made at approximately 3:22 p.m. on April

3    12, 2014.

4    Q.   What is the activity reflected there?

5    A.   Todd Engel added a new video.

6    Q.   Were you able to ascertain what that video was?

7    A.   Yes.

8    Q.   And what was the message there?

9    A.   "We win."

10   Q.   And is there a -- another message above that?

11   A.   Yes.

12   Q.   And what is the time of that?

13   A.   At approximately 4:30 p.m. on April 12th, 2014.

14   Q.   And what is the status reflected?

15   A.   Todd Engel added a new video.

16   Q.   And are you aware of that video?

17   A.   Yes.

18   Q.   What is the message?

19   A.   "Pardon the language."

20   Q.   I'm going to turn your attention to Exhibit 304, please.

21        MR. MHYRE:  If I may present it to the witness, the

22   Court, and counsel?

23        THE COURT:  Yes.

24        MR. MYHRE:  If you could -- that's fine.  Thank you.

25   BY MR. MYHRE:

Case 2:22-cv-01040-WQH-EJY   Document 19-5   Filed 11/21/22   Page 25 of 86
Case 2:12-cv-00040-GMN-PAL   Document 1825   Filed 04/05/17   Page 83 of 296

83

1    Q.   Do you recognize 304?

2    A.   Yes, I do.

3    Q.   Have you reviewed that and viewed it outside of the

4    courtroom?

5    A.   Yes.

6    Q.   Have you viewed it more than once?

7    A.   Yes.

8    Q.   And what -- what is depicted in Exhibit 304?

9    A.   These are BLM and National Park Service leaving the

10   direction of where Post 1 at the BLM ICP was located and

11   continuing across southbound I-15 across a median and onto

12   northbound I-15.

13   Q.   And the images that are captured there, did you capture

14   those images?

15   A.   Yes, I did.

16   Q.   How did you capture them?

17   A.   I went onto Facebook and downloaded the video.

18   Q.   And what --

19   A.   I'm sorry.  On the Facebook account for the user

20   Todd Engel and downloaded that video.

21   Q.   So you recognize this video as associated with the

22   Todd Engel Facebook?

23   A.   Yes, I do.

24   Q.   Were you able to listen to the audio portion of this

25   video?

84

1   A.   Yes, I was.

2   Q.   And did you recognize the voice on that video?

3   A.   Yes, I did.

4   Q.   And whose voice is it?

5   A.   Todd Engel.

6   Q.   How do you recognize that voice?

7   A.   I had reviewed numerous videos on his -- on Todd Engel's

8   Facebook page and compared it to the voice in this video and

9   determined that this is the voice of Todd Engel on this video.

10  Q.   And in this video -- you briefly touched upon it -- but

11  what, in general terms, does it depict?

12  A.   It depicts vehicles traveling on the northbound I-15

13  leaving the area of the BLM ICP.

14  Q.   And are those -- can you identify those vehicles or the

15  types of vehicles?

16  A.   I can identify some of them by the emblems on the side.

17  Q.   And what are those emblems?

18  A.   Including a BLM emblem and also National Park Services

19  emblems.

20  Q.   And is this the events after BLM -- as BLM was leaving the

21  ICP?

22  A.   Yes.

23  Q.   Now, does this -- does this video contain foul language?

24  A.   Yes, it does.

25  Q.   But does it relate to the vehicles leaving the -- leaving

1  the ICP?

2  A.  Yes.

3         MR. MYHRE:  Your Honor, we did not have an

4  opportunity to play this for the Court beforehand.  We don't

5  believe it's objectionable, but we would -- before we play it,

6  we would offer it at this time.

7         THE COURT:  Has 304 already been previously admitted?

8         MR. MYHRE:  No, Your Honor.  It was identified

9  previously by another witness, but this has not been previously

10  admitted.

11         THE COURT:  All right.  Any objection to the

12  admission of Exhibit 304?

13         MR. TANASI:  Hearsay, Your Honor.  Stewart.

14         MR. MARCHESE:  Parker joins.

15         THE COURT:  Mr. Leventhal?

16         MR. LEVENTHAL:  Relevancy.

17         PRO SE ENGEL:  Engel joins.

18         MR. PEREZ:  I'd join in that as well, Your Honor.

19         MR. JACKSON:  I'd join on grounds of hearsay and

20  relevance.

21         THE COURT:  Mr. Myhre, is this . . .

22         MR. MYHRE:  It's not offered for the truth of the

23  matter asserted, Your Honor.  It's offered as direct evidence

24  of Mr. Engel's intent that day with respect to his animosity

25  toward the vehicles or the individuals in the vehicles leaving

Case 2:22-cv-01040-WQH-EJY Document 19-5 Filed 11/21/22 Page 28 of 86
Case 2:16-cv-00046-GMN-PAL Document 1825 Filed 04/03/17 Page 88 of 206

86

1    the ICP.

2              THE COURT:  All right.  It will be admitted.

3              MR. JACKSON:  I object on the grounds it's more

4    probative -- or more prejudicial than probative.

5              MR. TANASI:  Stewart joins, Your Honor.

6              MR. MARCHESE:  Parker joins.

7              MR. PEREZ:  Lovelien joins in that as well,

8    Your Honor.

9              THE COURT:  All right.  The Court does not find that

10   it's . . . probative value is outweighed by any prejudicial

11   effect.  So Exhibit 304 will be admitted.

12        (Government Exhibit 304 received.)

13             MR. MYHRE:  And may we publish, Your Honor?

14             THE COURT:  Yes, you may.

15        (Video played.)

16             MR. MYHRE:  If you could stop the video there,

17   please.

18   BY MR. MYHRE:

19   Q.   Agent Willis, circling for you this area here

20   (indicating), what -- based on your investigation, what do you

21   know that area to be?

22   A.   That is a gravel turnaround median area in between the

23   northbound and southbound I-15 near Bunkerville.

24   Q.   And do you recognize the area over here (indicating) that

25   I'm circling, based on your investigation?

1   A.   Yes.

2   Q.   What is that area?

3   A.   That is the entrance to the BLM ICP, also known as Post 1.

4   Q.   And this (indicating) is what you described as the

5   northbound lane?

6   A.   Yes.

7        MR. MYHRE:  If you would continue the video, please.

8        (Video played.)

9        MR. MYHRE:  And the record should reflect that the

10  video is played.

11  BY MR. MYHRE:

12  Q.   Agent Willis, the voice associated with the foul language,

13  did you recognize that voice?

14  A.   Yes.

15  Q.   And whose voice was that?

16  A.   Todd Engel.

17  Q.   And you heard the words -- did you hear the words "we win"

18  during the course of that video?

19  A.   Yes.

20  Q.   And did you associate the voice with those words?

21  A.   Yes.

22  Q.   And belonging to who?

23  A.   Todd Engel.

24  Q.   After viewing the video, the vehicles appeared to come

25  from where?

88

1    A.    From the BLM ICP and the area of Post 1.

2    Q.    And did you recognize any of those vehicles?

3    A.    I recognized them as BLM and NPS vehicles.

4          MR. MYHRE:  If I could, Your Honor, ask that the --

5    we publish to the witness, the Court, and counsel, Exhibit 297.

6          THE COURT:  Yes, you may.

7    BY MR. MYHRE:

8    Q.    And do you have 297 in front of you?

9    A.    Yes.

10   Q.    And is this a three-page document?

11   A.    Yes, it is.

12   Q.    As with the other exhibits, is this a Facebook record,

13   business record, from the account associated with Todd Engel?

14   A.    Yes.

15   Q.    Does this reflect entries made on his Facebook page or on

16   other Facebook pages?

17   A.    Yes.

18   Q.    And is this in reverse chronological order?

19   A.    Yes, it is.

20   Q.    And do the entries contained herein relate to the events

21   of April 12, 2014?

22   A.    Yes, they do.

23         MR. MYHRE:  Your Honor, we offer Exhibit 297.

24         THE COURT:  I didn't hear you ask if this was from

25   the search warrant return, received from the search warrant

89

1    return.

2              MR. MYHRE:  Oh, I'm sorry, Your Honor.

3    BY MR. MYHRE:

4    Q.    Was this document received within the search warrant

5    return?

6    A.    Yes.

7    Q.    And it was recovered during your search of the Facebook

8    records?

9    A.    Yes, it was.

10             THE COURT:  All right.  Any objection to Exhibit 297,

11   other than what's been previously addressed?

12             MR. TANASI:  Nothing continuing -- or nothing

13   additional, Your Honor.

14             MR. MARCHESE:  No new objection.

15             MR. LEVENTHAL:  Nothing more on behalf of

16   Mr. Drexler.

17             PRO SE ENGEL:  No, Your Honor.

18             MR. PEREZ:  Nothing on behalf of Mr. Lovelien.

19             MR. JACKSON:  Nothing additional.

20             THE COURT:  All right.  Exhibit 297 will be admitted.

21        (Government Exhibit 297 received.)

22             MR. MYHRE:  Thank you, Your Honor.

23             May we publish?

24             THE COURT:  Yes, you may.

25             MR. MYHRE:  And if we could turn to Page 3 of that

90

1   document.

2   BY MR. MYHRE:

3   Q.   Of these entries, is this -- excuse me -- or the entries

4   appearing in 297, is this the earliest entry?

5   A.   Yes, it is.

6   Q.   What is the date and time, please?

7   A.   Approximately 7:58 a.m. on April 16, 2014.

8   Q.   And is that before or after the events of April 12?

9   A.   After.

10   Q.   What is the activity reflected here?

11   A.   Todd Engel shared a link.

12   Q.   And what is the message associated with that activity?

13   A.   "The Bundys are recommending everybody watch this video.

14   It will shed light on what's really happening."

15   Q.   And were you able to locate that video?

16   A.   No, I was not.

17   Q.   Turning to the entry above that, what is the activity

18   reflected there?

19   A.   That activity is dated at 8 -- approximately 8:00 a.m. on

20   April 16, 2014.  The story is "Todd Engel shared Bundy ranch's

21   photo."

22   Q.   And were you able to recover that photo?

23   A.   No, I was not.

24   Q.   What is the message associated with that photo?

25   A.   "Nice."

HEATHER K. NEWMAN, FOCR, RPR, CCR 774    (702)471-0002

1  Q.   Turning to the entry above that, what is the date and time

2  for that entry?

3  A.   The -- the date and time is 9:19 a.m. on April 19, 2014,

4  and the story is "Todd Engel likes Bundy ranch rallies and

5  support group."

6  Q.   And we've covered this before, but what does it mean to

7  "like" on Facebook?

8  A.   It -- it's a way of interacting with a post to show

9  you're -- whether or not you like it without actually posting

10  any type of text.

11  Q.   And are you able to tell what was posted that indicated a

12  "like"?

13  A.   No.

14  Q.   But was it something associated with Bundy ranch?

15  A.   Yes.

16  Q.   And what was that?

17  A.   The -- the Bundy ranch rallies and support group Facebook

18  page.

19  Q.   Now turning to Page 2 of this document, there appears to

20  be a long entry here.  Could you give us first the date and

21  time of this entry?

22  A.   Approximately 11:00 a.m. on April 20th, 2014.

23  Q.   What is the activity reflected here?

24  A.   Todd Engel updated his status.

25  Q.   And, as an updated status, where would the entry below

Case 2:22-cv-01040-WQH-EJY  Document 19-5  Filed 04/21/22  Page 34 of 86
Case 2:12-cv-00040-GMN-PAL  Document 1825  Filed 04/03/22  Page 92 of 296

92

1    this appear?

2    A.    Depending on his privacy settings -- depending on the

3    privacy settings of his Facebook page, on his timeline or wall.

4    Q.    Now, this entry is lengthy.  Does it continue to the entry

5    above the one posted here that we've just addressed?

6    A.    Yes, it does.

7    Q.    And then does it continue even beyond that up into the --

8    into the first page?

9    A.    Yes, it does.

10   Q.    So we'll take them one at a time.  So why don't we start

11   with the entry you just read of April 20th, 2014.

12   A.    Okay.

13             "Overview.

14             "I began watching the Bundy situation on Sunday, the

15   6th, and continued to monitor it the first part of the week and

16   evaluate its legality from both sides.  We decided by Tuesday

17   that the BLM was once again being heavy-handed tyrants and

18   Wednesday, when they threw a 57-year-old cancer survivor and

19   mother of 11 to the ground, then Tased and sic-ed an attack dog

20   on Ammon, that was it.  I prepped the truck on Thursday, threw

21   the gear required to live in the desert and fight a guerilla

22   war in the vehicle, and left early Friday morning.  A friend

23   came with me to help with the driving so we could make it

24   non-stop.  It was very difficult to get any real facts as to

25   what was going on on the ground and try to calculate the danger

Case 2:22-cv-01040-WQH-EJY  Document 19-5  Filed 11/21/22  Page 35 of 86
Case 2:12-cr-00040-GMN-PAL  Document 1826  Filed 04/03/17  Page 35 of 296

93

1    we were going into.  There were reports of roadblocks,

2    searches, seizure of weapons, and detainment of malitia.  We

3    drove all night and at about 1:00 a.m. I found a conference

4    call that had about 400 people on it trying to weed out facts

5    from rumor.  When we got into Mesquite, I was finally able to

6    get in contact with someone at the ranch.  His name was Kevin.

7    Thanks, Kevin.  And he let me know to get there ASAP.  We

8    pulled in at a quarter to 9:00, parked, and went to the rally

9    which started at 9:00 a.m.  Most of you know what happened at

10   the rally.  YouTube.  But I'll do a recap.  We prayed, said the

11   Pledge of Allegiance, and sang the National Anthem.  A very

12   moving -- all very moving considering the tense situation we

13   were facing.  After that, the sheriff got up on stage and said

14   the BLM would cease operations.  It wasn't good enough for the

15   crowd or Mr. Bundy and demands were placed on the sheriff by

16   Mr. Bundy and one of the demands was to disarm the BLM, put the

17   guns in the back of a pickup, and park it under the flag.  The

18   sheriff looked as though two quarts of blood had been drained

19   from his body and he walked off stage and left.  I was 15 feet

20   away from him and I'll never forget the look on his face.  We

21   waited over an hour and when the sheriff hadn't returned,

22   Mr. Bundy got . . . on the mic and looked up at the 40 or so

23   men on horseback and said, 'Get your guns, cowboys.  Let's go

24   get our cows.'"

25   Q.   Is that in quotations?

Case 2:12-cv-00040-GWF-PAL Document 1825 Filed 04/05/17 Page 36 of 86

94

1    A.   Yes, it is.

2    Q.   Continue please.

3    A.   "It was an unforgettable sight to see them riding off that

4    hill, dust rolling and flags flying.  I'll never forget it.  At

5    that point the crowd headed for their vehicles and a convoy of

6    over a hundred cars and trucks headed towards the BLM compound

7    with a lot of pissed off patriots.  After 3 miles we got on

8    I-15 northbound and headed straight at the compound.  When I

9    pulled up, I couldn't get my truck up to the confrontation so I

10   looked at my buddy and asked him, 'You got my truck?'" --

11   that's in quotations, "You got my truck?" -- "and I bailed and

12   ran down the freeway.  When I got there, it was general chaos.

13   Vehicles trying to get in to park.  Freeway completely shut

14   down.  Cops everywhere.  Planes circling overhead.  Sirens

15   blaring.  People with guns looking for a fight.  Me looking for

16   enemy positions the whole time, and a drone over us.  Chaos."

17   Q.   Does that continue onto the second page?

18   A.   Yes, it does.

19        "After about 10 minutes, six or [sic] Metro PD

20   officers came across the highway and had a talk with on [sic]

21   of the Bundy sons.  It wasn't what the crowd wanted to hear and

22   lots of people got even more angry, as if that was possible."

23   Q.   Does this message continue to the entry above this one

24   (indicating)?

25   A.   Yes, it does.

95

1    Q.   What is the date and time of that entry, please?

2    A.   That is 11:15 a.m. on April 20th, 2014.

3    Q.   And the activity associated with the entry?

4    A.   Todd Engel updated his status.

5    Q.   And does this message -- and does this message appear

6    below the story line?

7    A.   Yes.

8    Q.   If you would read that message, please.

9    A.   "We were looking at an observation post that BLM had set

10   up on a plateau about two miles distant and everyone was

11   concerned about them being snipers and I reassured them that

12   they may be snipers, but unless they had 20 millimeter canons,

13   we were safe.  It was too far for a .50 and too windy for any

14   real accuracy.  Just then someone came running up and said

15   they -- BLM -- were pointing guns at the people under the

16   bridge and 200 people ran down the middle of the freeway --

17   mind you, with guns.  Crazy to watch as I was with them -- and

18   got down there in time to see that brave or crazy reporter

19   walking towards the BLM barriers as the BLM kept yelling at him

20   to back up.  One man against an Army.  It reminded me of

21   Tiananmen Square.  Crazy, I say.  About then, the cowboys on

22   horseback and about 150 people come out from under the bridge

23   and I thought, 'Oh, S*+t.  It's getting frosty now.'  They

24   moved up to about the halfway point, the whole time the BLM

25   yelling at them to back off, that they had a lawful court order

Case 2:22-cv-01040-WQH-FJY  Document 19-5  Filed 11/21/22  Page 38 of 86
Case 2:13-cv-00040-GWH-FJY  Document 1825  Filed 04/03/17  Page 38 of 296

96

1    and that they would fire."

2    Q.   And that entry you just read you referred to ".50."  Do

3    you have an understanding what that references?

4    A.   They're referring to a .50 caliber rifle.

5    Q.   And the reference being that it was too far from what

6    area?

7    A.   From the plateau that they were observing.

8    Q.   Now, does this entry continue onto the first page at a

9    later-in-time entry?

10   A.   Yes, it does.

11   Q.   And what is that -- the time of that entry?

12   A.   11:47 a.m. on April 20th, 2014.

13   Q.   What is the activity associated with that entry?

14   A.   Todd Engel updated his status.

15   Q.   Is there a message that appears below that update?

16   A.   Yes.

17   Q.   Would you please read that message.

18   A.   "I was up on the northbound lane and had a great view of

19   the standoff.  For about an hour it was a Mexican standoff.  No

20   one moving forward and no one retreating.  Pretty tense.  As

21   this was occurring, I had my friend and another patriot

22   observing BLM gun locations with binoculars and they were able

23   to find two, both pointing their fingers in weapons at me.  The

24   gentleman that was working the other binos said I was target

25   Number 1.  So with that information I moved down the freeway to

Case 2:22-cv-01040-WQH-EJY   Document 19-5   Filed 04/31/22   Page 39 of 86
Case 2:12-cr-00040-GWF-PAL   Document 1825   Filed 04/03/17   Page 97 of 296

97

1    the south to get out of their line of fire.  I then walked up

2    to two Nevada state troopers and told them about the sniper

3    teams, gave them a description of the vehicles that they were

4    using as hides, and asked, or told, him to get those guns off

5    us.  He got on his cell phone and within a few minutes the

6    sniper teams pulled their weapons down but continued to observe

7    through binos.  A little while later a Metro PD officer pulled

8    up to us and one of the" -- "pulled up to us and one of the

9    Bundy boys and we were talking to him when I looked down into

10   the arroyo and saw the people and cowboys moving towards the

11   barricades.  This is when it almost went bad.  I saw the BLM

12   shooters move from the back of their vehicles and stack along

13   the side of one of their trucks.  At that point I began

14   screaming at the officer in his vehicle to tell them 'stand

15   down.'  I yelled the same thing to the BLM as loud as I could

16   and to the officer multiple times.  The officer got on his

17   phone and drove away quickly.  This was the moment that it

18   almost went hot.  Very tense.  Obviously the BLM backed off and

19   no shots were fired.  Thank God.  At this point the BLM backed

20   off about 40 yards and took up positions behind their vehicles

21   and continued to observe through binoculars as negotiations

22   were ongoing at the barricade/fencing.  During these

23   negotiations I had got the binos from my friend and began to

24   search for BLM gun positions.  They had vehicles off to our

25   10 o'clock but we didn't see any rifles, just" --

98

1   Q.   Does the message continue onto the second page?

2   A.   Yes.

3   Q.   Turning to the second page, does that message continue

4   from the top?

5   A.   Yes, it does.

6   Q.   Please continue reading.

7   A.   -- "agents hiding behind their engine blocks.  There was a

8   dark gray Silverado down on the left with about four guys

9   leaning all around it with binos looking at us when I noticed a

10  guy with the driver's side open and the front passenger door

11  open and I thought, it would be" -- "it would be an awkward

12  position to use binos from . . ."

13  Q.   Does that message then continue to the entry later in time

14  but above this entry?

15  A.   Yes, it does.

16  Q.   What is the date and time of that entry?

17  A.   This is approximately 11:56 a.m. on April 20th, 2014.

18  Q.   What does the status indicate?

19  A.   Todd Engel updated his status.

20  Q.   Is there a message below the status line?

21  A.   Yes, there is.

22  Q.   Would you continue reading that message.

23  A.   " . . . I continued to observe him and then he moved and I

24  could see a scoped rifle leaning over the seat, the outside

25  desert being very bright behind him and the inside of the

1   vehicle dark.  It was very evident as to what it was.  So I

2   walked back to the troopers and told to get F*-+-*g rifle off

3   of me and I described it [sic] location.  The officer

4   immediately got on his phone to the Metro officer that was

5   parked at the barricade and had him back his cruiser up to the

6   Silverado, but he went too far and we had to bring him back to

7   the right vehicle.  He rolled his passenger side window down

8   and I don't know what he said, but the BLM didn't like it.  At

9   that point they all turned around, disgusted, and walked away."

10  Q.   Does this message continue to the entry later in time but

11  above this entry?

12  A.   Yes.

13  Q.   What is the date and time of that entry?

14  A.   12 -- approximately 12:01 p.m. on April 20th, 2014.

15  Q.   What is the activity indicated?

16  A.   Todd Engel updated his status.

17  Q.   Does a message appear below that activity?

18  A.   Yes.

19  Q.   Continue reading the message, please.

20  A.   "After that, I thanked the two troopers that I had worked

21  with the last few hours and think they were more thankful to us

22  for showing up and doing what we did than anybody realizes and

23  they had actually told me that earlier.  You know the rest.  We

24  gave the BLM our favorite finger salute and off they went,

25  filming, saluting, and waving at us.  Pricks."

Case 2:22-cv-01040-WQH-EJY  Document 19-5  Filed 11/21/22  Page 42 of 86
Case 2:12-cr-00046-GMN-PAL  Document 1320  Filed 04/03/17  Page 100 of 256

100

1   Q.   And is that the final entry in Exhibit 297?

2   A.   Yes.

3           MR. MYHRE:  And, Your Honor, may we present to the

4   witness, Court, and counsel what's been marked as Exhibit 302?

5           THE COURT:  Yes, you may.

6   BY MR. MYHRE:

7   Q.   And do you have Exhibit 302 before you?

8   A.   Yes, I do.

9   Q.   Is this a one-page document?

10  A.   Yes, it is.

11  Q.   Is this a Facebook business record pertaining to the

12  account of Todd -- Facebook account of Todd Engel?

13  A.   Yes.

14  Q.   Was this obtained pursuant to the search warrant you

15  served on Facebook?

16  A.   Yes.

17  Q.   And was this a document recovered during the search of

18  that Facebook return?

19  A.   Yes, it was.

20  Q.   And do the entries here relate to the events of April 12,

21  2014?

22  A.   Yes, they do.

23          MR. MYHRE:  Your Honor, we'd offer Exhibit 302.

24          THE COURT:  Any other objection to Exhibit 302 other

25  than what's already been addressed by the Court?

Case 2:22-cv-01040-WQH-EJY  Document 19-5  Filed 11/21/22  Page 43 of 86
Case 2:22-cv-00046-GMN-PAL  Document 1320-5  Filed 11/03/22  Page 43 of 86

101

1            MR. TANASI:  Nothing additional Stewart, Your Honor.

2            MR. MARCHESE:  No, Your Honor.

3            MR. LEVENTHAL:  Nothing further, Your Honor.  Thank

4    you.

5            PRO SE ENGEL:  No, Your Honor.

6            MR. PEREZ:  No, Your Honor.

7            MR. JACKSON:  Same objections as before.

8            THE COURT:  All right.  Exhibit 302 will be admitted.

9        (Government Exhibit 302 received.)

10           MR. MYHRE:  And may we publish, Your Honor?

11           THE COURT:  Yes, you may.

12   BY MR. MYHRE:

13   Q.   And, Agent Willis, this record that we now have that the

14   jury is now seeing, is this different than the other documents

15   we looked at?

16   A.   Yes, it is.

17   Q.   And how is this -- does this differ?

18   A.   Well, it's organized a little bit differently and that's

19   because this is from the activity log record from the Facebook

20   search warrant return from Facebook.

21   Q.   And are there entries that are reflected in the activity

22   log that are not necessarily reflected in the mini-feed?

23   A.   Yes.

24   Q.   Is -- are we seeing entries here that did not appear in

25   the mini-feed?

1    A.   Yes.

2    Q.   And does this document proceed in reverse chronological

3    order or chronological order?

4    A.   Reverse chronological order.

5    Q.   So, going to the earliest entry, is that the bottom entry

6    of 4-11-2014?

7    A.   Yes, it is.

8    Q.   So we just finished entries.  Now we're moving sort of

9    back in time, if you will?

10   A.   Yes.

11   Q.   What is the time of the 4-11 entry?

12   A.   This would be at approximately 7:42 p.m. on April 10th,

13   2014.

14   Q.   So this would have appeared on the Facebook page on April

15   the 10th?

16   A.   Yes.

17   Q.   What type of activity is reflected here?

18   A.   It's comments.

19   Q.   Is there anything particular the comment -- the comment is

20   being made to?

21   A.   Yes.  Todd Engel commented on a photo.

22           "I'll be on scene Saturday morning.  Will post sit

23   rep (CHECK THIS) ASAP.  We need prayer and support, be it

24   material or financial.  God speed.  Molon labe."

25   Q.   Could you spell those last two words, please.

103

1   A.   M-o-l-o-n and the second word is l-a-b-e.

2   Q.   Do you have an understanding of what that means?

3   A.   It's a Greek --

4           MR. JACKSON:  Objection.  Calls for a conclusion.

5           MR. MYHRE:  Just -- if I may just lay further

6   foundation.

7           THE COURT:  Go ahead.

8   BY MR. MYHRE:

9   Q.   Just based on your investigation and training and

10  experience, is there any particular significance attached to

11  those words?

12  A.   Yes.  It means "come and take" or "come and take them."

13  It has to do with . . . gun rights and the -- your Second

14  Amendment right to possess firearms.

15  Q.   Now, with respect to the photo, do you have a -- were you

16  able to obtain the photo that's being commented upon?

17  A.   No, I did not.

18  Q.   You read, "I'll be on the scene Saturday morning."  What

19  day of the week did April 12 occur on?

20  A.   Saturday.

21  Q.   Did you have -- from your investigation, do you have

22  knowledge of where Mr. Engel was residing at or around the time

23  of this post?

24  A.   He either traveled to Bunkerville from Idaho or Montana.

25  Q.   Why do you say either-or?

Case 2:22-cv-01040-WQH-EJY Document 19-5 Filed 11/21/22 Page 46 of 86
Case 2:162-cr-00046-GMN-PAL Document 1320 Filed 04/03/17 Page 104 of 256

104

1  A.   Because his -- we do have records of him claiming to

2  reside in Montana, but his DMV records, everything else that we

3  have has him as a Idaho resident, including where he claims his

4  cabin was located on his Facebook page.

5  Q.   On the second line of the entry, you read "ASAP."  What's

6  your understanding of what that stands for?

7  A.   "As soon as possible."

8  Q.   Now, is there an entry above that that appears later in

9  time?

10  A.   Yes.

11  Q.   When was this entry made?

12  A.   At approximately 7:50 a.m. on April 11, 2014.

13  Q.   What type of activity is reflected here?

14  A.   It's comments.

15  Q.   Who is the author of the comment?

16  A.   Todd Engel.  Todd Engel who commented on a photo.

17  Q.   And what is the comment?

18  A.   "I'm 20 miles from Ruby Ridge.  Truck loaded and heading

19  to Nevada.  Pray for peace.  Prepare for war."

20  Q.   Is there an entry that occurs later in time above that?

21  A.   Yes.

22  Q.   What is the time of that entry?

23  A.   At approximately 4:02 p.m. on April 11th, 2014.

24  Q.   What type of activity is reflected?

25  A.   It's a comment where Todd Engel is commenting on a link.

Case 2:22-cv-01040-WQH-EJY Document 19-5 Filed 11/21/22 Page 47 of 86
Case 2:16-cr-00046-GMN-PAL Document 1326 Filed 04/03/17 Page 105 of 256

105

1    Q.   Do you have that link or were you able to obtain that link

2    in the course of your investigation?

3    A.   No, I was not.

4    Q.   How is the comment reflected there?

5    A.   "Cell towers might have been taken off line."

6    Q.   I'm sorry.  I asked a bad question.

7         Is there a little quotation surrounding the comment?

8    A.   Yes, there is.

9    Q.   Who would be the author of that comment?

10   A.   Todd Engel.

11   Q.   Okay.  If you could read the comment again, please.

12   A.   "Cell towers might have been taken off line."

13        MR. JACKSON:  I'm going to object to the relevance of

14   the comment and ask that it be stricken.  We don't even have

15   the link to connect the two.  It's speculation as to what the

16   comment means.

17        MR. MYHRE:  I haven't asked him --

18        THE COURT:  Not offered for the truth of the matter

19   asserted; right?

20        MR. MYHRE:  This particular one?

21        THE COURT:  Yeah.

22        MR. MYHRE:  Your Honor, this is all offered under

23   801(d)(2)(E).  He's commenting during his trip --

24        MR. JACKSON:  Well, I'm objecting to Mr. Myhre

25   testifying at this time.  Right now this --

1          THE COURT:  He's not testifying.  He's responding to

2   your objection.

3          MR. JACKSON:  Well . . .

4          MR. MYHRE:  Again, Your Honor, these are offered

5   under 801(d)(2)(E).  He's documenting -- we believe, that the

6   context of this shows that he's documenting his travel.

7          THE COURT:  That's right.  Objection overruled.

8   BY MR. MYHRE:

9   Q.   And is there an entry that appears later in time but above

10  that entry?

11  A.   Yes.

12  Q.   When is that entry made?

13  A.   At approximately 4:07 p.m. on April 11, 2014.

14  Q.   What type of activity is reflected?

15  A.   It's a comment.  Comments.

16  Q.   Is the comment reflected in this entry?

17  A.   Yes.

18  Q.   And what is the -- first of all, what does the comment

19  relate to?

20  A.   It's Todd Engel commented on a post.

21  Q.   And what is the comment?

22  A.   In single quotation marks it is, I'll be boots on the

23  ground at 4:00 a.m.

24  Q.   Do you have a general understanding of what the term

25  "boots on the ground" means?

Case 2:22-cv-01040-WQH-EJY  Document 19-5  Filed 11/21/22  Page 49 of 86
Case 2:18-cr-00046-GMN-PAL  Document 1326  Filed 11/03/17  Page 49 of 86

107

1    A.    Yes.

2    Q.    What does that mean?

3           MR. LEVENTHAL:  Objection.  Hearsay.

4           MR. TANASI:  Stewart joins.

5           MR. MARCHESE:  Parker joins.

6           PRO SE ENGEL:  Engel joins.

7           MR. PEREZ:  Lovelien joins.

8           MR. JACKSON:  Objection.  It's the kind of comment

9    the jury can determine what it means.  We don't need his

10   opinion on what it means.  It calls for opinion testimony.  The

11   words speak for themselves.

12          MR. MYHRE:  Just asking the witness based on his

13   training and experience and his investigation if that has

14   meaning in this context.

15          THE COURT:  Objection overruled.  He may answer the

16   question.

17   BY MR. MYHRE:

18   Q.    Based on your training and experience and your

19   investigation, do you ascribe a certain meaning to those words,

20   "boots on the ground"?

21   A.    Yes.

22          MR. LEVENTHAL:  Objection.  Foundation.

23          THE COURT:  Mr. Myhre?

24          MR. MYHRE:  Well, Your Honor, we're laying the

25   foundation for his understanding of those words, based on his

Case 2:22-cv-01040-WQH-EJY Document 19-5 Filed 11/21/22 Page 50 of 86
Case 2:22-cv-00046-GMN-PAL Document 132-5 Filed 11/03/22 Page 109 of 206

108

1  training and experience, and his knowledge of the

2  investigation.

3          THE COURT:  All right.

4          MR. LEVENTHAL:  Your Honor, foundationally, I don't

5  know where he's learning this from and that's --

6          THE COURT:  Right.  That's the objection, is what

7  is --

8          MR. LEVENTHAL:  -- the foundation part of it.  We're

9  getting right to the statement.

10          THE COURT:  Right.  I understand you're saying it's

11  training and experience, but what training, what experience

12  leads him to believe he knows what "boots on the ground" means?

13  BY MR. MYHRE:

14  Q.   Have you seen these words in other contexts?

15  A.   Yes.

16  Q.   And in what contexts have you seen words like this or

17  these words, "boots on the ground"?

18  A.   During the course of my FBI tactical training that I've

19  received over the years.

20  Q.   And what type of training -- it was tactical training.

21  Give us just a general sense of what that involved.

22  A.   That would be use of firearms, training with firearms,

23  training to effect arrests, search warrants, also to be ready

24  to respond as a team if -- if we were called upon on short

25  notice to respond to a location.

1    Q.   So, in your training as well as in your experience as an

2    agent, have you used -- have you heard the term "boots on the

3    ground" used?

4    A.   Yes, I have.

5    Q.   In what context?

6    A.   On a -- a -- I was on a hazardous materials response team

7    that was a tactical team in Newark, New Jersey, and we would be

8    on --

9    Q.   But that's -- that's fine.

10   A.   -- call-out notice.

11          MR. LEVENTHAL:  Then I'm going to object as to

12   relevance.  Relevance as to -- and same objection as to

13   foundation, as well as hearsay.  But what his training and

14   experience in Newark, New Jersey, has to do with this -- means,

15   this sentence means to him has no bearing nor should it come

16   in.

17          MR. TANASI:  Stewart joins.

18          THE COURT:  That's argument.  That's not about the

19   admissibility and he's laid a foundation for which tactical

20   training he's received with the FBI to cause him to believe he

21   understands the term "boots on the ground" and he's heard it

22   before and what it means to him.  So he can answer the

23   question.

24          Objection overruled.

25          MR. MYHRE:  Thank you, Your Honor.

1    BY MR. MYHRE:

2    Q.   So what does the term "boots on the ground" mean?

3    A.   In general, it means troops or a team arriving at a

4    location at a certain time.

5    Q.   Is there an entry above that . . . is there an entry that

6    appears later in time -- excuse me -- that occurs later in time

7    but that is above that entry?

8    A.   Yes.

9    Q.   And is the date and time reflected on another exhibit?

10   A.   Yes, it is.

11             MR. MYHRE:  And, Your Honor, may we publish just to

12   the Court, the witness, and counsel Exhibit 300 -- what's been

13   marked as Exhibit -- Government's Exhibit 300?

14             THE COURT:  Yes, you may.

15   BY MR. MYHRE:

16   Q.   And, Agent Willis, do you have 300 in front of you.

17   A.   Yes, I do.

18   Q.   And is this a four-page -- excuse me -- five-page

19   document?

20   A.   Yes, it is.

21   Q.   Does this document contain business records -- Facebook

22   business records for the account associated with Todd Engel

23   from Pages 436 to 440?

24   A.   Yes.

25   Q.   In general terms, do these reflect Facebook entries?

1    A.    Yes.

2    Q.    Were these documents obtained during and in the course of

3    executing a search warrant on the business -- excuse me -- the

4    Facebook account of Todd Engel?

5    A.    Yes.

6    Q.    And was this one of the documents obtained during the

7    course of the search?

8    A.    Yes.

9    Q.    And do the entries herein pertain to the events of April

10   12, 2014?

11   A.    Yes.

12              MR. MYHRE:  Your Honor, we offer Exhibit 300.

13              THE COURT:  Any objection to Exhibit 300 other than

14   what's already been addressed?

15              MR. TANASI:  Nothing additional Stewart, Your Honor.

16              MR. MARCHESE:  Same objections, Your Honor.

17              MR. LEVENTHAL:  Nothing further, Your Honor.

18              PRO SE ENGEL:  Nothing further.

19              MR. PEREZ:  Nothing further, Your Honor.

20              MR. JACKSON:  No additional objections.

21              THE COURT:  All right.  Objection [sic] 300 will be

22   admitted.

23         (Government Exhibit 300 received.

24              THE COURT:  Do you want to publish it?

25              MR. MYHRE:  Yes, Your Honor.  Thank you.

112

BY MR. MYHRE:

Q.   Turning to the last page of Exhibit 300, do you see a --
an entry at the very bottom of that page, Agent Willis?

A.   Yes, I do.

Q.   What is the date and time of that entry?

A.   It's at approximately 4:49 p.m. on April 11, 2014.

Q.   And is that the date and time that was reflected in the
entry of Exhibit 302?

A.   Yes.

         MR. MYHRE:  So if we may, Your Honor, turn back to
302 and we'll cover that comment.

         THE COURT:  Just a minute.  What was the date that
you said?  I don't think the date you said and the date I saw
were the same, but I may have misunderstood.

         MR. MYHRE:  Sure.  The -- going back to --

         THE COURT:  I thought he said April 14th, but I saw
April 11th.

         THE WITNESS:  I -- I might have said that.

BY MR. MYHRE:

Q.   Well, what is the date, the date and time reflected there?

A.   The correct date and time is 4 -- approximately 4:49 p.m.
on April 11th, 2014.

         THE COURT:  Okay.  Thank you.

BY MR. MYHRE:

Q.   Now turning to Exhibit 302, does that date and time that

113

1    you've just read correspond to this comment at the very top of

2    Page 302?

3    A.   Yes, it does.

4    Q.   What type of activity is reflected there?

5    A.   Comments.

6    Q.   Does it reflect what is being commented upon?

7    A.   Yes.  Todd Engel commented on a post.

8    Q.   Is there -- is the comment depicted within quotations?

9    A.   Yes.

10   Q.   According to the Facebook account, who would have made

11   this comment?

12   A.   Todd Engel.

13   Q.   Could you please read it.

14   A.   "500 of my thousand mile drive completed.  ETA 4:00 a.m."

15   Q.   Do you have an understanding of what "ETA" stands for?

16   A.   Yes.

17   Q.   What does it stand for?

18   A.   "Estimated time of arrival."

19   Q.   Okay.  Now to -- back to Exhibit 300.  Moving up from that

20   bottom entry, what is the next entry in time?

21   A.   That would be approximately 6:37 p.m. on April 11th, 2014.

22   Q.   What is the activity reflected?

23   A.   Comments.

24   Q.   Is the comment delineated or -- excuse me -- depicted in

25   quotations?

Case 2:22-cv-01040-WQH-EJY Document 19-5 Filed 11/21/22 Page 56 of 86
Case 2:12-cr-00046-GMN-PAL Document 1320 Filed 04/03/17 Page 132 of 256

114

1    A.   Yes.

2    Q.   And what is the comment -- how does the comment read?

3    A.   Todd Engel commented on a link in quotations.  "ETA

4    4:00 a.m."

5    Q.   Is there another entry later in time above that?

6    A.   Yes.

7    Q.   What is the date and time of that entry?

8    A.   That is approximately 7:16 p.m. on April 11th, 2014.

9    Q.   The activity that's indicated?

10   A.   It is comments.

11   Q.   And is there -- does it indicate what's being commented

12   upon?

13   A.   Yes.  Todd Engel commented on a post.

14   Q.   And please read the comment.

15   A.   In single quotations, it is, 'I'll be rolling in around

16   4:00 a.m.  What do you recommend?'

17   Q.   And is there an entry above that?

18   A.   Yes.

19   Q.   What is the time of that?

20   A.   That is at approximately 7:29 p.m. on April 11th, 2014.

21   Q.   Is this also a comment?

22   A.   Yes.

23   Q.   Is this a comment made by the account holder?

24   A.   Yes.

25   Q.   How does the comment read?

1   A.   Todd Engel commented on a post.  In single quotations, 'I

2   need to know where they are.'

3   Q.   Were you able to ascertain the post that's being commented

4   upon?

5   A.   No, I was not.

6   Q.   Going to Page 4 of the document, indicated as Page 439.

7   At the very bottom of that page, is there a later-in-time entry

8   reflected there?

9   A.   Yes.

10  Q.   Is this also a comment?

11  A.   Yes, it is.

12  Q.   The time of this one?

13  A.   This would be approximately 7:34 p.m. on April 11th, 2014.

14  Q.   Is this a comment on a post?

15  A.   Yes, it is.

16  Q.   What does the comment read?

17  A.   "Directions?"

18  Q.   Is there any punctuation after that?

19  A.   Directions, question mark.

20  Q.   And the entry above that, does that occur later in time?

21  A.   Yes.

22  Q.   Is that also a comment to a post?

23  A.   Yes, it is.

24  Q.   Approximately what time, local Nevada?

25  A.   At approximately 8:13 p.m. on April 11, 2014.

Case 2:22-cv-01040-WQH-EJY Document 19-5 Filed 11/21/22 Page 58 of 86
Case 2:16-cr-00046-GMN-PAL Document 1326 Filed 04/03/17 Page 58 of 86

116

1   Q.   Is the comment indicated in quotation?

2   A.   Yes, it is.

3   Q.   Could you read the comment, please.

4   A.   "So this is confirmed?  What road/location are the

5   roadblocks?"

6   Q.   Moving above that entry, we see an entry for a "like"; is

7   that correct?

8   A.   Yes, that is.

9   Q.   And what is indicated as being liked?

10  A.   Todd Engel likes Bundy ranch.

11  Q.   Moving above that activity, is there a comment reflected

12  on the 12th of April -- excuse me -- on the 11th of April,

13  2014, above that one?

14  A.   Yes.

15  Q.   What is the approximate time of that entry?

16  A.   The approximate time would be 9:56 p.m. on April 11, 2014.

17  Q.   Is this also a comment?

18  A.   Yes, it is.

19  Q.   And it's commenting on a status?

20  A.   Yes.

21  Q.   The comments are indicated in quotations?

22  A.   Yes.

23  Q.   Please read the comment.

24  A.   "Are there fed roadblocks?  I'll be there in five hours.

25  I won't take lightly to an illegal search.  Please advise."

Case 2:22-cv-01040-WQH-EJY Document 19-5 Filed 11/21/22 Page 59 of 86
Case 2:16-cr-00046-GMN-PAL Document 1326 Filed 04/03/17 Page 59 of 86

117

1  Q.   Based on your investigation, do you know what he's
2  commenting upon here?
3  A.   He's commenting on rumors that the BLM or another law
4  enforcement agency had set up roadblocks somewhere in between
5  wherever he was traveling from and the Bundy ranch.
6  Q.   In the course of your investigation, did you find evidence
7  of any roadblocks?
8  A.   No.
9  Q.   Moving later in time but above that entry, what is the
10 next entry reflected?
11 A.   It -- Todd Engel commented on a status.
12 Q.   And is that status also delineated in quotation marks?
13 A.   Yes.
14 Q.   What is the approximate time of that comment?
15 A.   At approximately 8:07 -- I'm sorry.  6:07 a.m. on April
16 12, 2014.
17 Q.   And what is the comment?
18 A.   "Stephanie, we're going to need supplies to live in the
19 desert, i.e., water, outhouses, fuel, batteries for continuous
20 night vision use.  And the list goes on and on.  Oath Keepers
21 are asking for financial assistance and we're going to need it
22 also.  Thank you."
23 Q.   During the course of your investigation, did you adduce
24 any evidence of indicia of Oath Keepers at the -- either at the
25 rally site or at the area of the wash?

1    A.    Yes.

2    Q.    Turning to the rally site, what type of indicia of Oath

3    Keeper presence were you able to ascertain?

4    A.    There were banners up --

5          MR. JACKSON:  Objection.  Irrelevant as to my client,

6    Burleson.

7          MR. MYHRE:  It's just referencing, Your Honor, the

8    term "Oath Keepers" within the comment itself and showing the

9    relevance and the connection to the events of April 12th.

10         THE COURT:  I'm not sure what you're saying.  The

11   relevance is . . .

12         MR. MYHRE:  Whether there was an Oath Keeper indicia

13   or presence at the events of April 12, specifically the rally.

14         THE COURT:  So it goes to the veracity of the

15   statements?

16         MR. MYHRE:  It goes to the veracity statement.

17   Corroborates the statements.

18         THE COURT:  All right.  Objection overruled.

19   BY MR. MYHRE:

20   Q.    Were there any indicia of Oath Keepers at the rally

21   site -- excuse me -- at the stage area on April 12, 2014?

22   A.    Yes.

23   Q.    What were those indicia?

24   A.    Banners.

25   Q.    Turning to the next comment -- later in time but above

Case 2:22-cv-01040-WQH-EJY   Document 19-5   Filed 11/21/22   Page 61 of 86
Case 2:16-cr-00046-GMN-PAL   Document 3326   Filed 04/03/17   Page 119 of 206

119

1  that one -- is this a comment on a photo?

2  A.   Yes.

3  Q.   Is this a comment by the account holder?

4  A.   Yes.

5  Q.   What's the approximate date and time of this entry?

6  A.   This is made at approximately 6:29 a.m. on April 12, 2014.

7  Q.   And what is the comment?

8  A.   "Facts.  Air space closed.  Cell towers working.  Malitia

9  mobilizing peacefully.  No guard units mobilizing.  9:00 a.m.

10 meeting with sheriff and Cliven."

11 Q.   And, during the course of your investigation, was there a

12 meeting with Cliven Bundy and the sheriff of Clark County?

13 A.   Yes.

14 Q.   And when did that occur, approximately?

15 A.   Approximately 9:00 a.m.

16 Q.   Turning to the next entry on the previous page, which

17 would be Page 3 of this exhibit, starting at the bottom, is

18 this a comment later in time from the previous one?

19 A.   Yes.

20 Q.   Approximately what time?

21 A.   Approximately 1:53 -- I'm sorry.  Excuse me.

22 Approximately 11:53 a.m. on April 12, 2014.

23 Q.   Is this before or after Cliven Bundy's speech on the stage

24 to tell people to get their cattle -- to get his cattle?

25 A.   After.

Case 2:22-cv-01040-WQH-EJY   Document 19-5   Filed 11/21/22   Page 62 of 86
Case 2:18-cr-00046-GMN-PAL   Document 3326   Filed 04/03/17   Page 120 of 86

120

1    Q.   What is the comment?

2    A.   "BLM has backed down.  Cowboys are retrieving cattle from

3    BLM compound.  I'm on location."

4    Q.   Is there a comment following that one later in time in the

5    entry above it?

6    A.   Yes.

7    Q.   What is the approximate time for this entry?

8    A.   And I'm also going to have to correct my last time.  The

9    last comment was made at 1:53 p.m. on April 12, 2014.  This

10   one -- this following comment above that one was made 31

11   seconds afterwards, again, on April 12, 2014.  "Very, very

12   tense for about a half an hour."

13   Q.   So this comment and the one below it refer to -- strike

14   that.

15            When were the -- when did BLM evacuate the ICP again?

16   A.   Approximately 2:00 p.m.

17   Q.   And approximately what time did they back away from the

18   Post 2 gate area?

19   A.   Between 1:30, 1:45 p.m.

20   Q.   Or about 12:00 -- 12:40?

21   A.   Yeah.  I'm sorry.  Not 1 -- 1:30, 1:45; 12:30, 12:45.

22   That time frame.

23   Q.   When it was backed away?

24   A.   Yes.

25   Q.   And there was the interval between 12:40 and approximately

1   2 o'clock?

2   A.   Yes.

3   Q.   What was occurring?

4   A.   The BLM were hooking up trailers, packing up what they

5   could, and preparing to de-mobilize out of the Bunkerville ICP

6   area.

7   Q.   Is there another entry later in time above that one?

8   A.   Yes.

9   Q.   Approximately what time?

10   A.   At 1 -- approximately 1:54 p.m. on April 12, 2014.

11   Q.   And what is the comment?

12   A.   "Snipers pointing guns at us.  Drones, chopper, BLM SWAT

13   team.  We win!"

14   Q.   And is "we win" written in all capital letters?

15   A.   Yes.

16   Q.   And is there a punctuation mark after that?

17   A.   Yes, there is.

18   Q.   What is it?

19   A.   Exclamation mark.

20   Q.   And, turning to the comment above that, is that -- does

21   that occur later in time?

22   A.   Yes, it does.

23   Q.   By about three minutes?

24   A.   Yes.

25   Q.   What is that comment?

122

1   A.   "I-15 is a disaster."

2   Q.   And, turning to the second page of the document, is there

3   a comment there that occurs about a day later?

4   A.   Yes.

5   Q.   And approximately what time?

6   A.   At approximately 1:58 p.m. on April 13, 2014.

7   Q.   What does this comment relate to?

8   A.   Todd Engel commented on a photo.

9   Q.   Have you been able to ascertain or collect that photo in

10  the course of your investigation?

11  A.   No.

12  Q.   Is a comment indicated in quotation marks?

13  A.   Yes.

14  Q.   Would you read this comment, please.

15  A.   "We're not backing down.  We're currently looking for

16  BLM's new location to see if they're staging to return.

17  Malitia arriving hourly from all over the country."

18  Q.   Would this comment have been written at a point after the

19  time that the BLM had left the ICP?

20  A.   Yes.

21  Q.   Is there a comment above that that occurs about half an

22  hour later in time?

23  A.   Yes.

24  Q.   Is that comment made by Todd Engel?

25  A.   Yes.

123

1   Q.   What does this comment relate to?  Does it relate to a

2   post?

3   A.   Yes.  Todd Engel commented on a post.

4   Q.   And this would have been a post on someone else's Facebook

5   page or on his Facebook page?

6   A.   On someone else's Facebook page.

7   Q.   What is the comment?

8   A.   "We are still here and adding to our numbers hourly.  They

9   better rethink their acts of aggression as we will continue to

10  respond in larger numbers."

11  Q.   Were you able to ascertain on what Facebook page this

12  comment appeared?

13  A.   No.

14  Q.   Is there a comment above that entry later in time?

15  A.   Yes.

16  Q.   What is the time for this entry?

17  A.   This would have been at approximately 8:37 on April 13,

18  2014.

19  Q.   Is this also a comment on a post?

20  A.   Yes.

21  Q.   Is the comment indicated in quotation marks?

22  A.   Yes.

23  Q.   Is that associated with -- and is this a comment made by

24  Todd Engel?

25  A.   Yes, it is.

124

1   Q.   Please read that comment.

2   A.   "I left about an hour ago.  20 malitia on site and 50

3   others, including news crews.  It's over!  We won!"

4   Q.   And is there punctuation situation following "it's over!

5   We won!"?

6   A.   Yes.  Both have exclamation marks after them.

7   Q.   Now, is there a comment and a photo posted later in time

8   to this entry that we've just read?

9   A.   Yes.

10  Q.   And is it about roughly 10 hours later?

11  A.   Yes.

12  Q.   Is the comment indicated in quotations?

13  A.   Yes, it is.

14  Q.   And is this a comment to a photo?

15  A.   Yes, it is.

16  Q.   Have you been able to ascertain that photo during the

17  course of your investigation?

18  A.   No, I have not.

19  Q.   What does this comment read?  Or how does this comment

20  read?  Excuse me.

21  A.   "What you don't see is there was another 150 of us with

22  guns behind those cowboys."

23  Q.   Moving to the next entry above that, does that occur later

24  in time to the entry you just read?

25  A.   Yes, it does.

125

1    Q.   And approximately what time was this entry made?

2    A.   Approximately 6:17 p.m. on April 14, 2014.

3    Q.   Is this a comment on a link?

4    A.   Yes, it is.

5    Q.   Were you able to find the link during the course of your

6    investigation?

7    A.   No, I did not.

8    Q.   Is the comment indicated in quotations?

9    A.   Yes, it is.

10   Q.   Would you please read the comment.

11   A.   "I have not received a call or a text from the Bundys

12   stating anything other than it's calm and quiet.  Metro PD is

13   patrolling and says there is no threat currently."

14   Q.   Turning to Page 1 of the document at the bottom, is there

15   a -- an entry reflected here that occurs later in time to the

16   one we just read?

17   A.   Yes.

18   Q.   And is that approximately 30 minutes or so later in time?

19   A.   Yes.

20   Q.   Is this also a comment?

21   A.   Yes.

22   Q.   Is it a comment on a status?

23   A.   Yes.

24   Q.   Is that a status on his Facebook page or someone else's?

25   Or can you tell?

Case 2:22-cv-01040-WQH-EJY Document 19-5 Filed 11/21/22 Page 68 of 86
Case 2:12-cr-00046-GMN-PAL Document 1326 Filed 01/03/17 Page 126 of 256

126

1   A.   I cannot tell.

2   Q.   Can you tell whether this -- the comment that's indicated

3   in quotations is attributable to the account holder for this

4   Facebook account?

5   A.   Yes.

6   Q.   What does that comment read -- or how does that comment

7   read?

8   A.   "Everybody please stop with the rumors.  At this time

9   there is no threat.  Two hours ago I talked to Metro PD and

10  they said" -- "said" -- sorry -- "and they stated there was no

11  threat and there was not one BLM law enforcement official in

12  the state of Nevada.  They are nervous about even getting the

13  equipment out of their compound.  Please stop rumors.  There is

14  no threat at this time.  If the threat escalates, I will let

15  you know.  I will receive texts and e-mails stating the threat

16  level is rising.  I will let you know at that time.  All is

17  calm here."

18  Q.   Based on your investigation and based on the context, do

19  you have an understanding from this comment what is being

20  referred to by "threat level"?

21  A.   The fear that the BLM would return --

22          MR. LEVENTHAL:  Objection.  Hearsay.  Foundation.

23          MR. MARCHESE:  Parker joins.

24          THE COURT:  Mr. Myhre?

25          MR. MYHRE:  Just in general terms, Your Honor, what

Case 2:22-cv-01040-WQH-EJY Document 19-5 Filed 11/21/22 Page 69 of 86
Case 2:22-cv-00046-GMN-PAL Document 1320 Filed 11/03/22 Page 129 of 166

127

1    the agent's understanding of this term "threat level" means in

2    the context of this post.

3              MR. LEVENTHAL:  Still foundation.

4              MR. MYHRE:  His understanding.

5              THE COURT:  But his understanding based on what?

6              MR. MYHRE:  Based on his investigation of this case.

7              THE COURT:  Did he see this term used somewhere else?

8    BY MR. MYHRE:

9    Q.    Have you seen this term used elsewhere in other contexts?

10   A.    Yes.

11   Q.    And would those be contexts where other Facebook users are

12   commenting?

13   A.    Yes.

14   Q.    Based on your investigation, was there a time when there

15   was discussion among Facebook users about the potential for BLM

16   coming back to the area?

17             MR. JACKSON:  I'm going to object.

18             MR. LEVENTHAL:  Leading.

19             MR. JACKSON:  It calls for hearsay.

20             MR. LEVENTHAL:  Object.  Leading.

21             MR. JACKSON:  We don't know who the other Facebook

22   users are.  He's soliciting hearsay to bring in irrelevant

23   information that has no bearing on this case.  It's --

24             THE COURT:  If you object on foundation --

25             MR. JACKSON:  Yes.

1          THE COURT:  -- he has the right to ask foundational

2    questions.  So objection overruled.  He can answer the

3    question.

4          MR. JACKSON:  I object on relevance as well.

5          MR. PEREZ:  And speculation, Your Honor.

6          THE COURT:  Well, the relevance is to how he knows

7    what "threat level" means or why he thinks that he knows what

8    "threat level" refers to.

9          He can answer the question.  You might have to

10   restate it now.

11         MR. MYHRE:  Thank -- thank you, Your Honor.

12   BY MR. MYHRE:

13   Q.   Based on your investigation, did you review Facebook

14   postings that were publicly available?

15   A.   Yes.

16   Q.   And did you review -- you reviewed Facebook postings that

17   related to the events of April 12, 2014?

18   A.   Yes.

19   Q.   In those postings that you read, was there mention made of

20   BLM perhaps returning to that area?

21   A.   Yes.

22         MR. LEVENTHAL:  Objection.  Hearsay.

23         MR. MYHRE:  Just in general terms, Your Honor.

24         THE COURT:  Overruled.  He can answer the question.

25         THE WITNESS:  Yes.

Case 2:22-cv-01040-WQH-EJY Document 19-5 Filed 11/21/22 Page 71 of 86
Case 2:16-cr-00046-GMN-PAL Document 1320 Filed 04/03/17 Page 129 of 256

129

BY MR. MYHRE:

Q.   What was the concern?

A.   That the BLM would return to . . . retrieve the cattle and the rest of their equipment and possibly attack the area of Bunkerville.

Q.   Was that area referred to in the chatter that you reviewed within Facebook as a "threat"?

A.   Yes.

Q.   Was there ever reference made to a "threat level"?

A.   Yes.

Q.   And in these -- in these contexts, the Facebook postings that you reviewed, what did "threat level" refer to?

A.   The level of fear or . . . the likelihood that the BLM would return to the Bunkerville area.

Q.   There is an entry on Page 1 above the entry we just read; is that correct?

A.   Yes.

Q.   Does that occur later in time?

A.   Yes.

Q.   Later in time than the previous one we've just read?

A.   Yes.

Q.   And what is the approximate date and time?

A.   At approximately 9:13 a.m. on April 15, 2014.

Q.   Is this a comment?

A.   Yes.

1   Q.   Is -- is this a comment pertaining to a link?

2   A.   Yes.

3   Q.   During the course of your investigation, were you able to

4   adduce the link?

5   A.   No, I was not.

6   Q.   Is the comment, however, reflected in quotations?

7   A.   Yes, it is.

8   Q.   Is it associated with the account holder?

9   A.   Yes.

10  Q.   Would you please read the comment.

11          MR. JACKSON:  I'm going to object to the comment at

12  this time.  The link, I think, has no relevance to the facts of

13  this case.  Mr. Engel's comment has no relevance to my client

14  and I'd object to it.  Commenting on a link is a First

15  Amendment right, but it has nothing to do with my client.  And

16  I would object and urge the Court to -- that it's more

17  prejudicial than probative as to my client, whatever Mr. Engel

18  might have said commenting on a link on Facebook made by

19  someone else.

20          THE COURT:  Okay.  This is a 801(d)(2)(E)?

21          MR. MYHRE:  Yes, Your Honor, 801(d)(2)(E).

22          THE COURT:  All right.  Objection overruled on that

23  basis.  Not overly prejudicial.  Probative effect -- value is

24  higher.

25          MR. MYHRE:  May he read the link, Your Honor?

Case 2:22-cv-01040-WQH-EJY Document 19-5 Filed 11/21/22 Page 73 of 86
Case 2:22-cr-00046-GMN-PAL Document 1326 Filed 04/03/22 Page 131 of 256

131

1          THE COURT:  Yes.

2          MR. MYHRE:  Or -- excuse me -- the comment?

3    BY MR. MYHRE:

4    Q.   Please read the comment indicated.

5    A.   "Thank you" -- "Thank you, Mark, for the link to that

6    article.  It is well written, thought out, and concise.  I was

7    there for the entire event as it unfolded and enjoyed watching

8    our Leviathan back down from an armed citizenry.  It's a shame

9    that has come to that as it was a shame that it came to that in

10   Concord and Lexington.  No one desires bloodshed but if there

11   is to be bloodshed, let it be on our watch and not our

12   children's.  It's so sad that the ballot box and the soap box

13   have failed us and now we have to resort to the ammo box, but

14   it is what the feds understand."

15   Q.   Based on the investigation you've conducted in this case,

16   the context of this post within the -- your investigation, do

17   you have an understanding of what is meant by the term

18   "Leviathan"?

19          MR. LEVENTHAL:  Objection.  Foundation.  Hearsay.

20          MR. TANASI:  Stewart joins.

21          MR. MARCHESE:  Parker joins.

22          THE COURT:  What was the term that you're asking

23   about?  "Leviathan"?

24          MR. MYHRE:  "Leviathan."

25          THE COURT:  All right.  Well, again, you need to lay

Case 2:22-cv-01040-WQH-EJY Document 19-5 Filed 11/21/22 Page 74 of 86
Case 2:16-cv-00046-GMN-PAL Document 1320 Filed 04/03/17 Page 132 of 256

132

1    a foundation for why he would know --

2              MR. MYHRE:  I'll move on, Your Honor.

3              THE COURT:  -- what that means or why he thinks he

4    knows or just move on.

5              MR. MYHRE:  I'll just move on, Your Honor, to the

6    next comment.

7    BY MR. MYHRE:

8    Q.   Is there another comment that occurs later in time?

9    A.   Yes.

10   Q.   Is this a comment on a link?

11   A.   Yes.

12   Q.   Was this comment made by the person associated with this

13   Facebook account, Todd Engel?

14   A.   Yes, it was.

15   Q.   And have you been able to ascertain the link during the

16   course of your investigation?

17   A.   No.

18   Q.   Approximate time and date for this entry?

19   A.   Approximately 11:22 a.m. on April 15, 2014.

20   Q.   Would you read the comment, please.

21   A.   "Will all of you gentlemen gave me aid and refuge if the

22   feds swear warrants against me for standing against them

23   Saturday or will you say I'm too much of a risk to your family

24   and livelihood.  Tough question, guys."

25   Q.   And, again, the events of April 12 occurred on a Saturday;

1   correct?

2   A.   Correct.

3   Q.   Now, during the course of your investigation, were you

4   able to -- or did you . . . . investigate the public-source

5   comments of Todd Engel?

6   A.   Yes.

7   Q.   And these were open source; correct?

8   A.   Yes.

9   Q.   And, during the course of your investigation, did you

10  discover a video posted by Mr. Engel?

11  A.   Yes.

12  Q.   When was that -- was that video posted early in 2016?

13  A.   Yes.

14           MR. MYHRE:  Your Honor, may we draw up Exhibit 300 --

15  excuse me -- 303 for the Court, counsel, and the witness?

16           THE COURT:  Yes.

17           This is -- there's multiple parts to this, isn't

18  there?  A through E?

19           MR. MYHRE:  It's 303, Your Honor.  I'm sorry.

20           THE COURT:  Yes.  There's A, B, C, D, and E to 303.

21           MR. MYHRE:  Oh, yes.  I'm sorry, Your Honor.  That's

22  correct.  A, B, C, D, and E.  There are five segments to 303.

23           THE COURT:  Are you doing one at a time or are you

24  showing them all?

25           MR. MYHRE:  I would like to admit the exhibit and

1    then show the cuts sequentially.

2              THE COURT:  Okay.  That's fine.

3              MR. MYHRE:  So you could stop the video there.

4    BY MR. MYHRE:

5    Q.   You've seen this video outside the courtroom; correct?

6    A.   Yes.

7    Q.   What is depicted in this video?

8    A.   Todd Engel standing on what appears to be a porch area in

9    a wooded area.

10   Q.   You recognize his image?

11   A.   Yes, I do.

12   Q.   Approximately when was -- did you capture this particular

13   video?

14   A.   On January 10th, 2016.

15   Q.   Was that during a search that you were conducting of open

16   source?

17   A.   Yes.

18   Q.   When you captured the video, how did you do that?

19   A.   Using the Internet and Facebook.com.  On the Facebook

20   account for Todd Engel, I right-clicked on the video and there

21   was a option to download it and I downloaded it.

22   Q.   And is this a fair and accurate depiction of what you

23   downloaded in January of 2016?

24   A.   Yes.

25   Q.   And, in this -- in this video, does Mr. Engel comment upon

135

1    the events at Bundy ranch?

2    A.   Yes.

3           MR. MYHRE:  Your Honor, we offer Exhibit 303A, B, C,

4    D, and E.

5           THE COURT:  Any objection to Exhibits 303A through E

6    other than what the Court has already addressed?

7           MR. MARCHESE:  Nothing new from Parker.

8           MR. TANASI:  Nothing new from Stewart.  Just to be

9    clear, I would add hearsay.

10          MR. LEVENTHAL:  Nothing new from Drexler.  Thank you.

11          PRO SE ENGEL:  Nothing new from Engel.

12          MR. PEREZ:  Nothing further from Lovelien.

13          MR. JACKSON:  Same objections that I've made.  No

14   other objections.

15          THE COURT:  All right.  Exhibit 303A through E will

16   be admitted.  Same ruling as before.

17      (Government Exhibit 303A through E received.)

18          MR. MYHRE:  May we publish, Your Honor?

19          THE COURT:  Yes, you may.

20          MR. MYHRE:  And starting with 303A, please.

21      (Video played.)

22   BY MR. MYHRE:

23   Q.   And that segment, Agent Willis, do you recognize or do you

24   see the background in this video; is that correct?

25   A.   Yes.

1   Q.   Do you have an understanding, based on your investigation,

2   what that is depicted in the background?

3   A.   Yes.  This is an area surrounding or near Todd Engel's

4   cabin which he had posted numerous photographs of on his public

5   Facebook page.

6   Q.   And that was his image that appeared in segment A;

7   correct?

8   A.   Yes.

9          MR. MYHRE:  May we continue with 303B, please.

10   (Video played.)

11  BY MR. MYHRE:

12  Q.   So, in both these last segments, segment A and segment B,

13  does Mr. Engel make reference to Dan Love?

14  A.   Yes.

15  Q.   And Dan Love was whom?

16  A.   A BLM special agent in charge.

17  Q.   Special agent in charge of what?

18  A.   The cattle impoundment operation in April 12, 2014, in

19  Bunkerville.

20         MR. MYHRE:  And may we public -- excuse me -- may we

21  publish 303C.

22   (Video played.)

23  BY MR. MYHRE:

24  Q.   During your investigation, do you -- is it possible to

25  discern how many people would have viewed this particular post?

137

1    A.   At this time, I don't recall viewing that information.

2    Q.   Was -- was this -- this was, however, viewable to you?

3    A.   Yes, it was.

4    Q.   So the privacy settings for that account did not prevent

5    you from accessing this video?

6    A.   Correct.

7         MR. MYHRE:  Continuing with 303D, please.

8    (Video played.)

9    BY MR. MYHRE:

10   Q.   In this video and in the previous two clips, does it

11   appear that Mr. Engel's reading from something?

12   A.   Yes.

13   Q.   What is he -- what is he reading from?

14        MR. LEVENTHAL:  Objection.  Calls for speculation.

15   BY MR. MYHRE:

16   Q.   From what you could observe on the video.

17   A.   A piece of paper.

18        MR. MYHRE:  And continuing with 303E, please.

19   (Video played.)

20   BY MR. MYHRE:

21   Q.   Now, Agent Willis, the Indictment in this case was

22   returned approximately when?

23   A.   March 2nd of 2016.

24   Q.   And were arrest warrants obtained from the Indictment?

25   A.   Yes.

Case 2:22-cv-01040-WQH-EJY  Document 19-5  Filed 11/21/22  Page 80 of 86
Case 2:16-cr-00046-GMN-PAL  Document 1320-5  Filed 04/03/17  Page 139 of 206

138

1   Q.   And were arrests effected on the defendants named on the

2   Indictment?

3   A.   Yes.

4            MR. LEVENTHAL:  Objection.  What's the relevance?

5            MR. MYHRE:  Your Honor, we -- we addressed the

6   relevance in our previous hearing.

7            THE COURT:  We did.

8   BY MR. MYHRE:

9   Q.   Were arrest warrants issued from the Indictment?

10  A.   Yes.

11  Q.   And were arrests made on the Indictment?

12  A.   Yes.

13  Q.   Did that arrest include defendant Engel?

14  A.   Yes.

15  Q.   Did the arrests also include the other defendants who are

16  in the courtroom today?

17  A.   Yes.

18  Q.   Were those arrests effected, on what date?

19  A.   On March 3rd, 2016.

20  Q.   When the arrests were made, was that a matter that was

21  made public?

22  A.   No.

23  Q.   And why is that, just in general terms?

24           MR. JACKSON:  Objection to relevance.

25           MR. MYHRE:  We addressed the relevance, Your Honor.

 1          MR. JACKSON:  It's not --

 2          THE COURT:  I'll allow -- I'll allow one answer to

 3   that.

 4          MR. MYHRE:  Let me --

 5          THE COURT:  Overruled.

 6          MR. MYHRE:  Thank you, Your Honor.

 7          I'll withdraw the question.

 8          THE COURT:  Okay.

 9   BY MR. MYHRE:

10   Q.   The information was not generally available to the public;

11   is that correct?

12          MR. LEVENTHAL:  Objection.  Leading.

13          THE COURT:  Overruled.  He can answer that question.

14   The other question was why wasn't it made public.  That, I

15   think, might have got far afield.  But whether or not it was a

16   publicly issued announcement that the arrests were going to

17   happen on a certain date or time is relevant for other purposes

18   as heard by the Court previously.  So objection overruled.

19   BY MR. MYHRE:

20   Q.   Was that information made public?

21   A.   No.

22   Q.   Now, on March the 3rd, 2009 -- or -- excuse me -- 2016,

23   did you capture a video from Todd Engel's Facebook page?

24   A.   Yes, I did.

25          MR. MYHRE:  And may we show, Your Honor, to the

140

1   witness, counsel, and the Court Exhibit 209?

2             THE COURT:  Yes, you may.

3             MR. MYHRE:  Thank you.

4   BY MR. MYHRE:

5   Q.   And you see that image in 209; is that correct?

6   A.   Yes, I do.

7   Q.   I'm sorry.  Did you -- did you get a chance to look at it?

8   A.   Yes, I did.

9   Q.   And is that the video that you captured on March the 3rd,

10  2016?

11  A.   Yes.

12  Q.   Does the video indicate an image of Mr. Engel?

13  A.   Yes.

14  Q.   And what is it that Mr. Engel appears to be doing?

15  A.   He appears to be driving a vehicle.

16  Q.   Does he make comments during the video?

17  A.   Yes.

18  Q.   And, from those comments, does it relate to the events of

19  April 12, 2014?

20  A.   Yes.

21            MR. MYHRE:  And, Your Honor, we offer Exhibit 209.

22            THE COURT:  Any other objection to Exhibit 209 other

23  than what's been previously addressed?

24            MR. TANASI:  Nothing additional from Stewart,

25  Your Honor.

```
 1              MR. MARCHESE:  No, Your Honor, Parker.

 2              MR. LEVENTHAL:  No, Your Honor.  Thank you.

 3              PRO SE ENGEL:  No, Your Honor.

 4              MR. PEREZ:  No, Your Honor.

 5              MR. JACKSON:  Just relevance as to my client.

 6              THE COURT:  All right.  Exhibit 209 will be admitted.

 7         (Government Exhibit 209 received.)

 8    BY MR. MYHRE:

 9    Q.   And, just in general terms, Agent Willis, concerning the

10    events of Bundy ranch, does it specifically address the issue

11    of arrests?

12    A.   Yes.

13              MR. MYHRE:  And may we publish, Your Honor?

14              THE COURT:  Yes, you may.

15         (Video played.)

16              MR. MYHRE:  And, Your Honor, it's my error.  I did

17    not specify.  That was 209A.  This was in four segments.  209A

18    through 209D.  I apologize.

19              THE COURT:  All right.

20              MR. MYHRE:  Permission to publish 209B?

21              THE COURT:  Yes.

22         (Video played.)

23    BY MR. MYHRE:

24    Q.   The reference to Eric Parker, was that the same

25    Eric Parker that's a defendant in this case?
```

1   A.   Yes.

2        MR. LEVENTHAL:  Objection.  Speculation.  Hearsay.

3   Foundation.

4        MR. TANASI:  Stewart joins, Your Honor.

5        MR. MARCHESE:  Parker joins.

6        PRO SE ENGEL:  Engel joins.

7        THE COURT:  Overruled.  He can answer the question.

8        THE WITNESS:  Yes.

9   BY MR. MYHRE:

10  Q.   And when was his arrest effected?

11  A.   On that same day, March 3rd of 2016.

12       MR. MYHRE:  Your Honor, may we publish 209C?

13       THE COURT:  Yes, you may.

14   (Video played.)

15  BY MR. MYHRE:

16  Q.   Agent Willis, can you tell from the video that we've seen

17  thus far what type of device is being used to transmit this

18  information?

19  A.   It appears to be a smartphone.

20  Q.   Is it possible to -- was this a recorded event or was this

21  occurring as it was being viewed?  In other words, was this

22  live or recorded?  Or could you tell from your investigation?

23  A.   I -- I could not tell.

24       MR. MYHRE:  And may we publish Exhibit 209D,

25  Your Honor?

Case 2:22-cv-01040-WQH-EJY Document 19-5 Filed 11/21/22 Page 85 of 86
Case 2:22-cv-00046-GMN-PAL Document 1326 Filed 04/05/22 Page 143 of 226

143

1          THE COURT:  Yes, you may.

2      (Video played.)

3          MR. MYHRE:  And the record should reflect that

4  concluded with Exhibit 209D.

5  BY MR. MYHRE:

6  Q.   During that segment, did Mr. Engel indicate how people

7  would -- how he would communicate with people?

8  A.   Yes.

9  Q.   What was -- what did he state in that regard?

10  A.   That he would communicate if he had heard about any

11  additional arrests or anything so that people could respond

12  accordingly.

13  Q.   And how would he communicate, via . . .

14  A.   Via Facebook social media.

15          MR. MYHRE:  Your Honor, that's -- that's probably a

16  natural break point here.

17          THE COURT:  Good idea.

18          MR. MYHRE:  Before I move to another area.

19          THE COURT:  Let's go ahead and take our lunch break.

20          During this time, I remind the jury that you are not

21  to discuss this case with anyone nor permit anyone to discuss

22  it with you.  You may speak to your fellow jurors about other

23  things, what did you do this weekend and so forth, but not

24  about this case.

25          Please do not read, or listen to, or view anything

Case 2:22-cv-01040-WQH-EJY Document 19-5 Filed 11/21/22 Page 86 of 86
Case 2:22-cr-00046-GMN-PAL Document 13:05 Filed 04/03/22 Page 134 of 206

144

 1    that touches upon this case in any way, and please do not

 2    attempt to perform any research or any independent

 3    investigation concerning any issues in this case.

 4         Finally, please do not form any opinion until after

 5    you have heard all the testimony, received the evidence.  I

 6    will provide to you the written jury instructions of law that

 7    will guide you in your deliberation process.  Then you will

 8    hear closing arguments from all counsel and then you will be

 9    excused to begin your deliberation process.  During that

10    deliberation process, then you can talk to each other about the

11    case and express your opinions and so forth but not until then.

12         So please enjoy your lunch.  It's 12:08.  Let's try

13    to be back here by 1:10.

14         We'll stand for the jury and after they exit,

15    Special Agent Willis, then you can take your lunch break.

16    Please be back here by 1:10 so we can continue.

17             THE WITNESS:  Okay.

18         (Jury excused from courtroom.)

19             THE COURT:  All right.  We're off record.  Be back

20    here by 1:10.

21             MR. MYHRE:  Thank you, Your Honor.

22         (Recess was taken at 12:08 p.m.)

23             COURTROOM ADMINISTRATOR:  All rise.

24             THE COURT:  All right.  Let's go ahead and call in

25    the jury.