# Exhibit 5

Case 2:22-cv-01040-WQH-EJY Document 19-6 Filed 03/21/22 Page 2 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 1 of 59
Vol. 5 - 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEVADA

3   UNITED STATES OF AMERICA,     )
                                  )   Case No. 2:16-cr-00046-GMN-PAL
4            Plaintiff,           )
                                  )   Las Vegas, Nevada
5        vs.                      )   February 14, 2017
                                  )   8:10 a.m.
6   ERIC J. PARKER (11), O.       )
    SCOTT DREXLER(12), RICHARD    )
7   LOVELIEN (13), STEVEN A.      )
    STEWART (14), TODD C. ENGEL   )
8   (15), and GREGORY P.          )
    BURLESON (16),                )
9                                 )   Day 5
             Defendants.          )
10  _____)

11                 TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE GLORIA M. NAVARRO
12      UNITED STATES DISTRICT COURT CHIEF JUDGE, AND A JURY

13

14  APPEARANCES:

15  For the Government:

16          STEVEN W. MYHRE, AUSA
            ERIN M. CREEGAN, SAUSA
17          NADIA JANJUA AHMED, AUSA
            NICHOLAS D. DICKINSON, AUSA
18          United States Attorney's Office
            District of Nevada
19          501 Las Vegas Boulevard South, Suite 1100
            Las Vegas, Nevada 89101
20

21  Appearances continued on next page.

22

23  Court Reporter:  Katherine Eismann, CSR, CRR, RDR
                     (702)431-1919 ke@nvd.uscourts.gov

Case 2:22-cv-01040-WQH-FJY Document 19-6 Filed 03/31/22 Page 3 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/22 Page 2 of 259
Vol. 5 - 2

1  APPEARANCES CONTINUED:

2  For the Defendant Eric J. Parker (11):

3          JESS R. MARCHESE, ESQ.
           Law Office of Jess R. Marchese
4          601 South Las Vegas Boulevard
           Las Vegas, NV 89101
5          marcheselaw@msn.com

6  For the Defendant O. SCOTT DREXLER (12):

7          TODD M. LEVENTHAL, ESQ.
           Leventhal and Associates
8          626 South Third Street
           Las Vegas, NV 89101
9          leventhalandassociatescmecf@gmail.com

10  For the Defendant Richard Lovelien (13):

11          SHAWN R. PEREZ, ESQ.
            Law Office of Shawn R. Perez
12          626 South Third Street
            Las Vegas, NV 89101
13          shawn711@msn.com

14  For the Defendant Steven A. Stewart (14):

15          RICHARD E. TANASI, ESQ.
            601 South Seventh Street, 2nd Floor
16          Las Vegas, NV 89101
            rtanasi@tanasilaw.com

17
    For the Defendant Todd C. Engel (15):
18
            TODD C. ENGEL, PRO SE
19          18427-023
            Nevada Southern Detention Center
20          2190 Ease Mesquite Avenue
            Pahrump, NV 89060
21
            JOHN G. GEORGE, ESQ. (Standby Counsel)
22          600 South 8th Street
            Las Vegas, NV 89101
23          johngeorgejr@fastmail.fm

Case 2:22-cv-01040-WQH-FJY Document 19-6 Filed 01/31/22 Page 4 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 4 of 259
Vol. 5 - 3

1 | APPEARANCES CONTINUED:

2 | For the Defendant Gregory P. Burleson (16):

3 |         TERRENCE M. JACKSON, ESQ.
        Law Office of Terrence M. Jackson

4 |         624 South Ninth Street
        Las Vegas, NV 89101

5 |         Terry.Jackson.Esq@gmail.com

Case 2:22-cv-01040-WQH-FJY Document 19-6 Filed 11/31/22 Page 5 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/22 Page 4 of 259
Vol. 5 - 4

 1          (Tuesday, February 14, 2017, 8:10 a.m.)

 2                        --oOo--

 3                P R O C E E D I N G S

 4          THE COURT:  Thank you.  You may be seated.

 5          COURTROOM ADMINISTRATOR:  This is the time set for

 6   the jury trial, Day 5, in Case No. 2:16-cr-046-GMN-PAL, United

 7   States of America versus Eric Parker, O. Scott Drexler, Ricky

 8   Lovelien, Steven Stewart, Todd Engel and Gregory Burleson.

 9          Counsel, please make your appearances for the record.

10          MR. MYHRE:  Good morning, Your Honor.  Steven Myhre,

11   Erin Creegan, and Nick Dickinson on behalf of the United

12   States.

13          THE COURT:  Good morning.

14          MR. TANASI:  Good morning, Your Honor.  Rich Tanasi

15   for Steven Stewart who is present.  Also is our group paralegal

16   Gwen Wilson in the back.

17          THE COURT:  Good morning.

18          MR. MARCHESE:  Good morning.  Jess Marchese on behalf

19   of Eric Parker.

20          THE COURT:  Good morning.

21          MR. LEVENTHAL:  Good morning, Your Honor.  Todd

22   Leventhal on behalf of Mr. Drexler.  He's present.

23          THE COURT:  Good morning.

Case 2:22-cv-01040-WQH-FJY Document 196 Filed 03/21/22 Page 6 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 5 of 259

Vol. 5 - 5

1          THE COURT:  Good morning.

2          MR. PEREZ:  Good morning, Your Honor.  Shawn Perez on

3    behalf of Rick Lovelien who is present.

4          THE COURT:  Good morning.

5          MR. JACKSON:  Good morning, Your Honor.  Terrence

6    Jackson for Gregory Burleson.

7          THE COURT:  Good morning.  Well, thank you for your

8    patience this morning.  The jury was here on time, but they had

9    to fill out some paperwork so that they can get their first

10   payment checks.  So that's what we were just waiting on, to

11   make sure they had time to fill that out correctly and if they

12   had any questions, because it's the first time they are filling

13   it out.

14         So, before we bring them in, I do want to make some

15   preliminary remarks just to remind everyone how court will be

16   conducted.  Remember, this is not a sporting event.  This is a

17   courtroom.  So it's never appropriate for people to make any

18   expression of their opinions, either verbally or through body

19   language, whether you approve or disapprove of what's being

20   said.

21         People may not speak out of turn.  The defendants are

22   represented by attorneys and they may speak only through their

23   attorney.  Mr. Engel is representing himself.  And likewise, he

Case 2:22-cv-01040-WQH-FJY   Document 19-6   Filed 01/31/22   Page 7 of 46
Case 2:16-cv-00046-CWD-PAL   Document 1785   Filed 03/29/22   Page 7 of 259

Vol. 5 - 6

1          Any distracting language or inappropriate body

2     language or any other kind of inappropriate displays will

3     result in the defendant being returned to the holding cell to

4     listen to the remainder of the day through the audio speaker in

5     the holding cell.

6          And I also ask everyone to please make sure that you

7     have no cell phones or any other electronic devices, whether or

8     not they are on or turned off.  Regardless, there are no cell

9     phones or electronic devices permitted in the courtroom.

10          I have instructed the marshals to remove anyone that

11     has a cell phone whether or not it's in use.  So please check

12     now to make sure that you left it outside.

13          This applies to the lawyers as well.  They are never

14     to record with their electronic devices, as recording is not

15     allowed in federal court, neither audio nor visual.  They can,

16     of course, use their electronic devices to present evidence

17     here during the trial.

18          And as you can see, the tables are all provided --

19     all have microphones, so you are welcome to stay at your desk

20     if you would like to, since you have a lot of notes and

21     computers and things.  On the other hand, we do have the podium

22     that's available for everyone as well.  So, if you prefer to

23     use the podium, you are welcome to do that.  It's up to you

Case 2:22-cv-01040-WQH-FJY Document 19-5 Filed 03/31/22 Page 8 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/22 Page 8 of 259
Vol. 5 - 7

Rand Stover - Direct

1   jury to come in.  We always stand for the jury, because they

2   are the judge of the facts.

3        (Jury in.)

4             THE COURT:  All right.  Everyone may be seated.  We

5   are joined by the jury, all 16 members returning after the

6   overnight break.

7             And we do have Special Agent Stover with us again

8   today sitting in the witness chair.  I do remind you,

9   Mr. Stover, that you are still under oath to tell the truth.

10            THE WITNESS:  Yes, Your Honor.

11            THE COURT:  And Mr. Myhre, you may continue with your

12  direct examination when you are ready.

13            MR. MYHRE:  Thank you, Your Honor.

14                          RAND STOVER,

15  having been previously sworn, was examined and testified as

16  follows:

17                       DIRECT EXAMINATION

18  BY MR. MYHRE:

19  Q.   Good morning, Agent Stover.

20  A.   Good morning.

21  Q.   When we broke -- we recessed last evening, we had just

22  finished talking about the arrest of Dave Bundy on April the

23  6th, 2014, and your knowledge of that event.

Case 2:22-cv-01040-WQH-FJY Document 19-5 Filed 11/21/22 Page 9 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/22 Page 9 of 259
Vol. 5 - 8

Rand Stover - Direct

1    effects that belonged to Mr. Bundy?

2    A.    Yes.

3    Q.    When did that meeting occur?

4    A.    That was the morning of April 9th at approximately 11:15

5    in the morning.

6    Q.    Where did this meeting occur?

7    A.    It occurred at a small gravel turnout at the junction of

8    Highway 170 and Gold Butte Road.

9    Q.    Did you travel there?

10   A.    I did.

11   Q.    How did you get there?

12   A.    I drove there.

13   Q.    Were you with anybody?

14   A.    I was.

15   Q.    Who were you with?

16   A.    With Dan Love the special agent in charge.

17   Q.    And Dan Love you mention was the special agent in charge.

18   You mean the special agent in charge of what?

19   A.    He was the -- his official title was the Regional Special

20   Agent in Charge over Utah and Nevada for BLM law enforcement.

21   But during this particular operation, he was part of the

22   unified command, so he was one of the law enforcement incident

23   commanders.

Rand Stover - Direct

1  A.   Yes.

2  Q.   So he was your boss.

3  A.   He was my boss during the impound.

4  Q.   And in terms of the overall impoundment operation itself,

5  what were Special Agent -- SAC Love's responsibilities and

6  duties?

7  A.   He was -- he was part of the unified command, so he and

8  the other top law enforcement officers would coordinate all the

9  major decisions that had to do with day-to-day operations, and

10 they had final decision authority over how the operation would

11 be conducted.

12 Q.   Was he on-site or off-site during the impoundment

13 operations?

14 A.   He was on-site.

15 Q.   So this meeting, was this a prearranged or preplanned

16 meeting that you had?

17 A.   It was.

18 Q.   Now, on your way to that meeting, you drove down State

19 Route 170; is that correct?

20 A.   Correct.  We left the incident command post, drove on

21 southbound Interstate 15, and got off at Exit 112.  Drove down

22 Highway 170 to that location I was just describing.

23       MR. MYHRE:  If I may, Your Honor, may I bring up

Case 2:22-cv-01040-WQH-FJY Document 18-5 Filed 03/29/22 Page 11 of 46
Case 2:16-cv-00046-GMN-PAL Document 1785 Filed 03/29/22 Page 11 of 250

Vol. 5 - 10
Rand Stover - Direct

1  BY MR. MYHRE:

2  Q.   Can you see 330 in front of you?  That's a map we went

3  over yesterday.  Would you just mind circling where this

4  meeting took place?

5  A.   Sure.

6  Q.   Okay.  The witness has indicated on the map about

7  two-thirds of the way down the center of the map.  Is that

8  north or south of the Virgin River bridge?

9  A.   It's just south of the Virgin River bridge.

10  Q.   Now, before you got to that area, did you notice any

11  changes in that area in around -- in and around State Route

12  170?

13  A.   Well, just north of the Virgin River bridge, the Bundy

14  family and some of their supporters had set up a small area

15  where they could -- they set up a stage and an area where they

16  could gather.

17  Q.   And if you wouldn't mind grabbing the exhibit book there

18  for a moment at Exhibit 332.

19  A.   Okay.

20  Q.   Do you have that in front of you?

21  A.   I do.

22  Q.   Okay.  And what is that?

23  A.   That's an overview photo of the bridge -- the Highway 170

Case 2:22-cv-01040-WOH-FJY  Document 195  Filed 03/29/22  Page 12 of 46
Case 2:13-cv-00046-GMN-PAL  Document 1785  Filed 03/29/22  Page 11 of 250

Vol. 5 - 11
Rand Stover - Direct

1    you just described?

2    A.   Yes, the area is on that -- on this particular map.

3    Q.   And does this map fairly and accurately depict that area

4    as it existed on April 12th, 2014?

5    A.   Yes, it doesn't show the stage.  But, yes, it shows the --

6    Q.   It shows the area?

7    A.   -- geographical area, yes.

8              MR. MYHRE:  Thank you.  Your Honor, we offer 332.

9              MR. MARCHESE:  No objection Parker.

10             MR. TANASI:  No objection Stewart, Your Honor.

11             MR. LEVENTHAL:   No objection, Judge.

12             MR. ENGEL:  None from Engel.

13             THE COURT:  Mr. Perez?

14             MR. PEREZ:  No objection Lovelien.

15             MR. JACKSON:  No objection Burleson.

16             THE COURT:  All right.  So Exhibit 332 will be

17   admitted.  Did you wish to publish it?

18             MR. MYHRE:  Yes, Your Honor.

19             THE COURT:  Go ahead.

20        (Exhibit 332 admitted.)

21             MR. MYHRE:  Thank you.

22   Q.   If you could clear your screen.

23   A.   Yes.

Case 2:22-cv-01040-WQH-FJY Document 195 Filed 03/29/22 Page 13 of 46
Case 2:16-cv-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 13 of 250
Vol. 5 - 12

Rand Stover - Direct

1  observed the staging this day.

2  A.   The area I'm talking about was generally in this area

3  here.

4  Q.   And you've drawn an oblong circle just next to the State

5  Route 170 toward the north portion as depicted on this map.

6        Now, did you, before moving down to this area on

7  April 9th, had you heard about this stage from different

8  sources that you had available to you?

9  A.   Yes.

10 Q.   And based on the information that you had received, what

11 was your understanding of what this stage was for?

12 A.   My understanding was it was an area for -- that the Bundy

13 family and their supporters were going to gather.  They were

14 going to have lawful protest activities.  They were giving

15 speeches.  They had meetings at that location.

16 Q.   So, was this area in an area of private property or public

17 lands?

18 A.   That's -- the area closest to the highway is a highway

19 right-of-way, but just adjacent there was some private

20 property.

21 Q.   So we talked yesterday a little bit about closure orders

22 and so forth.  You mentioned this was not subject to the

23 closure orders; is that correct?

Case 2:22-cv-01040-WQH-EJY Document 19-5 Filed 03/29/22 Page 14 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 13 of 250
Vol. 5 - 13

Rand Stover - Direct

1  A.   Well, it was a highway right-of-way, and it was also

2  private property.

3          MR. MYHRE:  If I may, Your Honor, may I pull up

4  Exhibit 132?

5          THE COURT:  Yes.

6  BY MR. MYHRE:

7  Q.   And if I could go to 18:18.  Just the first segment.  And

8  if you could stop it there.  Thank you.  Oops.  And stop right

9  there, please.  Oops.  Back just a little bit.

10          Okay.  We have stopped 132 at 18:18:03.  And do you

11  see that in front of you, Agent Stover?

12  A.   I do.

13  Q.   And what do you see in this frame?

14  A.   This is a frame showing that area I was just describing

15  that had an area where the Bundy family and their supporters

16  were gathering.  It had a small stage set up, and this is

17  typical of --

18  Q.   All right.  I'm circling, on your screen, an area in the

19  lower right-hand corner.  And do you recognize what that is?

20  A.   Yes, that looks like the -- the stage area and two

21  vertical posts that were set up to -- to hold a banner.

22  Q.   Okay.  Thank you.  So, if I could have 330 again, please.

23          So just going back to Exhibit 330, Agent, could you

Case 2:22-cv-01040-WQH-FJY Document 185 Filed 03/29/22 Page 15 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 15 of 250
Vol. 5 - 14
Rand Stover - Direct

1    Q.   And the witness is -- has again indicated with a circle

2    the location of the meeting.

3              When you got to that area, was anybody present there?

4    A.   Yes.

5    Q.   Who was present?

6    A.   There was a vehicle, and David Bundy was in the driver's

7    seat of the vehicle.  Mel Bundy was there.  There was an ATV

8    there.  Ammon Bundy was on the ATV.  David Bundy's wife was

9    present.  There was also another individual that I don't know

10   who he was.

11   Q.   You mentioned Ammon Bundy.  Was Ammon Bundy known to you?

12   A.   Yes.

13   Q.   And what did you -- what was his relationship to Cliven

14   Bundy?

15   A.   He is a son of Cliven Bundy.

16   Q.   Before this meeting on April 9th, had you ever met with

17   Ammon Bundy?

18   A.   Not in person.

19   Q.   With respect to Dave Bundy as well, had you ever met with

20   him before this meeting on April 9th?

21   A.   I wouldn't say I had met him.  I saw him in person briefly

22   at the incident command post after he was arrested.

23   Q.   But you didn't introduce yourself or anything of that

Case 2:22-cv-01040-WQH-FJY  Document 19-5  Filed 03/29/22  Page 16 of 46
Case 2:16-cv-00046-GMN-PAL  Document 1785  Filed 03/29/17  Page 15 of 250
Vol. 5 - 15
Rand Stover - Direct

1  Q.   So once you got there and you saw everybody there, did --

2  was there a conversation between you and the Bundys at all?

3  A.   There was a conversation.  Well, an attempted conversation

4  I would call it.

5  Q.   What was your attempt at a conversation?

6  A.   Well, I was driving in the vehicle.  Dan Love was a

7  passenger in my vehicle.  Dan Love got out first, and he was

8  the first one to introduce himself to the group that was there.

9       When I got out, I attempted to introduce myself to

10 Ammon Bundy and shake his hand.  He refused to do so.

11 Q.   You mentioned Mel Bundy as well, and I didn't cover this.

12 Was Mel Bundy known to you as well?

13 A.   He was.

14 Q.   And what was his relationship to Cliven Bundy?

15 A.   Also a son of Cliven Bundy.

16 Q.   Did you attempt to shake hands with either Mel or Dave?

17 A.   I did shake hands with Dave Bundy at one point.  I

18 introduced myself to Mel.

19 Q.   And from your understanding, the object of this meeting or

20 the purpose of this meeting was what?

21 A.   It was to return some property that belonged to Dave Bundy

22 that was held after his arrest.

23 Q.   And did you -- was the object of the meeting accomplished?

Case 2:22-cv-01040-WQH-FJY Document 195 Filed 03/29/22 Page 17 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 17 of 250
Vol. 5 - 16

Rand Stover - Direct

1    you overheard between Special Agent Love and any family

2    members?

3              MR. LEVENTHAL:  Objection as to relevance to all

4    this.

5              MR. MYHRE:  Your Honor, we intend to introduce a

6    statement from Ammon Bundy about this war beginning now, or

7    this war will be won, or we'll win this thing, something to

8    that effect.  So it's a statement in furtherance of the

9    conspiracy itself.

10              THE COURT:  For Count One.

11              MR. MYHRE:  In Count One, yes, Your Honor.

12              THE COURT:  Okay.  I will allow it then.  It is

13    relevant.

14    BY MR. MYHRE:

15    Q.   So, did you overhear any discussion or conversation

16    between SAC Love and any members of the Bundy family?

17    A.   Yes.

18    Q.   And what, generally, was the gist of the conversation?

19    A.   In general, it as was a very heated, confrontational

20    conversation I would describe it.  Both Dan Love and Ammon

21    Bundy were talking over each other.

22              Ammon Bundy was yelling at his brother Dave and also

23    at Dan Love.  They were -- Dan Love was trying to establish

Case 2:22-cv-01040-WQH-FJY Document 195 Filed 03/29/22 Page 18 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 18 of 250
Vol. 5 - 17
Rand Stover - Direct

1   conversation.

2              MR. LEVENTHAL:  Objection as to speculation.

3              MR. MYHRE:  It's his impression, Your Honor.

4              THE COURT:  His impression.  He was there.

5              MR. LEVENTHAL:  It is.  He indicated he's never met

6   these people before though, Your Honor.  He doesn't know how

7   they speak.

8              THE COURT:  Overruled.  You may continue.

9   BY MR. MYHRE:

10  Q.   And did you hear any words uttered by Ammon Bundy as you

11  were departing the area or getting ready to leave?

12  A.   I did.

13  Q.   And what were those words?

14  A.   He -- he said, "You know what you can do?  You can get the

15  hell off our land.  You can leave them cows right where they

16  are and get the hell out."

17              And then he said, "We're going to win this thing.

18  We're going to win this war today, guaranteed."

19  Q.   Did -- and when you -- when you heard this or these words

20  uttered by Mr. Bundy, where was he located?

21  A.   He was sitting on the ATV that he was riding.

22  Q.   Did you notice anything conspicuous about the ATV?

23  A.   He had one of the closure signs that the BLM had posted

Case 2:22-cv-01040-WQH-FJY Document 19-5 Filed 01/29/22 Page 19 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 18 of 259
Vol. 5 - 18

Rand Stover - Direct

1  what that is?

2  A.    Sure.  The BLM had posted many signs in the area

3  indicating the area was closed or temporarily closed.  It had

4  language on there.  It was a white sign with black and red

5  writing indicating the area was closed and that entering that

6  area could subject a person to a federal violation.

7  Q.    And those aren't normally posted on an ATV; is that

8  correct?

9  A.    Not that I'm aware of.

10  Q.    Is that how the meeting ended?

11  A.    That was -- the meeting concluded by Ammon Bundy telling

12  his brother Dave, "Come on Davie.  Let's go.  Let's get out of

13  here."  And then Ammon Bundy instructed Dave Bundy's wife to

14  get on the ATV with him and then they left the area.

15  Q.    What did you and SAC Love do after that?

16  A.    We let them depart the area, and then we got back in my

17  government vehicle, and we drove back to the incident command

18  post.

19  Q.    Now, in terms of your assessment of the threat level for

20  the impoundment operation, did this affect your -- your

21  assessment of the threat?

22  A.    It did.

23  Q.    In what way?

Case 2:22-cv-01040-WQH-FJY Document 19-5 Filed 03/29/22 Page 20 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 20 of 250

Vol. 5 - 19

Rand Stover - Direct

1      MR. JACKSON:  I'm going to object to his conclusion

2  as to what the Bundy family may or may not have done.  He can

3  state that they had a certain threat assessment, but his

4  conclusion as to what the Bundy family may have done is mere

5  speculation.  And it's irrelevant as to our clients, I believe,

6  in this matter.

7      THE COURT:  Mr. Myhre.

8      MR. MYHRE:  Thank you, Your Honor.  It's directly

9  relevant to the charge, not only the assault on a federal

10  officer, but to the conspiracy as well.

11      But this agent's state of mind is relevant not only

12  as to how the BLM ultimately was postured on April 12th, which

13  has been at issue in this case, but also what the agent

14  perceived in the wash during the assault on April 12th.

15      His state of mind, all -- every piece of information

16  that informs his judgment and his assessment is directly

17  relevant for this jury to assess whether the agent reasonably

18  perceived a threat of imminent bodily harm or injury.  And, so,

19  therefore, we are advancing proof of his state of mind.

20      THE COURT:  All right.  I will allow it for the

21  evidence of his state of mind and the steps that he took to

22  protect the contractors who were there to execute the order of

23  the Court.  You may proceed.

Case 2:22-cv-01040-WQH-FJY Document 19-5 Filed 01/29/22 Page 21 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 20 of 250
Vol. 5 - 20

Rand Stover - Direct

1    have contact with Mr. Robbins in Utah?

2    A.    I did.

3    Q.    And just to remind the jury again, Mr. Robbins is who?

4    A.    Mr. Robbins is the owner of the -- the livestock auction

5    in Utah that was contracted by the government. And I need to

6    clarify something I said yesterday. I inadvertently --

7           MR. MARCHESE: Objection. Nonresponsive.

8    BY MR. MYHRE:

9    Q.    Just don't worry about that part. Just --

10    A.    Okay.

11    Q.    Okay? We'll seek to clarify --

12    A.    Okay.

13    Q.    -- in a moment. So, Mr. Robbins, is that 'R' Livestock?

14    A.    Correct. He's the owner of 'R' Livestock.

15    Q.    Now, with regard to your discussion with him, did he call

16    you? Did he meet you in person?

17    A.    He called me on the telephone. On my cell phone.

18    Q.    Sure. And where were you located?

19    A.    I was at the incident command post.

20    Q.    And what was his purpose in calling you?

21    A.    He called me to let me know --

22           MR. MARCHESE: Objection. Speculation.

23    BY MR. MYHRE:

Case 2:22-cv-01040-WQH-FJY Document 185 Filed 03/29/22 Page 22 of 46
Case 2:13-cv-00046-GMN-PAL Document 185 Filed 03/29/22 Page 21 of 50
Vol. 5 - 21

Rand Stover - Direct

1          MR. MARCHESE:  Objection.  Hearsay and relevance.  I

2   mean --

3          THE COURT:  It's relevant, but it is hearsay.  Just

4   ask him what steps he took after the call.

5          MR. MARCHESE:  Well, Your Honor, I want to make a

6   record as to relevance.  We keep saying that this is about

7   conspiracies and that this is somehow relevant to these

8   gentlemen here.  We have not had one witness --

9          THE COURT:  All right.  We don't need to have the

10  theatrics.  You have made your point.  You know that your

11  clients are charged with aiding and abetting in every single

12  count except the one where they are charged with conspiracy.

13         So the government has the right to lay down the

14  conspiracy that these people allegedly joined.

15         MR. MARCHESE:  But --

16         THE COURT:  Or the other acts that they allegedly

17  aided and abetted in.  So the government has the right to

18  introduce that information first.  And that's what they are

19  doing now.  You know that.  So enough with theatrics.  Let's

20  move on.

21         MR. MARCHESE:  I know that, Your Honor, but the

22  issue --

23         THE COURT:  You are right it is hearsay, and I am

Case 2:22-cv-01040-WQH-FJY Document 195 Filed 03/29/22 Page 23 of 46
Case 2:13-cv-00046-GMN-PAL Document 785 Filed 03/29/22 Page 23 of 46
Vol. 5 - 22
Rand Stover - Direct

1          MR. MARCHESE:  Okay.  Can I make a record or no?

2          THE COURT:  At the break you may.

3    BY MR. MYHRE:

4    Q.   Agent, without going into specifically what he told you,

5    how did what he told you affect your assessments in terms of

6    the threat of interference and the threat of violence in

7    connection with the impoundment operation?

8    A.   It -- it increased my knowledge and impression that

9    interference of our operation would continue to occur, not just

10   in the local area, but in the various areas outside of the

11   immediate location such as where the cattle were supposed to be

12   transported to.

13   Q.   Now, before we move off of the topic of the 'R' Livestock,

14   you indicated you wanted to clarify something.  Did you want to

15   clarify with respect to the name of the organization or the

16   name of the --

17          MR. MARCHESE:  Objection.  Leading.

18          THE COURT:  Overruled.  Go ahead.

19          THE WITNESS:  Yes.  Correct.  Yesterday I

20   inadvertently said the business was called 'R' Livestock

21   Exchange.  It's 'R' Livestock Connection.  I said Exchange

22   instead of Connection.  My apologies.

23   BY MR. MYHRE:

Case 2:22-cv-01040-WQH-FJY Document 195 Filed 03/29/22 Page 24 of 46
Case 2:16-cv-00046-GMN-PAL Document 1785 Filed 03/29/22 Page 24 of 46
Vol. 5 - 23
Rand Stover - Direct

1  A.   Yes.

2  Q.   And was that reported to you in the normal course of your

3  duties as the Operations Section Chief?

4  A.   Yes.

5  Q.   And did that information as well inform your judgment

6  about the nature of the threat?

7  A.   It did.

8  Q.   Now, following the events of April 9th, did you receive

9  information from your intelligence sources about what was being

10  said just generally in social media?

11  A.   I did.

12  Q.   And were there things that were being said, were they said

13  about the BLM's operation in conducting the impoundment?

14  A.   Yes.

15  Q.   Now, just what type -- we talked yesterday briefly about

16  the intelligence information, but you had someone at the site

17  who was actually gathering this information?

18  A.   That's correct.

19  Q.   And they were gathering it from what types of sources?

20  A.   They were gathering it from mainstream media, from

21  newspapers, from open source Internet, from social media

22  sources.

23  Q.   And was it your impression, from what you were being

Case 2:22-cv-01040-WQH-FJY Document 195 Filed 03/29/22 Page 25 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/22 Page 25 of 46
Vol. 5 - 24
Rand Stover - Direct

1   A.   It was significantly increasing by this time.

2   Q.   And what was your impression in terms of just the level of

3   rhetoric?  Was it critical, noncritical, or neutral?

4   A.   There was a narrative being created, especially on social

5   media, that was critical to our operation and the threat to our

6   operation.

7   Q.   And just generally speaking, what was the nature or the

8   substance of the narrative that you were hearing from your

9   intelligence folks?

10  A.   The general narrative was that the BLM was stealing Cliven

11  Bundy's cattle, that they were acting illegally, that they were

12  violating Mr. Bundy's rights, and that the BLM was attempting

13  to lock people out of public land.

14  Q.   Now, moving on to just the overall impoundment operation,

15  while these events are going on, is the -- are the contractors

16  still collecting or gathering cattle?

17  A.   Yes.

18  Q.   And where are those cattle being held?

19  A.   They are being held at the incident command post.

20  Q.   Had you moved any cattle from the incident command post to

21  Utah?

22  A.   No.

23  Q.   Do you have an understanding as to why that is?

Case 2:22-cv-01040-WQH-FJY Document 185-6 Filed 03/29/22 Page 26 of 46
Case 2:16-cv-00046-GMN-PAL Document 1785 Filed 03/29/22 Page 26 of 250
Vol. 5 - 25
Rand Stover - Direct

1   April 9th as of that day.

2   Q.   As of April 9th, they were not going to be moved to Utah?

3   A.   Correct.

4   Q.   Were you later instructed to find an alternative site to

5   move the cattle?

6   A.   Not me personally, but the BLM employees that were working

7   directly with the contractors, they were making efforts to try

8   and find a different location to move the cattle as an

9   alternate plan.

10  Q.   Did you ever -- in connection with that, did you ever get

11  involved in terms of trying to find an alternative location?

12  A.   Yes.

13  Q.   And what was your involvement with that?

14  A.   My -- specifically, there was -- there was a location in

15  Arizona that quickly fell through.  There was another location

16  in Twin Falls, Idaho, that fell through.  And there was also a

17  location in Euclid, California.

18  Q.   Now, when you say fell through, what generally do you mean

19  by that?

20  A.   Meaning it was -- the BLM made initial attempts to try and

21  use those locations to take the cattle to, but the plans did

22  not go very far.  The implementation of those plans didn't go

23  very far.

Case 2:22-cv-01040-WQH-FJY Document 185 Filed 03/29/22 Page 27 of 46
Case 2:13-cv-00046-GMN-PAL Document 785 Filed 03/29/17 Page 26 of 250
Vol. 5 - 26
Rand Stover - Direct

1    A.    Correct.

2    Q.    Did you reach out to any of your contacts in order to

3    establish a relationship with Euclid?

4    A.    I did.

5    Q.    And what was the nature of those contacts?

6    A.    I spoke with the local BLM ranger that's familiar with

7    that area, and I also -- and he directed me to a sheriff's

8    department sergeant that worked in that area.

9    Q.    And was there -- what type of facility was in Euclid?  Was

10   it another sale barn?

11   A.    It was another livestock auction barn or livestock auction

12   facility.

13   Q.    Now, based on those conversations, without going into the

14   conversations, did you have an understanding as to whether this

15   would be a potential place to move the cattle to?

16   A.    Yes, it -- it appeared to be -- at that time, it appeared

17   to be a viable place to take the cattle.

18   Q.    And did that change?

19   A.    It did.

20   Q.    When did that change?

21   A.    It was -- it changed within -- I don't remember the exact

22   time, but it -- it wasn't long after, a few hours to half of a

23   day.

Case 2:22-cv-01040-WQH-FJY Document 19-5 Filed 03/29/22 Page 28 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 28 of 250
Vol. 5 - 27

Rand Stover - Direct

1    A.   Once we -- once we got far enough down the road of
2    actually planning and believing that this could be a potential
3    option, and we started putting reasonable plans in place to do
4    so, within a half a day of that, it was no longer -- it became
5    no longer an option.
6    Q.   If you could look at Exhibit 11 in your book, please.  And
7    do you recognize that?
8    A.   Yes, I do.
9    Q.   And what is it?
10   A.   It's a copy of a Facebook posting indicating that --
11   Q.   Without reading what it says, just generally, it's a
12   Facebook posting.  And what is the sponsor of the Facebook?
13   A.   It's from the "We support Cliven Bundy."
14   Q.   And the date of it is April 11th?
15   A.   April 11th, 2014.
16   Q.   And how are you familiar with this document?
17   A.   It was provided to me by one of our special agents.
18   Q.   And does this address the Euclid Stockyard?
19   A.   Yes, it does.
20             MR. MYHRE:  Your Honor, we offer Government
21   Exhibit 11.
22             THE COURT:  Any objection?
23             MR. MARCHESE:  Objection.  Authentication.

Case 2:22-cv-01040-WQH-FJY Document 195 Filed 03/29/22 Page 29 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/22 Page 29 of 46

Vol. 5 - 28
Rand Stover - Direct

1           MR. LEVENTHAL:  I will object on all three.

2           MR. PEREZ:  I'll join.

3           MR. ENGEL:  I'll join.

4           THE COURT:  All right.  Mr. Myhre.

5           MR. MYHRE:  Yes, Your Honor.  This is offered as a

6    801(d)(2)(e) statement in furtherance of the conspiracy.

7           The authentication is that this agent recognizes it.

8    It was provided to him from another agent.  It's -- from the

9    face of the document itself, it's clear that it's from a Cliven

10   Bundy supporter, and it addresses relevant information directly

11   on point with respect to Euclid Stockyard.

12          So, therefore, we believe that it's both authentic as

13   well as relevant under 801(d)(2)(E).

14          THE COURT:  All right.  I will admit it.

15          MR. MYHRE:  Thank you, Your Honor.  May we publish?

16          THE COURT:  Yes, you may.

17       (Exhibit 11 admitted.)

18   BY MR. MYHRE:

19   Q.   And Agent Stover, if you could just -- it's a relatively

20   short message.  Would you mind reading that for us, please?

21   A.   Sure.  It says: "Attention.  I just got some information

22   in.  The cattle are going to be transported to the Euclid

23   Stockyard in California.  Scheduled for Monday.  Could be

Case 2:22-cv-01040-WQH-FJY Document 19-5 Filed 03/29/22 Page 30 of 46
Case 2:16-cv-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 30 of 250
Vol. 5 - 29

Rand Stover - Direct

 1   corners of the Internet.  If you are in California, you will be

 2   a great asset on this one.  Euclid Stockyard information is as

 3   follows."

 4   Q.   That's fine right there.  And at the bottom, there appears

 5   to be some information with hashtags there; is that correct?

 6   A.   That's correct.

 7   Q.   Are you familiar with hashtags?

 8   A.   No.

 9   Q.   So, now, the information contained in this document, was

10   that information generally available to the public?

11   A.   No, it was not.

12   Q.   How -- did you -- in terms of your contacts for the Euclid

13   Stockyard, were -- did you ask that information be shared with

14   others?

15   A.   No, I specifically asked that it be kept as confidential

16   as possible.

17   Q.   If you could turn to Exhibit 10, please.  Do you recognize

18   this document?

19   A.   Yes.

20   Q.   And what is this?

21   A.   This is another copy of a Facebook posting.

22   Q.   And is it from the "We the Cliven Bundy" Facebook page?

23   A.   Yes.

Case 2:22-cv-01040-WQH-FJY Document 19-5 Filed 03/29/22 Page 31 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 30 of 250
Vol. 5 - 30

Rand Stover - Direct

1  Q.   And just without going into detail, what does this

2  generally address?

3  A.   It generally addresses a -- I don't know how to describe

4  it without reading it -- a method of operation or a method of

5  rule of engagement.

6  Q.   Thank you.

7        Your Honor, we offer Exhibit 10.

8        THE COURT:  Any objection to Exhibit 10?

9        MR. MARCHESE:  As to Mr. Parker, it's hearsay, lack

10 of authentication, lack of personal knowledge and relevance.

11       MR. TANASI:  Join as to Mr. Stewart.

12       MR. LEVENTHAL:  Join for Mr. Drexler.

13       MR. ENGEL:  Join from Engel.

14       MR. PEREZ:  Join for Lovelien.

15       MR. JACKSON:  I join in those objections as well for

16 Mr. Burleson.

17       THE COURT:  Thank you.

18       MR. MYHRE:  Your Honor, the same bases as before,

19 801(d)(2)(E).  This agent has identified this document as

20 something he had seen in the normal course that was provided to

21 him.  He's familiar with it, and it directly goes to the

22 conspiracy in this matter.

23       It is, in essence, a call to arms, which we will be

Case 2:22-cv-01040-WQH-EJY Document 195 Filed 03/29/22 Page 32 of 46
Case 2:16-cv-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 32 of 250
Vol. 5 - 31

Rand Stover - Direct

1    Is it also Facebook?

2            MR. MYHRE:  Exhibit 10 is Facebook as well, Your

3    Honor, from the "We the Cliven" -- "We Support Cliven Bundy."

4    So the document itself --

5            THE COURT:  Purports to be from --

6            MR. MYHRE:  Right.  Purports to be from the Bundy

7    supporter.

8            THE COURT:  I will admit it.

9            MR. MYHRE:  Thank you, Your Honor.  May we publish?

10           THE COURT:  Yes.

11       (Exhibit 10 admitted.)

12   BY MR. MYHRE:

13   Q.   And Agent Stover, as before, would you mind reading into

14   the record just the brief statement here?

15   A.   Yes, it says:  "Stand your ground.  Do not fire unless

16   fired upon.  But if they mean to have a war, let it begin

17   here."

18   Q.   And there's a photograph associated with this as well?

19   A.   There is.

20   Q.   And essentially, there's -- that photo depicts those words

21   on some sort of monument?

22   A.   Yes.  The quote I just read is listed in the photograph.

23   Q.   Now, the message that you see here, was this consistent or

Case 2:22-cv-01040-WQH-FJY Document 195 Filed 01/29/22 Page 33 of 46
Case 2:16-cv-00046-GMN-PAL Document 1785 Filed 03/29/22 Page 33 of 250
Vol. 5 - 32

Rand Stover - Direct

1   you were receiving?

2   A.   It was consistent with that narrative I spoke of earlier.

3   Q.   Now, I want to move to April 11th further.

4        During the course of that day, did -- was there a

5   determination made as to whether you are going to continue

6   operations through the rest of that weekend?

7   A.   On April 11th?

8   Q.   Yes.

9   A.   Yes, there was.

10  Q.   Okay.  And just for the record, April the 11th was a

11  Friday; is that correct?

12  A.   That's correct.

13  Q.   What was the initial determination as to how you were

14  going to conduct operations going forward?

15  A.   Initially, we were going to not conduct any operations

16  over the weekend, because the contractors were going to go --

17  not all, but a majority of contractors were going to go back to

18  Utah to attend a funeral for a mutual friend.

19  Q.   Now, was this determination made in the morning or the

20  afternoon?  When did it occur?

21  A.   It was -- it was -- that determination was made -- I -- I

22  believe it was the evening of the 10th or the morning of the

23  11th.

Case 2:22-cv-01040-WQH-FJY Document 195 Filed 03/29/22 Page 34 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 34 of 46
Vol. 5 - 33
Rand Stover - Direct

1  information from your intelligence sources as to whether there

2  were people in the area moving into the area to support

3  Mr. Bundy?

4  A.    Yes.

5  Q.    What -- generally speaking, what type of information were

6  you receiving?

7  A.    Generally I was receiving a significant amount of

8  information from one of our special agents that individuals

9  calling themselves "militia members" were coming to the area.

10  Q.    Did you have a sense -- I'm focusing now on the morning of

11  April the 11th.  Did you have a sense of the numbers?

12  A.    One report I saw said 150.

13          MR. JACKSON:  I'm going to object to what --

14          THE WITNESS:  But the numbers varied.

15          MR. JACKSON:  -- the report said on the grounds that

16  they are hearsay, on grounds that we don't have any foundation

17  for reports.  We don't know who made them.  And unless we can

18  confront and cross-examine the authors of the report, I object

19  to the content of these reports.

20          THE COURT:  Any joinder?

21          MR. TANASI:  Stewart joins.

22          MR. MARCHESE:  Parker joins.

23          MR. LEVENTHAL:  Drexler joins.

Case 2:22-cv-01040-WQH-EJY Document 195 Filed 03/29/22 Page 35 of 46
Case 2:13-cv-00046-GWN-PAL Document 185 Filed 03/29/22 Page 35 of 250

Vol. 5 - 34
Rand Stover - Direct

1          THE COURT:  Mr. Myhre, your response?

2          MR. MYHRE:  As before, Your Honor, this is directly

3    relevant to his state of mind, his understanding of what the

4    threat was in the area and informs his decisions through the

5    11th and the 12th in the wash.

6          THE COURT:  All right.

7          MR. JACKSON:  Your Honor, I'll stipulate to his state

8    of mind as long as they don't bring in evidence that's hearsay,

9    and I can't confront or cross-examine.

10         I will stipulate that he had a state of mind that he

11   was in fear or his officers were in fear.  If he wants to draw

12   up a stipulation that he had -- he had information that caused

13   him to be anxious.  He said they had moderate threat level.

14         We'll accept that.  We'll stipulate to that.  But as

15   far as these reports that we don't know who wrote them, or we

16   can't confront and cross-examine the basis of their facts, we

17   would object to that, because we think it violates the

18   constitutional right to confront and cross-examine witnesses.

19         MR. LEVENTHAL:  On behalf of Mr. Drexler, I do not

20   join in that.

21         MR. TANASI:  Your Honor, same thing for Mr. Stewart.

22         MR. MARCHESE:  Parker as well.

23         MR. ENGEL:  Engel as well.

Case 2:22-cv-01040-WQH-EJY Document 195-5 Filed 03/29/22 Page 36 of 46
Case 2:13-cv-00046-GMN-PAL Document 785 Filed 03/29/22 Page 36 of 250

Vol. 5 - 35
Rand Stover - Direct

1        MR. MYHRE:  Yes, Your Honor.  The witness is

2   available for cross-examination.  All -- what Mr. Jackson is

3   objecting to merely goes to the weight of the evidence, not to

4   admissibility.

5        He certainly is free to cross-examine Agent Stover

6   all day long as to his source of information; the reliability

7   of it.  But the government is entitled to prove that Agent

8   Stover acted reasonably.  And in order to do that, we need to

9   advance proof of the information he was working on and where he

10  derived it from.

11       THE COURT:  All right.  That's sufficient.  I will

12  allow it.  Overruled.

13  BY MR. MYHRE:

14  Q.   So, Agent Stover, you said you understood, again, with

15  respect to the numbers in the area?

16  A.   Yes.  That was one of the reports I received, yes.

17  Q.   Now, in terms of how that affected your operation going

18  forward, did it have any effect on it at that point, just

19  having this information?

20  A.   Again, it increased my belief that interference was likely

21  and people were -- more people than I expected were coming to

22  the area.

23  Q.   Did you believe, however, at least on that information,

Case 2:22-cv-01040-WQH-FJY Document 185 Filed 03/29/22 Page 37 of 46
Case 2:13-cv-00046-GMN-FAL Document 185 Filed 03/29/22 Page 36 of 259
Vol. 5 - 36
Rand Stover - Direct

1   A.   I believed at that -- on the morning of the 11th, because

2   so much information was coming in, that we were going to -- I

3   was going to continue with my plan of conducting operations

4   when we picked back up on Monday.

5   Q.   At this point in time, midmorning or late morning of

6   April 11th, approximately how many cattle had been gathered?

7   A.   We were at approximately -- after the morning of the 11th,

8   we were at approximately 377 cows.

9   Q.   And those were corralled in the ICP?

10  A.   They were.

11  Q.   Now, did the plan to, you know, take off the weekend and

12  begin the operations later, did that change later on the 11th?

13  A.   Yes, it did.

14  Q.   And what occurred to change that plan?

15  A.   There was a conference call that I participated in at

16  approximately -- I don't remember if it was 4:00 or 6:00 that

17  evening.

18  Q.   It was in the evening of April 11th?

19  A.   Yes.

20  Q.   And where did this call take place?

21  A.   It occurred at the incident command post in the command

22  trailer.

23  Q.   Who was present for this conversation?

Case 2:22-cv-01040-WQH-EJY Document 19-5 Filed 01/21/22 Page 38 of 46
Case 2:16-cr-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 37 of 259
Vol. 5 - 37

Rand Stover - Direct

1   management.  There were upper level National Park Service

2   management.

3          There was a deputy assistant director from the FBI on

4   the call.  And there present in -- at the -- inside the

5   trailer, our director of BLM law enforcement, the unified

6   command staff that was working on the operation, myself.

7   Q.   That would have included SAC Love in that party?

8   A.   Yes.

9   Q.   Now, the people on the other end of the phone, they were

10  in Washington?

11  A.   Yes, some were in Washington, DC.  Some were in other

12  locations.

13  Q.   What was the general gist of this or the general purpose

14  of this call?

15  A.   The general purpose was to try and evaluate the current

16  threat level to the operation and to try and get a handle on

17  the many groups that had come in -- the many groups calling

18  themselves militia members or militia groups that had come into

19  the area or were reported to still be in transition to the

20  area.

21  Q.   Who was leading the call?

22  A.   It was Dan Love, our director of law enforcement, and then

23  the upper level management from Washington, DC.  I wouldn't say

Case 2:22-cv-01040-WQH-FJY Document 195 Filed 03/29/22 Page 39 of 46
Case 2:13-cv-00040-GMN-PAL Document 185 Filed 03/29/22 Page 39 of 250

Vol. 5 - 38
Rand Stover - Direct

1  A.   Most of the talking was done by the deputy assistant

2  director from the FBI.

3  Q.   And was he conveying information to you?

4  A.   Yes.

5  Q.   And what was the nature of that information?

6  A.   In general, he said that at that particular time --

7           MR. LEVENTHAL:  I object.

8           MR. JACKSON:  I object to hearsay, what he heard from

9  the deputy.

10          THE COURT:  Sustained.

11          MR. MYHRE:  Your Honor, again, this goes to his state

12 of mind.  The information that he's receiving informs his

13 actions in the wash on both the 11th and the 12th.  So it's the

14 same bases that we offered the previous information that he

15 received.

16          MR. JACKSON:  Object on confrontation grounds as

17 well.  I would just like to be able to cross-examine this

18 deputy district director, and I don't know if he's listed on

19 their witness list.

20          MR. MYHRE:  It's not --

21          THE COURT:  Once again, the jury is instructed.  This

22 is one of those times when you are only to accept the

23 information for a limited purpose.  Not for the truth of what's

Case 2:22-cv-01040-WQH-EJY Document 19-5 Filed 03/29/22 Page 40 of 46
Case 2:16-cv-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 39 of 250

Vol. 5 - 39

Rand Stover - Direct

1          You may continue.

2          MR. MYHRE:  Thank you, Your Honor.

3   Q.   So what was the general -- again, during this

4   conversation, what was the information that was conveyed to

5   you?

6   A.   The deputy assistant director said at that particular

7   time, the FBI had never seen that number of purported militia

8   groups and organizations coming together in cooperation to one

9   area to support one common cause.

10          He recommended to the BLM that we conclude and end

11   operations, and he listed a number of what he termed "flash

12   points" to support that conclusion.

13   Q.   And what were the flash points?

14   A.   He -- he said if the BLM continued to gather cattle, it

15   would be a flash point.  If the BLM attempted to transport the

16   cattle, it would be a flash point.  If the BLM confronted the

17   Bundy family, it would be a flash point.  Or if the BLM left

18   the area en masse, it would be a flash point.

19   Q.   Now, based on that information, did that affect your

20   continuing operations?

21   A.   Yes.

22   Q.   And how did it affect it?

23   A.   It greatly affected our operations that I felt he said no

Case 2:22-cv-01040-WQH-FJY  Document 195  Filed 03/29/22  Page 41 of 46
Case 2:16-cr-00046-GMN-PAL  Document 1785  Filed 03/29/17  Page 41 of 250
Vol. 5 - 40
Rand Stover - Direct

1   Q.   Did the -- how did the call end?

2   A.   The call ended with our director and our special agent in

3   charge thanking the deputy assistant director for his time and

4   saying thank you for his analysis and conclusions.

5   Q.   Did Special Agent Love or the director of the BLM then

6   make any decisions with respect to the continuation of the

7   operations?

8   A.   They did.  At the end of the call, they determined that we

9   were going to conclude operations and stop gathering cattle.

10  Q.   Were there any decisions made with respect to the

11  disposition of the cattle?

12  A.   At that point, at that particular moment in time, no.

13  They said the top priority was to ensure the safety of the

14  civilians and the contractors working and to develop a plan to

15  get the -- to move the cattle out of the area.

16  Q.   Now, did you and the rest of the staff at the incident

17  command post take steps then to add security or enhance

18  security at the command post?

19  A.   Yes.

20  Q.   And what -- what were those steps?

21  A.   In general, I doubled the security positions around the

22  incident command post.  We called the officers that were

23  currently working in the incident command post to give them a

Case 2:22-cv-01040-CWH-EJY Document 195 Filed 03/29/22 Page 42 of 46
Case 2:13-cr-00046-CWH-PAL Document 785 Filed 03/29/22 Page 42 of 46
Vol. 5 - 41
Rand Stover - Direct

1    our incident command post and increase the number of roving

2    patrols in the area to try and gauge if any violent encounters

3    were imminent.

4              MR. MYHRE:  Your Honor, may I recall Exhibit 329,

5    please?

6              THE COURT:  Yes.

7    BY MR. MYHRE:

8    Q.   Agent Stover, this is the map we used yesterday, Exhibit

9    329.

10             Would you just, if you could, draw on this map for us

11   some of the steps that you took to increase the security around

12   the command post.

13   A.   Sure.  So, as we discussed, the main entrance to the

14   incident command post was there through that fence line and

15   down into the incident command post.

16   Q.   Okay.  You have drawn a line near that median strip on the

17   15 north and southbound lanes just north of that; correct?

18   A.   Correct.

19   Q.   And that was again referred to as what?

20   A.   It was referred to as the "post one" by our officers.

21   Q.   Okay.

22   A.   I -- so I increased the number of officers in that

23   location.  I also increased the number of officers down here in

Case 2:22-cv-01040-WQH-FJY Document 195 Filed 03/29/22 Page 43 of 46
Case 2:13-cv-00046-GMN-PAL Document 795 Filed 03/29/22 Page 43 of 250
Vol. 5 - 42

Rand Stover - Direct

1    of that southbound lane of the 15.  And that's referred to as

2    what?

3    A.    That was referred to by our officers as "post two."

4    Q.    Now, why did you put officers at post two?

5    A.    That was -- that was a potential -- not the main, but a

6    potential ingress/egress area and a definite security concern.

7    Q.    And did you enhance security elsewhere at the ICP?

8    A.    I did.

9    Q.    And where else did you place?

10   A.    I positioned officers -- this isn't representative of how

11   many, but along this general line up in here.  I increased --

12   Q.    Would you mind making that a solid line?

13   A.    Sure.  Sure.  You bet.  In the area up in here, I

14   increased the number of officers and there were also some

15   roving patrols in that area.

16   Q.    And were these officers instructed in any way as to what

17   they were going to be doing there or why they were there?

18   A.    They were.  They were there to maintain the security

19   perimeter of the incident command post and to be vigilant for

20   any potential individuals trying to -- or unauthorized

21   individuals trying to get in to the incident command post.

22   Q.    Did you enhance security elsewhere?

23   A.    Yes.

Rand Stover - Direct

1   here in this area to the north of the incident command post.

2   Q.   And why did you place someone at that position?

3   A.   Well, there -- from the -- from the north there and down

4   the wash, there is a -- the possibility that someone could come

5   into the incident command post from the north down the wash.

6   Q.   So, and I meant to ask this question when we were -- you

7   drew that line.  That line was drawn to the west of the main

8   ICP; is that correct?

9   A.   That's correct.

10  Q.   And your purpose in placing security there was what?

11  A.   That was to prevent or deter any unauthorized people from

12  getting into the incident command post and to maintain the

13  security perimeter around our incident command post.

14  Q.   So any -- did you do anything with respect to the east

15  portion of the ICP?

16  A.   Yes, there were officers in a -- in a roving patrol

17  fashion to the east.

18  Q.   Now, we discussed yesterday a little bit about the number

19  of officers you had, and you also had two shifts.  Did you take

20  steps to extend the shifts of any of the officers?

21  A.   Yes.

22  Q.   And what were those steps?

23  A.   The officers on that day on the 11th that had worked

Case 2:22-cv-01040-WQH-FJY Document 185 Filed 03/29/22 Page 45 of 46
Case 2:16-cv-00046-GMN-PAL Document 185 Filed 03/29/22 Page 45 of 250

Vol. 5 - 44
Rand Stover - Direct

1   of the 12th.

2            And the officers that were -- that had come on to

3   work the night shift of the 11th were also stationed at the

4   incident command post.

5   Q.   So you had essentially two shifts working?

6   A.   Essentially, yes.

7   Q.   Now, were these officers allowed to -- to rest that

8   evening, or were they to maintain security?  What were their

9   instructions in that regard?

10  A.   They were instructed to maintain the security of the

11  incident command post.  And if they happened to be in a

12  position where there were multiple officers, to switch off and

13  get some rest or grab a snack out of their vehicle, if they

14  could, and get a little bit of downtime.  And then switch

15  assignments and let somebody else stand the post while they

16  took a little bit of a rest.

17  Q.   And just in terms of approximation, how many officers were

18  involved in this security that evening?  That night?

19  A.   I -- I don't remember the exact number.

20  Q.   But it involved both day and night shift?

21  A.   Yes.  Or for the most part.  There were some officers that

22  that still had other assignments in -- around the hotels where

23  some employees were staying.  But the majority of the officers

Case 2:22-cv-01040-WQH-FJY Document 19-5 Filed 03/29/22 Page 46 of 46
Case 2:16-cv-00046-GMN-PAL Document 1785 Filed 03/29/17 Page 45 of 250
Vol. 5 - 45

Rand Stover - Direct

1    there, were any steps taken to provide extra security for them?

2    A.   Yes.

3    Q.   And what were those steps?

4    A.   Some of those officers or those employees were escorted

5    out by some officers.  And there were a few of the employees

6    that were required to stay there, such as people working in our

7    radio dispatch trailer.  Some of the employees that were there

8    to make sure the cattle were fed and watered, they stayed.

9         But some of the employees were allowed to leave.

10   They were escorted out by law enforcement and allowed to leave

11   to a safe location.

12   Q.   I would like to just address briefly with you how these

13   officers were equipped, not only for the evening of the

14   11th and then the following day.

15        Were the officers who were involved in the

16   impoundment operation -- were they issued any special equipment

17   or any sort of special gear to conduct this security for the

18   operation?

19   A.   In general, no.

20   Q.   Generally speaking, how -- what is the normal issue of

21   equipment for a law enforcement officer?  Let's begin with

22   the -- with the BLM ranger, for example.

23   A.   Sure.  A BLM ranger has a standard uniform.  He has a