# Exhibit 9

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              COURTROOM ADMINISTRATOR:  Off record?

 2              THE COURT:  Off record.

 3         (Recess at 11:29 a.m., until 11:36 a.m.)

 4              THE COURT:  Mr. Engel, are you ready now, sir?

 5              THE DEFENDANT:  Yes, Your Honor.

 6              MR. MARKOWITZ:  Thank you, Your Honor.

 7              THE DEFENDANT:  Good morning, Your Honor.

 8              THE COURT:  Good morning.

 9              THE DEFENDANT:  I want to thank my attorney,

10    Mr. Markowitz, for what he's done.  But may I continue where I

11    feel that he may have left off concerning the PSR?

12              THE COURT:  Yes.

13              THE DEFENDANT:  There's some issues here that I would

14    like to address with you.

15              Your Honor, concerning line 76 and the mitigating

16    factor, during the course of separating the three tiers, that

17    was approximately six weeks before my trial commenced.  I

18    would imagine at that point that the Government would have had

19    the entirety of the inculpatory evidence against me; yet, in

20    their motion separating us the tiers, they state --

21              THE COURT:  Let me clarify.  Are you asking to argue

22    or just to provide information in --

23              THE DEFENDANT:  Well, I would like to argue --

24              THE COURT:  -- allocution and mitigation of

25    sentencing?
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1            THE DEFENDANT:  I would like to argue.  Yes, Your
 2    Honor.
 3            THE COURT:  All right.  Well, that's what your
 4    attorney is for, and he's -- he's done actually a very good
 5    job of representing you and --
 6            THE DEFENDANT:  Okay.
 7            THE COURT:  So I've already made those determinations
 8    based on his argument.  But this is your opportunity to tell
 9    me anything else that you think I should know --
10            THE DEFENDANT:  Okay.
11            THE COURT:  -- in determining what your sentence
12    should be.  The new range is now 135 to 168 based on the fact
13    that I am not adding the four levels for the loss amount.
14            THE DEFENDANT:  When we -- when you read off the --
15    I'm not arguing because I know you're not going to change --
16    but read off the different things, the planning, all the
17    different things, as you well know, I didn't have any
18    planning.  I didn't know any of the Bundies prior to this.
19    Did I have a leading role in it?  No.  And I think the
20    Government knew that when they stated in a motion as they
21    separated us that our group was the least culpable.  Not just
22    less culpable.  They say the least culpable.  And they knew
23    that.  And that's why they took us to trial.  But as you well
24    know, Your Honor, I didn't -- there's no evidence that I had
25    anything to do with the Bundies or conspiracy or planning or
```

TRANSCRIBED FROM DIGITAL RECORDING

1    was a leading role in this -- in this thing.  So I just wanted

2    to address that on mitigating role.

3              On the victim-related adjustments in 3A1.2(c)(1), on

4    line 75, Your Honor, I was indicted for assault on a federal

5    officer.  I was not found guilty of assault on a federal

6    officer.  The jury was hung on that.  Yet, when you read down

7    to the fourth line, on line 75, it says on the third line,

8    "Knowing or having reasonable cause to believe that a person

9    was a law enforcement officer" -- which I knew they were law

10   enforcement officers -- "assaulted such officer during the

11   course of the offense or the immediate flight thereof."

12             Your Honor, I faced that charge in trial, assault on

13   a federal officer, and I was not convicted of that.  And now

14   the PSR wants to give me six points for assault on an officer.

15   I don't understand how that can be possible that I am now

16   being sentenced for assault on an officer when I wasn't found

17   guilty of assault on an officer, Your Honor.

18             Your Honor, on line 74, brandishing a firearm is

19   almost exactly like a 924(c).  And what this does when -- when

20   you add the five-point enhancement of brandishing or

21   possessing a firearm, it takes -- it adds 89 months to my

22   sentence from -- remove 89 months from the 210 is where I

23   would be with this five-points.  But had I been convicted of a

24   924(c), Your Honor, I would have had a minimum mandatory of 84

25   months.  So they've effectively added five extra months over

TRANSCRIBED FROM DIGITAL RECORDING

1    and above what I would have received had I been convicted of a

2    924(c).  I've been through the guidelines a million different

3    directions, and possessing a firearm usually brings a two to

4    three-level enhancement.  There's possession, there's use,

5    there's brandishing, and possession is usually the lowest one.

6    I would have preferred to have been convicted of a 924(c) than

7    to receive this five-points adding an extra five months over

8    and above a 924(c).  I don't understand how that can happen,

9    Your Honor.  I just don't.

10            Your Honor, in interstate travel and aid of

11   extortion, it says in line 71, pursuant to 2E1.2(a)(2), that

12   2B3.2 is referenced.  When you look at the guidelines,

13   Your Honor, 2'12 is the guideline for interstate travel and

14   aid of extortion.  It would have been appropriate to use in

15   this case, and then they take me and they reference 2B3.2,

16   Your Honor, which is the guideline that is used to sentence

17   people that were convicted of 1951, actual extortion.

18   Your Honor, I wasn't convicted of extortion which is 2B3.2.  I

19   was convicted of -- of interstate travel and aid of extortion,

20   which is 2E1.2.  I know they have their different directions

21   that they go to get me over there.  I just don't know how you

22   get me over there when I'm -- 2E1.2 is the appropriate

23   guideline.  And if you can't use that, then why -- Your Honor,

24   why does it exist?  Why does -- why does 2E1.2 exist if

25   anybody who's a -- convicted of interstate travel and aid of

TRANSCRIBED FROM DIGITAL RECORDING

1    extortion immediately gets taken to actual extortion and is

2    sentenced off of that guideline?

3            And under, Your Honor, 2B3.2, we have everything

4    else.  Everything comes underneath that, and that's why

5    they -- they wanted to take me there.

6            Your Honor, if you'll look at 2B3.2 and read it -- I

7    don't have it in front of me.  I apologize.  But it talks

8    about threatening and -- and fear and intimidation and all

9    these things that add up to that 18 points as the -- as the

10   base level.  But when we come down, Your Honor, to seven --

11   line 72, 2B3.2(b)(1), Your Honor, we're -- it states it's

12   involved in express or implied threat of death, bodily injury,

13   or kidnapping.  But those -- that wording, Your Honor, is

14   encompassed in the 18-points under 2B3.2 if -- if you are to

15   use that still.  It's in the 2B3.2 in the initial 18 points;

16   yet, they're doubling down and using another two-point

17   enhancement of implied threat of death or bodily injury.  And

18   once again, Your Honor, I faced a jury, and I was indicted

19   with threatening a federal officer with bodily injury and all

20   these things.  I was indicted and I faced them with

21   threatening death and all this stuff, and the jury did not

22   find me guilty of that, Your Honor.  Yet here they're adding

23   two more points for the very thing I was not found guilty of.

24   Your Honor, I understand that had I not --

25            **THE COURT:**  The burden of proof at trial is beyond a

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   reasonable doubt.
 2           THE DEFENDANT:  Yes, Your Honor.
 3           THE COURT:  The burden of proof for the sentencing
 4   factors is preponderance of the evidence.
 5           THE DEFENDANT:  Um-hum, I understand.
 6           THE COURT:  So it's a different standard, and the
 7   jury did not acquit you, which means some people thought you
 8   did and some people thought you didn't.  They just couldn't
 9   decide.  Just -- I mean, you keep asking me you can't -- you
10   don't understand, you don't understand.  I'm not able to
11   provide you legal advice and information to the extent that I
12   think you might need.  Your attorney can and probably has
13   already to quite a degree and has a much better grasp of this
14   obviously than you do right now.  And I don't mean to
15   disrespect you by saying that, but maybe keep that in mind.
16   That might help for you to understand why, when you compare
17   what the jury did or didn't do and what's happening now at
18   sentencing, there are two different burdens that apply.
19           THE DEFENDANT:  I understand, Your Honor.
20           THE COURT:  Hope that at least helps a little bit for
21   you to understand.
22           I think it's a big part of sentencing and of the
23   sentence itself for people to be able to understand what
24   happened and why so they can move on and have some closure and
25   feel that they were treated fairly by society, by the courts,
```

TRANSCRIBED FROM DIGITAL RECORDING

1   by law enforcement, by everyone, so that we can have a more

2   harmonious community the way that the constitution hoped that

3   we would be able to govern ourselves.  So that's why I try to

4   explain to you -- and you know throughout trial I did

5   sometimes, too, try to explain to you so that you would

6   understand a little better what's going on and feel more

7   comfortable with the process because I -- I feel more than

8   just that you don't understand but that you were sometimes

9   very angry about what was being done and felt that you were

10  being treated very unfairly.

11          But tell me what -- what should I consider in

12  determining your guideline -- or rather your sentence right

13  now with the guideline range of 135 to 168?

14          **THE DEFENDANT:**  Well, Your Honor, if -- if you were

15  to determine interstate travel off of 2E1.2, that's a

16  six-point base level.  But I understand that that wouldn't

17  apply because you have to go to that next -- the highest one

18  as your -- as your base level, which would be obstruction of

19  justice, which is 12 points.  So that would remove six points

20  right there, Your Honor, from the base level.  And then, from

21  there, the other enhancements of, you know, threatening a

22  federal officer and assault on an officer, those would be

23  reduced.  And branding -- like I say, brandishing a firearm,

24  Your Honor, is just -- it's so over and above what I would

25  have received had I been convicted of a 924(c), Your Honor.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              I made some serious mistakes here.  It's obvious.  I
 2     went down there, Your Honor, for -- for good intentions, but I
 3     let my -- myself get away from me.  When everything was
 4     happening, it was easy, Your Honor, to get caught up in the --
 5     in the emotion, the hype of it all.  I'm not going to sit here
 6     and make excuses to who wrote what on Facebook.  I know who
 7     posted what, and I know who didn't.  But I'll take
 8     responsibility for all of them.
 9              When I got down there on the bridge, Your Honor, and
10     I saw what was going on, you've seen the video.  I moved away.
11     I went -- I moved away fast, and I found the first law
12     enforcement officer I could to help me try to stop what was
13     going on.  I know my Facebook posts are ridiculous and I
14     shouldn't have never wrote those, and I'm sorry for it.
15              Your Honor, if any law enforcement officers who were
16     there down in that wash that day were here and I effected them
17     in any way, I would apologize to them.  I meant no harm to
18     those guys.  That's why I went the opposite direction,
19     Your Honor.  I didn't want to be seen harmful to them.
20              THE COURT:  You wish now that you didn't seem harmful
21     to them, or you don't think at the time that you wanted to be
22     harmful?  Because --
23              THE DEFENDANT:  No.
24              THE COURT:  -- here's -- I'll -- this is really,
25     really disturbing.  I'm 20 miles from Ruby Ridge, truck
```

```
 1    loaded, heading to Nevada.  Pray for peace, prepare for war.
 2    I'll be boots on the ground at 4:00 a.m.  I'm ready to go to
 3    Nevada.  I want to plow through all of the BLM's barricades
 4    and set fire to them.  Reminds me of Ruby Ridge and Waco.  Are
 5    there fed roadblocks.  I'll be there in five hours.  I won't
 6    take kindly to an illegal search.
 7            I know you weren't on drugs, but it almost sounds
 8    like this manic, crazy, emotional --
 9            THE DEFENDANT:  Your Honor --
10            THE COURT:  So -- so are we talking -- are you -- are
11    you backtracking and telling me now that you didn't mean --
12    you never meant to -- to have any forceful appearance or are
13    you telling me now that you wish you hadn't acted the way that
14    you did and realize that you got swept up in something that
15    was going to end up wrong 99 percent of the time and by the
16    grace of God didn't that one day?
17            THE DEFENDANT:  Your Honor, I didn't --
18            THE COURT:  I'm not trying to put words in your
19    mouth, but --
20            THE DEFENDANT:  No, and --
21            THE COURT:  -- if you want to be convincing, you
22    aren't going down the right road.
23            THE DEFENDANT:  Well, that's why I didn't want to
24    make excuses for my Facebook posts, Your Honor.
25            THE COURT:  Okay.
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1        THE DEFENDANT:  But since you've brought it up,

 2   during the course of traveling there, I had a friend with me.

 3   During the course of -- of being on the bridge, he was sitting

 4   in my truck charging my phone the entire time because it was

 5   dead.  And then he would bring it over to me, and we would

 6   take some pictures.  And it would die, and he would take it

 7   back.

 8        I take full responsibility of everything that's on

 9   there, but I'm here to tell you, Your Honor, I didn't post

10   every single one of those.  And a couple of those are tags

11   that I didn't post at all.  The one about burning barricades

12   and all of that, Your Honor, is a tag from somebody else onto

13   my Facebook that these gentlemen just read to you as though I

14   wrote them and I didn't.

15        I take responsibility, Your Honor, for everything

16   after the fact of driving there, being there.  When we went

17   home, the one that's embellishing about everything that

18   happened, yes, I wrote that.  But during the course of it, I

19   was driving, my friend sat in my truck, he had access to it,

20   I'm not going to make excuses because I have to own this, but

21   I want you to know that since you've just brought it up to me.

22        Obviously behind us, Your Honor, there was not 150

23   gunmen; okay?  So who -- we know there was 40 people in the

24   entire place, and there was nobody behind us.  How would I

25   text 150 behind us?  That would put them down over the side of
```

TRANSCRIBED FROM DIGITAL RECORDING

1    the bridge behind where they couldn't see anything.  He was

2    sitting in my truck.

3           I didn't want to make excuses for this.  I want to

4    own what happened here.  But, Your Honor, these gentlemen also

5    have brought up -- the Government's also brought up now you're

6    a refuge.  I went there.  They didn't say anything disparaging

7    about me being there because I went there to talk Ammon Bundy

8    into hopefully leaving that place before anybody got hurt.

9    Ammon Bundy would be able to tell you that.  I spent 45

10   minutes with him in a room literally begging him to leave

11   before anybody got hurt, and I was unsuccessful.  And now we

12   have one man that's been killed

13          **THE COURT:**  So paragraph 58 of the PSR has the post

14   that's a video posted January 13, 2016, in which you state the

15   Feds should back down from the Malheur National Wildlife

16   Refuge, and you express displeasure that Ammon Bundy, leader

17   of the occupation, chose a tactically poor plan for a

18   confrontation with the Government.  And you say, "So what now?

19   We have to come to your aid with rifles because you can't

20   handle it."

21          **THE DEFENDANT:**  And, Your Honor, nobody went to his

22   aid.  There was requests.  There was screams for the militia

23   to go there.  I went there, but I didn't go there with a gun.

24   I went there to ask him to please leave before somebody got

25   hurt.  So once again, I'm posting stuff on Facebook, but my

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    actions are different.  My actions are I went there to help.
 2    I post stuff on Facebook, Your Honor, and my actions at the
 3    Bundy Ranch show that, as soon as I saw law enforcement, I
 4    went the other way and talked to the highway patrol to please
 5    help us to keep this calm.  My Facebook posts are ridiculous,
 6    but my actions, Your Honor, are not violent.  They're not
 7    assaultive.  They're not threatening.  You've seen the video.
 8    You saw me go the opposite direction.  You saw me with Nevada
 9    Highway Patrol for over an hour.  You have that gentleman on
10    the -- on the -- testifying and he said in your courtroom I
11    was helpful.  He said I was helpful.  You saw him pat us on
12    the back as we were leaving and smiling.  How, Your Honor, was
13    I standing next to a law enforcement officer for an hour and
14    20 minutes while I assaulted federal officers, threatened them
15    with death, and was extorting people when I was 200 yards away
16    from them standing with a sergeant of the Nevada Highway
17    Patrol?  If my Facebook posts and all that grandiose didn't
18    exist, I wouldn't be here for any of them.  If my Facebook
19    didn't exist, would I have ever been arrested?  It's doubtful,
20    Your Honor.
21         Sergeant Serena said I was helpful to him.  He patted
22    me on the back as I left.  I went to the Malheur refuge not
23    with a rifle, not with the militia.  I went there to talk
24    Ammon Bundy to leave before somebody got hurt because we knew
25    that the FBI was going to ultimately move on them and we were
```

1    begging them to please leave.

2           My actions, Your Honor, are much different than

3    Facebook posts.  I've spent almost two and a half years in

4    prison, Your Honor, and I know that my attorney is asking for

5    time served.  I don't think you're going to do that, but

6    something substantial less than sending me to -- away till I'm

7    70 years old.  Your Honor, Greg Burleson, he had 57 years for

8    three minimum mandatories.  But then he was convicted of -- by

9    a jury of assault, threatening, extortion, interstate travel

10   and aid of extortion, and obstruction of justice; five charges

11   in which he received an additional 11 years.  And I'm here

12   before you with the two -- according to you, the least charges

13   of obstruction and interstate travel, and I'm facing almost 18

14   years for two of them.  I'm begging you, Your Honor, to -- to

15   not do that to me.  I'm here to tell you I'm -- whatever you

16   do and whenever I get out, I'll never be a part of -- of this

17   anymore.  I've tried to do the right thing, and -- and like

18   they say, no good deed goes unpunished.  And I tried to get

19   everything to calm down out there that day in that wash, and

20   I'm about to get sentenced to who knows what.  I posted the

21   wrong thing on Facebook, but I went to the Malheur refuge for

22   the right intentions and now that's being held against me.

23          Your Honor, I'm -- I'm at your mercy, but it's not me

24   that has suffered here as bad as it is my family.  I fear that

25   if you send me away, I won't be there for my mom's funeral or

1  my dad's.  Your Honor, I plead mercy on the Court.  That's all

2  I can do.  Not just mercy for me but mercy for my mom and my

3  sister who this has literally tortured.  And that I'm sorry

4  for it and I'm sorry for causing you grief during the trial.

5      **THE COURT:**  Is that your sister with the white shirt

6  in the front?  Which one is sister?  Okay.  So there's quite a

7  few folks that I see here that were here for the entirety of

8  this; day in, day out, day in, day out.

9      **THE DEFENDANT:**  I don't know what else to say to you,

10  Your Honor, other than I'm -- I'm -- I apologize for -- if I

11  scared any BLM officers, I would apologize to them.  I just --

12      **THE COURT:**  If you scared?  You still think that you

13  didn't scare them, that they're lying?

14      **THE DEFENDANT:**  No, no, no.  I don't know --

15  Your Honor, I was so far away from them, I wouldn't see them

16  hardly at all.  I don't know how they could see me.  That's --

17  that's the point.  I -- I was --

18      **THE COURT:**  You were here for the testimony.

19      **THE DEFENDANT:**  But, Your Honor, there was not one

20  BLM officer that ever described me from the bench, ever seen

21  me or saying he saw me dressed in any type of clothing.  I

22  don't know how he could.  I was so far down the opposite end

23  of the freeway, I don't know how he could see me.  In fact,

24  Your Honor, I was so far away when Agent Simkins put his

25  overview up there with all the dots, I was the dot with the

1    gun the furthest away than any other dot in that whole entire

2    day.  So I don't know how I threatened or assaulted anybody or

3    extorted anybody being the furthest away from the entire wash

4    and the BLM agents, standing with a law enforcement officer

5    with a weapon -- they used this picture of me, Your Honor,

6    kneeling down.  Mr. Markowitz is right.  I was in front of

7    a -- of the car and you don't see it but the Nevada Highway

8    Patrol is 10 feet away from me standing right there.  It's --

9    you can see it on the video.  Was I in the low ready position,

10   Your Honor?  Two months before that, Your Honor, I had a

11   double spinal fusion.  I had my disk cut out of my back, and I

12   have a cage in there now.  And I had that in my hand.  I

13   wasn't even released from the doctor.  I had been standing

14   there for an hour, and I had to take a knee and get the weight

15   off my brand-new double spinal fusion.  I'm not in the low

16   ready position.  Everybody else is standing around having

17   conversations because we couldn't see all the way down there

18   the Bureau of Land Management hardly at all.  So there was no

19   threat from them to us.  We were so far away.  I don't know

20   how I could have been threatening to a BLM officer at that

21   distance.

22          I was the first dot on Agent Simkins' map.  There was

23   how many people with rifles in the wash right up against the

24   fence?  Your Honor, how many other people testified or do you

25   know of that worked with law enforcement to try to calm the

1   situation down?  There wasn't anybody.  I'm the only one.  The

2   only one out of 400 people that day that was begging a highway

3   patrolman to please help calm the situation down and how to do

4   that, to get the BLM to please stop pointing rifles at the

5   people because it was causing the people to point rifles back.

6   And I didn't want it to escalate.  That's why I'm yelling at

7   everybody to stand down, please stand down.  I don't know how

8   much further I could have gone away.  If I would have gone

9   away any further from the protest, I wouldn't have been on

10  Agent Simkins' map of dots.  That's why I say I don't know how

11  I threatened them.  Not one of them described me from the

12  stand.  Not one of them ever described me in one of their

13  reports, they 302s or MOAs.  Nobody does.  The only person

14  that describes me is the two highway patrol officers who said

15  I was helpful in their MOAs, was very cooperative.

16          I posted stuff on Facebook, and it's going to put me

17  in prison.  I didn't post all of that, but I'll take

18  responsibility because I have to.  I'm not one to make

19  excuses.

20          Your Honor, my life's in your hands.  I don't know

21  what else to say.

22          **THE COURT:**  Thank you, Mr. Engel.

23          Does the probation office have anything to add?

24          **PROBATION OFFICER:**  No, Your Honor.  Thank you.

25          **THE COURT:**  And does the Government have any victims

TRANSCRIBED FROM DIGITAL RECORDING

1    who wish to be heard?

2          **MR. SCHIESS:**  Your Honor, we rely upon the victim

3    statements that are in the presentence report.

4          **THE COURT:**  The Court has heard the statements of

5    counsel for the Government, counsel for the defense, and the

6    defendant's statements.  I've read the presentence report

7    submitted by the probation office, and I do find that the

8    calculation is correct with the exception of the four level

9    amount of loss added to the base offense level.  So I do find

10   that the appropriate total offense level is a 33, which

11   provides a guideline range of 135 to 168.  Is that right,

12   Officer?

13         **PROBATION OFFICER:**  That's correct, Your Honor.

14         **THE COURT:**  All right.  And the Court has already

15   considered the factors set forth in Title 18 of the United

16   States Code Section 3553(a).  It's clear to me that Mr. Engel

17   is still in denial and still doesn't understand or maybe

18   doesn't wish to understand, wants to manipulate the

19   information, what he's heard and what he believes to be true.

20   I'm not sure how much of it is -- is an act and how much of it

21   is just that he's so deep in this rhetoric that he can't see

22   the difference between reality and a persecution that he feels

23   and that he's the only person out of 400 people there who was

24   trying to calm everybody down.  It's a very dangerous thing.

25   Perhaps that's what the jury saw when they convicted you and

1    chose not to convict the others and only you and Mr. Burleson.

2    I hope that you use this time not to dig deeper into this

3    feeling of being treated unfairly but that you start to

4    realize the pain that you really did cause and that there are

5    people that you did really effect in a very real way;

6    individuals who don't get paid all that much and spend a lot

7    of time defending the community to keep the peace, who really

8    are trying to keep the peace as their job, and they sacrifice

9    to do that every day.  And they were faced with a situation

10   unlike anything that anyone has ever seen here in terms of

11   being face-to-face with the reality of death.  So many of them

12   called their family to say I don't know if I'm coming home

13   tonight, this might be it.  And even afterwards struggling

14   with that fear and that constant reminder and trying to get

15   over it and finding that they can't and that they still have

16   there -- trying to play with their kids and instead they're

17   making Legos and they're still thinking about the situation

18   and they go up to perform just a very routine stop, a traffic

19   stop, and they think that they've got it all together and they

20   hear their voice trembling.

21         I know you were here.  You've seen the videos.  I

22   know you've read transcript.  It doesn't seem to sink in, and

23   those -- I'm not a therapist.  So there's not very much that I

24   can really say or do, so I'm just kind of wasting everybody's

25   time, I'm afraid.  But I think that's what it comes down to,

1   though, is that you're still in denial, and it's still a very

2   dangerous thing.

3           So, Mr. Engel, if you'll please stand.  You're hereby

4   committed to the Bureau of Prisons for Count 12 a term of 120

5   months, for Count 16, 168 months concurrent to each other.

6   And this is the sentence that the Court does find to be

7   sufficient but not more than necessary to comply with the

8   purposes of sentencing.  There will be no fine due to your

9   financial condition.  I understand that you're -- it states in

10  the probation office that your home and your land and all of

11  your assets were sold off to your sister, so you don't have

12  any financial income to pay for a fine.  So the fine is

13  waived.

14          And restitution will be determined at a later date

15  after I can be provided with the information.  I do find that

16  it is reasonable and necessary to give the Government an

17  opportunity because there wasn't any prior notice that the

18  restitution affidavit would be questioned or objected to.  So

19  I think it is fair to give the Government that opportunity.

20  They can submit either a redacted form, if they want to file

21  it publicly or they can just submit an *in camera* evidence of

22  the -- either the -- oh, what is it?  The time sheets or

23  whatever information that they want the Court to consider,

24  they should be made available to Mr. Markowitz as well.  He

25  can come to your office and look at it, or if you want to give

1    him a redacted copy.  You can figure that out.

2          But there's also a mandatory penalty assessment of

3    $100 per count.  There's two counts.  So that's a 200-dollar

4    total amount that is due immediately.

5          And supervised release is imposed for a term of three

6    years per count concurrent.  I am imposing the standard as

7    well as the mandatory conditions of supervised release and the

8    following three special conditions:

9          No. 1, you must participate in an outpatient

10   substance abuse treatment program and follow the rules and

11   regulations of that program and the probation office will

12   supervise your participation in the program regarding the

13   provider, location, modality, duration, intensity.  And you

14   must pay the cost of the program.

15         No. 2, you must not communicate or otherwise interact

16   with any co-conspirators either directly or through someone

17   else without first obtaining the permission of the probation

18   officer.

19         And No. 3, you shall submit to the search of your

20   person, your property, your residence -- this is the wrong

21   one.  Do you have the new one, Aaron?

22         **COURTROOM ADMINISTRATOR:**  I do, Your Honor.  I'm

23   pulling it up now.

24         **THE COURT:**  I have a copy printed up because this

25   happens so often.  We've got new language, and it doesn't

TRANSCRIBED FROM DIGITAL RECORDING

1    always make its way on to the...

2            I don't have a copy.  Do you have it?  All right.

3    Thank you.

4            You must submit your person, property, house,

5    residence, vehicle, papers, computers as defined in Title 18

6    United States Code Section 1030(e)(1), other electronic

7    communications or data storage devices or media or office to a

8    search conducted by the United States probation officer.

9    Failure to submit to the search may be grounds for revocation

10   of release, and you must warn any other occupants that your

11   premises may be subject to search pursuant to this condition.

12   And the probation officer may conduct a search under this

13   condition only when reasonable suspicion exists that you have

14   violated a condition of supervision and that the areas to be

15   searched contain evidence of this violation.  Any search must

16   be conducted at a reasonable time and in a reasonable manner.

17           Do you have a copy of those conditions --

18           **PROBATION OFFICER:**  I do, Your Honor.

19           **THE COURT:**  -- to provide to the defendant?

20           All right.  So those are the conditions being

21   provided to you.  If for any reason you lose that document

22   before you're released, you can go to any federal probation

23   office to receive a new copy.  And if you have any questions

24   or concerns about those conditions, you can ask for

25   modifications to be made.  The probation office does have some

TRANSCRIBED FROM DIGITAL RECORDING

1  discretion to make modifications on their own.  Otherwise, if
2  they don't, then a motion has to be filed with the Court, and
3  then the Court will have to determine whether or not the
4  modification requested is appropriate.
5      Let's see.  You do -- this is for your appeal.  I'm
6  advising you now that you do have only 14 days to file a
7  notice of appeal, if you would like to do so.  If you cannot
8  afford an attorney, the Court will appoint one for you free of
9  charge.  If you cannot afford a copy of the court transcript,
10  one will be prepared for you at the Government's expense.  You
11  just need to let the Court know.
12      Was there any forfeiture being sought today?
13      **MR. SCHIESS:**  No, Your Honor.
14      **THE COURT:**  I know there was originally.
15      **MR. SCHIESS:**  No, Your Honor.
16      **THE COURT:**  But not anymore?  All right.
17      And Mr. Markowitz, do you have a recommendation for a
18  particular facility or geographical region for Mr. Engel to
19  serve his sentence?  I'm not guaranteeing he'll be placed
20  there, but I will place on the Judgment of Conviction a
21  recommendation.  And it's my understanding the Bureau of
22  Prisons, if he qualifies, tries to comply with that
23  recommendation.
24      **MR. MARKOWITZ:**  May I have a moment, Your Honor?
25      **THE COURT:**  Of course.

TRANSCRIBED FROM DIGITAL RECORDING

1    **MR. MARKOWITZ:** Your Honor, for convenience sake,

2    since I intend to continue to represent Mr. Engel in his

3    appeal, so we will notify the Court through the direct process

4    with the docket as well as the records that we will be

5    appealing the conviction, we're asking the Court to place him

6    in either Arizona or California, some place accessible to me

7    and in the grand scheme of things easily gotten to by his

8    family. So we're going to leave that up to the Court and the

9    Bureau of Prisons, but California or Arizona would be

10   appropriate.

11        **THE COURT:** All right. And so California's really

12   big --

13        **MR. MARKOWITZ:** Southern California.

14        **THE COURT:** -- so anywhere in California or --

15        **MR. MARKOWITZ:** No. Southern California, Your Honor.

16   Thank you.

17        **THE COURT:** I just wanted to make sure. All right.

18   So I will place that in the Judgment of Conviction that I do

19   recommend that he be placed, if possible, in a facility in

20   either Southern California or Arizona so he can remain close

21   to his attorney who will be representing him for --

22        **MR. MARKOWITZ:** I have one more question for the

23   Court.

24        **THE COURT:** Yes.

25        **MR. MARKOWITZ:** Will he be granted any credit for the

 1    time he's already served?

 2            THE COURT:  That's up to the Bureau of Prisons, but I

 3    have no reason to believe that he would not be receiving

 4    credit for the time that he's already served because he only

 5    served the time for this case.  Sometimes people are in

 6    custody for a state court case and not for, you know, the case

 7    here in Federal Court.  So then they start off with zero time.

 8            MR. MARKOWITZ:  Understood.

 9            THE COURT:  But he doesn't have any other cases.  He

10    only has this case.  So all the time that he's serving I

11    believe is for this case.  If I'm wrong -- that's -- the

12    Bureau of Prisons looks at everything else, and they're the

13    ones who make that determination.  If you think that their

14    calculation is incorrect, there is an administrative process

15    for appealing those calculations.  But the Court doesn't --

16    doesn't have anything to do with that.

17            MR. MARKOWITZ:  Understood, Your Honor.  Thank you.

18            THE COURT:  But I hope that eases your mind at least

19    is I think there's no reason why he wouldn't be receiving

20    time.  I don't know the calculation for good time credits, if

21    there's some extra time because he's at the Pahrump jail

22    instead of a prison facility and whether or not he's lost

23    because of any infractions.  That's why the Bureau of Prisons

24    handles all of that.

25            All right.  Now, we do need to set -- I was thinking

TRANSCRIBED FROM DIGITAL RECORDING

1   maybe 30 days.  I don't know how much time because it's summer

2   and people are taking vacations.  Mr. Schiess, how much time

3   it would take for you to obtain the information that you need

4   to provide the Court --

5           **MR. SCHIESS:**  Your Honor --

6           **THE COURT:**  -- to --

7           **MR. SCHIESS:**  -- may I ask 45 days, please.

8           **THE COURT:**  Forty-five days?

9           **MR. SCHIESS:**  Yes, ma'am.

10          **MR. MARKOWITZ:**  May I ask where that falls on the

11  calendar?

12          **THE COURT:**  Yes.  Aaron's going to pull that up for

13  us and tell us what day of the week and what time.

14          **COURTROOM ADMINISTRATOR:**  Your Honor, that would be

15  the first week of September, and I'm looking at Wednesday,

16  September 5, 2018, at 9:00 a.m.

17          **THE COURT:**  All right. so are you available,

18  Mr. Markowitz, on Wednesday, September 5, at 9:00 a.m.?

19          **MR. MARKOWITZ:**  With all due respect, Your Honor, I

20  have a funny feeling I'm going to be in Syracuse.  My

21  daughter's going to college.

22          **THE COURT:**  Oh.

23          **MR. MARKOWITZ:**  I think I'm dropping her off that

24  week.  So I -- may I inform the Court within the next couple

25  of days?  Would that be acceptable?

TRANSCRIBED FROM DIGITAL RECORDING

1       **THE COURT:** We'll go ahead and set it now for

2 Wednesday, September 5 at 9:00 a.m., and then the parties can

3 get together and see if you find a different time that's more

4 convenient. And then please contact my courtroom deputy to

5 see what the Court's availability is so you can just file a

6 stipulation for a new date if you need to.

7       **MR. MARKOWITZ:** Thank you.

8       **MR. SCHIESS:** Thank you.

9       **THE COURT:** Anything else, Aaron, or anything else

10 the probation office needs me to clarify?

11       **PROBATION OFFICER:** A clarification, Your Honor.

12 Going back to the beginning of our hearing, we talked about

13 the Facebook posts and whether or not to incorporate a

14 sentence --

15       **THE COURT:** Right.

16       **PROBATION OFFICER:** -- determined that.

17       **THE COURT:** So I did order that the term sniper be

18 removed from paragraph 42 and 54. I was satisfied with the

19 posts made in paragraph 45, and as to the posts made in

20 paragraph 48 through 55, I think the dispute that remained was

21 paragraph 50. So I will order you to add to that paragraph at

22 the end that the defendant disputes making that post; although

23 he sort of later said he would take responsibility for it.

24 But I think it's fair to say that he disputes actually making

25 the post whether or not he adopts it or takes responsibility

TRANSCRIBED FROM DIGITAL RECORDING

1    for it.  So that was just as to paragraph 50 was the only one

2    that was -- did not have sufficient evidence to support that

3    statement without more.

4            And then the other -- does that answer your question?

5            **PROBATION OFFICER:**  Yes, Your Honor.  Thank you.

6            **THE COURT:**  Okay.  All right.  Anything else, Aaron,

7    that you need?

8            **COURTROOM ADMINISTRATOR:**  No, Your Honor.

9            **THE COURT:**  All right.  Then we'll be in recess.  Off

10   record.

11           **COURTROOM ADMINISTRATOR:**  Off record.

12       *(Proceedings adjourned at 12:21 p.m.)*

13                                    * * *

14       I, AMBER M. McCLANE, court-appointed transcriber, certify

15   that the foregoing is a correct transcript transcribed from

16   the official electronic sound recording of the proceedings in

17   the above-entitled matter.

18

19   /s/  *Amber M. McClane*                 9/28/2018
         Amber M. McClane, CCR 914           Date

20

21

22

23

24

25