**Exhibit 1**

Case No. 18-10287

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*

v.

CLIVEN D. BUNDY, et al
*Defendants-Appellees*

From the United States District Court For the District of Nevada
The Honorable Gloria Navarro, Presiding
Case No. 2:16-CR-00046-GMN-PAL-1

**APPELLEE'S EXCERPTS OF RECORD VOLUME 1**

Larry Klayman, Esq.
2020 Pennsylvania Avenue,
N.W.  Suite 800
Washington, D.C. 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com
Counsel for Appellee Cliven Bundy

Date: August 21, 2019

## **TABLE OF CONTENTS**

Transcript of Proceedings from December 20, 2017 ...............................0001 - 0035

Transcript of Proceedings from January 8, 2018 ....................................0037 - 0059

Larry Wooten's Whistleblower Memorandum .......................................0060 - 0075

Cover Letters from Bureau of Land Management ..................................0076 - 0084

Excerpts from Documents Release by Bureau of Land Management .....0085 - 0250

Larry "Clint" Wooten

---

**From:** Larry C. Wooten
    Special Agent
    U.S. Department of Interior, Bureau of Land Management
    1387 S. Vinnell Way, Boise, ID 83709
    Office Phone █████████ Gov't Cell Phone: █████████,
Email:█████████
    Personal Cell Phone█████████ Personal Ema█████████

**To:** Andrew D. Goldsmith
    Associate Deputy Attorney General
    National Criminal Discovery Coordinator
    Email: █████████

**Subject:** Disclosure and Complaint Narrative in Regard to Bureau of Land Management Law Enforcement Supervisory Misconduct and Associated Cover-ups as well as Potential Unethical Actions, Malfeasance and Misfeasance by United States Attorney's Office Prosecutors from the District of Nevada, (Las Vegas) in Reference to the Cliven Bundy Investigation

**Reference:** DI-17-2830, MA-17-2863, LM14015035, District of Nevada Case 2:16-cr-00046-GMN-PAL (United States of America v. Cliven Bundy, et al)

**Issue:** As a U.S. Department of Interior (DOI), Bureau of Land Management (BLM). Office of Law Enforcement and Security (OLES) Special Agent (SA) and Case Agent/Lead Investigator for the Cliven Bundy/2014 Gold Butte Trespass Cattle Impound Case out of the District of Nevada in Las Vegas (Case 2:16-cr-00046-GMN-PAL-United States of America v. Cliven Bundy, et al), I routinely observed, and the investigation revealed a widespread pattern of bad judgment, lack of discipline, incredible bias, unprofessionalism and misconduct, as well as likely policy, ethical, and legal violations among senior and supervisory staff at the BLM's Office of Law Enforcement and Security. The investigation indicated that these issues amongst law enforcement supervisors in our agency made a mockery of our position of special trust and confidence, portrayed extreme unprofessional bias, adversely affected our agency's mission and likely the trial regarding Cliven Bundy and his alleged co-conspirators and ignored the letter and intent of the law. The issues I uncovered in my opinion also likely put our agency and specific law enforcement supervisors in potential legal, civil, and administrative jeopardy.

When I discovered these issues, I promptly reported them to my supervisor (a BLM Assistant Special Agent-in-Charge, but also my subordinate co-case agent). Often, I realized that my supervisor was already aware of the issues, participated in, or instigated

2

the misconduct himself, was present when the issues were reported to both of us, or was the reporting party himself. When I reported these issues, my supervisor seemed generally unsurprised and uninterested and was dismissive, and seemed unconcerned.

I tried to respectfully and discretely urge and influence my supervision to stop the misconduct themselves, correct and/or further report the issues as appropriate and remind other employees that their use of electronic communications was likely subject to Federal Records Protections, the case Litigation Hold, the Freedom of Information Act (FOIA) and Case/Trial Discovery. I also tried to convey to my supervisor that the openly made statements and actions could also potentially could be considered bias, used in witness impeachment and considered exculpatory and subject to trial discovery.

As the Case Agent and Lead Investigator for the DOI/BLM (for approximately 2 years and 10 months), I found myself in an unusual situation. I was specifically asked to lead a comprehensive, professional, thorough, unbiased and independent investigation into the largest and most expansive and important investigation ever within the Department of Interior. Instead of having a normal investigative team and chain of command, a BLM Assistant Special Agent-in-Charge (ASAC) decided to act as a subordinate co-case agent, but also as my supervisor. Agent's senior to me acted as my helpers. I was basically the paper work, organizational and research guy. I did all the stuff that the senior and supervisory agents didn't want to do, but they called me the "Case Agent" and "Lead Investigator." They often publicly recognized and thanked me, and nominated me for many awards, but their lack of effort and dependability led to numerous case issues. During this timeframe, my supervisor (but subordinate), a BLM ASAC specifically wanted and had the responsibility of liaison and coordinator for interaction with higher agency officials, cooperating/assisting agencies and with the U.S. Attorney's Office. Although the BLM ASAC was generally uninterested in the mundane day to day work, he specifically took on assignments that were potentially questionable and damaging (such as document shredding research, discovery email search documentation and as the affiant for the Dave Bundy iPad Search Warrant) and attended coordination and staff meetings. Sometimes, I felt like he wanted to steer the investigation away from misconduct discovery by refusing to get case assistance, dismissing my concerns and participating in the misconduct himself. In February of 2017, it became clear to me that keeping quite became an unofficial condition of my future employment with the BLM, future awards, promotions, and a good future job reference.

The longer the investigation went on, the more extremely unprofessional, familiar, racy, vulgar and bias filled actions, open comments, and inappropriate electronic communications I was made aware of, or I personally witnessed. In my opinion, these issues would likely undermine the investigation, cast considerable doubt on the professionalism of our agency and be possibly used to claim investigator bias/unprofessionalism and to impeach and undermine key witness credibility. The ridiculousness of the conduct, unprofessional amateurish carnival atmosphere, openly made statements, and electronic communications tended to mitigate the defendant's culpability and cast a shadow of doubt of inexcusable bias, unprofessionalism and embarrassment on our agency. These actions and comments were in my opinion offensive in a professional federal law enforcement work environment and were a clear

3

Subpoena by former Congressman Jason Chaffetz and the February 14, 2017, letter that Congressman Jason Chaffetz and Congressman Blake Farenthold sent the U.S. Department of Interior's Deputy Inspector General, Ms. Mary L. Kendall regarding Dan Love allegedly directing the deletion of official documents). Also after this, I believe I overheard part of a conversation in an open office space where my supervisor was speaking to a BLM SAC as they discussed getting access to my government email account. Note: *The personal notes that I was directed to turn in and the items seized from my office and safe wasn't for discovery, because I was transferring to another agency, because I was the subject of an investigation, or because my supervisor simply needed to reference a file. These items were taken because they contained significant evidence of misconduct and items that would potentially embarrass BLM Law Enforcement Supervision.* Additional Note: *The BLM ASAC also ordered me not to contact the U.S. Attorney's Office, even on my own time and with my personal phone. Later, when I repeatedly asked to speak with the BLM OLES Director, my requests went unanswered until April 26, 2017. The BLM ASAC simply told me it is clear no one wants to speak with me and that no one is going to apologize to me.* Further Note: *In this same secured individual office space and safe, I kept copies of my important personal documents such as medical records, military records, family personal papers, computer passwords, personal property serial numbers, etc., as a precaution in case for some reason my house is destroyed and personal papers are lost/destroyed. It was clear to me the BLM ASAC didn't know what he seized and when I told him about my personal papers, the BLM ASAC just told me "no one is interested in your medical records." It is unknown what unrelated case materials, notes, and personal documents were actually taken and it is impossible for me, any misconduct investigator, or any attorney to prove to a court or Congress what case information was taken. I still haven't heard back what (if any) personal items were in the seized materials and I don't know where the seized materials are being stored. It should be noted that I am missing personal medical physical results that I previously has stored in my office. Additionally, I believe if the BLM ASAC found my accidently seized medical records, instead of giving them back to me, he would shred them just like I have seen him shred other items from an agent that he didn't like. (I can elaborate on this.)*

Please Note: *This seized case related material (to include the hard drives) contains evidence that directly relates to a BLM SAC's heavy handedness during the 2014 Gold Butte Nevada Trespass Cattle Impound, the BLM SAC ignoring U.S. Attorney's Office and higher level BLM direction, documentation of the BLM SAC's alleged gross supervisory misconduct, potential misconduct and violation of rights issues during the 2014 Gold Butte Nevada Trespass Cattle Impound, as well as potential emails that were possibly identified and captured before they could have been deleted (as identified as an issue in the Office of Inspector General Report and possibly concerning a Congressional subpoena). I believe this information would likely be considered substantive exculpatory/jencks material in reference to the Cliven Bundy Nevada Series of Trials and would be greatly discrediting and embarrassing, as well as possibly indicate liability on the BLM and the BLM SAC.*

I am convinced that I was removed to prevent the ethical and proper further disclosure of the severe misconduct, failure to correct and report, and cover-ups by BLM OLES

7

supervision. My supervisor told me that AUSA Steven Myhre "furiously demanded" that I be removed from the case and mentioned something about us (the BLM, specifically my supervisor) not turning over (or disclosing) discovery related material (which is true), issues I had with the BLM not following its own enabling statute (which is true, I can elaborate on that later), and a personal issue they thought I had with former BLM SAC Dan Love. Note: *Prior to taking the assignment as Bundy/Gold Butte Investigation Case Agent/Lead Investigator for the BLM/DOI, I didn't know and had never spoken to former BLM SAC Dan Love. I was new to the agency and I was also specifically directed to lead an unbiased, professional, and independent investigation, which I tried to do, despite supervisory misconduct. Time after time, I was told of former BLM SAC Love's misconduct. I was told by BLM Law Enforcement Supervisors that he had a Kill Book" as a trophy and in essence bragged about getting three individuals in Utah to commit suicide (see Operation Cerberus Action out of Blanding, Utah and the death of Dr. Redd), the "Failure Rock," Directing Subordinates to Erase Official Government Files in order to impede the efforts of rival civilian BLM employees in preparation for the "Burning Man" Special Event, unlawfully removing evidence, bragging about the number of OIG and internal investigations on him and indicating that he is untouchable, encouraging subordinates not to cooperate with internal and OIG investigations, his harassment of a female Native American subordinate employee where Mr. Love allegedly had a doll that he referred to by the employees name and called her his drunk little Indian, etc., etc., etc. (I can further explain these many issues.)*

Following this, I became convinced that my supervisor failed to properly disclose substantive and exculpatory case and witness bias related issues to the U.S. Attorney's Office. Also, after speaking with the BLM OLES Chief of the Office of Professional Responsibility/Internal Affairs and two former BLM ASAC's, I became convinced that the previous BLM OLES Director Salvatore Lauro not only allowed former BLM SAC Dan Love complete autonomy and discretion, but also likely provided no oversight and even contributed to an atmosphere of cover-ups, harassment and retaliation for anyone that questioned or reported former BLM SAC Dan Love's misconduct.

In time, I also became convinced (based on my supervisor and Mr. Myhre's statements) that although the U.S. Attorney's Office was generally aware of former BLM SAC Dan Love's misconduct and likely civil rights and excessive force issues, the lead prosecutor (currently the Acting Nevada United States Attorney) Steven Myhre adopted an attitude of "don't ask, don't tell," in reference to BLM Law Enforcement Supervisory Misconduct that was of a substantive, exculpatory and incredible biased nature. Not only did Mr. Myhre in my opinion not want to know or seek out evidence favorable to the accused, he and my supervisor discouraged the reporting of such issues and even likely covered up the misconduct. Furthermore, when I did report the misconduct, ethical, professional, and legal issues, I also became a victim of whistleblower retaliation.

Additionally, AUSA Steven Myhre adopted a few troubling policies in reference to this case. When we became aware that Dave Bundy's seized iPad likely contained remarks from BLM Law Enforcement Officers that is potentially evidence of civil rights violations and excessive use of force, Mr. Myhre and my supervisor not only apparently failed initiate the appropriate follow-on actions, Mr. Myhre apparently failed to notify the

8

Defense Counsel and also decided not to return the iPad back to Dave Bundy, even though the iPad wasn't going to be searched pursuant to a search warrant or used as evidence in trial and Dave Bundy claimed he needed the iPad for his business. Mr. Myhre also adopted a policy of not giving a jury the option or ability to convict on lesser offenses and instead relied on a hard to prove, complicated prosecution theory in order to achieve maximum punishments (which has generally failed to this point). Also, the government relied on factually incorrect talking points and on (or about) February 15, 2017, misrepresented the case facts about government snipers during trial (it is unknown if this misrepresentation was on purpose or accidental, I can explain this in detail). Note: *The investigation indicated that there was at least one school trained Federal Sniper equipped with a scoped/magnified optic bolt action precision rifle, another Federal Officer equipped with a scoped/magnified optic large frame (308 caliber) AR style rifle, and many officers that utilized magnified optics with long range graduated reticles (out to 1,000 meters-approximately 500 meters on issued rifles depending on environmental conditions) on standard law enforcement issued AR (223 caliber/5.56mm) and that often officers were in "over watch" positions. Additionally, the investigation also indicated the possibility that the FBI and the Las Vegas Metropolitan Police Department had law enforcement snipers/designated marksmen on hand for possible deployment.*

The reporting of these severe issues and associated cover-ups are a last resort. I tried continually to respectfully and discretely influence my chain of command to do the right thing and I made every effort to make sure the Prosecution Team had the information they needed and were accurate in their talking points. I just wanted the misconduct to stop, the necessary and required actions be taken and I wanted to be sure these issues wouldn't create a fatal error in the case and further undermine our agency's mission. I also needed to be convinced that I was correct. If I was wrong, or errors were simply mistakes or simple errors in professional judgement or discretion, I didn't want to create more problems or embarrass anyone. However, my personal experience and investigation indicated that not only did my management fail to correct and report the misconduct, they made every effort to cover it up, dismiss the concerns, discourage its reporting and retaliate against the reporting party. I also tried to make sure that despite my supervisor's failings, the Prosecution Team had the most accurate information in terms of case facts, Discovery, and witness liability.

The Whistleblower Retaliation and agency wrongdoing is being investigated by the U.S. Office of Special Counsel and is also being looked at by the House Committee on Natural Resources (Subcommittee on Oversight & Investigations) and the House Oversight and Government Reform Committee (Subcommittee on the Interior, Energy, and the Environment). Additionally, a formal complaint has been filed with my agency in reference to the religious, sexually vulgar, and the other workplace harassment. Furthermore, there have been several investigations by the DOI Office of Inspector General (OIG) that at least in part contributed to the recent firing of BLM Special Agent-in-Charge Dan Love (which I wasn't a part of).

I ask that your office ensure that Acting United States Attorney Steven Myhre and the rest of the Cliven Bundy/Gold Butte Nevada Prosecution and Investigative Team is

9

conducting the prosecution in an ethical, appropriate, and professional matter. I also specifically ask that your office provide oversight to Mr. Myhre and his team regarding the affirmative responsibility to seek out evidence favorable to the accused, not to discourage the reporting of case issues and suspected misconduct, to report/act on suspected civil rights violations and not to retaliate against an agent that does his required duty. I also ask that your office ensure that the Prosecution Team is free of bias and has ethically and correctly turned over exculpatory evidence to the Defense. I ask that as appropriate, prosecution team bias (by Mr. Myhre and possibly by AUSA Daniel Schiess) and factually incorrect talking points (by AUSA Nadia Ahmed and Mr. Myhre) be disclosed and corrected. Note: *Mr. Myhre previously referred to the defendants as a cult and Mr. Schiess said let's get these "shall we say Deplorables." I was also asked "You're not a Mormon are you." (I can explain these and similar issues in detail.)*

I don't make this complaint lightly. I do this with a heavy heart and I hope that at least in some ways I am mistaken. However, I know that is extremely unlikely. When we speak I can identify subjects, witnesses, and the location of evidence and corroborating information.

I believe this case closely mirrors the circumstances of former Alaska Senator Ted Stevens trial. As you may notice from the trials and several defense cross-examinations, very little of the impeachment and exculpatory issues were brought up by the defense. I believe this is most likely because the defense counsel was unethically not made aware of them and the severe issues were covered up. Additionally, I believe I can easily show that both my supervision and possibly Mr. Myhre entered into an unethical agreement to remove me from being the lead investigator and case agent for the BLM/DOI due to my objection to, and disclosure of outrageous misconduct, the belief that my testimony under oath would embarrass supervisory law enforcement officials in our agency and negatively affect the prosecution, my insistence that my supervisor stop his individual misconduct, correct the misconduct of other employees and report the misconduct as appropriate (for counseling, correction, discipline and the possible required internal investigations) and my belief that my agency is violating the letter and intent of the law.

In regard to prosecution team misconduct, I believe some of it may be attributable to simple mistakes and simple poor judgement. However, I believe it is unlikely (if my supervisor's statements to me are true) that Mr. Myhre wasn't himself acting unethically and inappropriately. Prior to the last few weeks of the investigation, I held Mr. Myhre in the highest of regards. He is an extremely hard worker and very intelligent. However, I feel that his judgement is likely clouded by extreme personal and religious bias and a desire to win the case at all costs. I feel he is likely willing to ignore and fail to report exculpatory material, extreme bias and act unethically and possibly deceptively to win.

All in all, it is my assessment and the investigation showed that the 2014 Gold Butte Trespass Cattle Impound was in part a punitive and ego driven expedition by a Senior BLM Law Enforcement Supervisor (former BLM Special Agent-in-Charge Dan Love) that was only in part focused on the intent of the associated Federal Court Orders and the mission of our agency (to sustain the health, diversity, and productivity of America's public lands for the multiple use and enjoyment of present and future generations). My

EOR0068

investigation also indicated that the involved officers and protestors were themselves pawns in what was almost a great American tragedy on April 12, 2014, in which law enforcement officers (Federal, State, and Local), protestors, and the motoring public were caught in the danger area. This investigation also indicated, the primary reasons for the escalation was due to the recklessness, lack of oversight, and arrogance of a BLM Special Agent-in-Charge and the recklessness, failure to adhere to Federal Court Orders and lack of recognition of the Federal Government in matters related to land management within Nevada, by Rancher Cliven Bundy.

The investigation further indicated that the BLM SAC's peers didn't likely attempt to properly influence or counsel the BLM SAC into more appropriate courses of action and conduct or were unsuccessful in their attempts. The investigation indicated that it was likely that the BLM SAC's peers failed to report the BLM SAC's unethical/unprofessional actions, misconduct, and potential crimes up the chain of command and/or to the appropriate authorities, or that the chain of command simply ignored and dismissed these reports. The investigation further indicated when individuals did report issues with the BLM SAC, the reports were likely ignored or marginalized by higher BLM OLES officials. The investigation also indicated that former BLM OLES Director Salvatore Lauro likely gave the former BLM SAC complete autonomy and discretion without oversight or supervision. The investigation further indicated that it was unlikely that the BLM OLES Director wasn't aware of the BLM SAC's unethical/unprofessional actions, poor decisions, misconduct, and potential crimes. My investigation and personal observations in the investigation further revealed a likely unethical/unlawful "cover-up" of this BLM SAC's actions, by very senior law enforcement management within BLM OLES. This investigation indicated that on numerous occasions, senior BLM OLES management broke their own policies and overlooked ethical, professional, and conduct violations and likely provided cover and protection for the BLM SAC and any activity or operation this BLM SAC was associated with. My investigation further indicated that the BLM's civilian leadership didn't condone and/or was likely unaware of the BLM SAC's actions and the associated cover-ups, at least until it was too late.

During the investigation, I also came to believe that the case prosecution team at United States Attorney's Office out of Las Vegas in the District of Nevada wasn't being kept up to date on important investigative findings about the BLM SAC's likely alleged misconduct. I also came to believe that discovery related and possibly relevant and substantive trial, impeachment, and biased related and/or exculpatory information wasn't likely turned over to, or properly disclosed to the prosecution team by my supervisor.

I also came to believe there were such serious case findings that an outside investigation was warranted on several issues to include misconduct, ethics/code of conduct issues, use of force issues (to include civil rights violations), non-adherence to law, and the loss/destruction of, or purposeful non-recording of key evidentiary items (Unknown Items 1 & 2, Video/Audio, April 6, 2014, April 9, 2014, April 12, 2014-the most important and critical times in the operation). I believe these issues would shock the conscious of the public and greatly embarrass our agency if they were disclosed.

11

EOR0069

Ultimately, I believe I was removed from my position as Case Agent/Lead Investigator for the Cliven Bundy/Gold Butte, Nevada Investigation because my management and possibly the prosecution team believed I would properly disclose these embarrassing and substantive issues on the stand and under oath at trial (if I was asked), because my supervision believed I had contacted others about this misconduct (Congress, possibly the defense and press) and possibly audio recorded them, because I had uncovered, reported, and objected to suspected violations of law, ethics directives, policy, and the code of conduct, and because I was critical of the misconduct of a particular BLM SAC. This is despite having already testified in Federal Grand Jury and being on the trial witness list.

The purpose of this narrative is not to take up for or defend the actions of the subjects of this investigation. To get an idea of the relevant historical facts, conduct of the subjects of the investigation and contributing factors, you may consider familiarizing yourself with the 2014 Gold Butte Timeline (which I authored) and the uncovered facts of this investigation. The investigation revealed that many of the subjects likely knowingly and willingly ignored, obstructed, and/or attempted to unlawfully thwart the associated Federal Court Orders through their specific actions and veiled threats, and that many of the subjects also likely violated several laws. This investigation also showed that subjects of the investigation in part adopted an aggressive and bully type strategy that ultimately led to the shutdown of I-15, where many armed followers of Cliven Bundy brandished and pointed weapons at Federal Officers and Agents in the Toquop Wash near Bunkerville, Nevada, on April 12, 2014, in a dangerous, high risk, high profile national incident. This investigation further indicated that instead of Cliven Bundy properly using the court system or other avenues to properly address his grievances, he chose an illegal, uncivilized, and dangerous strategy in which a tragedy was narrowly and thankfully avoided.

Additionally, it should be noted that I was also personally subjected to Whistleblowing Discouragement, Retaliation, and Intimidation. Threatening and questionable behaviors included the following: Invasion of Privacy, Search and Seizure, Harassment, Intimidation, Bullying, Blacklisting, Religious "tests," and Rude and Condescending Language. Simply put, I believe I was expected to keep quiet as a condition of my continued employment, any future promotions, future awards, or a favorable recommendation to another employer.

During the course of the investigation, I determined that any disagreement with the BLM SAC, or any reporting of his many likely embarrassing, unethical/unprofessional actions and misconduct was thought to be career destroying. Time and time again, I came to believe that the BLM SAC's subordinates and peers were afraid to correct him or properly report his misconduct (despite a duty to act) out of fear for their own jobs and reputation.

Sometimes, I felt these issues (described in depth below) were reported to me by senior BLM OLES management and line Rangers/Agents/employees because they personally didn't like a particular BLM SAC (although, some of these same people seemed to flatter, buddy up to, openly like, and protect the BLM SAC). Sometimes, I thought BLM OLES management wanted to talk about these actions because they thought these blatant

EOR0070

inappropriate acts by a BLM SAC and others were funny. Sometimes, I thought the reporting parties wanted the misconduct corrected and the truth to come to light, but they were afraid/unwilling to report and correct the misconduct themselves. Sometimes, I thought the reporting parties just wanted to get the issues off their chest. Sometimes, I thought supervisors wanted to report the misconduct to me, so they could later say they did report it (since I was the Case Agent/Lead Investigator). Therefore, in their mind limit their liability to correct and report the misconduct and issues. However, it was confusing that at the same time, I thought some of these reporting parties (particularly in management) sought deniability and didn't want to go "on the record." These same reporting/witnessing parties in most cases apparently refused to correct the misconduct and further report it to higher level supervision, the Office of Inspector General, and the U.S. Attorney's Office (as required/necessary) and even discouraged me from further reporting and correcting the issues. When I did try to correct and further report the issues as I believed appropriate and necessary, these same supervisors (who were reporting/witnessing parties) acted confused and unaware. Ultimately, I became an outcast and was retaliated against.

I also feel there are likely a great many other issues that even I am not aware of, that were likely disclosed or known to my supervisor, at least two other BLM SACs, the former BLM SAC's subordinates, and the former BLM OLES Director. In addition to the witnesses I identify, I would also recommend interviews with the BLM OLES Chief of the Office of Professional Responsibility/Internal Affairs and I would recommend reviews of my chain of command's emails and text messages.

Unfortunately, I also believe that the U.S. Attorney's Office Prosecution Team may have adopted an inappropriate under the table/unofficial policy of "preferred ignorance" in regard to the likely gross misconduct on the part of senior management from the BLM Office of Law Enforcement and Security and Discovery/Exculpatory related trial issues.

What indicated to me there was likely deception and a failure to act on the part of my supervision was the actions, comments, and questions of senior BLM Law Enforcement Officials, comments by the BLM's Chief of the Office of Professional Responsibility (Internal Affairs), and the pretrial Giglio/Henthorn Review.

Additionally, actions, comments, and questions by the U.S. Attorney's Office Lead Prosecutor, the strategy to deny the Dave Bundy iPad evidence from coming to light, the direction by a BLM ASAC for me not to speak with any member of the Prosecution Team, and factually deceptive/incorrect talking points (snipers, Bundy property, Bundy cattle overall health, etc.), indicated to me the Prosecution Team wanted to possibly and purposefully remain ignorant of some of the case facts and possibly use unethical legal tricks to prevent the appropriate release of substantive/exculpatory and bias/impeachment material. I believe that it is more likely than not, that there was not only a lack of due diligence by the Prosecution Team in identifying and locating exculpatory material, but there was also a desire to purposely stay ignorant (which my chain of command was happy to go along with) of some of the issues and likely an inappropriate strategy to not disclose substantive material to the Defense Counsel and initiate any necessary civil rights related or internal investigations. Furthermore, I was surprised about the lack of

13

Defense Counsel questions about critical vulnerabilities in the case that should have been disclosed to the Defense in a timely manner. It is my belief that the Defense Counsel was simply ignorant of these issues.

Also, please keep in mind that I am not an "Internal Affairs," "Inspector General," or "Office of Professional Responsibility Investigator." Therefore, I couldn't, and can't independently conduct investigations into government law enforcement personnel. Additionally, I haven't been formally trained on internal investigations. Therefore, my perception, the opinions I offer, and the fact pattern that I found relevant was gained from my experience as a regular line investigator and former uniformed patrol and Field Training Officer (FTO).

Each, and every time I came across any potential criminal, ethical, or policy related issue, in the course of my duties as the DOI/BLM Case Agent/Lead Investigator for the Gold Butte/Cliven Bundy Nevada Investigation, I reported the issues up my chain of command with the intent to run an independent and unbiased, professional investigation, as I was instructed. Later, I determined my chain of command was likely already aware of many of these issues and were likely not reporting those issues to the prosecution team and higher headquarters. Later, I also was informed by the BLM Office of Professional Responsibility (OPR) Chief that any issues that had anything to do with a particular favored BLM SAC, the BLM OLES Director looked at himself instead of OPR. The OPR Chief told me he was shut out of those types of inquiries. I noted in the pre-trial Giglio/Henthorn Review that this appeared to be accurate. I also noted that these types of issues I discovered apparently weren't properly investigated as required. The bad joke I heard around the office was that the BLM SAC knew where the BLM OLES Director had buried the pr0stitutes body and that is why the BLM OLES Director protects him.

I know good people make mistakes, are sometimes immature and use bad judgement. I do it all the time. I am not addressing simple issues here. However, some simple issues are included to indicate a wide spread pattern, openly condoned prohibited/unprofessional conduct and an inappropriate familiar and carnival atmosphere. Additionally, the refusal to correct these simple issues and conduct discrepancies, harassment, and ultimately cover-ups and retaliation are indicated and explained throughout this document.

Since I wasn't a supervisor and since I was one of the most junior criminal investigators in our agency, I tried to positively influence those above me by my example and discrete one on one mentoring and urging. I simply wanted the offensive and case/agency destructive conduct to stop, to correct the record where appropriate, and inform those who we had a duty to inform of the potential wrong-doing. I attempted to positively influence my management in the most respectful and least visible way possible. In order to accomplish this, I adopted a praise in public and counsel in private approach. When that failed to work for the long term, I had to become more "matter of fact" (but always respectful), when that failed to work I resorted to documenting the instances and discussions. Later, I resorted to official government email to make a permanent record of the issues. When this failed to deter the offensive conduct or instigate appropriate action by my supervision, I had to notify others and identify witnesses. I respected and stayed

EOR0072

within my chain of command until I was expressly forbidden from contacting the U.S. Attorney's Office and my requests to speak with the BLM OLES Director went unanswered.

Simply put, as a law enforcement officer, I can't allow injustices and cover-ups to go unreported or half-truths and skewed narratives go unopposed. I have learned that when conduct of this sort isn't corrected, then by default it is condoned, and it becomes unofficial policy. When I determined there were severe issues that hurt more than just me, and I determined that my supervision apparently lacked the character to correct the situation, I knew that duty fell to me. I still felt I could accomplish this duty without embarrassing my supervision, bringing shame on our agency, or creating a fatal flaw in our investigation.

Initially, I felt I could simply mentor and properly influence my supervision to do the right thing. Time and time again, I urged my supervision to correct actions and counsel individuals who participate in conduct damaging to our agency and possibly destructive to the integrity of our case or future investigations. I attempted to urge my supervision to report certain information to senior BLM management and the U.S. Attorney's Office. Note: *Evidence of some of this offensive conduct is potentially available through Freedom of Information Act (FOIA) requests and subject to a Litigation Hold, may be considered Exculpatory Material in trial discovery process, and may be subject to federal records protections. Additionally, in many instances, I can provide evidence, identify the location of evidence and identify witnesses.*

Ultimately, in addition to discovering crimes likely committed by those targeted in the investigation, I found that likely a BLM Special Agent-in-Charge recklessly and against advisement from the U.S. Attorney's Office and apparent direction from the BLM Deputy Director set in motion a chain of events that nearly resulted in an American tragedy and mass loss of life. Additionally, I determined that reckless and unprofessional conduct within BLM Law Enforcement supervisory staff was apparently widespread, widely known and even likely "covered up." I also found that in virtually every case, BLM senior law enforcement management knew of the suspected issues with this BLM SAC, but were either too afraid of retaliation, or lacked the character to report and/or correct the suspected issues.

**Note:** *This entire document was constructed without the aid of my original notes due to their seizure by a BLM Assistant Special Agent-in-Charge outside of my presence and without my knowledge or permission. Additionally, I was aggressively questioned regarding the belief that I may have audio recorded BLM OLES management regarding their answers concerning this and other issues. All dates, times, and quotes are approximate and made to the best of my ability and memory. I'm sure there are more noteworthy items that I can't recall at the time I constructed this document.* Also Note: *The other likely report worthy items were seized from me on February 18, 2017, and are believed to be in the possession of a BLM ASAC. I recommend these items be safeguarded and reviewed.*

15

EOR0073

As the case agent/lead investigator for the DOI in the Cliven Bundy investigation out of the District of Nevada, I became aware of a great number of instances when senior BLM OLES leadership were likely involved in **Gross Mismanagement** and **Abuse of Authority** (which may have posed a substantial and specific threat to employee and public safety as well as wrongfully denied the public Constitutionally protected rights). The BLM OLES leadership and others may have also violated **Merit System Principles** (Fair/Equitable Treatment, High Standards of Conduct, Failing to Manage Employee Performance by Failing to Address Poor Performance and Unprofessional Conduct, Potential Unjust Political Influence, and Whistleblower Retaliation), **Prohibited Personnel Practices** (Retaliation Against Whistleblowers, Retaliation Against Employees that Exercise Their Rights, Violation of Rules that Support the Merit System Principles, Enforcement of Policies (unwritten) that Don't Allow Whistleblowing), **Ethics Rules** (Putting Forth an Honest Effort in the Performance of Duties, the Obligation to Disclose Waste, Fraud, Abuse, and Corruption, Endeavoring to Avoid Any Action that Creates the Appearance that there is a Violation of the Law, and Standards of Ethical Conduct for Employees), **BLM OLES Code of Conduct** (Faithfully Striving to Abide by all Laws, Rules, Regulations, and Customs Governing the Performance of Duties, Potentially Violating Laws and Regulations in a Unique Position of High Pubic Trust and Integrity of Profession and Confidence of the Public, Peers, Supervisors, and Society in General, Knowingly Committing Acts in the Conduct of Official Business and/or in Personal Life that Subjects the Department of Interior to Public Censure and/or Adverse Criticism, Conducting all Investigations and Law Enforcement Functions Impartially and Thoroughly and Reporting the Results Thereof Fully, Objectively, and Accurately, and Potentially Using Greater Force than Necessary in Accomplishing the Mission of the Department), **BLM Values** (To serve with honesty, integrity, accountability, respect, courage and commitment to make a difference), **BLM Guiding Principles** (to respect, value, and support our employees. To pursue excellence in business practices, improve accountability to our stake holders and deliver better service to our customers), **BLM OLES General Order 38** (Internal Affairs Investigations), **Departmental and Agency Policies** (BLM Director Neil Kornze Policy on Equal Opportunity and the Prevention of Harassment dated January 19, 2016, DOI Secretary Sally Jewell Policy on Promoting an Ethical Culture dated June 15, 2016, DOI Secretary Sally Jewell Policy on Equal Opportunity in the Workplace dated September 14, 2016, DOI Deputy Secretary of Interior Michael Connor Policy on Workplace Conduct dated October 4, 2016, DOI Secretary Ryan Zinke Policy on Strengthening the Department's Ethical Culture dated March 2, 2017, DOI Secretary Ryan Zinke Policy on Harassment dated April 12, 2017, Memorandum dated December 12, 2013, from Acting DOI Deputy Assistant Secretary for Human Capital and Diversity Mary F. Pletcher titled "The Whistleblower Protection Enhancement Act of 2012 and Non-Disclosure Policies, Forms, Agreements, and Acknowledgements, Email Guidance by Deputy Secretary of Interior David Bernhardt titled "Month One Message," dated August 1, 2017, Email Guidance by Deputy Secretary of Interior David Bernhardt titled "Month Two Message," dated September 22, 2017, BLM Acting Deputy Director of Operations John Ruhs guidance contained in an Email titled "Thank You for Making a Difference," dated September 29, 2017, which referenced BLM Values and Guiding Principles, BLM/DOI Email and Computer Ethical Rules of Behavior, BLM "Zero Tolerance" Policy Regarding Inappropriate Use of the Internet, 18 USC 1663 Protection of Public Records

16

and Documents, 18 USC 4 Misprison of a Felony, 18 USC 1519 Destruction, Alteration, or Falsification of Records in Federal Investigations, 18 USC 241 Conspiracy Against Rights, 18 USC 242 Deprivation of Rights Under Color of Law, 43 USC 1733 (c) (1) Federal Land Policy Management Act, 43 USC 315 (a) Taylor Grazing Act, 5 USC 2302 Whistleblower Protections-Prohibited Personnel Practices/Whistleblower Protection/Enhancement Acts, 5 CFR 2635 Gifts Between Employees, 5 USC 7211 Employees Rights to Petition Congress, and Public Law 112-199 of November 27, 2012.

Additionally, the BLM Criminal Investigator/Special Agent Position Description (LE140) in part states the following: "Comprehensive and professional knowledge of the laws, rules, and regulations which govern the protection of public lands under jurisdiction of the Bureau of land Management, and their applicability on a national basis,"(under Factor 1, Knowledge Required by the Position), "Knowledge of the various methods, procedures, and techniques applicable to complex investigations and other law enforcement activities required in the protection of natural resources on public land. The applicable methods, procedures, and techniques selected require a high degree of judgement that recognizes sensitivity to the violations, as alleged, discretion in the manner that evidence and facts are developed, and an awareness of all ramifications of a criminal investigation. The incumbent must have the ability to establish the interrelationship of facts and evidence and to present findings in reports that are clear, concise, accurate, and timely submitted for appropriate review and action." (under Factor 1, Knowledge Required by the Position), "Comprehensive knowledge of current and present court decisions, criminal rules of evidence, constitutional law, and court procedures to be followed in criminal matters, formal hearings and administrative matters in order to apply court and constitutional requirements during the conduct of an investigation and to effectively testify on behalf of the Government." (under Factor 1, Knowledge Required by the Position), "great discretion must be taken to avoid entrapment of suspects and to protect the integrity of the investigation" (under Factor 4, Complexity), and "The incumbent must be able to safely utilize firearms...." (Factor 8, Physical Demands)

Please also note the potential Constitutional issues regarding "religious tests," search and seizure, and speech/assembly protections.

Please further note the following Rules of Criminal Procedure/Evidence: Memorandum of Department Prosecutors dated January 4, 2010, from David W. Ogden to the Deputy Attorney General, Rule 16, 18 USC 3500-the Jencks Act, the Brady Rule, Giglio, U.S. Attorney's Manuel 9-5.001 Policy Regarding Disclosure of Exculpatory and Impeachment Information, 9-5.100 Policy Regarding the Disclosure to Prosecutors of Potential Impeachment Information Concerning Law Enforcement Agency Witnesses, American Bar Association Standards 3-1.2 The Function of the Prosecutor, 3-2.8 Relations with the Courts and Bar, 3-3.1 Conflict of Interest, 3-3.11 Disclosure of Evidence by the Prosecutor, 3-5.6 Presentation of Evidence, and 3-6.2 Information Relevant to Sentencing.

**Case Details:** 2-year/10-month case, approximately 570 DOI Exhibits/Follow-on Turn-in Items, approximately 508 DOI Identified Individuals-19 Defendants

EOR0075