**Exhibit 3**

Case No. 18-10287

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*

v.

CLIVEN D. BUNDY, et al
*Defendants-Appellees*

From the United States District Court For the District of Nevada
The Honorable Gloria Navarro, Presiding
Case No. 2:16-CR-00046-GMN-PAL-1

**APPELLEE'S EXCERPTS OF RECORD VOLUME 1**

Larry Klayman, Esq.
2020 Pennsylvania Avenue,
N.W.  Suite 800
Washington, D.C. 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com
Counsel for Appellee Cliven Bundy

Date: August 21, 2019

## TABLE OF CONTENTS

Transcript of Proceedings from December 20, 2017 ...............................0001 - 0035

Transcript of Proceedings from January 8, 2018 ....................................0037 - 0059

Larry Wooten's Whistleblower Memorandum .......................................0060 - 0075

Cover Letters from Bureau of Land Management ..................................0076 - 0084

Excerpts from Documents Release by Bureau of Land Management .....0085 - 0250

**From:** U.S. Dept. of Interior/Bureau of Land Management Special Agent
**Subject:** Agent Notes in Regard to the Bureau of Land Management and the Cliven Bundy Investigation
**Reference:** DI-17-2830, MA-17-2863, BLM-18-0058, LM14015035, District of Nevada Case 2:16-cr-00046-GMN-PAL (United States of America v. Cliven Bundy, et al)

**Issue:** **As a U.S. Department of Interior (DOI), Bureau of Land Management (BLM), Office of Law Enforcement and Security (OLES) Special Agent (SA) and Case Agent/Lead Investigator for the Cliven Bundy/2014 Gold Butte Trespass Cattle Impound Case out of the District of Nevada, I routinely observed a widespread pattern of bad judgment and lack of discipline among senior and supervisory staff at BLM OLES that made a mockery of our position of special trust and confidence and adversely affected our agency's mission.**

**The Investigation, which I participated in as the Case Agent/Lead Investigator on behalf of the DOI/BLM into the 2014 Cliven Bundy/Gold Butte Nevada Trespass Cattle Impound and associated crimes also revealed widespread conduct, ethical and professional issues as well as potential crimes, policy violations and "cover-ups." Additionally, during this time, I was personally continually exposed to Retaliation, Harassment and a Hostile Work Environment due to what I believe is my insistence those issues be reported, corrected, and my urging for my supervision to change their offensive individual conduct as appropriate. Time after time, I personally observed or was told of actions by senior agency law enforcement management in these positions of special trust and confidence, where these senior law enforcement officials failed to display a "moral compass," burden of leadership, or lead by example. It is my assessment that from time to time, the responsible law enforcement management also attempted to delegate away their responsibility, but retain their influence and authority to steer the associated investigations away from misconduct discovery, reporting, and correction. It is also my assessment that it is likely the 2014 Gold Butte Trespass Cattle Impound was in part a punitive and ego driven expedition by a Senior BLM Law Enforcement Supervisor (a BLM Special Agent-in-Charge) that was only in part focused on the intent of the associated Federal Court Orders and the mission of our agency (to sustain the health, diversity, and productivity of America's public lands for the multiple use and enjoyment of present and future generations). My investigation also indicated that the involved officers and protestors were themselves pawns in what was almost a great American tragedy on April 12, 2014, in which law enforcement officers (Federal, State, and Local), protestors, and the motoring public were caught in the danger area. This investigation also indicated, the primary reasons for the escalation was due to the recklessness, lack of oversight, and arrogance of a BLM Special Agent-in-Charge and the recklessness, failure to adhere to Federal Court Orders and lack of recognition of the Federal Government in matters related to land management within Nevada, by Rancher Cliven Bundy.**

**The investigation further indicated that the BLM SAC's peers didn't likely attempt to properly influence or counsel the BLM SAC into more appropriate courses of action and conduct or were unsuccessful in their attempts. The investigation indicated that it was likely that the BLM SAC's peers failed to report the BLM SAC's unethical/unprofessional actions, misconduct, and potential crimes up the chain of command and/or to the appropriate authorities, or that the chain of command simply ignored and dismissed these reports. The investigation further indicated when individuals did report issues with the BLM SAC, the reports were likely ignored or marginalized by higher BLM OLES officials. The investigation also indicated that the BLM OLES Director likely gave the BLM SAC complete autonomy and discretion without oversight or supervision. The investigation further indicated that it was unlikely that the BLM OLES Director wasn't aware of the BLM SAC's unethical/unprofessional actions, poor decisions, misconduct, and potential crimes. My investigation and personal observations in the investigation further revealed a likely unethical/unlawful "cover-up" of this BLM SAC's actions, by very senior law enforcement**

1

management within BLM OLES. This investigation indicated that on numerous occasions, senior BLM OLES management broke their own policies and overlooked ethical, professional, and conduct violations and likely provided cover and protection for the BLM SAC and any activity or operation this BLM SAC was associated with. My investigation further indicated that the BLM's civilian leadership didn't condone and/or was likely unaware of the BLM SAC's actions and the associated cover-ups, at least until it was too late.

During the investigation, I also came to believe that the case prosecution team at United States Attorney's Office out of Las Vegas in the District of Nevada wasn't being kept up to date on important investigative findings about the BLM SAC's likely alleged misconduct. I also came to believe that discovery related and possibly relevant and substantive trial and/or exculpatory information wasn't likely turned over to, or properly disclosed to the prosecution team.

I also came to believe there were such serious case findings that an outside investigation was _____ on several issues to include misconduct, ethics/code of conduct issues, use of force issues (to include civil rights violations), non-adherence to law, and the loss/destruction of, or purposeful non-recording of key evidentiary items.

I also became aware of troubling potential misconduct issues and a strategy not to disclose the issues to the defense counsel or make the evidence available unless required by the court.

Finally, the investigation showed a great many incorrect talking points, some which even perpetuated themselves in trial and likely portrayed a false image to the judge and jury. These incorrect points included the following: No government snipers, Federal Agents/Officers were never on Bundy's personal property, and the Bundy cattle were in poor physical condition.

Ultimately, I believe I was removed from my position as Case Agent/Lead Investigator for the Cliven Bundy/Gold Butte, Nevada Investigation because my management and possibly the prosecution team believed I would properly disclose these embarrassing and substantive issues on the stand and under oath at trial, because my supervision believed I had contacted others about this misconduct and possibly audio recorded them, because I had uncovered, reported, and objected to suspected violations of law, ethics directives, policy, and the code of conduct, and because I was critical of the misconduct of a particular BLM SAC. This is despite having already testified in Federal Grand Jury and being on the trial witness list.

The purpose of this narrative is not to take up for or defend the actions of the subjects of this investigation. To get an idea of the relevant historical facts, conduct of the subjects of the investigation and contributing factors, you may consider familiarizing yourself with the 2014 Gold Butte Timeline and the uncovered facts of this investigation. The investigation revealed that many of the subjects likely, knowingly and willingly ignored, obstructed, and/or attempted to thwart the associated Federal Court Orders through their specific actions and veiled threats, and that many of the subjects also likely violated several laws. This investigation also showed that subjects of the investigation in part adopted an aggressive and bully type strategy that ultimately led to the shutdown of I-15, where many armed followers of Cliven Bundy brandished and pointed weapons at Federal Officers and Agents in the Toquop Wash near Bunkerville, Nevada, on April 12, 2014, in a dangerous, high risk, high profile national incident. This investigation further indicated that instead of Cliven Bundy properly using the court system or other avenues to address his grievances, he chose an illegal, uncivilized, and dangerous strategy in which a tragedy was narrowly and thankfully avoided.

2

Additionally, I was also personally subjected to Whistleblowing Discouragement, Retaliation, and Intimidation. Threatening and questionable behaviors included the following: Invasion of Privacy, Search and Seizure, Harassment, Intimidation, Bullying, Blacklisting, Religious "tests," and Rude and Condescending Language. Simply put, I believe I was expected to keep quiet as a condition of my continued employment, any future promotions, future awards, or a favorable recommendation to another employer.

Furthermore, upon discovery of potential gross supervisory misconduct, abuse of authority, unethical actions, unprofessional actions, and likely unlawful activities conducted by senior level BLM OLES management, I came to believe that my direct supervision not only failed to correct and report those instances as required, but also discouraged me in reporting or even mentioning those instances. When I did report those instances, my supervision deceptively acted confused and I became a victim of whistleblower retaliation.

During the course of the investigation, I determined that any disagreement with the BLM SAC, or any reporting of his many likely embarrassing, unethical/unprofessional actions and misconduct was thought to be career destroying. Time and time again, I came to believe that the BLM SAC's subordinates and peers were afraid to correct him or properly report his misconduct (despite a duty to act) out of fear for their own jobs and reputation.

Additionally, I believe the likely misconduct and inappropriate actions by leaders within BLM Law Enforcement Management does tend to mitigate the circumstances of the crimes and the associated cover-up actions could overturn any convictions and greatly discredit and embarrass the BLM as a whole. Also, it should be noted that the issues captured on email, text, and electronic media are likely subject to the FOIA, Discovery, the Litigation Hold, and Federal Records Protections and that openly made verbal comments may also be subject to Trial Discovery and may be used to impeach trial witnesses, show incredible bias by members of the investigative team and further discredit our agency.

Also, the pervasive unprofessional work environment that I personally observed or that was briefed to me by multiple witnesses is unacceptable and violates numerous laws, policy's, ethical and professional standards and was widely known and even encouraged by some management within BLM's Office of Law Enforcement and Security.

Note: *To explain the misconduct, unethical actions, violations of policy/code of conduct, potential crimes, Whistleblower Retaliation and the Hostile Work Environment and Workplace Harassment, I must address and give some limited background about each issue. However, the central issue is a constant. It is an uncaring, knowing, willing and frequent violation of ethics/conduct guidelines and policy and also a lack of oversight and supervision. Basically, those in law enforcement authority positions felt free to openly and routinely engage in misconduct without any fear of consequence. Additionally, when they were questioned, urged to correct the issues, or someone complained, BLM Law Enforcement Supervisors downplayed the concerns, marginalized, harassed, retaliated and tried to coerce and intimidate the reporting parties until the reporting parties or those harassed simply quit or found another job. These actions also seemed to initiate apparent self-serving public praise and accolades of professionalism from/to and between many of the worst offenders. It seemed like the offenders were trying to get out ahead of any possible complaints and establish a baseline narrative of their unquestionable professionalism.*

*Time and time again, I saw instances by BLM Law Enforcement Management where they knew about misconduct and failed to report it, they participated in the misconduct themselves, or they personally instigated the misconduct.*

3

*Additionally, when the misconduct was reported, supervisors within BLM's Office of Law Enforcement acted confused and unaware. They also attempted to marginalize the reporting person, discourage further reporting of the misconduct and finally, they retaliated when the misconduct was reported.*

*When I discovered, was notified about, or personally observed misconduct, I tried to discretely and respectfully influence my chain of command to stop the misconduct themselves, address the employee misconduct with oversight and reminders and report the misconduct where appropriate in order to initiate any required internal investigations. Ultimately, I failed to correct the issues. Finally, I my concerns were ignored and dismissed and I was also harassed and retaliated against.*

The unprofessional actions of some BLM Supervisory Law Enforcement Officers would "shock the conscious" of the public, our civilian management, and the Secretary/Deputy Secretary of the Interior. We all know and have been informed and trained on acceptable professional workplace conduct. We even usually receive the typical routine reminders in the form of emails and guidance and government electronic media advisements. However, some supervisors in our agency routinely chose to ignore that guidance and others were reluctant to correct their "friend's" misconduct and lapses in judgement.

Unfortunately, these issues are widespread and often made openly and publicly and even captured on electronic communications subject to Federal Records Protections, the Bundy Case Litigation Hold, the Freedom of Information Act (FOIA), and even trial discovery (as exculpatory/bias/impeachment information).

The longer the Bundy investigation went on, and the longer I personally interacted with my supervisor and other senior and supervisory law enforcement management, the more unacceptable issues (both case related and individual supervisor conduct related) I personally observed or discovered.

I observed/ discovered extremely unprofessional, familiar, racy, vulgar and bias filled actions, open comments, and inappropriate electronic communications. In my opinion, these issues would likely undermine the investigation, cast considerable doubt on the professionalism of our agency and be possibly used to claim investigator bias/unprofessionalism and to impeach and undermine key witness credibility.

The ridiculousness of the conduct, unprofessional amateurish carnival atmosphere, openly made statements, and electronic communications tended to mitigate the defendant's culpability, cast a shadow of doubt of inexcusable bias, unprofessionalism and embarrassment on our agency and in general make the average day at the office miserable.

It seemed like the more I discretely and respectfully reported these issues and the more I tried to simply influence and encourage my chain of command to do the right thing and correct and further report the misconduct, the more my chain of command got tired of me "mothering" them. More and more, it seemed like my relationship with my supervisor grew more and more strained. He usually continued on with the inappropriate conduct, ignored my concerns, tried to coerce and intimidate me as well as marginalize, harass and retaliate against me.

The inappropriate behavior, misconduct and unprofessional comments were offensive and uncalled for in a professional federal law enforcement work environment and were a clear violation of professional workplace norms, our code of conduct, policy, and possibly even law. The misconduct caused considerable disruption for me personally in the workplace, was shameful and rude to

<div align="center">4</div>

fellow employees and citizens and was discriminatory, harassing and further showed clear prejudice against the defendants, their supporters and Mormons.

I told my supervisor on several occasions that this type of conduct is unprofessional and that it makes me uncomfortable. I also urged my supervisor to correct the misconduct and I told him that I don't want to be around it. Additionally, I specifically told my supervisor that I didn't want to be overly sensitive, but it felt like he and others are being disrespectful to me and making fun of me and my family.

In March of 2016, after I confronted my supervisor about his inappropriate conduct, he apologized to me and for a time he seemed genuinely sorry and things got better. During this timeframe and following, I was even nominated for several awards and honors to include a nomination for Special Agent of the Year, the Department of Interior Honor Award for Superior Service (awarded by my Agency's Director), a $5,000.00 performance bonus, a $1,000.00 performance bonus, and a Glock Pistol gift. However, the misconduct never completely stopped, but his treatment of me and open disrespect to others got worse.

Often times this misconduct centered on being sexually inappropriate, profanity, appearance/body shaming and likely violated privacy and civil rights. Additionally, this offensive conduct sometimes targeted those with disabilities and health issues.

Many times, these open unprofessional and disrespectful comments and name calling (often by law enforcement supervisors who are potential witnesses and investigative team supervisors) reminded me of middle school.

At any given time, you could hear individuals openly referred to as "ret*rds," "r*d-necks," "Overweight woman with the big jowls," "d*uche bags," "tractor-face," "idiots," "in-br*d," etc., etc., etc.

Also, it was common to receive or have electronic communications reported to me during the course of the investigation in which senior investigators and law enforcement supervisors (some are potential witnesses and investigative team members) specifically made fun of suspects and referenced "Cliven Bundy felony...just kind of rolls off the tongue, doesn't it?," di1dos, western themed g@y bars, odors of sweat, playing chess with menstru*ting women, Cliven Bundy sh1tting on cold stainless steel, personal lubricant and Ryan Bundy holding a giant pen1s (on April 12, 2014).

Extremely biased and degrading fliers were also openly displayed and passed around the office. A booking photo of Cliven Bundy was (and is) inappropriately, openly, prominently and proudly displayed in the office of a potential trial witness and my supervisor. Additionally, altered and degrading suspect photos were put in to what amounted to be a public office presentation by my supervisor.

It's no secret. We are trained that this type of behavior is unprofessional, unacceptable and that it can embarrass our agency and disrupt investigations and cases at trial. We know that when this type of behavior is relevant to a criminal case, or an officers individual conduct, it must be turned over to the U.S. Attorney's Office or local prosecutors. We also know that when misconduct is discovered, it should be corrected and reported. Additionally, the more serious types of misconduct must be referred for an internal investigation. We don't have a choice in this matter. It is our duty. If we fail, then we are complicit ourselves in the misconduct.

EOR0154

The Bundy investigation even indicated that former BLM SAC XXXXXXXXX sent photographs of his own feces and his girl-friend's vag1na to coworkers and subordinates. It was also reported by another BLM SAC that former BLM SAC XXXXXXXXX bragged to him that there is no way he gets more pu$$y than the BLM SAC.

On two occasions, I overheard a BLM SAC tell a BLM ASAC that another/other BLM employee(s) and potential trial witnesses didn't properly turn in the required discovery material (likely exculpatory evidence).

My supervisor even instigated the unprofessional monitoring of protected communications (jail calls) between defendants and their wives, without prosecutor or FBI consent, for the apparent purpose of making fun of post arrest telephone calls between Idaho defendants/FBI targets (not subjects of BLM's investigation) in which the detainees were crying.

I even had a BLM ASAC tell me that he tried to report misconduct, but no one listened to him. I had my own supervisor tell me that former BLM SAC XXXXXXXXX is the BLM OLES "Director's boy" and he indicated they were going to hide and protect him. A previous Department of Inspector General Investigation even indicated that the BLM SAC allegedly said that he owned the BLM Law Enforcement Director. The BLM OLES Chief of the Office of Professional Responsibility/Internal Affairs indicated to me the former BLM OLES Director protected former BLM SAC XXX and shut the Office of Professional Responsibility out when misconduct allegations were reported about XXXX and that the former BLM OLES Director personally (inappropriately) investigated misconduct allegations about XXXX.

Another former BLM ASAC indicated to me that former BLM SAC XXXX was a liability to our agency and the Cliven Bundy Case. I was even told of threats of physical harm that this former BLM SAC made to his subordinate employee and his family.

Also, more and more it become apparent that the numerous statements made by potential trial witnesses and victims (even by good officers under duress), could potentially cast an unfavorable light on the BLM. (See openly available video/audio footage titled "The Bundy Trial 2017 Leaked Fed Body Cam Evidence," or a video posted on You Tube titled "Leaked Body Cams from the Bundy Ranch!" published by Gavin Seim.) Some of these statements included the following: "Jack-up Hage" (Wayne Hage Jr.), "Are you fucXXXX people stupid or what," "Fat dude, right behind the tree has a long gun," "MotherFuXXXX, you come find me and you're gonna have hell to pay," "FatAsX slid down," "Pretty much a shoot first, ask questions later," "No gun there. He's just holding his back standing like a sissy," "She must not be married," "Shoot his fucXXXX dog first," "We gotta have fucXXXX fire discipline," and "I'm recording by the way guys, so…" Additional Note: *In this timeframe, a key witness deactivated his body camera. Also, the three key radio traffic events weren't captured or were unlawfully deleted from the archived dispatch audio files.* Further Note: *It became clear to me a serious public and professional image problem had developed within the BLM Office of Law Enforcement and Security. I felt I needed to work to correct this and mitigate the damage it no doubt had already done.*

This carnival, inappropriate and childish behavior by senior BLM Law Enforcement Officials didn't stop with the directed bias and degradation of subjects of criminal investigations and civil cases.

The childish misconduct extended to citizens, cooperators from other agencies and even our own employees. BLM Law Enforcement Supervisors also openly talked about and gossiped about private employee personnel matters such as confidential medical conditions (to include mental

illness), work performance, marriage issues, religion, punishments, internal investigations and derogatory opinions of higher level BLM supervisors and agents/officers. Some of these open comments centered on B1ow J0bs, Ma$terbation in the office closet, Addiction to P0rn, a Disgusting Butt Crack, a "Weak Sister," high self-opinions, strong willed, crying and scared women, "Leather Face," "Pu$$y," "Mormons (little Mormon Girl)," "he has mental problems and that he had some sort of mental breakdown," "PTSD," etc., etc., etc.

Additionally, it should be noted that there was a "religious test" of sorts. On two occasions, I was specifically asked "You're not a Mormon are you," I was also specifically, and individually asked to agree that the defendants (who are reportedly Mormon) are like a "cult" and I was asked "I bet you think I am going to hell, don't you." Time after time I was subjected to disrespectful comments and opinions about the Church of Jesus Christ of Latter-Day Saints (LDS), faith, such as a BLM ASAC making fun of a Mormon child on a school trip in which he was a chaperone and speaking poorly of Mormon farmers. (I explain these and other related incidents later.)

Sometimes, I felt these issues (described in depth below) were reported to me by senior BLM OLES management and line Rangers/Agents/employees because they personally didn't like a particular BLM SAC (although, some of these same people seemed to flatter, buddy up to, openly like, and protect the BLM SAC). Sometimes, I thought BLM OLES management wanted to talk about these actions because they thought these blatant inappropriate acts by a BLM SAC and others were funny. Sometimes, I thought the reporting parties wanted the misconduct corrected and the truth to come to light, but they were afraid/unwilling to report and correct the misconduct themselves. Sometimes, I thought the reporting parties just wanted to get the issues off their chest. Sometimes, I thought supervisors wanted to report the misconduct to me, so they could later say they did report it (since I was the Case Agent/Lead Investigator). Therefore, in their mind limit their liability to correct and report the misconduct and issues. However, it was confusing that at the same time, I thought some of these reporting parties (particularly in management) sought deniability and didn't want to go "on the record." These same reporting/witnessing parties in most cases apparently refused to correct the misconduct and further report it to higher level supervision, the Office of Inspector General, and the U.S. Attorney's Office (as required/necessary) and even discouraged me from further reporting and correcting the issues. When I did try to correct and further report the issues as I believed appropriate and necessary, these same supervisors (who were reporting/witnessing parties) acted confused and unaware. Ultimately, I became an outcast and was retaliated against.

Additionally, please keep in mind that at the time this document is read, the U.S. Attorney's Office, the Court, and the Defense Counsel may not be fully aware of the specifics mentioned in this document (this is explained later in the document). I believe that it is highly likely that my supervisor (a BLM ASAC) didn't properly seek out, disclose and turn-over material and statements that are substantive and discoverable/exculpatory in nature and may be considered Brady, Giglio, and Jencks material and are subject to trial discovery requirements as well as are likely subject to Federal Records Protections, the case litigation hold, and the Freedom of Information Act. I believe my supervisor failed to seek out, disclose and turn over this material to the U.S. Attorney's Office, due to the embarrassment (specifically to a BLM SAC and higher-level BLM OLES supervision) and potential trial and public relations complications these issues expose and indicate (please see below for additional details). I have made it clear to this BLM ASAC and other BLM supervision that we must disclose/turn-over all related information to the U.S. Attorney's Office and then let the U.S. Attorney's Office use their best judgement to determine what is necessary to turn over to the defense counsel. I also made it clear to my supervision that we needed to address issues by agency law enforcement employees to include the unprofessional use of email, text messages, instant messages, and openly made comments that could subject the case to issues and the agency to

7

further embarrassment.  These substantive electronic communications and statements offered
incredible evidence of bias, contained impeachment information, showed prejudice, and an often
racy and vulgar harassing and amateurish law enforcement operation that made a mockery of the
case and are likely material to the defense.  Time after time, these actions of a few BLM
Supervisory Law Enforcement Officials also caused disruption in the federal professional
workplace.  On more than one occasion, I told the BLM ASAC that the way we lose the case is
when the jury or the judge thinks we aren't being completely truthful or there is a cover-up.

Please keep in mind that I am not an "Internal Affairs," "Inspector General," or "Office of
Professional Responsibility Investigator."  Therefore, I couldn't, and can't independently conduct
investigations into government law enforcement personnel.  Additionally, I haven't been formally
trained on internal investigations.  Therefore, my perception, the opinions I offer, and the fact
pattern that I found relevant was gained from my experience as a regular line investigator and
former uniformed patrol and Field Training Officer (FTO).

Each, and every time I came across any potential criminal, ethical, or policy related issue, in the
course of my duties as the DOI/BLM Case Agent/Lead Investigator for the Gold Butte/Cliven
Bundy Nevada Investigation, I reported the issues up my chain of command with the intent to run
an independent and unbiased, professional investigation, as I was instructed.  Later, I determined
my chain of command was likely already aware of many of these issues and were likely not
reporting those issues to the prosecution team and higher headquarters.  Later, I also was informed
by the BLM Office of Professional Responsibility (OPR) Chief that any issues that had anything to
do with a particular favored BLM SAC, the BLM OLES Director looked at himself instead of OPR.
The OPR Chief told me he was shut out of those types of inquiries.  I noted in the pre-trial
Giglio/Henthorn Review that this appeared to be accurate.  I also noted that these types of issues I
discovered apparently weren't properly investigated as required.  The bad joke I heard around the
office was that the BLM SAC knew where the BLM OLES Director had buried the prostitutes body
and that is why the BLM OLES Director protects him.  (Please see the below for more specific
information.)

One of the chief purposes of this document is to provide a multi-use comprehensive timeline (that notes
the timeframes in which these activities were committed, observed, or reported and specifically identifies
the location of supporting information and evidence) and explanation of the misconduct and ethical issues
I observed, experienced, or I discovered during my duties as the Cliven Bundy/Gold Butte Nevada Case
Agent and Lead Investigator of the DOI/BLM.  Additionally (at a later date), I can go through this
document line by line and identify the subjects and the witnesses (who in this document are referred to by
title only).

To get a better understanding of the historical aspects and non-agency incriminating findings of this
investigation, it is recommended that the reader review the comprehensive Cliven Bundy/Gold Butte
Nevada Investigative Timeline that I constructed and completed in early February 2017.  As you go
through the document below, please keep in mind that in addition to offering the raw information, where I
felt it was appropriate, I interjected my thoughts and specifically referenced subject material.  I
recommend that this document isn't used as a case report, but rather a narrative written from my point of
view in relation to the facts that are known to me.  I also recommend that each item (email, text, audio
file, video file, etc.) I reference be independently obtained in its original form and that the items be
safeguarded from destruction and alteration.  I also recommend the items that were seized from me on or
about February 18, 2017, and computer activity profiles and phone records be obtained and safeguarded.
I further recommend that my chain of command be questioned under oath about the destruction of
government records and seized files and other key aspects of this case.

8

I also feel there are likely a great many other issues that even I am not aware of, that were likely disclosed or known to my supervisor, at least two other BLM SACs, the BLM SAC in question's subordinates, and the former BLM OLES Director. In addition to the witnesses I identify, I would also recommend interviews with the BLM OLES Chief of the Office of Professional Responsibility/Internal Affairs and I would recommend reviews of my chain of command's emails and text messages.

Unfortunately, I also believe it is a possibility that the U.S. Attorney's Office Prosecution Team may have adopted an inappropriate under the table/unofficial policy of preferred ignorance in regard to the likely gross misconduct on the part of senior management from the BLM Office of Law Enforcement and Security and Discovery/Exculpatory related trial issues. These issues are explained in depth later in this document.

Additionally, actions, comments, and questions by the U.S. Attorney's Office Lead Prosecutor, the strategy to deny the Dave Bundy iPad evidence from coming to light, the direction by a BLM ASAC for me not to speak with any member of the Prosecution Team, and factually deceptive/incorrect talking points (snipers, Bundy property, Bundy cattle overall health, etc.), indicated to me the Prosecution Team wanted to possibly and purposefully remain ignorant of some of the case facts and possibly use unethical legal tricks to prevent the appropriate release of substantive/exculpatory material. I believe that it is more likely than not, that there was not only a lack of due diligence by the Prosecution Team in identifying and locating exculpatory material, but there was also a desire to stay ignorant of some of the issues and likely an inappropriate strategy to not disclose substantive material to the Defense Counsel and initiate any necessary civil rights related or internal investigations.

I was surprised about the lack of Defense Counsel questions about critical vulnerabilities in the case that should have been disclosed to the Defense in a timely manner. These issues are explained in depth later in the document.

I know good people make mistakes, are sometimes immature and use bad judgement. I do it all the time. I am not addressing simple issues here. However, some simple issues are included to indicate a wide spread pattern, openly condoned prohibited/unprofessional conduct and an inappropriate carnival atmosphere. Additionally, the refusal to correct these simple issues and conduct discrepancies, harassment, and ultimately cover-ups and retaliation are indicated and explained throughout this document.

Since shortly after becoming part of the Gold Butte Investigative Team (May of 2014), I was subjected to a hostile work environment and harassment (not initially related to the Bundy Investigation), but I could cope with it. To me (at first), it wasn't a big deal and I had an important mission to accomplish. Note: *This was an unusual situation in which I was one of the most junior agents in the agency and the most junior agent of the investigative team, but I was asked to be the Case Agent and Lead Investigator for the DOI with the understanding that the senior agents "would work for me."*

However, I almost immediately brought the conduct issues to the attention of my case supervisor (a BLM Assistant Special Agent-in-Charge) and periodically, discreetly and respectfully talked to this BLM Assistant Special Agent-in-Charge (ASAC) about this offensive conduct. Specifically, I spoke with my supervisor initially in May 2014, the Fall of 2015, in March of 2016, and several times in the Fall of 2016. I will bring these offensive conduct issues to light in the following narrative to dispute an April 26, 2017, comment by this BLM ASAC that I was "never really happy" in the BLM. Note: *My supervisor was also often physically present during the instances of prohibited offensive conduct, participated in, or instigated those instances himself.* Additional Note: *Although the BLM ASAC was initially very apologetic, I believe he just got tired of me respectfully and discretely urging him to discontinue the conduct himself and correct others (his friends) that were also participating in the offensive conduct.*

9

My supervisor would seem understanding and once told me he understood what I meant and that he didn't like the conduct either, but almost every time he was part of the crowd, he not only failed to discourage or correct the conduct, but he participated in and often instigated the conduct.

This behavior created a work and leisure environment that was not only offensive to me, but more importantly greatly discredited our agency and would have been shocking to the public. I felt this conduct had the potential to taint witnesses and subvert not only our case, but also our mission and public/cooperator perception. In some cases, this conduct tended to dehumanize subjects of the investigation (to the point that Use of Force inquiries could be effected/questioned), embarrass and make co-workers uncomfortable and disrupt the workplace. I found this pervasive environment difficult to work in or be around, as well as potentially greatly embarrassing for co-workers, discrediting for cooperators, and potentially damaging to the integrity of the priority investigation for the entire DOI, as well as potentially damaging to the reputation to our agency. Note: *These suspected occurrences are potentially unlawful, unethical, against policy and the code of conduct, as well as outside of workplace professional norms.*
As a result, I stopped hanging around, eating with, or working close to the offenders (who were BLM OLES supervisory officials). As a result, I worked and ate alone almost 100% of the time while in this group environment. Thus, I didn't generally have access to the rental vehicle since it was being used by the others.

Additionally, eventually my supervisor (as my default co-case agent) pulled back and virtually quit working and even refused and/or neglected to facilitate another quality co-case agent to provide much needed case assistance. Note: *I held some of these offenders in high regard, but they simply lacked discipline, good judgement or a "filter" and my supervisor apparently lacked the character or was afraid to correct this type of conduct, even when I urged him to.*

Note: *I was designated as the Case Agent and Lead Investigator for the highest priority case ever within the BLM and even the DOI. I was put as a lead over those higher in General Schedule (GS) level and/or step with more experience in the agency. Additionally, I was specifically directed by a BLM Special Agent-in-Charge (SAC) appointed to oversee the Gold Butte Investigation Team (GBIT) to conduct a* **professional**, **comprehensive**, **unbiased**, *and* **independent** *investigation. The BLM SAC told me that I shouldn't share sensitive case related information with non-Gold Butte Investigative Team members and that everyone will be interested, but they understand this is a sensitive issue and that no one will ask me what I learn through the course of the investigation.*

Since I wasn't a supervisor and since I was one of the most junior criminal investigators in our agency, I tried to positively influence those above me by my example and discrete one on one mentoring and urging. I simply wanted the offensive and case/agency destructive conduct to stop, to correct the record where appropriate, and inform those who we had a duty to inform of the potential wrong-doing. I attempted to positively influence my management in the most respectful and least visible way possible. In order to accomplish this, I adopted a praise in public and counsel in private approach. When that failed to work for the long term, I had to become more "matter of fact" (but always respectful), when that failed to work I resorted to documenting the instances and discussions. Later, I resorted to official government email to make a permanent record of the issues. When this failed to deter the offensive conduct or instigate appropriate action by my supervision, I had to notify others and identify witnesses. I respected and stayed within my chain of command until I was expressly forbidden from contacting the U.S. Attorney's Office and my requests to speak with the BLM OLES Director went unanswered.

Simply put, as a law enforcement officer, I can't allow injustices and cover-ups to go unreported or half-truths and skewed narratives go unopposed. I have learned that when conduct of this sort isn't corrected, then by default it is condoned and it becomes unofficial policy. When I determined there were severe

10

issues that hurt more than just me and I determined that my supervision apparently lacked the character to correct the situation, I knew that duty fell to me. I still felt I could accomplish this duty without embarrassing my supervision, bringing shame on our agency, or creating a fatal flaw in our investigation.

Initially, I felt I could simply mentor and properly influence my supervision to do the right thing. Time and time again, I urged my supervision to correct actions and counsel individuals who participate in conduct damaging to our agency and possibly destructive to the integrity of our case or future investigations. I attempted to urge my supervision to report certain information to senior BLM management and the U.S. Attorney's Office. Note: *Evidence of some of this offensive conduct is potentially available through Freedom of Information Act (FOIA) requests and subject to a Litigation Hold, may be considered Exculpatory Material in trial discovery process, and may be subject to federal records protections. Additionally, in many instances, I can provide evidence, identify the location of evidence and identify witnesses.*

Ultimately, in addition to discovering crimes likely committed by those targeted in the investigation, I found that likely a BLM Special Agent-in-Charge recklessly and against advisement from the U.S. Attorney's Office and apparent direction from the BLM Deputy Director set in motion a chain of events that nearly resulted in an American tragedy and mass loss of life. Additionally, I determined that reckless and unprofessional conduct within BLM Law Enforcement supervisory staff was apparently widespread, widely known and even likely "covered up." I also found that in virtually every case, BLM senior law enforcement management knew of the suspected issues with this BLM SAC, but were either too afraid of retaliation, or lacked the character to report and/or correct the suspected issues.

**Note:** *This entire document was constructed without the aid of my original notes due to their seizure by a BLM Assistant Special Agent-in-Charge outside of my presence and without my knowledge or permission. Additionally, I was aggressively questioned regarding the belief that I may have audio recorded BLM OLES management regarding their answers concerning this and other issues. All dates, times, and quotes are approximate and made to the best of my ability and memory. I'm sure there are more noteworthy items that I can't recall at the time I constructed this document.* Note: *The other likely report worthy items were seized from me on February 18, 2017, and are believed to be in the possession of a BLM ASAC. I recommend these items be safeguarded and reviewed.*

As the case agent/lead investigator for the DOI in the Cliven Bundy investigation out of the District of Nevada, I became aware of a great number of instances when senior BLM OLES leadership were likely involved in **Gross Mismanagement** and **Abuse of Authority** (which may have posed a substantial and specific threat to employee and public safety as well as wrongfully denied the public Constitutionally protected rights). The BLM OLES leadership and others may have also violated **Merit System Principles** (Fair/Equitable Treatment, High Standards of Conduct, Failing to Manage Employee Performance by Failing to Address Poor Performance and Unprofessional Conduct, Potential Unjust Political Influence, and Whistleblower Retaliation), **Prohibited Personnel Practices** (Retaliation Against Whistleblowers, Retaliation Against Employees that Exercise Their Rights, Violation of Rules that Support the Merit System Principles, Enforcement of Policies (unwritten) that Don't Allow Whistleblowing), **Ethics Rules** (Putting Forth an Honest Effort in the Performance of Duties, the Obligation to Disclose Waste, Fraud, Abuse, and Corruption, Endeavoring to Avoid Any Action that Creates the Appearance that there is a Violation of the Law, and Standards of Ethical Conduct for Employees), **BLM OLES Code of Conduct** (Faithfully Striving to Abide by all Laws, Rules, Regulations, and Customs Governing the Performance of Duties, Potentially Violating Laws and Regulations in a Unique Position of High Pubic Trust and Integrity of Profession and Confidence of the Public, Peers, Supervisors, and Society in General, Knowingly Committing Acts in the Conduct of Official Business and/or in Personal Life that Subjects the Department of Interior to Public Censure and/or Adverse Criticism, Conducting all Investigations and Law Enforcement Functions Impartially and

11

Thoroughly and Reporting the Results Thereof Fully, Objectively, and Accurately, and Potentially Using Greater Force than Necessary in Accomplishing the Mission of the Department), **BLM Values** (To serve with honesty, integrity, accountability, respect, courage and commitment to make a difference), **BLM Guiding Principles** (to respect, value, and support our employees. To pursue excellence in business practices, improve accountability to our stake holders and deliver better service to our customers), **BLM OLES General Order 38** (Internal Affairs Investigations), **Departmental and Agency Policies** (BLM Director Neil Kornze Policy on Equal Opportunity and the Prevention of Harassment dated January 19, 2016, DOI Secretary Sally Jewell Policy on Promoting an Ethical Culture dated June 15, 2016, DOI Secretary Sally Jewell Policy on Equal Opportunity in the Workplace dated September 14, 2016, DOI Secretary Sally Jewell Policy on Equal Opportunity and Workplace Conduct (no date listed), DOI Deputy Secretary of Interior Michael Connor Policy on Workplace Conduct dated October 4, 2016, DOI Secretary Ryan Zinke Policy on Strengthening the Department's Ethical Culture dated March 2, 2017, DOI Secretary Ryan Zinke Policy on Harassment dated April 12, 2017, Memorandum dated December 12, 2013, from Acting DOI Deputy Assistant Secretary for Human Capital and Diversity Mary F. Pletcher titled "The Whistleblower Protection Enhancement Act of 2012 and Non-Disclosure Policies, Forms, Agreements, and Acknowledgements, Email Guidance by Deputy Secretary of Interior David Bernhardt titled "Month One Message," dated August 1, 2017, Email Guidance by Deputy Secretary of Interior David Bernhardt titled "Month Two Message," dated September 22, 2017, BLM Acting Deputy Director of Operations John Ruhs guidance contained in an Email titled "Thank You for Making a Difference," dated September 29, 2017, which referenced BLM Values and Guiding Principles, BLM/DOI Email and Computer Ethical Rules of Behavior, BLM "Zero Tolerance" Policy Regarding Inappropriate Use of the Internet, Privacy Act of 1974 (5 USC 522a), 18 USC 1663 Protection of Public Records and Documents, 18 USC 4 Misprison of a Felony, 18 USC 1519 Destruction, Alteration, or Falsification of Records in Federal Investigations, 18 USC 241 Conspiracy Against Rights, 18 USC 242 Deprivation of Rights Under Color of Law, 43 USC 1733 (c) (1) Federal Land Policy Management Act, 43 USC 315 (a) Taylor Grazing Act, 5 USC 2302 Whistleblower Protections-Prohibited Personnel Practices/Whistleblower Protection/Enhancement Acts, 5 CFR 2635 Gifts Between Employees, 5 USC 7211 Employees Rights to Petition Congress, and Public Law 112-199 of November 27, 2012.

Please also note the potential Constitutional issues regarding "religious tests," search and seizure, and speech/assembly protections.

Note: *There is no confusion that the exact types of misconduct that BLM OLES Senior/Supervisory Officers/Agents openly displayed, encouraged, instigated, tolerated and failed to correct/report was condoned, widespread and frequent. Whether by law, policy, or direction and no matter that the rules of appropriate professional conduct were thoroughly explained and set forth in numerous admonishments training and guidance, these "professionals" and "examples" were considered untouchable and beyond correction. If an employee politely, respectfully and discretely objected to the misconduct, tried to correct it, or reported it, there was a retaliatory effort to ignore, isolate and destroy that employee, until the employee either quit or transferred.*

Please further note the following Rules of Criminal Procedure/Evidence: Memorandum of Department Prosecutors dated January 4, 2010, from David W. Ogden to the Deputy Attorney General, Rule 16, 18 USC 3500-the Jencks Act, the Brady Rule, Giglio, U.S. Attorney's Manuel 9-5.001 Policy Regarding Disclosure of Exculpatory and Impeachment Information, 9-5.100 Policy Regarding the Disclosure to Prosecutors of Potential Impeachment Information Concerning Law Enforcement Agency Witnesses, American Bar Association Standards 3-1.2 The Function of the Prosecutor, 3-2.8 Relations with the Courts and Bar, 3-3.1 Conflict of Interest, 3-3.11 Disclosure of Evidence by the Prosecutor, 3-5.6 Presentation of Evidence, and 3-6.2 Information Relevant to Sentencing.

12

**Position Descriptions:**

**BLM Criminal Investigator/Special Agent** Position Description (GS 11/12, LE140) indicates that the Special Agent conducts complex operations that must be pursued with integrity and efficiency, consults with AUSAs regarding the development of investigations, evidence and all aspects of preparation for trial and part states the following: "Comprehensive and professional knowledge of the laws, rules, and regulations which govern the protection of public lands under jurisdiction of the Bureau of land Management, and their applicability on a national basis,"(under Factor 1, Knowledge Required by the Position), "Knowledge of the various methods, procedures, and techniques applicable to complex investigations and other law enforcement activities required in the protection of natural resources on public land. The applicable methods, procedures, and techniques selected require a high degree of judgement that recognizes sensitivity to the violations, as alleged, discretion in the manner that evidence and facts are developed, and an awareness of all ramifications of a criminal investigation. The incumbent must have the ability to establish the interrelationship of facts and evidence and to present findings in reports that are clear, concise, accurate, and timely submitted for appropriate review and action." (under Factor 1, Knowledge Required by the Position), "Comprehensive knowledge of current and present court decisions, criminal rules of evidence, constitutional law, and court procedures to be followed in criminal matters, formal hearings and administrative matters in order to apply court and constitutional requirements during the conduct of an investigation and to effectively testify on behalf of the Government." (under Factor 1, Knowledge Required by the Position), "great discretion must be taken to avoid entrapment of suspects and to protect the integrity of the investigation" (under Factor 4, Complexity), and "The incumbent must be able to safely utilize firearms...." (Factor 8, Physical Demands).

**Assistant Special Agent-in-Charge** (GS-13) Certification of Position Approval for Retirement states that the primary purpose of the position is to provide assistance in the oversight of law enforcement planning, operations, investigation and program management efforts at the regional level and that the work requires extensive knowledge of specialized investigative and case management techniques as well as the procedures of laws evident and functions and jurisdictions of Federal, state and local agencies. Note: *The Nature of the Position is labeled as "Critical-Sensitive" indicates the position has investigative duties that are of the nature as having the potential to cause exceptional or grave damage to national security such as counterintelligence investigations.*

Under the Major Duty of Program Management, the BLM ASAC notifies by written and oral communications the BLM SAC and other agency/department officials the status of fraud and other serious criminal activity, problems, waste and abuse disclosed by investigations, the status of major investigations and other matters. The Major Duty under the Supervision portion of the position states that the BLM ASAC will hear and resolve complaints from employees and accept recommendations regarding the development and training needs of law enforcement personnel. Major Duties under the Operations portion of the position states "the ASAC ensures these investigations are handled with the utmost professionalism and integrity." This duty also requires the BLM ASAC ensure effective interaction with the Department of Justice and the U.S. Attorney's Office. This duty requires the sensitive and discrete handling of cases and the development of evidence and indicates the BLM ASAC is responsible for maintaining liaison with Federal, State, and local law enforcement authorities. In the Special Requirements portion, it is indicated that the BLM ASAC must safely utilize firearms. Under the Factors portion of the position description the following is stated: "Extensive professional knowledge, gained as a law enforcement officer and/or criminal investigator of investigative and case management techniques and procedures of the laws of evidence and the functions and jurisdictions of other Federal, state and local agencies," "The incumbent must have the requisite skills, knowledge and ability to evaluate, administrate, and guide subordinate criminal investigators and to analyze extremely complex nationwide programs and their linkages and impact on Federal, state, and local governments," "Managerial, organizational, and

13

leadership ability in the accomplishment of goals and objectives maintaining an awareness of the delicate nature of Federal, state, and intergovernmental relationships sufficient to guide a complex, geographically dispersed organization with subordinate supervisors, criminal investigators, and staff in such an environment," "Through knowledge of the scope, application and interpretation of specific laws and regulations related to the investigative jurisdiction of the DOI and BLM," "The incumbent operates with substantial technical independence, including selecting the means by which assigned responsibilities are accomplished, and latitude to apply mature judgement, original thought and willingness to make decisions," "The incumbent is recognized as a managerial and technical expert in the field of criminal investigations," and "The incumbent is responsible to the SAC for the professional reputation and image of the assigned investigative program…must expire to the highest level of professional conduct."

**Special Agent-in-Charge** (GS-14) Position Classification Amendment (DI-625) states the BLM SAC's work will be reviewed and additional guidance will be provided for more complex assignments, in terms of discussions of policies, controversial or sensitive areas, for the interpretation of policies, guidelines, judgement used, and effectiveness. The BLM SAC position description indicates: "The incumbent is responsible for the oversight of a regional law enforcement program that includes the investigative and the enforcement functions. Responsibilities include managing, planning, developing, evaluating, implementing, and directing all matters pertaining to the Office of Law Enforcement and Security, which includes the Bureau's programs of investigations, law enforcement, security, resource protection operations, drug enforcement, ranger activities, and unauthorized use. Incumbent serves as the regional expert and principal advisor on (sic) for all law enforcement managed programs and activities."

The Major Duties section states the following: "The incumbent is responsible for the oversight of a complex regional law enforcement program that includes the investigative and the enforcement functions," "The incumbent provides counsel to the Director, Office of Law Enforcement and Security, and other senior BLM officials, which includes the State Directors, District, and/or Field Office Managers on matters perceived within the incumbent's area of jurisdiction, as having an adverse impact on Agency or Departmental program integrity through criminal misconduct, mismanagement, waste, and abusive practices, and recommends specific program functions for detection audits. Also, provides counsel and assistance to the Department of Interior's Regional Solicitor in matters of non-criminal or administrative/civil nature. The incumbent acts in an oversight role to line managers supervising law enforcement personnel" and "Notifies, by written and oral communication the Director, Office of Law Enforcement and Security and other agency/department officials the status of fraud and other serious criminal activity, problems, waste and abuse disclosed by investigations, the status of major investigations; and other matters of interest." This section also states that the BLM SAC "cooperates with appropriate Agency and Departmental elements and participates fully in the development of an Equal Employment Opportunity Affirmative Action Plan and efforts regarding staffing, motivation and training."

Under the Supervision Section it states that the BLM SAC "hears and resolves complaints from employees; and accepts recommendations regarding developmental and training needs of regional law enforcement personnel.

The Operations Section states that the incumbent interacts on a continuing basis with officials from the U.S. Department of Justice, United States Attorneys, ….the Inspector General…Congressional Staff, State Attorney's General, elected County Sheriffs and Chiefs of Police." This section also states "The incumbent manages the commitment of all manpower and resources for investigations of marked difficulty and responsibility, which are of international and national significance having high political sensitivity and public visibility" and "the SAC ensures these investigations are handled with the utmost professionalism and integrity.."

14

Under the Factors section, the position description states the following under Knowledge Required by the Position: "Extensive professional knowledge, gained as a law enforcement officer and/or criminal investigator of investigative and case management techniques and procedures of the laws of evidence and the functions and jurisdictions of other Federal, state and local agencies" and "Expert knowledge of specialized investigative techniques and equipment, i.e., informant use and development, undercover and surveillance work and the ability to deal with emergency situations." This section also indicates the requirement for advanced managerial, organizational, and leadership ability as they relate to subordinate supervisors, criminal investigators and staff. It is also required that the BLM SAC has a "thorough knowledge of the scope, application and interpretation of the specific laws and regulations related to the investigative jurisdiction of DOI and BLM including Title 18, United States Code.

Under the Supervisor Controls Factor, it states: "the incumbent is directly responsible to the Director, Office of Law Enforcement and Security who provides administrative supervision and special assignments. The incumbent operates with substantial technical independence, including selecting the means by which assigned responsibilities are accomplished, and latitude to apply mature judgement, original thought and willingness to make decisions. The work is reviewed in terms of soundness of overall approach, effectiveness in producing results, and adherence to requirements. The work is normally not reviewed for the methods used."

Under the Guidelines Factor, it states "Guidelines for the incumbent are broad policy directives of the BLM; Department of Interior, existing legislation, laws and statutes; and the general expressions and directives of the Congress, the President, and other agencies of the Federal Government insofar as they affect the function of the Bureau's Law Enforcement Program."

Under the Complexity Factor, it states: "The incumbent is recognized as a managerial and technical expert in the field of criminal investigations."

Under the Purpose of Contacts Factor, it states: The incumbent is responsible to the Director, Office of Law Enforcement and Security for the professional reputation and image of the regional law enforcement program. In this regard his/her personal contacts with the state leadership team, other federal agencies; private industry; State and local government; and importantly, the general public, must aspire to the highest level of professional conduct.

**BLM State Chief Ranger** (GS-13) Position Description indicates that the BLM Law Enforcement State Chief Ranger is a uniformed law enforcement officer that is a technical expert and authority on all aspects of the uniformed law enforcement function on a Bureau wide basis and that this individual demonstrates mastery and skill in the application of laws and regulations. The position description also indicates that the State Chief Ranger is a principle technical expert and authority on Ranger operations and that he/she develops, implements and monitors the unauthorized use prevention program. This position description also indicates that the State Chief Ranger works with Rangers to ensure that operations are legal and within the authority and mission of the BLM and that he/she has expert knowledge of law enforcement and investigative functions. This position description also indicates that an example of a BLM State Chief Ranger applying significant adaptation and interpretation is the regular interaction with various United States Attorney's Offices and U.S. Courts to find "new and unique ways of preserving the BLM's ability to enforce Class A Misdemeanor regulations under FLPMA." Under Factor 5, Scope and Effect, the BLM State Chief Ranger position description indicates that a "Faulty decision in application of the law may result in extreme embarrassment to the Agency, physical injury to the accused, or damage to his/her reputation, or civil action against the arresting officer and the agency. This position description also indicates that the technical expertise of the position has significant influence on sensitive and highly visible across a range of program activities affecting performance and including employee training, moral, and public safety. This position description further indicates that the BLM law enforcement

15

program is "highly visible, potentially controversial and can significantly impact the BLM's public image" and that the effectiveness of the BLM State Chief Ranger's performance "promotes or restrains law enforcement operations bureau wide."

**Case Details:** 2-year/10-month case, approximately 570 DOI Exhibits/Follow-on Turn-in Items, approximately 508 DOI Identified Individuals-19 Defendants

**Employee Experience:** 14 Years as a Federal and State Law Enforcement Officer, Tactical Team Member, State Field Training Officer, Federal and State Law Enforcement Instructor, 10 Years as a United States Marine Infantry Officer/Enlisted Infantryman (7 Active-Captain, 3+Reserve Sergeant), Personally managed in excess of 330 individuals and intimately led over 50 individuals, organized and managed law enforcement investigative and raid operations for more than 100 participants.  Conducted official sworn statements and testimony several hundred times.

**Relevant Employee Awards:** Directors Award at the Federal Law Enforcement Training Center (FLETC), DEA Surveillance Leader Award, $5,000.00 and $500.00 DEA Performance Cash Awards, Department of Justice (DOJ)/DEA Special Service Award for the designated priority and organized crime investigation in the Division, FLETC "Most Wanted" Officer Award, 2015 $1,000.00 BLM Cash Performance Cash Award, 2015 BLM 16 Hour Time Off Performance Award, 2016 BLM Special Agent of the Year Nomination, 2016 DOI Honor Award for Superior Service, 2016 $5,000.00 BLM Cash Performance Award, 2016 Letter of Appreciation, 2016 Additional $1,000.00 BLM Cash Performance Award, Glock Pistol Award, and a Knife Gift, 2017 BLM Cash Performance Award.  Note: *Additionally, the former Acting United States Attorney for the District of Nevada also gave me a book titled SGT. RECKLESS AMERICA's WAR HORSE by Robin Hutton.*
**\*I was told my supervision was again putting me in for "Agent of the Year" and as recently as 2/13/2017 was told "I want you to know what a great job you are doing."**

**Employee Conduct:** professional, takes initiative, eager to work hard and accept additional responsibilities, does not jump the chain of command, respectful and polite with a "can do" attitude, and does not use disrespectful or unprofessional language.  Per my fiscal year (FY) evaluations on my Employee Performance Appraisal Plans, I have been rated as an Exceptional/Superior Employee.  Additionally, I have never been the subject of a disciplinary measure, instead I was consistently the subject of praise and appreciation.

## Synopsis

For the purpose of this document, I will give some background and describe both the specific reprisal/retaliation and some of the harassment based on my opposition to discrimination, violations of policy and law.  Due to the length of time this reprisal and retaliation went on and the numerous associated incidents, I will give a brief background and list only some of the instances on this document.

In early May 2014, I was assigned to work over approximately 800 miles from my normal duty station in Central Oregon to participate in the priority investigation for the DOI/BLM in Las Vegas, NV.  Shortly thereafter, I was asked to be the Case Agent/Lead Investigator for this priority national impacting investigation.

Since almost the beginning, often times in public, I noticed an exceptional amount of discrimination related vulgarity, profanity and unprofessional/childish actions and comments by

16

senior members of BLM Law Enforcement Management in what is best described as an intermittent ridiculous carnival type atmosphere.

During several instances, I respectfully and discretely objected to this unprofessional and discriminatory misconduct to my direct supervisor, BLM Assistant Special Agent-in-Charge (          I told          that I didn't want to be overly sensitive, but I just didn't want to be around this type of atmosphere. Although,          seemed to agree with me in private, in public he apparently condoned these inappropriate actions, continued this type of unprofessional conduct and often instigated the unprofessional and discriminatory conduct himself. Instead of correcting the misconduct, **I found myself as a periodic target of          bantering and unprofessional comments.** In many cases, this same unprofessional discriminatory, often vulgar and "body shaming" type activity was also directed at cooperators and co-workers despite my previous objections to

From then on, for several weeks,          would loudly and **openly refer to me as "Dirty Larry"** in front of BLM Special Agent-in-Charge (          BLM Office of Professional Responsibility (OPR) Senior Special Agent (SSA)          and at times others. Additionally,          would make a point of openly asking me if I was going to go to a strip or gentleman's club "with benefits," meaning with prostitutes. During this same timeframe,          would boastfully tell or jokingly **threaten me** to do this or that or he was going to kick my ass.          would also tell me to get my ass over here or there. Pretty soon, in my opinion this **atmosphere became hostile**, but was veiled as funny office banter and horseplay.

These comments by          were so open, loud and obnoxious that I had an Airforce Service Member mention them during an investigative team barbeque in the pool area of the Hampton Inn Las Vegas/North Speedway, located at 2852 E. Craig Rd., North Las Vegas, NV 89030. This individual even told          something like "I don't think so."

Note: *Although          and others were generally still obnoxious,          quit telling me he was going to kick my ass or ordering me to get my ass over here or there until March 3, 2016. Later in March 2016, I specifically confronted          about these types of unprofessional and inappropriate actions and he indicated he was sorry and that it wouldn't happen again, from that point on,          never told me he was going to kick my ass or ordered me to get my ass over here or there. Therefore, I forgave him.* (7)(C)

Since I didn't want to be a part of the hostile and unprofessional work environment with the crew in Las Vegas, NV, and since          failed to correct the atmosphere, or even modify his own behavior, I found myself **isolated** and I had to resort in most cases to not going out for our evening meal with the investigative team and others, but rather simply drinking a protein shake in my hotel room at night. In most cases, I didn't have access to a government rental vehicle.

Eventually, I had to **withdraw and I found myself even more isolated** due to the obnoxious and often discriminatory, sexually vulgar, profane, religiously insensitive, "body shaming" and unprofessional loud and open comments. On several occasions, I felt like          was acting in this unprofessional way on purpose, despite my previous objections in order **intimidate** me and to show me that he didn't have to answer to me. This resulted in me not wanting or even feeling welcome to eat lunch with          and others in the office. However, usually at first, and from time to time thereafter, when I was one on one with          he was nice and respectful. (7)(C)

17

EOR0166

Even though, on numerous occasions, I respectfully and discretely spoke to _____ and others and further tried to correct these issues, ultimately, I was **ignored** and nothing was corrected long term and the misconduct didn't change for very long.

However, I wanted to make this situation work. Additionally, I didn't want anyone to get into trouble, but I wanted to change the professional environment for the better.

The situation became significantly more overt and obnoxious in the Summer of 2015, when I transferred from Central Oregon to Boise, Idaho. Now, I saw _____ almost every day. Shortly after I moved, I noticed my government locker in the equipment cage was **labeled with "Redbone** _____ I felt that label and play on my name, much like **"Dirty Larry"** was an effort by _____ to **talk down to me, ignore my objections to the misconduct** and infer that I was a "simpleton," ignorant, a hillbilly and not one of the boys. Note: *Even as of April 2, 2018, my locker is still labeled with "Redbone* _____ *despite my objection.*

Many, many times _____ praised my performance and complimented me in public, but in private, especially among smaller crowds of other supervisors and his friends, often times I felt he talked down to me, was disrespectful and unapologetically acted in discriminatory manner that was in violation of numerous policies and professional workplace norms.

However, during other times, especially in a mixed gender public audience, _____ seemed professional and polite.

I did my best to put _____ misconduct and the misconduct from others behind me and simply do my job in this important case until ultimately, the misconduct was so ridiculous that I confronted _____ privately in late March 2016. When I respectfully and discretely, but sternly confronted _____ he indicated that he was sorry and that he wouldn't do those types of things again.

Following this, I received many recognitions and awards. These included being nominated for DOI/BLM Special Agent of the Year and told by _____ that I was going to be nominated as Special Agent of the Year for a second straight year in a row. Additionally, I received the DOI Honor Award for Superior Service (awarded by BLM Director Neil Kornze during Police Week 2016), a $5,000.00 Performance Award, a $1,000.00 Performance Award, a Glock Pistol Award and other awards and recognitions. Note: *Previous to this, while at the BLM, I had also received a $1,000.00 Performance Award, a 16 Hour "Time-Off" Performance Award, the "Most Wanted" Officer Award at the Federal Law Enforcement Training Center, and other recognitions and honors.*

Although the work atmosphere improved for the short term, it didn't stay professional very long.

On October 13, 2016, and later on October 14, 2016, during a telephone conference call with Assistant United States Attorney ( _____ and Federal Bureau of Investigation (FBI) Special Agent ( _____ (who didn't speak, but was reported to be a participant), **I elevated my concerns and reported significant derogatory, discriminatory and inflammatory investigative findings about the case's primary investigative witness, BLM** _____ **and possibly other key witnesses.** These expected and required disclosures included allegations of discriminatory misconduct about BLM _____ such as _____ sending photographs of his own feces to his coworkers (verified by BLM _____ and BLM _____ BLM _____ sending photographs of his girlfriend's vagina (reported by _____ as a Salt Lake City, UT Weather Lady and

(F),
(b)     18
(7)(C)

verified by BLM              and BLM                       BLM         having
a "Kill Book" as a trophy in reference to getting several defendants in a criminal case(s) to
commit suicide (reported by BLM                          and likely witnessed by BLM
    BLM                and BLM                            BLM
boastful claims that others don't get as much  pu$$y as he does (reported by BLM
        and other alleged instances of gross supervisory misconduct.

This disclosure also referenced photo-shopped images circulated by potential trial witnesses to
include images of defendant Ryan Bundy holding a giant penis/dildo (verified by BLM
        BLM Field                           and others, witnesses also likely include
BLM            BLM Field Staff                       and others).  During these
necessary disclosures,              in my opinion deceptively acted ignorant and confused
although I had reported each and every incident to him and complained to him about the
misconduct and discriminatory actions.

To apparently make light of the misconduct,              openly called (within hearing of
                              and FBI            seemed to give many indications
married lady and mother) a **"little hussy."**
that along with a BLM SAC and other BLM Law Enforcement Supervisors, he thought the
discriminatory based antics were funny and/or not a big deal even though many of them were
captured on government electronic devices and now subject to Federal Records Protections, a
litigation hold, trial discovery as exculpatory and impeachment material and to Freedom of
Information Act (FOIA) requests.  Additionally, many of the unprofessional and discriminatory
verbal comments and actions were proudly and openly made, often times in front of likely trial
witnesses and investigative team members.

After this expected and required disclosure to members on the Cliven Bundy/Gold Butte
Prosecution and Investigative Team, I even felt that              purposely made a point to
make the work environment even more unprofessional and show me that he isn't required to
adjust his discriminatory actions and to show me that I work for him, not the other way around.

One such incident was on or about November 9, 2016. During this incident, I had a
conversation with              in the presence o
                                        in the parking lot of the BLM
Idaho State office at approximately 10:15 a.m., in reference to the support provided by other
agencies to include the Federal Protective Service (FPS).  During this conversation,
        made it a point to openly and loudly call the FPS supervisor a Pussy because this FPS
Supervisor wasn't aggressive enough with protestors that were recently at the BLM Idaho State
Office.

Also, during a very hectic time period when attention to detail and case organization was key, I
noticed from time to time what appeared to be files moved around my desk and work area.
This led to time being wasted in an attempt to complete assignments in this long-term and
complex investigation.  On one occasion and in the presence of BLM

                          chuckled and **said that he likes to rearrange things on
people's desks and to "mess" with me.**              specifically said that he would
frequently move things on a U.S. Attorney's Desk to mess with him as well.

            seemed to withdraw from diligently working and for a long period of time
ignored my requests for investigative assistance in what I believe was **at least in part an effort
to overload me and reprisal/retaliation for me reporting and objecting to the misconduct,**

19

**discriminatory actions and ridiculous carnival work environment.**          long term conduct didn't change and neither did the rampant accepted misconduct of other members of management within BLM's Office of Law Enforcement and Security (OLES) or the related unethical protection and associated "cover-ups."

Finally, in November 2016, I confronted        again and I told him that I didn't want to be a part of his chain of command or associated with the unprofessional and hostile work atmosphere any longer

    , but at the same time I didn't want to put the investigation or agency in a bind. Therefore, I was willing to stay on for several more months to ensure a smooth transition.

Following this, on November 16, 2016, at approximately 1:18 p.m., in what I believe was another effort to **intimidate** me,        sent me an email titled "A few important points from our recent conversation," in which       stated the following:

"We recently had a conversation on November 14, 2016, that covered many topics during a two hour period. I don't intend to summarize all the conversation, but some topics were:

We discussed your willingness to complete future job duties related to your role as the case agent on the Gold Butte investigation. You stated that you agreed to continue working in your role as case agent and the BLM's lead investigator on this case for as long as you are employed in your current position.

I (       stated that you don't have the flexibility as an employee to select which job duties you will and will not perform, and you agreed to perform all duties assigned by me (       including Gold Butte case agent duties for as long as you work for me.

You also indicated it is your desire to apply for other jobs within the federal government and that you may proceed with these external job pursuits after a medical procedure that you might schedule in Spring of 2017.

You expressed your desire to identify another special agent to start learning the Gold Butte case to assist with current trial preparation and to help work this case into the future. I informed you that I had already initiated that process.

Again, this is not intended to summarize everything we talked about. It only captures notes on a few of the important points as a record for both of us.

Thanks, and I appreciate your work."

Following this,       came into my office and told me that he is going to "protect himself" in what I also believe was another effort to **intimidate** me.

Note: *Please fill free to review my email response titled "Re: A few important points from our recent conversation," dated November 16, 2016. Additionally, I can go into much more detail regarding this event.*

From then on, the **work environment became toxic and even more hostile and harassing**.       withdrew even more from working and began apparently taking even longer lunches, breaks, etc., which increased the **work overload**.

Note: *This was an unusual situation in which       was my supervisor and my superior, but he worked as my subordinate assistant and Co-Case Agent. The problem was that*

20

*it is challenging to correct, influence and direct your own supervisor, even if they pretend to be your assistant.*

After the case concerns weren't addressed and my objections to the misconduct were ignored and after ⎯⎯⎯⎯ failed to correct the work environment, on or about February 3, 2017, I met with BLM ⎯⎯⎯⎯ and his supervisor, BLM SAC ⎯⎯⎯

⎯⎯⎯⎯ in the Law Enforcement Office of the BLM Idaho State Office, located at 1387 S. Vinnell Way, Boise, ID 83709. During this meeting we spoke about previously identified trial and Bureau related concerns as well as addressed the vulgar and unprofessional work environment, specifically the use of government electronic communications to send discriminatory, vulgar, damaging and inappropriate content.

In what I believe was **another effort to intimidate me**, BLM ⎯⎯⎯ said that it appeared I was running "some sort of internal investigation" and that I need to "stay in my swim lane." ⎯⎯⎯ also said that my choices were to either "continue on or to find another job." To that I replied that my other choices were to initiate an Office of Inspector General (OIG) Investigation or to contact Congress, but I didn't want to do that. BLM ⎯⎯⎯ then aggressively asked if that was a threat. I told him it wasn't and that I didn't want to do that. At the conclusion of the meeting I asked ⎯⎯⎯ to inform BLM Office of Law Enforcement and Security ( ⎯⎯⎯ of the issues and I recommended additional training about appropriate federal workplace behavior, especially as it pertained to official government or potentially exculpatory and impeaching electronic communications.

As I was preparing to leave, in reference to ⎯⎯⎯ disclosing that BLM ⎯⎯⎯ sent photographs of his own feces to employees and that ⎯⎯⎯ tried to correct it, but no one would listen to him, ⎯⎯⎯ indicated ⎯⎯⎯ was disloyal by saying that ⎯⎯⎯ quit and abandoned the BLM during a rough time in our history.

On February 18, 2017, **my privacy was violated** and my secured singular occupied office and the secured safe in my office was searched by BLM ⎯⎯⎯ and numerous files to include specific documentation of the discriminatory actions and misconduct were wholesale seized from my office. Following this wholesale seizure outside of my presence and without my permission, ⎯⎯⎯ didn't provide any property receipt documentation (DI-105/Form 9260) or other chain of custody documentation as required and expected. I believe it was ⎯⎯⎯ plan to destroy any documentation or evidence of misconduct or discriminatory actions.

Note: *Previously, I personally witnessed ⎯⎯⎯ shred reports from BLM OPR SSA ⎯⎯⎯ When ⎯⎯⎯ pulled out ⎯⎯⎯ original signed reports, he threw them in the shred bin and said something like, here's what I think about him ⎯⎯⎯ and his work. Additionally, ⎯⎯⎯ ordered me to delete another finalized report by OPR SSA ⎯⎯⎯ from a database that ⎯⎯⎯ viewed as harmful. (7)*

Additional Note: *In October 2017, SAC ⎯⎯⎯ reported to me in the presence of ⎯⎯⎯ that ⎯⎯⎯ ordered his subordinates to erase federal records in an effort to impede rival civilians in the office from conducting their duties in relation to the Burning Man Special Event in Nevada.*

21

Also, merely for reference and as an example of past relevant conduct, please note the following:

On or about January 30, 2017, a Public Release version of an Office of Inspector General (OIG) Investigation titled "Investigative Report of Ethical Violations and Misconduct by Bureau of Land Management Officials was posted. Note: *This investigation indicated that a BLM SAC violated ethics rules in reference to the Nevada Burning Man Event in 2015 and a hiring process for a friend. The investigation also noted that it was reported that the BLM SAC stated that "he owned" the BLM OLES Director and as a result no action could be taken against him. The investigation further stated that it was reported the BLM SAC said that "You know, if you don't side with me, grenades are going to go off and you'll get hit" and the BLM SAC bragged about ruining the reputation of a subordinate and indicated to another subordinate that the BLM SAC would ruin the career of that subordinate if she did anything against him.*

On or about July 26, 2017, U.S. Department of Interior, Office of Inspector General case number OI-PI-17-0088-I came out regarding the mishandling of evidence in a criminal case by a senior BLM law enforcement manager and the failure to report or question the mishandling. The report in part stated the following: "At least five BLM employees were aware of the mishandling of evidence but did not report or question the misconduct, which demonstrated an alarming lack of integrity and accountability."

On or about August 24, 2017, an investigation by the Department of Interior's Office of Inspector General titled "Investigative Report of Misconduct by a Senior BLM Law Enforcement Manager" was posted to the web. Note: *This investigation referenced the unauthorized removal of evidence in a criminal case from an evidence storage facility, without authorization keeping and giving the evidence away, a process for searching and scrubbing emails for messages that could be harmful for a BLM SAC or that were viewed as demeaning or derogatory, deletion of documents from a Google drive the day before a Congressional request, the "loss" of two government issued MacBook computers by a BLM SAC and previous statements by that BLM SAC that indicated that the computers would "disappear" or be reported as broken if things ever got bad or if anyone comes after the BLM SAC or his job.*

_____ also directed me to turn over all my personal case related notes, which included documentation of the ridiculously inappropriate, unprofessional and discriminatory work environment.

This violation of my privacy and wholesale seizure of files and documents wasn't done because _____ simply needed to reference these files and it wasn't done because I was transferring to another duty station, or because I was the subject of an investigation. I believe it was no doubt done to conceal the rampant BLM Supervisory Law Enforcement Misconduct and case issues.

Additionally, I was **aggressively questioned** by _____ about who I reported the misconduct to, and I was directed to specifically not contact the U.S. Attorney's Office Prosecution Team. Later, when I told _____ that I wanted to speak with the BLM OLES Director, _____ said that it is clear that no one wants to speak with me and that no one is going to apologize to me. To me, these statements by _____ were clearly meant to **intimidate me and coerce me** into not complaining any further or reporting the misconduct and discriminatory actions outside of my immediate chain of command.

It was clear to me that _____ didn't know what all he had seized. After this, I noticed some of my personal records that I kept at the office were missing. When I told _____

22

that when he wholesale seized the items in my office that he likely also took some of my personal papers (such as medical records, financial records, military records and account information), _____ **dismissed my concerns** and only said "no one is interested in your medical records."

## Approximate Impound Timeline

On or about March 26, 2014, the United States Attorney's Office (USAO) sent a BLM SAC and others an email that stated in part:

"please keep in mind that the USAO's perspective is that the ultimate goal is a safe and successful impoundment with <u>no arrests or citations</u> arising out of the operation. To that end, the USAO is relying on the BLM to minimize adverse contacts with the public, including Bundy and his family, third party protesters, and any others who happen to be out there in violation of the closure order. To achieve this result, <u>we (the USAO) want BLM officers to understand that they should not issue citations or make arrests as a first recourse</u>. Unless there is an actual serious assault on an officer beyond just physical contact we do not want officers citing or arresting anyone in connection with the impoundment. Absent serious deliberate physical assault or a directed, specific threat with a weapon, <u>we are expecting BLM officers to work around the various difficult situations that may arise whether that means finding alternate routes to avoid protestors, standing down for the rest of the day, stepping back from physical contact, etc.</u>, where possible. Consistent with the USAO's current policy, <u>any arrests must be approved by an AUSA prior to the arrest</u>. Additionally, <u>officers should also seek approval prior to issuance of a citation and exercise great restraint in seeking authority to cite</u>."

Reference an email titled "Impoundment – USAO policy re: arrests and citations," dated March 26, 2014, at approximately 6:45 p.m., from|                    | to a BLM SAC and others and "cc'd" to the Nevada U.S. Attorney and other AUSAs.

Additionally, the following was also stated:

"We are confident that you (a BLM SAC) will guide the BLM law enforcement officers to <u>utilize their training to diffuse situations and not resort to criminal processes except sparingly and as a last resort with our approval</u>, and with this direction, we will collectively do our best to contribute to a safe and smooth operation."

Reference an email titled "Impoundment – USAO policy re: arrests and citations," dated March 26, 2014, at approximately 6:45 p.m., from|                    | to a BLM SAC and others and "cc'd" to the Nevada U.S. Attorney and other AUSAs.

Also Reference an email titled "Re: Impoundment – USAO policy re: arrests and citations,' dated March 26, 2014, at approximately 7:07 p.m., from a BLM SAC to the BLM OLES Director and "cc'd" to the BLM Nevada State Director. In reference to the above described email, this email from the BLM SAC to the BLM OLES Director stated the following: "I assume you will be speaking to Bogden (the Nevada U.S. Attorney) about the problem this presents for us. By not taking strong and affirmative action we will just embolden those who are opposed to our actions and things will likely escalate."

Sometime in this timeframe, a Nevada Brand Inspector had a telephone conference call with higher level BLM Law Enforcement Supervisory Staff. During this conference call, the Brand Inspector recommended a "soft impound" with an associated civil property lien on Cliven Bundy's trespass cattle.

23

A BLM supervisor (which I believe was a BLM SAC) stated "That's not the kind of message we want to send."

Reference interviews of Nevada Brand Inspectors in September 2015.

On or about March 27, 2014, in response to the above AUSA's email, a BLM SAC informed the BLM OLES Director "an unnecessary show of force or arrogant authority would never be my first play" and "BLM's Agents and Rangers are profficently (sic) trained in law enforcement, and the officers assigned to this operation have been handpicked. I am well are aware of powers of arrest and citation delegated to me, and I'm also aware of the potential consequences if I abuse my authority. Although a passive approach may have the desired effect, it may also be considered a sign of weakness or ordered constraint, which may embolden one or more members of those we are confronting."

Reference an email titled "Fwd:" with attached email correspondence, dated March 27, 2014, at approximately 9:43 a.m., from a BLM SAC to the BLM OLES Director and the BLM Nevada State Director also "cc'd" to the BLM Southern Nevada District Chief Ranger, the BLM Utah ASAC, the BLM Nevada ASAC, the BLM Southern Nevada Associate District Ranger, a National Park Service Chief Ranger and a BLM Field Staff Ranger.

On or about March 28, 2014, equipment was put in place in the Toquop Wash area near Mesquite, NV, in order to carry out the 2013 Federal Court Ordered Cliven Bundy Trespass Cattle Impound. (Timeline Talking Point)

At some point during this timeframe, a BLM SAC told an audience something like "we're going to go out there and kick Cliven Bundy in the teeth (or mouth) and take his cows." (Witness's include BLM
BLM                    and USFS LEO                                          (F),
                                                                            (b)

On or about March 29, 2014, a BLM SAC stated the large expansive closure (approximately 600,000 acres) "plays into my (a BLM SAC) bluff". Note: *The email review clearly indicated that the BLM Deputy Director, through the BLM Nevada State Director clearly directed a much smaller "roving" closure in order to not shut down public access to such a vast amount of Federal Public Lands.*

Reference an email titled "Re: cattle trespass map," dated March 29, 2014, at approximately 7:38 p.m., from a BLM SAC to the BLM Nevada State Director. Please also reference the entire email chain, including the email from the BLM Deputy Director and the BLM Southern Nevada District Manager.

At some point during this timeframe, a BLM SAC stated to a BLM ASAC (voluntarily downgraded to a BLM SA) something like "go out there and get the troops fired up to get Bundy's cows and not to take any crap from anyone." (Witness Available)

On or about April 6, 2014, Dave Bundy was arrested as he stood on the shoulder of a state highway and apparently attempted to film/record impound operations with his iPad. Additionally, his iPad was seized by law enforcement. (See openly available video/audio footage titled "The Bundy Trial 2017 Leaked Fed Body Cam Evidence," or a video posted on You Tube titled "Leaked Body Cams from the Bundy Ranch!" published by Gavin Seim. Note: *At 2:03 into the video it appears the U.S. Attorney's Office again issued instructions that were relayed to officers on the ground as "U.S. Attorney's Office just put out no arrest authority," "They* (The U.S. Attorney's Office) *don't want us to hook'em," and "They said cite'em.")* Additional Note: *At a point soon after the arrest and Dave Bundy's release from custody, BLM law enforcement returned Dave Bundy's personal items with the exception of his iPad.* Additional Note: *It was indicated that Dave Bundy needed that iPad to manage his business.* Further Note: *Following this arrest, Dave Bundy was released from custody with only citations and then those citations*

24

*were dismissed.* Also Note: *A BLM ASAC told me that he was concerned because some of the officers allegedly said some rude comments that may have been picked-up and recorded on Dave Bundy's iPAD. Although the BLM ASAC told me who reported this likelihood to him, I can't remember for sure. However, I believe it was the BLM ASAC's longtime friend, co-worker and godfather to his daughter. At the time I didn't personally know this SA, so I can't be 100% sure. The BLM ASAC specifically indicated to me and later indicated to the former Acting U.S. Attorney and an Assistant United States Attorney that the comments consisted of the officers bragging about roughing Dave Bundy up, slamming him to the ground, grinding his face against the pavement, and Dave Bundy having gravel stuck to his face.* (At some point later, I saw videos where the Bundy family basically described the same thing in reference to Dave Bundy's arrest. Additionally, at this point it was a given that there was going to be an independent internal use of force investigation initiated.) Further Note: *On or about January 24, 2017, while at the U.S. Attorney's Office in the lead prosecutors work space, the lead prosecutor told me that had it not been for the armed stand-off and assault on Federal Officers on April 12, 2014, the only person that would have been charged in this case would have been Ammon Bundy for his actions on April 9, 2014.* Note: *This issue should be discussed about in length in relation to use of force and exculpatory material likely contained on the iPAD. Additionally, my investigation indicated that a BLM SAC likely instructed a U.S. Park Police Sergeant to arrest Dave Bundy despite the U.S. Attorney's direction on multiple times not to arrest. I recommend pulling telephone records between the U.S. Park Police Sergeant and the BLM SAC. I had previously asked the U.S. Park Police Sergeant if the BLM SAC instructed him to make the arrest of Dave Bundy and the Park Police Sergeant told me that he couldn't remember for sure, but he is sure that he would have got the BLM SAC's authorization prior to making the arrest.* Further Note: *In a Gold Butte Investigative/Prosecution Team meeting in the Winter of 2016, the lead prosecutor stated that he had no intention of giving the iPad back to Dave Bundy, even though, the contents of the iPad weren't going to be used as evidence subsequent to search authorized by a search* _____ Continuing Note: *When I generally spoke with officers about specifically why Dave Bundy was arrested, a general comment I heard was simply that he needed to go to jail. This concerned me because although I didn't do the Use of Force Investigation, it seemed that in general there wasn't a good articulation for the need to arrest Dave Bundy and the associated use of physical force to conduct that arrest.* (Witnesses Available)

On or about April 9, 2014, Ammon Bundy ran his all-terrain vehicle (ATV) in front of/or rammed a BLM convoy vehicle, thereby causing it to stop. Following these disruptive and almost rioting type actions by Ammon Bundy and others, Ammon Bundy was tased and possibly bit by a BLM law enforcement canine, and Margaret Bundy Houston was thrown to the ground by a BLM Supervisory Ranger. (See openly available/YouTube video/audio footage of Ammon Bundy being tased and Margaret Bundy Houston being thrown to the ground titled "Leaked Body Cams from Bundy Ranch!" published by Gavin Seim (at the 4:40 minute mark) and a video titled "Margaret Houston thrown to the ground at Bundy Ranch" at the 00:07 second mark.) Note: *This issue should be discussed further. A BLM SAC's narrative was that the BLM Supervisory Officer threw Margaret Bundy Houston to the ground to save her life from being run over by the government convoy vehicles (look at the foot placement and the officer having a taser in his hand). Additionally, the prosecution team employed a Use of Force Specialist that indicated potential excessive use of force.* Additional Note: *On or about February 24, 2017, I spoke with the Chief of the BLM OLES Office of Professional Responsibility (OPR) and he told me that there were many issues in violation of policy referencing virtually everything that the BLM SAC was involved with, including use of force investigations and police canine deployments, but the BLM OLES Director for some reason allowed the BLM SAC to get away with it. The BLM OLES OPR Chief went on to say that time after time, this BLM SAC caused him many issues and that he was shut out of any investigations that this BLM SAC had anything to do with.* Further Note: *While going over the internal investigation review (Henthorn, Giglio) of potential trial witnesses, I didn't notice any of the instances which were very troubling and that had been described to me included as internal investigations. Additionally, I did notice that multiple internal investigations of this BLM SAC appeared to be referred to the BLM OLES Director, who then ruled the allegations as unfounded.* Also Note: *Please also note in the following timeline about the allegations*

EOR0174

*this BLM SAC bragged about the number of internal investigations he had opened on him, the instances of alleged retaliation, and the BLM SAC allegedly stating that he "owns" the BLM OLES Director and a BLM ASAC statements that this BLM SAC is "the Director's boy."*

On or about April 12, 2014, following the direction of Cliven Bundy, many armed and unarmed protestors and Bundy followers converged at the Toquop Wash area just off Interstate 15 (I-15) in Southern Nevada and unlawfully shut down the interstate and unlawfully pointed and brandished weapons at Federal Law Enforcement Officers (LEOs). These actions led to the release of the Federal Court Ordered Impound Cattle. (See openly available video/audio footage of the events of April 12, 2014, and photographs of a BLM SAC. Additionally, please see openly available photographs of the BLM SAC as a representative of the Federal Government in negotiations with his black hat turned around backwards, his Oakley sunglasses, "operator beard," black short sleeve t-shirt, and camouflage plate carrier vest with "Police" markings.)

On or about April 14, 2014, until approximately April 20, 2014, I conducted a personal protective detail for a BLM Supervisory Ranger. Note: *This supervisory Ranger received several rude and threatening contacts following the April 9, 2014, incident in which Margaret Bundy Houston was thrown/pushed to the ground. For additional details, please see available open source videos available online.*

On or about April 16, 2014, at approximately 7:56 p.m., an AUSA (who was also present at the Incident Command Post (ICP) and/or in the field during the 2014 Cliven Bundy/Gold Butte Trespass Cattle Impound) sent an email to a BLM SAC. This email stated the following: "Hey hope everyone is back with no issues from the ICP. I wanted to ask who our case agent will be as far as the BLM side goes? There are things I'd like to get like the dispatch records for Saturday. Am wondering who I should ask for this kind of stuff so that I don't have to bug you. I'd prefer someone either from your office or from NV so that its easy and quick to communicate and get stuff and get the agent in to our offices as needed." Note: *These dispatch audio files we never recovered.*

On or about April 16, 2014, at approximately 8:07 p.m., the BLM SAC replies to the AUSA with "Case agents attached. Note: *Evidently, the BLM SAC "cc'd" two other BLM SAs on this email.*

On or about April 16, 2014, at approximately 8:33 p.m., one of the BLM SAs (who was later promoted to be a BLM ASAC) responded with the following: "Holy cow, XXXXX and I are the case agents? Sweet!" On or about April 16, 2014, at approximately 9:34 p.m., the BLM SAC responded with the following: "Yup."

Note: *In May of 2014, the one of the BLM SAs told me he was burned out and was looking for another job. Additionally, at some point thereafter, the other BLM SA was promoted to be a BLM ASAC. Furthermore, prior to this, yet another BLM SA had been assigned as the Case Agent.*

On April 27, 2014, a video titled "BLM Procession at Burning Man" was published on You Tube by Rich Van Every. Note: *It appears this video was from Burning Man 2013, at or around August 29, 2013. This footage in part in a very limited way also depicts a BLM SAC and his state of dress and interaction.*

On or about May 1, 2014, I received a telephone call from a BLM Special Agent -in-Charge (SAC) that requested that I travel to Las Vegas, NV for up to 90 days of intense work to conduct the investigation into the alleged crimes committed by Cliven Bundy and his followers referencing the 2014 Federal Court ordered trespass cattle impound and associated April 12, 2014, stand-off near Bunkerville, NV. (Reference an email titled "My Thanks!" from a BLM SAC dated May 1, 2014, at approximately 3:28 p.m.) Note: *This email stated the following: "I appreciate you stepping up for this important investigation. I just spoke with DD (Deputy Director) XXXXX (an Acting Deputy Director-current SAC)*

26

*and he is still making calls to the other Regions to get some additional assistance............Thanks again guys, I really appreciate you taking this on."*

On or about May 1, 2014, at approximately 3:44 p.m., I received an email titled "Re: My thanks!" from a BLM SAC to another BLM SAC, two BLM ASACs and myself. Note: *In part, this email stated the following: "Yes thank you fellas this is a huge investigation and the #1 priority for the BLM."*

On or about May 5, 2014, I traveled to Las Vegas, NV, to participate as a team member in the BLM investigation into the associated crimes. When in Las Vegas, I joined up with the BLM SAC, a BLM Assistant Special Agent-in-Charge (ASAC), two BLM Senior Special Agents (SSAs), and a seasoned BLM Special Agent (SA) that was assigned as the case agent for this investigation. Note: *The BLM investigative team was later joined in a limited capacity by another BLM ASAC and four BLM SAs.* Additional Note: *On the evening of approximately May 5, 2014, in a Hampton Inn Hotel Room, I was asked by a senior member of supervision in the presence of an Assistant Special Agent-in-Charge, "You're not a Mormon are you?" (as what appeared to be some sort of religious test.)* Further Note: *On or about May 6 or 7, 2014, I was asked to be the Case Agent and Lead Investigator.* Also Note: *Fairly routine comments for a few days after this was "I bet you think I'm going to hell" and "____ thinks we are going to hell."* (b) (7) (C)

On or about May 6, 2014, in a meeting at the Federal Bureau of Investigation (FBI) Las Vegas, NV Field Office, located at 1787 W. Lake Mead Blvd., Las Vegas, NV 89106, a BLM SSA from the BLM's Office of Professional Responsibility informed meeting members that he was the BLM Cliven Bundy/Gold Butte Investigation's Case Agent for the BLM.

Note: *Over the course of the next several days, in the presence of supervision I was put in an uncomfortable, but what I thought was an innocent and joking position of having to justify my religion to senior BLM Law Enforcement. I often had to reply to seemingly joking comments such as "I bet you think I'm going to hell don't you" and "I would want to go to heaven, but I don't think I would know anyone there." Also, several times, a BLM ASAC continually mentioned going to "Dirty Larry's gentleman's club with benefits," as a way to be funny in regard to my name.*

Additional Note: *Following this May 6, 2014, meeting at the FBI office, senior/supervisory agency law enforcement officials made more and more of a habit of openly making fun of people to include individuals skin color, skin complexion, and voice. In particular, a fellow FBI agent became the new (but short-term) subject of disrespectful and rude comments such as old "Leather Face."*

Further Note: *During this timeframe, a BLM SAC indicated that two of his employees were Mormons and were constantly talking about religion and even emailing religious stuff back and forth and the BLM SAC indicated he had to put a stop to that.*

On May 10, 2014, at approximately 7:53 p.m., a BLM ASAC sent me, a BLM SAC, BLM Senior Special Agents, and a BLM SA an email titled "Re: Latest Protest" in reference to an unlawful all-terrain vehicle/off highway vehicle trail ride in Recapture Canyon Utah. In this email, the BLM ASAC and potential Gold Butte Investigation Trial witness referred to subjects of this investigation as "Idiots." Note: *This email would potentially be available through Freedom of Information Act Requests and possibly considered Jencks Material if this witness testifies during the Gold Butte Trial.* Additional Note: *This is a simple example of poor internet/social media discipline that was highlighted time after time during the course of this investigation by senior individuals who have been trained to know better.*

On or about May 6, 2014, or May 7, 2014, a BLM ASAC in the presence of a BLM SAC asked me to be the BLM's case agent and lead investigator for the aforementioned investigation. I was specifically told

27

that my mission was to conduct a **comprehensive, unbiased**, and **independent** investigation for the BLM into all violations and crimes pertaining to the 2013 Federal Court Orders, looking first at the Bundy family members. Note: *Prior to this time, but after the events of April 12, 2014, the BLM had identified two other case agents, and a third case agent (an Office of Professional Responsibility Investigator and trained lawyer volunteered, but was denied due to a BLM ASAC).* Additional Note: *Before the active trespass cattle impound operations began, the BLM had identified yet another different case agent and assistant case agent.* Also Note: *It appeared to me that several BLM officers seemed reluctant to get involved with any operation/investigation that this BLM SAC was a part of.* Further Note: *I was told by the SAC and ASAC that it was important that I was to remain unbiased and independent. I was told that the reason so many of the agency's solid performers can't be used, is because they were considered victims on April 12, 2014, and therefore in terms of the investigation are assumed to have bias. Additionally, the SAC told me that although the case is very important to so many people in the agency, it should remain independent and that no one outside of the investigative team will ask me case related questions or expect to remain in the information loop and in terms of the investigation, the ASAC will be my immediate supervisor (although would perform duties as my co-case agent) and the SAC will be his supervisor.* Further Note: *A BLM ASAC joking told me that he wouldn't want the SSA that was not allowed to be the case agent investigating him (in his OPR/Internal Affairs capacity) and a BLM SAC told me that he hopes this BLM SSA gets a reference check from him in reference to another job and that he wants the BLM SSA out of the agency so bad, that he would give him a false great recommendation.* Also Note: *Prior to this time, I was aware of at least three previously designated Case Agents since March of 2014.*

Approximately a week later at the United States Attorney's Office, which was then located at 333 Las Vegas Blvd., Las Vegas, NV 89101, after being introduced as the BLM Cliven Bundy/Gold Butte Case Agent, an unknown member of the staff asked me "You're not a Mormon are you?" (as what appeared to again be some sort of religious test.) (I can speculate on who asked me this, but at the time I didn't know the staff. Therefore, I can't be 100% sure.) Note: *I believe very strongly that the person that asked me this was either Acting United States Attorney for Nevada, XXXX or Assistant United States Attorney XXXX. However, since this was the first time that I met them, it is very hard to be 100% sure.*

Note: *By this time, due to associated issues, I felt I could no longer go out to eat or socially visit with the assembled team. The loud, obnoxious and unprofessional talk often consumed much of the dinner time discussion. Instead, I chose to drink a protein shake in my room by myself every evening.* Additional Note: *I brought this unprofessional conduct to the attention of the BLM ASAC and he also indicated to me that he felt the same way, but out of a sense of politeness he continued to hang around the rest of the group.*
Further Note: *In the absence of the larger group, the BLM ASAC and I were mostly able to go out to eat or interact without issue. This ASAC told me that when he goes out to eat with the aforementioned individuals, it is usually an ego fest with everyone bragging and trying to outdo everyone else.*

Around this timeframe, I asked the BLM ASAC if I could utilize a very knowledgeable BLM SA as a Co-Case Agent in this investigation. The BLM ASAC told me that I didn't want him because he has mental problems and that he had some sort of mental breakdown. Note: *This information, passed by a supervisor is confidential health related information. I later found this supervisor routinely informed others of protected/confidential health and confidential personnel disciplinary/evaluation information regarding subordinate employees.*

Additionally, around this timeframe a BLM SAC in the presence of a BLM ASAC told me the National Park Service offered to have one of their quality investigators assist in the investigation. The BLM SAC told me that he told them that we don't need their help and that we could take care of it and that we had it covered. Note: *This was simply not true. I certainly needed this help. Time after time the others*

28

*assigned to the case simply quit the investigative team. I was told they had attitude problems, girlfriend problems, no longer wanted to help, took other jobs, had other issues, etc. More and more, I came to believe the BLM ASAC, who was my co-case agent and subordinate helper, but also my supervisor, wanted to maintain complete control of the investigation in an unethical way. The issue was also that in general, the BLM ASAC didn't want to do the tedious case research and projects that were frequent, expansive and necessary.*

On or about June 8, 2014, Jerad Miller and Amanda Miller ambushed and murdered Las Vegas
Metropolitan Police Department (LVMPD)⎟                ⎟and LVMPD⎟                ⎟as well as
(Timeline Talking Point)

In August of 2014, while conducting a Bundy Ranch site visit and area familiarization near Bunkerville and Mesquite Nevada, while at a gas station, the BLM ASAC and I saw Margaret Bundy Houston and another lady that we believed was also a Bundy Family Member. From then on, for a time period thereafter, the BLM ASAC refereed to this other lady as the "overweight lady with big jowls" or similar names. (Reference an email titled "Margaret car," dated August 19, 2014, at approximately 11:46 a.m., from the BLM ASAC.)

On or about September 15, 2014, at approximately 11:33 a.m., I received an email titled "OPR cases," from a BLM SAC. This email stated the following: "R2 (BLM Region 2-Alaska, Washington, Oregon, Idaho), Just wanted to send out a reminder that if you receive new information related to an allegation against a BLM employee please notify the SCR (state Chief Ranger), ASAC (Assistant Special Agent-in-Charge), or SAC (Special Agent-in-Charge). We will then make an official referral to OPR (Office of Professional Responsibility) Chief Huegerich to assign a case agent in a timely manner. A special thanks to Rangers XXXXX, XXXX and XXXXXX who've done a great job over the last few weeks reporting and working with management and OPR on some sensitive internal cases."

Note: *This is exactly what I tried to do, time after time, after time. When I did, I was ignored, talked down to, removed from the Bundy Investigation, retaliated against and harassed. As a matter of fact, the author of this email and his ASAC were two of the primary perpetrators. Please see below for more information.*

On or about September 16, 2014, at approximately 8:18 p.m., a BLM ASAC sent me an email titled "Re: Request for Historical Native American Information." In this email, the BLM ASAC stated the following: "You are addicted to Cliven Bundy."

On or about November 3, 2014, I submitted eight search⎟          ⎟that I authored to a BLM ASAC for his review. Note: *Ultimately, the BLM ASAC was the affiant to one of the search⎟          ⎟the iPad of Dave Bundy. The other search⎟          ⎟were turned over in draft form to the FBI.* (See an email from me to a BLM ASAC titled "GBIT Search⎟          ⎟and dated November 3, 2014.) Additional Note: *I would like to talk about this issue more.* Further Note: Again, my investigation indicated there is likely unacceptable indications of unprofessionalism and potential evidence of excessive physical force contained in the electronic files of the iPad. (Witnesses Available) Also Note: *A BLM ASAC told me that the U.S. Attorney's Office wanted him (instead of me, the author) to go ahead and come down to Las Vegas to swear to the iPad search⎟          ⎟ahead of schedule or at a particular time because they were able to get it through to a favorable or preferred judge.*

During this time period and many times after, a BLM ASAC made remarks regarding the poor organizational skills and attention to detail of a particular Special United States Attorney (SAUSA). Additionally, it was a somewhat common occurrence for BLM Law Enforcement Staff to ask how this particular SAUSA was doing/performing. Note: *It was clear to me that there was concern within BLM*

EOR0178

*Law Enforcement about this particular SAUSA's dedication, attention to detail and performance in such an expansive, important and far reaching case.*

On or about November 20, 2014, an email titled "Litigation Hold Notice for Gold Butte Impoundment Activities" (Cliven Bundy Cattle) went out. This hold required the preservation of all information related to operations in the Gold Butte (NV) area conducted in March and April 2014 to impound trespass cattle owned by Cliven Bundy. The scope of this litigation hold included email, instant messages, text messages on personal and government issued phones, recordings, and voicemails. (See email titled "Litigation Hold Notice for Gold Butte Impoundment Activities" (Cliven Bundy Cattle), dated November 20, 2014.)

On or about December 31, 2014, my supervisor (a BLM ASAC) completed a fiscal year 2014 Employee Performance Appraisal Plan (fiscal year evaluation). This BLM ASAC (not the same BLM ASAC described throughout the rest of this report) rated me as "Exceptional." The following are some of the quotes from the evaluation: " ____ accepted the assignment of case agent on a complex, high media attention case with national implications for the BLM. He spent 2nd half of FY14, and continues to travel extensively at great burden to this family life. He continues to move the case forward receiving nothing but praise and compliments on his performance from all involved." " ____ was/is case agent on a large complex case w/ national implications for BLM. The case includes voluminous amounts of evidence and historical documents. ____ Continues to locate items of relevance, catalogue and organize, and prepare reports and supporting documentation for the U.S. Attorney's Office, his superiors, and cooperating agencies. All work produced is of the highest caliber." " ____ was/is case agent on a large complex case w/national implications for BLM. The case has taken him to another state/district in which he does not normally work. ____ has built from the ground up a network of relationships w/ the U.S. Attorney's Office, cooperating agencies, witnesses, and w/in the BLM. ____ is respected by all for his work and professionalism w/in that sphere." Note: *This EPAP had me rated as an "Exceptional" employee and gave me a numerical score of 4.75.* **(C)**

On or about December 10, 2015, I received awards for my performance as the Gold Butte/Cliven Bundy Nevada Case Agent/Lead Investigator. Note: *The SF-50 Notification of Personnel Action was dated December 10, 2015, for the $1000.00 Performance Cash Award and December 11, 2015, for the Performance 16 hour "Time Off" Award. The award was recommended on November 3, 2015, by a BLM ASAC.* Additional Note: The justification for the performance awards stated the following: ____ is the case agent for the BLM's portion of the Gold Butte Cattle Impound criminal investigation, and he has excelled in that role for this rating period. He has led the team effort to collect and analyze all the information in the case which included historical information dating back to the 1800s, a review project of over 90,000 employee emails, analysis of extensive social media posts and many other large investigative tasks. He analyzed all the information and wrote a lengthy, concise case package which he presented to the U.S. Attorney's Office. This BLM case report includes over 500 exhibits and details the involvement of nearly 600 witnesses. He continues to handle daily follow-up assignments from the prosecutors while performing at a very high level and displaying excellent work ethic. Gathering facts and writing case reports is at the heart of any special agent job, but ____ is accomplishing this on a grand scale-bigger than any case our agency has ever done-and he is doing an excellent job of it. I highly recommend him for this award." **(C)**

During this timeframe, a BLM ASAC (my current supervisor and partial de facto co-case agent), asked me if I would be willing or interested in moving to Boise, ID, and working for him there. Due to the necessity and long-term commitment in reference to the Gold Butte/Cliven Bundy Nevada Investigation, I accepted the offer out of a sense of duty to work side by side with the BLM ASAC on the Gold Butte/Cliven Bundy Nevada investigation and out of a sense of dedication to the case's mission and the mission of our agency. Reference an offer letter in reference to the Boise Idaho Voluntary Transfer dated

April 22, 2015, by a BLM Human Resources Specialist. Also reference a memorandum titled "Request for Exception to Hiring Freeze," dated April 7, 2015, signed by the BLM OLES Director that authorized the transfer during the hiring freeze. This memorandum in part stated the following: "As a result of recent high-profile events affecting BLM managed lands, Region 2 (Idaho, Oregon, Washington, Alaska) has been tasked with providing significant investigative assistance to other Regions."

On April 22, 2015, I received an email titled "RE: Financial Questions" from a BLM SSA. This email stated in part "I have no hardcopy documents/CDs in my possession related to this matter" and "I have no further information to provide." (Timeline Talking Point)

Note: *This email serves as an example of a degrading degree of assistance and cooperation from those assigned to assist in the investigation.* Additional Note: *In response to the author of the email, a BLM ASAC referred to the BLM Office of Professional Responsibility (OPR) Chief and agency senior as "a weak sister."*

At some point, a BLM ASAC was the affiant to the search _____ for the Dave Bundy iPad. Note: *At some point in time (during the search _____ construction process), the BLM ASAC informed me that he had heard that some rude comments in reference to Dave Bundy's April 6, 2014, arrest may have been accidently recorded on Dave Bundy's iPad. Soon after, the ASAC informed the U.S. Attorney's Prosecution Team in my presence.* Additional Note: *These comments give evidence of several conduct and ethical violations as well as potential excessive force.* (Witnesses Available) Further Note: *Please see later entry in reference to Dave Bundy's iPad.*

During approximately the winter or spring of 2015, issues continued to arise with the Dave Bundy iPad in reference to electronically opening it up pursuant to the search _____ Ultimately custody was transferred to the FBI. From then on, time after time, every time the iPad came up, the BLM ASAC and I just looked at each other. It was apparent that this issue was out of our hands and we shouldn't discuss it further.

At some point, a BLM ASAC directed me to delete a report from the Gold Butte Investigation Team's internal shared internet site that was very derogatory towards the FBI. This report wasn't relevant to the investigation or to the defense and would only serve to stress the relationship between the BLM and the FBI, so I complied and deleted the electronic version of the report from the computer system share drive. However, I did think it was unusual for the ASAC to direct me to do something that he could do himself and something that at face value would seem to be inappropriate. Because of this, and in an effort to provide proof that nothing unlawful or unethical was done, I printed out the report and included it in the general administrative file for this investigation. Note: *On or about February 18, 2017, this general administrative file along with all records for the investigation was seized from my office without permission and outside of my presence or knowledge.* Additional Note: *The strained relationship with the FBI was indicated in an email from May 12, 2014, by a BLM Senior Special Agent to members of the investigative team. This email stated: "That bridge is burned boys."* Further Note: *It became apparent to me the BLM ASAC also had a strained relationship with the BLM SSA from OPR/Internal Affairs. At one point in Las Vegas (as I remember) the BLM ASAC cheerfully shredded administrative material provided by the BLM SSA. During this time, the BLM ASAC stated something like "here's what I think about his work."*

On or about June 20, 2015, at approximately 12:28 p.m., a BLM ASAC sent me an email titled "FW: Re:" In reference to this email forward, the BLM ASAC stated the following in reference to a BLM SAC: "Just came across this email again. That is some management style." Note: *This email forward included the following previously referenced emails:*

31

*Email dated April 16, 2014, at approximately 7:56 p.m., an AUSA (who was also present at the Incident Command Post (ICP) and/or in the field during the 2014 Cliven Bundy/Gold Butte Trespass Cattle Impound) sent an email to a BLM SAC. This email stated the following: "Hey hope everyone is back with no issues from the ICP. I wanted to ask who our case agent will be as far as the BLM side goes? There are things I'd like to get like the dispatch records for Saturday. Am wondering who I should ask for this kind of stuff so that I don't have to bug you. I'd prefer someone either from your office or from NV so that its easy and quick to communicate and get stuff and get the agent in to our offices as needed."*

Email dated April 16, 2014, at approximately 8:07 p.m., the BLM SAC replies to the AUSA with "Case agents attached. Note: *Evidently, the BLM SAC "cc'd" two other BLM SAs on this email.*

Email dated April 16, 2014, at approximately 8:33 p.m., one of the BLM SAs (who was later promoted to be a BLM ASAC) responded with the following: "Holy cow, XXXXX and I are the case agents? Sweet!" On or about April 16, 2014, at approximately 9:34 p.m., the BLM SAC responded with the following: "Yup."

On June 22, 2015, I received an email that stated I will be officially supervised by a BLM ASAC and that ASAC will be 100% dedicated to the Bundy case. In this email, the BLM ASAC stated the following: "I will be giving up my regular Idaho/Eastern Oregon ASAC supervision duties and will devote 100% of my time to the Bundy case" and "         will officially be supervised by me from here forward and will be 100% dedicated to the Bundy case. His effective date is July 26 to have his duty station in XXX." Additionally, this email stated that my effective date for my move to Boise, ID is July 26, 2015. Note: *In BLM OLES, a BLM ASAC is a GS-13 and a BLM SA is a GS-12.* Additional Note: *This BLM ASAC supervised two other individuals. One is a longtime friend and hunting buddy of a BLM SAC and the other is this BLM ASAC's longtime friend and godfather to his daughter.* Further Note: *The other senior law enforcement officer in our office is a family friend and hunting buddy of the BLM SAC.* Also Note: *This BLM ASAC has told me time after time that since the BLM SAC is so close with two of these individuals, these individuals are impossible to control and lack any sort of work ethic.* Continuing Note: *I elected to move to Boise, ID after I was specifically recruited by the BLM ASAC and chiefly for the purpose of working side by side with this BLM ASAC in order to best fulfill obligations in reference to the Gold Butte/Cliven Bundy Nevada Investigation.* Follow-on Note: The BLM ASAC told me that he and the BLM SAC were friends while they were in the National Park Service (NPS) together and that the BLM SAC talked the BLM ASAC into coming to the BLM as a BLM Ranger in Wyoming. The BLM ASAC went on to say that his friend, the BLM SAC then brought the BLM ASAC to Boise, Idaho to work for the BLM SAC (back when the BLM SAC was an ASAC). I was aware the BLM SAC then hired the BLM ASAC as the ASAC, when the BLM SAC was promoted from his previous position as BLM ASAC.

During this timeframe and previous, during the course of my investigation, I found several issues historically into the handling of the Cliven Bundy Cattle Trespass and associated issues. These issues including the following: BLM Southern Nevada District Office motto's "no moo in 92" and "cattle free in 93," Gold Butte likely being part of Arizona Territory when the Nevada Constitution was adopted, Clark County Nevada actually controlling the specific BLM grazing allotments around the time Cliven Bundy sent a check to Clark County Nevada for the partial payment of the grazing fees, suspicious activity in regards to forever withdrawing grazing opportunities on Federal Public Lands in which there was a grazing preference "buy-out" and what appeared to be a shell company/organization that controlled the grazing preference during this timeframe, mass captive Desert Tortoise euthanization, Desert Tortoise predation by ravens (which themselves are protected under the Migratory Bird Treaty Act), Desert Tortoise population study issues, gross over population of (failure of BLM to responsibly manage)

32

Wild/Feral Burros within the Gold Butte area, water rights and water improvement destruction during the 2014 Gold Butte Trespass Cattle Impound, etc. Note: *These numerous issues were briefed following every discovery to a BLM ASAC and the written documentation of these issues was seized on February 18, 2017, when my office was searched without my permission and outside of my presence (see below).* Additional Note: *These issues were not deemed to be terminal to the investigation, to the issuance of the Federal Court Orders, or to the guilt of the subjects of this investigation in part since Cliven Bundy failed to respond to an offer by the BLM to renew his grazing preference with a 10-year contract and that this questionable conduct on behalf of the government didn't necessarily negate the crimes committed during the 2014 Gold Butte Trespass Cattle Impound (especially on April 12, 2014).* Further Note: *These uncovering of these potential issues were not a stated task of this investigation and were only discovered during incidental historic information gathering and then reported to a BLM ASAC.* Also Note: *The Gold Butte Trial Preparation/Historical Timeline that I created would be helpful in researching any relevance that emerges out of this entry. This timeline was emailed to two BLM SACs and a BLM ASAC on February 8, 2017, and is available for review.*

Around July of 2015, several troubling issues about very important person (VIP) demands in reference to a BLM SAC and his management and leadership of BLM Law Enforcement and contract negotiations in reference to the Burning Man Event began to emerge. Collectively, this became known as the "Choco Taco Incident" throughout the BLM. See Article: BLM director (Neil Kornze): "We are addressing Burning Man Issues," dated July 8, 2015, in the Reno Gazette-Journal. Additionally, see the Google Alert Email Forward for "BLM Rangers," titled "Bureaucrats, VIP Boxes at Burning Man," dated August 20, 2015, by Michael Shannon.

On or about July 8, 2015, at approximately 7:08 p.m., I received an email from a BLM ASAC titled "Re: Chaco Taco Gate." Within this email chain the BLM ASAC wrote the following: "Yes, it is hilarious." This email contained a link to http://captiongenerator.com/47960/ _____ Reacts-to-ChacoTacoGate. Note: *This email chain included a BLM SAC/potential trial witness a BLM SA/potential trial witness and in total, three members of the investigative team.* Additional Note: *In the included link, BLM_____ _____ was compared to Adolf Hitler.*

During this timeframe, as I completed the discovery email review, I noticed what I thought were gaps in time in reference to a BLM SAC's emails. I thought it appeared somewhat strange that the principle leader of the trespass cattle impoundment apparently had few emails, especially as it pertained to the very controversial Emergency Closure Order. In my review of the emails that were present, I saw indications that the Emergency Closure Order approval process seemed to go from having some issues to abruptly being approved. I attributed this to two likely reasons. One reason was that the follow-on coordination could have been done by telephone/conference call and the other was that other emails may have simply not met the word search criteria for discovery email inclusion and review. When I came across this possible issue, I informed a BLM ASAC. The BLM ASAC told me that with such scrutiny at the BLM and DOI Solicitor's level, he was satisfied there were no issues. I agreed at the time.

On or about August 27, 2015, at approximately 11:13 a.m., I received an email titled "Bundy email review" from a BLM ASAC. Note: *In part, this email described how the email review as conducted and gave a quick brief.* Additional Note: *This email further indicated that the BLM ASAC would take the initial work (separation into relevant and non-relevant categories) by the assistants and further faired down the relevant category and then he provided the relevant emails to me to review.* (Timeline Talking Point)

During this time period, I attempted to once again to get a dedicated Co-Case Agent and Secondary Investigator to assist me with the priority investigation for the entire Department. I specifically asked the BLM ASAC about others who displayed interest and may have availability in assisting in the

33

investigation. The ASAC told me the following: "You don't want her, she is too strong willed and has direct contact with the Director (of BLM OLES-I think)," "She doesn't take direction well," "Just ask XXXX (a BLM Supervisory Ranger) you don't want her, he used to be her supervisor," and something like she has to do it her way.  Note: *This was in reference to three quality individuals that had completed the Criminal Investigators Training Program at the Federal Law Enforcement Training Center. Ultimately, a person with very limited experience in the BLM was assigned to be a Co-Case Agent (until he abruptly took another job without completing his assigned tasks).*

On July 7, 2015, I received an email titled "XXXXXX working on Bundy Tasks." The email stated XXXX priority will be assignments on the Bundy case.  (Reference email titled "XXXXXX working on Bundy Tasks," dated July 7, 2015.)

On August 11, 2015, I drove my Government Owned Vehicle (GOV) to Boise, ID.  (Timeline Talking Point)

On or about August 20, 2015, I was forwarded an email titled "Fwd: Google Alert – BLM Rangers," by a BLM SAC.  This email contained an article by Newsmax titled "Bureaucrats, VIP Boxes at Burning Man," dated August 20, 2015, by Michael Shannon.  (See article by Newsmax titled "Bureaucrats, VIP Boxes at Burning Man," dated August 20, 2015, by Michael Shannon.)

On or about August 20, 2015, at approximately 9:55 p.m., a BLM ASAC sent me an email titled "Re: Vegas Baby!!!"
This email stated the following: "Is there an event she is coming for or is it EPAP time for your ass? Sorry you won't be getting that WGI.  Dude – if you have the Secretary coming to bust your balls on your sorry performance then you must have really stepped on it.  Sorry, but it was good to know you. Love, XXXX."

On or about August 23, 2015, at approximately 3:27 p.m., I was sent an email forward titled "Fwd: Big Sky MT op" by a BLM SAC.  This email had an attached photograph of a subject of the investigation.  At approximately 4:33 p.m., a senior member of BLM Law Enforcement Staff replied to the BLM SAC, the BLM Idaho Associate State Director, a BLM ASAC, a BLM Supervisory Ranger, me and others.  The BLM State Chief Ranger stated "What an F'in douche bag!!." I responded back to the individual by stating "I love explaining email like this" to which he replied "Dang it!!! Sorry!!!!!." Note: *Following this small incident, I spoke with a BLM ASAC about talking to the team about using good discipline on emails and texts in reference to potentially FOIA/discoverable material and the litigation hold.*

On or about August 25, 2015, a BLM SAC forwarded an email from BLM Office of Law Enforcement and Security (OLES) Director titled "Fwd: Burning Man Law Enforcement."  This email indicated that the BLM OLES Director would provide high level guidance and assistance to the Incident Management Team and that a BLM SAC will serve as the event's Incident Commander for Federal Law Enforcement and that the BLM SAC will have overall operational command of the federal law enforcement assets supporting the event and that there was **not a change of leadership** as a previously published article indicated.  (See an email from BLM Office of Law Enforcement and Security (OLES) Director titled "Fwd: Burning Man Law Enforcement," dated August 25, 2015, and an article titled "BLM top director to run Burning Man law enforcement," by Jenny Kane, dated August 23, 2015.) Note: *The indication from individuals that I overheard talking was that the BLM OLES Director was once again protecting and empowering the BLM SAC.  More and more I began to notice BLM employees apparently taking a large degree of interest and almost joy in reference to any amount of scrutiny on this BLM SAC.*

During this timeframe, a BLM ASAC told me to take permanent change of station (PCS) administrative leave because he wanted to be the one to introduce me around the office and he will be on annual leave

34

during this timeframe. The BLM ASAC told me that if I show up when he isn't in the office, the BLM SAC will do it and that is problematic because the SAC always wants to do the ASAC's job. The ASAC further indicated that since the ASAC became the ASAC, the SAC (the former ASAC) doesn't let the ASAC be in charge very often and constantly tries to do the ASAC job and that the SAC allows his friends (other BLM OLES employees) to not do what they are supposed to do. The BLM ASAC indicated that the BLM SAC would complain about the other employees, but not correct them because they are hunting buddies or family friends. The BLM ASAC also told me that the BLM SAC didn't like it when subordinates lived near him, in his subdivision, but then told me that they are sure proud of their houses (or something like that), in what I took as the BLM ASAC telling me that I wouldn't want to live there anyway. Note: *It should be noted that this BLM ASAC is also the BLM SACs long-time friend and acquaintance from the NPS and that the BLM SAC (according to the BLM ASAC) convinced the BLM ASAC to initially transfer to the BLM as a Ranger and then the BLM SAC hired the BLM ASAC as a Special Agent and then promoted the BLM ASAC to his current position of Assistant Special Agent-in-Charge when the BLM SAC was promoted to his current position as Special Agent-in-Charge.*

On or about September 2, 2015, I testified in front of the Federal Grand Jury (FGJ), in Las Vegas, NV, in reference to the 2014 Cliven Bundy/Gold Butte Investigation. (Timeline Talking Point) Note: *Following this testimony, the subject of a particular BLM SAC came up. A BLM ASAC asked me something like, did I tell the members of the FGJ, that the BLM SAC probably scr\*wed their wives last night.*

On or about September 18, 2015, I travelled to Elko, NV and met up with a Federal Bureau of Investigation (FBI) SA in order to interview two Nevada Brand Inspectors that were present at the 2014 Federal Court Ordered Gold Butte Trespass Cattle Impound near Bunkerville, Nevada. This meeting occurred at the Nevada Department of Agriculture Office, located at 4780 E. Idaho Street, Elko Nevada 89104.

In this meeting, one of the Brand Inspectors informed myself and the FBI SA that he was part of a coordination telephone conference prior to the 2014 impound in which a higher level, male BLM supervisor stated: "That's not the kind of message we want to send," when the Brand Inspector recommended a "soft impound" with an associated civil property lien on Cliven Bundy's cattle instead of a large scale, aggressive and confrontational impound operation. The Brand Inspector indicated that he recommended against such a large operation and heavy show of force. Note: *I believe this individual was a BLM SAC. Additionally, this is the first time that I believed that there may be an issue with the BLM SAC regarding the 2014 Gold Butte Trespass Cattle Impound Operation.* Further Note: *Following this possible discovery, I informed a BLM ASAC the next day (due to my drive time from Elko, NV). The BLM ASAC indicated to me that he was sure this was a particular BLM SAC and that this BLM SAC XXXXXs the spotlight and big operations and that in 2012, this BLM SAC got some sort of large award at BLM Headquarters in Washington DC for planning the 2012 postponed Bundy Cattle Impound Operation. This BLM ASAC further stated that the BLM SAC had the arrogance to tell the BLM ASAC and others helping him during Operation Cerberus Action in Utah that the operation would be the highlight of their career.* Also Note: *A Nevada State Attorney (believed to be Dennis Belcourt from the Nevada Attorney General's Office) listened in over an open speaker phone. Notes of this conversation may be available. My notes for the interview were seized from my secured office on February 18, 2017.*

Around this timeframe, the lead prosecutor mentioned on a conference call that the narrative of the prosecution theory was that Cliven Bundy's cattle were sickly and in bad physical shape. I told the prosecutor that my research through interviews with the Nevada Brand Inspectors and talking to a project leader (a BLM Wild Horse and Burro Specialist) for the 2014 Gold Butte Trespass Cattle Impound was

35

that Bundy's cattle were actually in pretty good physical shape for free range desert cattle. This seemed to irritate the prosecutor, but ultimately, we agreed that a better phrased narrative would be that great many of Bundy's cattle were feral and spread over a huge area.

At some point during this timeframe, while at the BLM Southern Nevada District Office, located at 4701 N. Torrey Pines Dr., Las Vegas, NV 89130, I was laughingly shown a displayed/circulated rude pin-up titled "Mad Compares Infamous Bundys" by a BLM ASAC. On this piece of paper, a comparison was made between Cliven Bundy, Al Bundy, Ted Bundy, and King Kong Bundy. The final section listed Cliven Bundy as "an unrepentant, tax-dodging, faux-patriotic, racist douchebag. (Example Item Available)

Additionally, an unflattering photograph of Cliven Bundy was physically posted on the wall of the Gold Butte Investigative Team Office Space located in the BLM Southern Nevada District Office. It was relatively common for a BLM ASAC to openly make comments referring to Cliven Bundy's big gut hanging over his pants. Note: *This relatively small work space had a bad smell that ultimately was attributed to dry erase board markers. This the door was usually open and the BLM ASAC's comments were no doubt loud enough to be heard within the office by civilian employees, some of whom are victims and potential witnesses.* Additional Note: *I became more and more concerned about this BLM ASAC's openly displayed bias and the implications it could have on witness tainting and impeachment.*

At some point during this timeframe (and from time to time thereafter), during our weekly Gold Butte/Cliven Bundy Nevada Investigation conference calls, a BLM ASAC purposely failed to mention other staff members in the room as sensitive information was discussed on the calls over speaker phone. For instance, the BLM ASAC would say the BLM ASAC and I were present, but fail to mention that other staff were in the room and listening on speaker phone. It was clear to me this was a deceptive answer and in violation of our direction to conduct an independent investigation.

At some point during this timeframe, a BLM ASAC told me that I speak to senior level management too formally and respectfully and it makes them uncomfortable. The BLM ASAC said that everyone wants to be on a first name basic and that law enforcement within the office are like a family and don't keep secrets from each other. Note: *We were specifically directed by the BLM SAC over the Gold Butte/Cliven Bundy-Nevada Investigation team that we were to conduct an independent investigation.* Additional Note: *Throughout this timeframe, this BLM ASAC continually gossiped and openly told me of confidential personnel discipline issues, and confidential/privacy issues regarding religion and health information regarding other employees.* Further Note: *In addition to the gossip, the unprofessional and offensive language, as well as the disclosure of confidential and private information made me more and more uncomfortable. Also, during this timeframe, the BLM ASAC felt it was appropriate to talk to me about another subordinate employee's deeply held religious beliefs in a derogatory manner. During a particular discussion, the BLM ASAC told me that he and a BLM SAC would no longer allow a particular Investigative Technician to participate in any field or enforcement operations. The BLM ASAC told me that this particular BLM employee relied on "prayer" and it was too risky to allow her to participate in field operations. This BLM ASAC told me of a particular occasion when the BLM employee told him that one of the employee's friends or family members "got down" and just couldn't get back up and passed away shortly thereafter. Once again, I became concerned of another "religious test" by management.*

During this timeframe, a BLM ASAC commonly referred to items he purchased with authorized investigation overtime money as "Cliven Bundy bought me" this or that. One such instance was a flyrod and reel that the BLM ASAC would commonly, in what appeared to be a bragging way said things like look at the fly rod Cliven Bundy bought me. Note: *I was concerned that these comments would infer to bystanders that in restitution, Cliven Bundy would be responsible for the investigative team's overtime, thus buying the ASAC's fly rod and reel.* Additional Note: *The problematic issue is that throughout the*

36

*agency, there is understandable apprehension about the over use and unjustifiable use of cost codes and statements like these infer misconduct. It should be noted that our agency has routinely had to do damage control in many such issues.*

On or about September 30, 2015, a BLM ASA

Note: *My relationship with this BLM ASAC was growing more and more stressed. Although, I wanted to keep working on the case and I didn't want to get anyone in trouble, the content of the conversations was often ridiculous and the BLM ASAC didn't appear to have a "filter," or understand appropriate open comments.*

On or about October 16, 2015, the BLM Deputy Director spoke at a BLM Idaho "All Employees" Meeting that a BLM ASAC and I attended. (Timeline Talking Point) Note: *During this meeting, the BLM Deputy Director said something along the following lines: The Governor of Idaho (Butch Otter) is a problem and he just better watch himself in regards to the Sage Grouse (Endangered Species proposed listing by the U.S. Fish and Wildlife Service), and that Wyoming Senator John Barrasso and Utah Congressman Jason Chaffetz need to quit being such a hassle regarding the wild horse issue or they will find themselves with several thousand wild horses moved to their states. Additionally, the BLM Deputy Director went on to say that when Democrats win elections, public service jobs are safer and projects are government projects are funded better.* Additional Note: *Following this "All Employee" Meeting, I told the BLM ASAC that type of announcement is problematic with us making relationships with our state and local counterparts. The BLM ASAC stated how poor of an example the BLM Deputy Director was and how he can't stand him and that he always got everyone else to do his work.*

On or about October 21, 2015, a BLM ASAC presented me with an Employee Performance Appraisal Plan (Evaluation) for FY 2015. During this timeframe, I was given a superior evaluation.

Sometime during this timeframe (late 2015/early 2016), during a discussion at the U.S. Attorney's Office in Las Vegas, in which myself, a BLM ASAC, and others were present, the subject of the decided charges against the subjects of the investigation was brought up. The lead prosecutor stated that he was going to charge the subjects with the maximum possible charges and not many of the other charges that I recommended. The lead prosecutor told me that he didn't want to give the jury the option to convict on the more minor charges. Note: *These charges were complicated and required to the potential jury to buy into a "prosecution theory" instead of simply examining the elements of the crime (actual charges) and looking at the suspects relevant actions. I specifically asked the lead prosecutor to further consider the lesser charges.*

During this timeframe, a BLM ASAC told me he was going to put me in for BLM 2015 Special Agent of the Year. (Special Agent of the Year Nomination Write-up Available, See nomination narrative from February 18, 2016)

On or about January 2, 2016, armed protestors took over the Malheur National Wildlife Refuge near Burns, Oregon. (Timeline Talking Point) Note: *During this time-period, troubling comments (somewhat understandably) got worse. I also volunteered to assist in the Burns, Oregon area. I recommended to my supervision several tactical support measures that I believe would have been beneficial such as XXXXXXXXXXXXXXXXX. Additional Note: Per an FBI Press Release titled "FBI Arrests All Remaining Occupiers at the Malheur National Wildlife Refuge," by the FBI Portland, Oregon Office, dated February 11, 2016, the following 16 individuals were indicted on February 3, 2016, by a Federal Grand Jury: Dylan Wade Anderson (34, of Provo, UT), Sandra Lynn Anderson (48, of Riggins, ID), Sean Larry Anderson (47, of Riggins, ID), Jeff Wayne Banta (46, of Yerington, NV), Ammon Edward Bundy (40, of Emmett, ID), Ryan C. Bundy (43, of Bunkerville, NV), Brian Cavalier (44, of Bunkerville, NV), Shawna*

37

EOR0186

*Cox (59, of Kanab, UT), Duane Leo Ehmer (45, or Irrigon, OR), David Lee Fry (27, of Blanchester, OH),
Kenneth Medenback (62, of Crescent, OR), Joseph Donald O'Shaughnessy (45, of Cottonwood, AZ),
Jason S. Patrick (43, of Bonaire, GA), Ryan Waylen Payne (32, of Anaconda, MT), Jon Eric Ritzheimer
(32, of Peoria, AZ), and Peter Santilli (50, of Cincinnati, OH).* (Reference an email titled "Fwd: FBI
Update," dated February 11, 2016, at 2:31 p.m., from a BLM SAC to BLM Region 2 Law Enforcement
and others.)

Sometime in this timeframe, it appeared that the BLM ASAC (second in charge of the Gold Butte
Investigative Team) generally and in some cases almost completely stopped working and became
generally uninterested in completing tasks that involved this investigation. Additionally, more and more
he appeared to be constantly personally offended by the subjects of this investigation, their supporters,
and their world view in general. The office narrative that evolved was that there needs to be an officer
involved shooting to make these types of people get the message. The BLM ASAC often made
statements like "You can love your job, but it won't love you back," "Family first," "I'm not working any
LEAP (law enforcement availability pay) today," and it seemed he would often take very long lunches,
workouts, and leave early on "Federal Friday's." The issue most important to me was that I needed
assistance and not only was he often not willing to do the work, he only wanted other team members he
could control that were new to the BLM.

During this timeframe (and also at other times) a BLM ASAC would contrast himself with Federal Land
Users by saying that he has a "soft hands" type job and that others don't (such as farmers, ranchers,
loggers, miners, etc.). More and more, I come to notice a widening cultural gap between land
management/natural resource protection employees and their constituents. More and more, I noticed a
massive erosion of respect between the people who use and enjoy the land and the people charged with
the management of the land.

Note: *I told the BLM ASAC that this type of conversation is potentially dangerous and could contribute
to use of force instances which may be ill advised or where our officers find themselves unprepared and
outgunned. It was clear to me that the BLM ASAC wasn't interested in my opinion as he continued to
condone that type of talk.* (Much of this can be corroborated through witnesses and email/computer file
review.) Additional Note: *This BLM ASAC told me the supervisor for the Gold Butte Investigative team
doesn't actually routinely work LEAP as required. Instead, this BLM SAC just goes home and is
available for telephone calls.* Further Note: *I thought this BLM ASAC was trying to either justify his lack
of effort or discredit the BLM SAC to me and potentially drive a wedge into my respect for the BLM SAC.*

Sometime during this timeframe (or just previous), while on our way to pick up lunch at Hugo's Deli,
located at 10599 W. Overland Road, Boise, ID 83709, a BLM ASAC told me that he had been a
chaperone for a camp that his son had recently been involved with, in either McCall or Cascade, Idaho.
The BLM ASAC told me that there was a "little Mormon girl" that fell down and got muddy and had to
go the rest of the day dirty and muddy. The BLM ASAC went on to say that that made his day and
something along the lines of the little Mormon girl wasn't able to use her essential oils." Note: *To me,
this was another apparent indication of a deep dislike for the Mormon faith (which is the same faith as
many of the defendants) that I witnessed from individuals in authority positions.* Additional Note: *I have
friends that are members of the Church of Jesus Christ of Latter-Day Saints (LDS) aka "Mormons" and I
find these types of statements (as described throughout this report) as disrespectful and I find the
questioning of my faith (as described within this report) to be wholly inappropriate and a "religious test"
of sorts.* Further Note: *Because of my demeanor and my refusal to go out drinking with the BLM ASAC
and others during the frequent trips to Las Vegas or other areas and my refrain from using foul,
disrespectful, and inappropriate language in a professional environment, I came to suspect that I was
believed to be a Mormon as well.* Further Note: *Research indicated this likely occurred on February 9,*

*2016, following a return trip to Boise, ID, from Las Vegas, NV, when a BLM ASAC and I arrived at the Boise Airport at approximately 12:20 p.m.*

More and more, BLM Supervisory Agents (mostly the BLM ASAC) spoke openly in an unprofessional manner about subordinate employee's confidential personnel matters such as punishments, private family issues, and internal issues. Note: *I knew it was a strong possibility the BLM ASAC was also speaking in the same way about me to others in the office.*

The BLM ASAC time and time again openly interjected his opinion of subordinate employees. I can reference many of these issues. For the purpose of this document, I will include a few below.

On one instance, the BLM ASAC told me that there is no one that he dislikes as much or more than a particular subordinate BLM Field Staff Law Enforcement Ranger. The BLM ASAC went on to say he just can't stand to be around him and something like he hopes he never sees him again. Later, a BLM SAC told me the BLM Field Staff Ranger was like a bull in a China shop (or something to that effect) and that he and other law enforcement officers butt heads. The BLM SAC went on to say that the BLM Field Staff Ranger "self-dispatched" himself to a wildland fire and got into some sort of argument and received, or was going to receive "days-off" (punitive unpaid time off) due to his misconduct. Note: *The BLM SAC and a BLM State Chief Ranger knew that I was friends with the Field Staff Ranger and tempered their associated remarks with, they like him and that he is a good family man, just not a good fit in law enforcement, or something like that. The BLM SAC went on to say that the BLM Field Staff Ranger knows the "resource" (meaning Federal Public Lands and their associated plant, wildlife and other natural resources) and would make a great civilian employee, just not such a good law enforcement officer.* Additional Note: *This same BLM Field Staff Ranger told me that following the failed 2014 Cliven Bundy/Gold Butte Trespass Cattle Impound, the interviewing FBI agents failed to document his concerns about the BLM leadership and actions during the impound operation. Additionally, this BLM Field Staff Ranger told me that BLM Supervisory Law Enforcement Officials gained access to his computer and erased certain files.*

The BLM ASAC also would frequently open talk about others that weren't performing up to his standard. The BLM ASAC would from time to time specifically mention that a BLM Supervisory Ranger (a peer of the BLM ASAC, but senior to me) doesn't shave, isn't prepared, isn't organized, doesn't work, surfs sports websites online all day, and is never in uniform, and is often late and undependable. The BLM ASAC would say that at one point, that particular BLM Supervisory Ranger was a good worker and squared away officer, but that since he started working for the BLM SAC he has just quit and is more interested in his children's sports activities than doing his job. The BLM ASAC went on to tell me that although the BLM SAC doesn't approve, he lets the Supervisory Ranger get away with it because they are buddies.

The BLM ASAC would also confide in me that the BLM SAC allowed this type of activity to take place because one of the individuals is the BLM SAC's long-friend and hunting buddy from the National Park Service and the other is a close family friend and hunting buddy. Note: *The BLM ASAC told me of a story where the BLM SAC needed a BLM SA (the BLM SAC's and BLM ASAC's direct subordinate) to work on a priority sexual predator type case in Eastern Idaho, but the BLM SA had other personal plans (a family trip to a National Park as I recall) and didn't want to assist. The BLM ASAC went on to say that the BLM SAC will never allow the BLM ASAC to hold the BLM SA accountable because they are hunting buddies. The BLM ASAC went on to say that the BLM SA owns all the tents and hunting camp equipment and that the BLM SAC needs the BLM SA to provide the hunting camp for the BLM SAC's hunting trips. The BLM ASAC also told me of a story where the BLM SA refused to help the BLM ASAC drive because the BLM SA was too tired after a big meal and that the BLM SA doesn't produce any cases or make relationships with his co-workers and cooperators in the area. The BLM ASAC went on to tell*

39

*me that there is a feud between the BLM SA and the BLM Ranger Supervisor. The BLM ASAC also mentioned to me that prior to the changing of the law enforcement offices within the larger BLM Idaho State Office building, a particular BLM Supervisory Ranger would surf sports websites on the internet all day and that his non-work activities were often observed by civilian staff in the office and it was embarrassing to this BLM ASAC. The BLM ASAC indicated that the BLM SAC allowed subordinate employees to get away with so much because they were also hunting buddies, family friends, and something like their children were friends or dating.*

This type of talk and what often amounted to workplace gossip went on routinely. It seemed in general, this BLM ASAC (a relatively new supervisor) made a habit of talking about many subordinates in a rude/non-flattering way when they were not around. This conduct also commonly included the BLM ASAC talking about other subordinate employees not performing well and not taking his advice as well as talking about subordinate employee vanity and over emphasis on money and nice things. For instance, this BLM ASAC spoke poorly of a subordinate Ranger by stating she doesn't take direction well and that she needs the most expensive jogging strollers and loves posting pictures of herself doing handstands, etc. Note: *I believed these comments originated out of insecurities on the part of the BLM ASAC. Therefore, when possible, I supported, encouraged, thanked, and bragged on the BLM ASAC when possible/appropriate.*

Also, during this timeframe, the BLM ASAC openly spoke poorly of, and criticized superiors within the agency. In general, during this timeframe, the BLM ASAC would simply make fun of their work ethic and family relationships.

Additionally, during this timeframe, a BLM ASAC told me that when he first was hired as a Ranger, he wasn't aware he had even put in for a law enforcement position. The BLM ASAC told me that it wasn't until the first day at the law enforcement academy that he knew his job was going to include conducting law enforcement activities.

Also, during this timeframe, I noticed that my locker, which was located within the law enforcement storage cage area of the BLM Idaho State Office had been physically labeled "Redbone XXXXXX." Note: *This label was still present on my locker as of approximately March 12, 2018.* Additional Note: *To me, based on my upbringing, this was a derogatory term that represented an ignorant, isolated/backwoods hillbilly and a person of mixed black/white race. I told the BLM ASAC that I didn't want to be overly sensitive, but with the unprofessional work-place comments (such as tractor face, ret\*rd, inbred, red-neck, idiot, doucheb\*g, overweight woman (Bundy family member) with big jowls, etc.) I felt like me and my family were being made fun of and that I thought the BLM ASAC should simply correct the issues, and remind the officers this type of activity is unprofessional (of course this implied the BLM ASAC shouldn't be acting this way or instigating the conduct either). Further Note: The point of this entry (and several others) is to bring attention to this and many other seemingly innocent/ignorant, but certainly unprofessional instances where the BLM ASAC and other members of BLM OLES senior law enforcement management at one point perpetuated an atmosphere of "horse play" and unprofessional office banter based on a sexual, religious, personal appearance, and confidential nature (performance, discipline, confidential evaluation and medical material), and at another point "laid down the law" and selectively enforced their rules. I believe once a supervisor starts down the road of horseplay and unprofessional office banter, they lose much of their credibility. It should also be noted that these individuals aren't my friends or peers, they are senior to me and in supervisory positions over me. This BLM ASAC would often talk down and disrespectfully to me (do this or that or I'll kick your a\*\*, unprofessional sexual, body shaming, and inappropriate religious comments), make fun of other fellow employees, act like one of the boys, then immediately shift to a strict supervisor and act all professional. Most times this BLM ASAC was polite and professional, then he would suddenly shift to being obnoxious and child-like.*

40

On January 7, 2016, at approximately 3:32 p.m., I received an email from a BLM ASAC titled "FW: http://rollingstone.com/politics/news/the-dumb-and-the-restless-20160107#ixzz3waaMniEY. (Reference email titled "FW: http://rollingstone.com/politics/news/the-dumb-and-the-restless-20160107#ixzz3waaMniEY, dated January 7, 2016.) Note: *This email contained a link to a Rolling Stone article by Matt Taibbi, dated January 7, 2016.* Additional Note: *This article contained the following quotes/partial quotes: "Ammon Bundy and his band of weeping, self-pitying, gun-toting, wannabe-terrorist metrosexuals are America's most ridiculous people," "syllable or two if they could manage it," "gun-wielding outpatients," "Y'all Qaeda/Vanilla ISIS," and "play chess with menstruating women."* Further Note: *I believe this type of email is unprofessional in a federal law enforcement workplace, especially when it was shared with a BLM SAC who is a potential trial witness and likely now subject to the litigation hold, Discovery/Exculpatory Material, FOIA, and is prohibited conduct.*

On January 8, 2016, at approximately 10:58 a.m., I received an email forward from a BLM ASAC titled "FW: What a shame." This email forward was from a likely potential trial witness at referenced a subject of the investigation. The narrative in the forwarded email stated "Hahahahaha" and "Oh yeah? Check out this one I got from _____ This email contained the following enclosed links: http://www.dailymail.co.uk/news/article-3387117/Stolen-valor-Militiaman-bodyguard-ranchers-Cliven-Ammon-Bundy-posing-retired-Marine-served-Afganistan-Iraq-boost-combat-credentials.html and http://deadstate.org/oregon-militiamen-turn-on-each-other-as-member-blows-groups-donations-on-booze-at-a-bar/"

Quotes in the first of the two links state that Brian Cavalier is a "big-bellied braggart" and the second link again references "Y'all Qaeda."

On or about January 10, 2016, at approximately 9:51 a.m., I received an email titled "Re: Militia (PPN) confronting FBI at airport,' from a BLM ASAC. Within this email, the BLM ASAC stated the following: "So bold. Turns my stomach."

On or about January 15, 2016, while working in the BLM Idaho State Office located at 1387 S. Vinnell Way, Boise, ID 83709, I was jokingly shown an offensive video by a BLM ASAC from Comedy Central, the Nightly Show from January 14, 2016. This video was titled "Militia, D*ldos, & Bernie Sanders Surge," (Timeline Talking Point-Please look at this openly available video. I started more and more to come to believe the professional judgement of this BLM ASAC was clouded.) Note: *This video contained sexually explicit material and profane language and was laughingly shown to me by a BLM ASAC, who is my direct supervisor in my office space from a government issued device. Once again, this was an instance that was unnecessary and disrespectful to the subjects of the investigation and was catalogued on a government issued device. Specifically, this video contained several references to dild\*s, profanity, and very sexually explicit and disrespectful attempts at humor. During this encounter the BLM ASAC told me to stand close to him so I could see the video as he made numerous comments on how funny it was (both sexually and as making fun of the subjects of the investigation). During the video, armed ladies were staged in what appears to be a post office and were shouting they want d\*ldos now. Additionally, two armed men were stating they earned their d\*ldos and using profanity.* Additional Note: *It is my belief that if this offensive pervasive conduct was discovered, it would again tend to discredit the professionalism of our agency and is completely inappropriate conduct by a law enforcement supervisor.*

On or about January 26, 2016, LaVoy Finicum was killed by law enforcement following an attempted traffic stop on Highway 395 between Burns and John Day Oregon. (Timeline Talking Point) Note: *This is an issue of much controversy, as the investigation by the Deschutes County Oregon Sheriff's Office apparently indicated that FBI Agents fired their weapons and then actively and passively attempted to deceive investigators.* (See openly available news articles to include an article titled "FBI Agent Charged

41

with Lying About Oregon Standoff Shooting" from the New York Times, dated June 28, 2017, and an article from Oregon Live/The Oregonian, dated March 8, 2016, and titled "Full coverage of the LaVoy Finicum Shooting Investigation.") Note:  *On or about the evening of January 26, 2016, I received a telephone call on my government cell phone by a BLM ASAC.  During this call, the BLM ASAC mistakenly told me that Ryan Bundy had been killed (at some point later I was informed that it was actually LaVoy Finicum who had been killed).  I remember I replied with something like "oh no."  At this point in the investigation, due to my research, I felt like I knew Ryan Bundy to some small extent and I was aware he had a beautiful family.  I simply felt bad for their loss.  Following that reply, and over the next several days, I was discouraged to see how little the BLM ASAC seemed to care about the tragic event.  On many occasions, I remembered hearing numerous comments about how actions have consequences.  I was disappointed this mindset seemed to be exceptionally cold.  Additionally, I was disappointed to hear open apparently ignorant speculation (often by the lead prosecutor) about how LaVoy Finicum allegedly treated his foster children like slaves on his ranch/farm and inappropriately used the money he received from the government to care for his foster children as some sort of illicit income source.*  Additional Note:  *I believe these were just disrespectful off-the-cuff office comments due to Mr. Finicum not being a subject of our investigation in Nevada and the team not having a mandate or need to conduct criminal financial research on Mr. Finicum or his family.*  Further Note:  *Following this, a BLM ASAC told me that an FBI Group Supervisor in Boise (who is senior to the BLM ASAC) didn't want to openly share with him what she knows.  The BLM ASAC went on to say something like, she likes to play she's got a secret (or something like that) and that she thinks pretty highly of herself.*

During this timeframe and before, in part due to the increasing threat situation, BLM law enforcement personnel conducted plain clothes security and observation type operations.  Often, these operations didn't involve the officers providing any sort of case documentation (self-initiated reports or gathered evidence) and in one case, an operation included an officer receiving a pocket Constitution and having an interaction with a subject of the investigation.

On January 30, 2016, at approximately 11:31 a.m., I received an email from a BLM ASAC and my direct supervisor titled "Hilarious" that stated "…Smells like personal lubricant and sedition… Too funny."  This email contained the following link:
http://www.oregonlive.com/geek/2016/01/this_ammon_bundy_craigslist_ad.html#incart_story_p ackage.  (Reference email titled "Hilarious," dated January 30, 2016.)  Note:  *I find this us of email to potentially be damaging to our efforts and potentially subject to FOIA.*  Additional Note:  This email was also sent to a BLM SAC (who is a potential trial witness), another BLM SA (who is also a potential trial witness), and another BLM Supervisory Ranger.  Further Note: *This link was from an Oregonian/OREGONLIVE article by Joseph Rose that referenced a pretend Craigslist Ad that was attempting to sell Ammon Bundy's jacket.*  This article stated the following: "*Slightly Used Blue Plaid Wool Jacket. Worn 24 hrs. / day for the last 26 days to weather it out in Burns Or. Due to a sudden lifestyle change, I've decided to only wear orange jumpsuits. A couple of snags from barbed wire. Some odors of sweat, beef jerky, gun oil, personal lubricant and sedition. Includes one pocket copy of the U.S. Constitution.*
*Careful wearing this in any western-themed gay bars, because this unit is HOT!!!*
*Will consider trade for 200 cartons of cigarettes or some snacks.*"
Further Note:  *Once again, I believe this type of email is unprofessional in a federal law enforcement workplace, especially when it was shared with a BLM SAC and BLM SA who are potential trial witness and likely now subject to the litigation hold, Discovery/Exculpatory Material, FOIA, and is prohibited conduct.*

On February 4, 2016, at approximately 4:50 p.m., I received an email titled "Fwd: the indictments for the crowd," from a BLM ASAC.  Note:  *This email was sent by the BLM SAC to BLM Region 2 with*

42

the narrative "Good news." Additional Note: *This email included the following link: heep://www.opb.org/news/series/burns-oregon-standoff-bundy-militia-news-updates/ammon-bundy-other-militants-indicted-on-conspiracy-/#.VrOQ1BB06FQ.twitter.*

On or about February 8, 2016, at approximately 9:30 a.m., a BLM ASAC and I had a meeting with staff at the BLM Southern Nevada District Office, located at 4701 N. Torrey Pines Dr., Las Vegas, NV 89130. During this meeting, the BLM ASAC cried and mentioned the frustration and feeling of abandonment and fear for the officers assaulted on April 12, 2014. (Timeline Talking Point)

On February 11, 2016, at approximately 6:21 a.m., I received an email from a BLM ASAC titled "Fwd: Cliven Bundy arrested by the FBI." Within this email the BLM ASAC stated: "Looks like the deed is done. FBI hooked up Cliven at the Portland airport."

On February 11, 2016, at approximately 9:07 a.m., I received an email titled "Good looking portrait," from a BLM ASAC. Note: *This email contained an attached Booking Photograph for Cliven Bundy. Additional Note: This email was sent to a BLM SAC/potential trial witness, another BLM SAC, a BLM Investigative Technician, a BLM SA/potential trial witness and the BLM Idaho State Chief Ranger.*

On February 16, 2016, at approximately 3:52 p.m., I received an email from a BLM ASAC titled "RE: Detained." The content of the email stated "BAM!!! Nice work." (Reference email titled "RE: Detained," dated February 16, 2016.)

Note: *During this timeframe the comments among BLM employees (to include law enforcement and senior leadership) began to ramp up and I became concerned that unprofessional comments, emails, and text messages by quality employees and potential witnesses may have a negative effect on the investigation and the BLM's public image. It was apparent that a BLM ASAC didn't share my same concerns.*

Additional Note: *During this timeframe, I felt like the inappropriate and unprofessional workplace conduct, especially on the part of the BLM ASAC got worse.*

Also, on or about February 16, 2016, I received a text message from a BLM ASAC that stated the following: Thanks XXXXX great to hear from you. |_____ sure has a way with words – explained the collective investigation quite well. (b)(7)(F)

Added bonus, Cliven was just detained pending trial."

The response was the following: "Yea it was almost like. Chapter out of a book! Hee the whole other piece!"

On February 17, 2016, at approximately 8:37 p.m., I received an email from a BLM ASAC titled "Re: Little present for you all." This email contained a link to Federal Indictment in reference to the Cliven Bundy/Gold Butte Nevada Case for Cliven Bundy, Ryan Bundy, Ammon Bundy, Ryan Payne and Peter Santilli. The BLM ASAC stated "If I had a Like button I would press it…thanks." Additionally, at 5:38 a.m., the BLM ASAC email a BLM SA (a victim and potential trial witness) and stated "Drink up buddy."

On February 17, 2016, at approximately 9:19 p.m., an email titled "Re: FTB" (which would stand for fu*k the Bundys) was forwarded to me by a BLM ASAC. This email was from a quality and hard-working BLM SA who was a trial witness and victim on April 12, 2014. This email stated the following: "makes me warm inside knowing CB (Cliven Bundy) is sh*tting on cold stainless steel." The BLM

43

ASAC responded with the following: "Love you man. We're sorry you had to go through all that crap. It's for you guys." Note: *Although I could tell this was a touchy subject with the BLM ASAC, I tried to simply influence the BLM ASAC to get a reminder out to BLM employees to use professionalism in their correspondence due to the FOIA and Discovery/Impeachment Material.* Additional Note: *This email also represents another instance of familiarity that this BLM ASAC used with subordinate employees, when the BLM ASAC felt like it.* Further Note: *At some point, I was told this particular BLM SA was previously friends with a BLM SAC, but had to transfer to get away from him and that now they can't stand each other.*

Also, more and more it was becoming apparent that the numerous statements made by potential trial witnesses and victims (even under duress), could potentially cast an unfavorable light on the BLM. (See openly available video/audio footage titled "The Bundy Trial 2017 Leaked Fed Body Cam Evidence," or a video posted on You Tube titled "Leaked Body Cams from the Bundy Ranch!" published by Gavin Seim.) Some of these statements included the following: "Are you fucXXXX people stupid or what," "Fat dude, right behind the tree has a long gun," "MotherFuXXXX, you come find me and you're gonna have hell to pay," "FatAsX slid down," "Pretty much a shoot first, ask questions later," "No gun there. He's just holding his back standing like a sissy," "She must not be married," "Shoot his fucXXXX dog first," "We gotta have fucXXXX fire discipline," and "I'm recording by the way guys, so…" Additional Note: *In this timeframe, a key witness deactivated his body camera.* Further Note: *It became clear to me a serious public and professional image problem had developed within the BLM Office of Law Enforcement and Security. I felt I needed to work to correct this and mitigate the damage it no doubt had already done.*

On February 18, 2016, at approximately 7:30 a.m., I received a cc'd email from a BLM ASAC titled "Indictments." The content of the email stated, <mark>"Cliven Bundy felony…just kind of rolls off the tongue, doesn't it?"</mark> (Reference email titled "Indictments," dated February 18, 2016.) Note: *Once again, I find this us of email to potentially be damaging to our efforts and potentially subject to FOIA, the Litigation Hold, and Discovery. It seemed like the more I tried to influence the BLM ASAC not to do these types of things, the more he did them.*

Also, on February 18, 2016, at approximately 1:00 p.m., at the Ada County Idaho Sheriff's Office, located at 7200 Barrister Drive, Boise, ID 83704, a BLM ASAC openly spoke very disrespectfully of a subordinate BLM Resident Law Enforcement Ranger. This BLM ASAC stated several times that he hates the BLM Ranger's facial hair and made a rude comment that was something like, he was going to shave that Ranger's beard and that the BLM Ranger makes the BLM look very unprofessional. Note: *This BLM Ranger told me that religiously, he believes it is appropriate to wear beards.* Additional Note: *The BLM isn't issued gas masks and doesn't employ or train for the use of riot control agents such as CS gas or operate in a required respirator environment. Therefore, there is no requirement for a no facial hair policy due to concerns of a proper gas mask facial seal.* Further Note: *On March 7, 2017, at approximately 2:01 p.m., I received an email from the BLM Duty Officer that contained an attachment titled "Facial hair standards for the BLM Law Enforcement Ranger positions." This email attachment contained Instructional Memorandum (IM) 2017-050, dated February 2, 2017, which in part stated that BLM Law Enforcement Rangers were required to have an evenly trimmed beard not to exceed 3/8 inch in length and that* waivers may be considered for religious reasons, but it required initial compliance with the policy prior of any waiver submission. This IM stated that all waiver requests shall be directed to the BLM OLES Director, who will be the deciding official. Also Note: *On April 5, 2017, at approximately 12:36 p.m., I received an email from the BLM Duty Officer titled "IM 2017-059." This email rescinded the facial hair direction sent out on March 7, 2017.* Please Note: *It was clear to me and several others that this new attempted BLM law enforcement policy was directed specifically toward one particular BLM Law Enforcement Ranger that wasn't favored by BLM Law Enforcement Management.* Continued Note: *Please reference a BLM SAC's appearance, dress and facial hair during the 2014 Gold*

44

*Butte Trespass Cattle Impound. Also note that during a conversation between myself and a BLM SA in the afternoon of February 16, 2017, at the Las Vegas U.S. Attorney's Office, the BLM SA told me that prior to the 2014 Gold Butte Trespass Cattle Impound, the BLM SAC wanted SAs to grow "Operator Beards."*

Additionally,

On or about February 24, 2016, a First Aid/CPR/AED Class was taught at the BLM Idaho State Office, located at 1387 S. Vinnell Way, Boise, ID 83709. During this time, the BLM ASAC grew more and more offensive and continually made rude sexually degrading comments (even about a fellow employee). Specifically, on this day following this training, the BLM ASAC continually loudly mentioned how disgusting one of the female employees in our office was and how he is now forced to look at her big disgusting butt crack instead of a "hot" lady who previously conducted the training. This BLM ASAC not only made these comments repeatedly in the office, but in the open hall as well. This BLM ASAC went on to say something of a sexual nature in reference to a baby shower for this BLM employee's daughter, but I walked away and didn't clearly hear the comments. Note: *This lady is known to be a hard-working and involved employee. Additionally, this lady has identified as a Christian by using a "Jesus Loves You" green, red and blue cup.* (Witness Available, Timeline Talking Point)

Around this time period, I informed a BLM ASAC that as I attempted to disprove likely trial defense talking points, I received indications that our agency isn't following the letter or the intent of our primary enabling statute, the Federal Land Management Policy Act (see the detailed discussions later in the document and on the separately prepared document). I told the BLM ASAC that my investigation indicated that the BLM isn't offering any law enforcement contracts to enforce Federal Laws and Regulations on Federal Public Lands to local law enforcement officials and that the Federal Land Policy Management Act states that the agency "shall" offer those contracts with the intent of "maximum feasible reliance" on local law enforcement to enforce Federal Laws and Regulations on Federal Public Lands. The ASAC didn't appear to fully understand what I was talking about. The ASAC told me that in June when I attend the Introduction to Resource Protection Class (IRP), things will likely get cleared up.

Also, around this time-period, a BLM ASAC became more subversive and often openly spoke to me disrespectfully of members of BLM leadership. For instance, the BLM ASAC spoke poorly of the BLM OLES Deputy Director (usually by making fun of his hard work ethic), the BLM OPR (Internal Affairs) Chief (by calling him "weak" and a "weak sister"), a BLM SAC (vanity and having his judgement clouded by his friends that work for him) and the BLM Director (calling him a politician). Note: *During this timeframe, I tried to help the BLM ASAC and simply be nice to him and provide an outlet for him to vent his frustrations.*

On February 29, 2016, at approximately 3:48 p.m., a BLM ASAC sent me, the prosecution team and others and email titled "Ranger photo." This email stated the following: "Team In case you were wondering what BLM officers are feeling after hearing of the recent news of Cliven's arrest, I think this picture of Ranger XXXX XXXXX pretty much sums it up. XXX and another Ranger were traveling through Nevada a few days ago and wanted to see the wash again to help their mental healing process. Thank you all very much for all your determined work on this continued effort. We all greatly appreciate it."

Following this email, the lead prosecutor replied to the BLM ASAC with the following: "Thank you XXXXX. The officers and employees who were forced to suffer the fear engendered by the indignities and violence hurled at them in the wash that day are the reason we are all here – to see justice is done; to show that bullies and thugs do not carry the day; to ensure that the rule of law prevails over the rule of the

45

gun. We all share that goal and are all dedicated to that common cause - - nothing thrown in our way matters. That photo is a great reminder of why we do what we are doing. Thank you for sharing that."

On or about March 2, 2016, a Federal Grand Jury for the District of Nevada out of Las Vegas indicted the following individuals in reference to USA v. Bundy et al, Case 2:16-cr-00046-GMB-PAL: Cliven Bundy (69, of Bunkerville, NV-originally indicted on February 17, 2016), Ammon Bundy (40, of Emmett, ID-originally indicted February 17, 2016), Ryan Bundy (43, of Cedar City, UT/Bunkerville, NV-originally indicted February 17, 2016), Ryan Payne (31, of Anaconda, MT-originally indicted on February 17, 2016), Peter Santilli (50, of Cincinnati, OH, originally indicted on February 17, 2016), Brian Cavalier (44, of Bunkerville, NV-originally indicted on February 17, 2016), Joseph O'Shaughnessy (45, of Cottonwood, AZ-originally indicted on February 17, 2016), Mel Bundy (41, of Bunkerville, NV), Dave Harold Bundy (39, of Delta, UT), Gerald Delumus (62, of Rochester, NH), Eric Parker (33, of Hailey, ID), Orville Scott Drexler (44, of Challis, ID), Richard Ray Lovelien (53, of Westville, OK), Scott Christopher Engel (49, of Boundary County, ID), Steven Arthur Stewart (35, of Hailey, ID), Gregory Paul Burleson (53, of Phoenix, AZ), Gregory Paul Burleson (53, of Phoenix, AZ), Jason David Woods (30, of Chandler, AZ), Micah McGuire (37, of Chandler, AZ), and Blaine Cooper (36, of Humbolt/Prescott, AZ-originally indicted on February 17, 2016).

Note: *The following were the charges: Count 1: 18 USC Conspiracy to Commit a Federal Offense, Count 2: 18 USC 372 Conspiracy to Impede a Federal Officer, Count 3: 18 USC 924 (c) Use of a Firearm in Relation to a Crime of Violence, Count 4: 18 USC 111 Assault on a Federal Officer (Pinkerton), Count 5: 18 USC 111 Assault on a Federal Officer (Pinkerton), Count 6: 18 USC 924 (c) Use of a Firearm in Relation to a Crime of Violence, Count 7: 18 USC 115 Threaten a Federal Officer, Count 8: 18 USC 115 Threaten a Federal Officer, Count 9: 18 USC 924 (c) Use of a Firearm in Relation to a Crime of Violence, Count 10: 18 USC 1503 Obstruction of Justice, Count 11: 18 USC 1503 Obstruction of Justice, Count 12: 18 USC 1503 Obstruction of Justice, Count 13: 18 USC 1951 Extortion by Use of Force, Fear, or Violence (Hobbs Extortion), Count 14: 18 USC 1951 Extortion by Use of Force, Fear, or Violence (Hobbs Extortion), Count 15: 18 USC 924 (c) 18 USC 924 (c) Use of a Firearm in Relation to a Crime of Violence, and Count 16: 18 USC 1952 Interstate Transportation in Aid of Racketeering (ITAR).*

On March 2, 2016, at approximately 4:24 p.m., I received a cc'd email from a BLM ASAC titled "BLM in the house." Note: *This email was in reference to participation at the FBI's Command Post on March 3, 2016, for the Gold Butte Investigation Arrest Operation.* Some content of the email stated, "Feel free to get in touch with us as long as the conversation doesn't include the words "no bill."" (Reference email titled "BLM in the house," dated March 2, 2016.) Note: *This is another example of what I believe is unprofessional familiarity on the part of the BLM ASAC.*

On March 2, 2016, at approximately 7:19 a.m., I received a text message from a BLM SAC that stated: "It's a beautiful morning fellas!" A BLM ASAC replied "Hopefully one that will rebalance a little bit of history." Note: *At this point, the pending arrest operation should have been confidential and on a "need to know" basis. We were specifically tasked with running an independent and confidential investigation. This was the most important time to maintain operational security.*

On or about March 3, 2016, while at the FBI Command Post located at 1787 W. Lake Blvd., Las Vegas, NV 89106, a BLM SAC, a BLM ASAC, and I participated in command post operations and assisted the FBI when possible in reference to the suspect arrest operation. During this operation, the U.S. Attorney' Office/Prosecution Team Staff, the FBI staff and investigative team, and another BLM/Bureau of Reclamation (BOR) SA were also present. While at the FBI Command Post, I believe the BLM ASAC conducted himself in an unprofessional and somewhat childish manner taking into account the seriousness of the numerous "high risk" nationwide arrest operations. This BLM ASAC apparently took

pleasure in "Xing" and directing me to "X" suspect photos off the target list. Additionally, Cliven Bundy and Eric Parker were "X'ed" across their face as well. Then, the BLM ASAC photographed these suspect photos and despite being told that no photos were allowed in the FBI Command Post and emailed the picture of these photo's out, thereby possibly making the pictures subject to the Litigation Hold, Discovery, FOIA, and public scrutiny. Note: *I would discuss this issue further.* Additional Note: *I felt the ASAC's lightheartedness, unconcerned, and almost festive outward demeanor with respect to the seriousness of the "high-risk" wide-ranging arrest operations was completely inappropriate.*

Also, on or about March 3, 2016, I overheard part of a conversation between a BLM ASAC and BLM SAC where the BLM SAC mentioned to the BLM ASAC, something like he knew that a particular BLM SA and likely key trial witness in the BLM SAC's chain of command didn't appropriately turn over his text messages. Note: *This date is an approximate and although I am sure of the content that I overheard, I can't be 100% sure of the date.*

March 3, 2016, text message (at approximately 6:35 p.m.) back and forth between a BLM ASAC and a BLM SAC in which the BLM ASAC stated "This is our view swilling beers on the pool deck. Not bad duty" and "Thanks. Good Feeling XXXX and I are trying to convince XXXX to get a V over O tattoo," to which the reply was given "I'll throw in a 40 hr time off award." Note: *The "V over O" is in reference to Cliven Bundy's livestock brand.* Additional Note: *This text message now possibly subject to Federal Records protections as well as the Litigation Hold.*

On March 3, 2016, at approximately 5:13 p.m., I received an email titled "Arrest tracking wall." Note: *This email contained two photographs of 19 subjects of the Gold Butte Investigation with a red "X" drawn through each one and two "X's" drawn through Cliven Bundy and Eric Parker.* Note: *These photographs were taken by a BLM ASAC in a "No Photograph" sensitive area within the FBI Las Vegas Office's Command Post during command post operations during the arrest of subjects of this investigation. These photographs were emailed out despite the BLM ASAC being told there were no photographs allowed in the area. This action possibly made the photographs subject to the Litigation Hold, Freedom of Information Act Requests, and Trial Discovery.* (Reference email titled "Arrest tracking wall," dated March 3, 2016.)

On March 3, 2016, I also received a voicemail by a BLM ASAC that asked me if I wanted to go look "stare" at some "T&A" with the BLM ASAC and a BLM SAC as a celebration. Note: *Prior to this, just outside the hotel lobby, the BLM ASAC told me the BLM SAC was addicted to porn (pornography).* Additional Note: *Since, I didn't have a rental car in my name this would mean that in effect, I wasn't really invited to dinner unless I also wanted to go look at some "T&A."* Further Note: *I am aware T&A means t\*ts and as\*.* Further Note: *At this point, I believed the BLM ASAC was purposely trying to discourage me from going to hang out with him and the BLM SAC on this evening in Las Vegas, as they celebrated the days previous successful arrest operations. I also believed the BLM ASAC could have been trying to hurt my impression of the BLM SAC.*

At some point in this timeframe, a booking photo of Cliven Bundy was prominently displayed in the BLM Law Enforcement Supervisor's Office at the BLM Idaho State Office, located at 1387 S. Vinnell Way, Boise, ID 83709, in a location that is clearly visible to civilian employees and office visitors. (See Photograph from April 27, 2017) Note: *I believe this conduct is unprofessional and gives office visitors and civilian employees the wrong idea about what our agency is about.* Note: *This booking photograph was still prominently displayed as of November 2, 2017.* Additional Note: *Images of this booking photo are also on the BLM internal website located at id (\\ilmidso3ds1.blm.doi.nt) (Q:)-so-loc-law_enforcement, under "Cliven Bundy Booking Photo" and dated February 17, 2016. Additionally, another image is located at* \\ilmidso3ds1.blm.doi.nt) (Q:)-so-loc-law_enforcement-Admin *"cliven bundy arrest mug jpg-320227db4...," and dated February 26, 2016.*

47

During this timeframe, under the observation and implied consent of a BLM ASAC, other BLM law enforcement employee(s) retrieved the logged jail calls of Idaho defendants in order to listen to their recorded telephone conversations. Note: *The referenced BLM employee(s), were either not involved in the investigation or were potential likely witness(s)/victim(s) of the assault on April 12, 2014.* Additional Note: *There were inappropriate comments about subjects of the investigation to include their recorded telephone interactions with their spouse(s).* Further Note: *These subjects of the investigation weren't being investigated by the BLM. They were part of the FBI's subject list and their actions centered around their conduct on April 12, 2014.* Also Note: *The lead prosecutor (AUSA), upon hearing of this activity told the BLM ASAC to direct others to stop this type of activity.* Additional Note: *During this timeframe, the BLM ASAC also told me about technical investigative equipment that had been stored in the BLM Idaho State Office's Law Enforcement Equipment Storage Cage. This BLM ASAC described to me what amounted to a parabolic microphone covert/spy listening device and a bionic ear booster and amplifier. The BLM ASAC indicated this old directional eavesdropping microphone and headset allowed for covert monitoring of individuals for compliance and law enforcement purposes in the field and around campsites and was purchased and used a good while ago by someone who had retired. I told the BLM ASAC that this activity would require a _____ since it is basically a search similar to a Title-III Wiretap since none of the parties in the conversation would have given consent. It seemed to me that the BLM ASAC didn't understand this. It also seemed to me that although he has no doubt been trained and as a knowledge factor of his position, he should understand search, seizure and protected communications.*

During this timeframe, the unprofessional language and unprofessional conduct (to include in reference to the subjects of the investigation) greatly increased and was apparently condoned by a BLM ASAC, as well as openly participated in by the BLM ASAC. There was an apparent glee in the office about the thought of Cliven Bundy spending the rest of his life in Federal Prison.

On or about March 8, 2016, the shooting investigation into the death of LaVoy Finicum was released by the Deschutes County Oregon Sheriff's Office. Reference an article from Oregon Live/The Oregonian, dated March 8, 2016, and titled "Full coverage of the LaVoy Finicum Shooting Investigation" and note the event from January 26, 2016. (Timeline Talking Point)

On or about March 9, 2016, at approximately 7:12 p.m., I received an email from a BLM ASAC titled "Re: Still Sick." Within this email, the BLM ASAC stated the following: Man I wish you could have been in court today. Very satisfying."

On or about March 18, 2016, at approximately 2:40 p.m., I received a text message with a photograph of a vehicle that displayed an Idaho III% decal. This text included the following comments from senior/supervisory BLM Law Enforcement Staff: "Time to find a new gym," "Did u put a junior ranger badge on the windshield" and "Oh man if I had one." Note: *This is concerning because the inside of the gym makes the parking lot open to observation and the supervisory BLM Law Enforcement Officer apparently took the chance of taking this photograph for non-law enforcement purposes in the open. Additionally, I was concerned that this text message would be subject to a Litigation Hold and Discovery.*

At some point near this time, I was told by a BLM SA of an exceptionally rude and disrespectful photoshopped series of photographs that were circulated by BLM Law Enforcement regarding a subject of this investigation. Note: *I found out that one of these photoshopped photographs reportedly included Ryan Bundy holding up a giant pen*s in front of "The West Has Now Been Won" sign on April 12, 2014.* It is my opinion that this series of photographs would possibly undermine prosecution efforts and public outreach efforts as well as discredit BLM's Law Enforcement Program. Note: *It appeared to me that BLM supervision was aware of this incident previously.* Additional Note: *Even with knowledge of this issue, it was apparent to me that BLM Law Enforcement Supervision was unwilling to give additional*

48

*training, send out a reminder or give additional guidance on problematic issues such as this as they relate to public perception, ethics, discovery material, and the litigation hold.* Further Note: *The emails containing these photographs were not viewed in the Discovery email review. I began to think they may have been unlawfully deleted.* Also Note: *Later, I found out these photos were sent by text message, not email.*

During this timeframe, the BLM ASAC told me that he could tell something was bothering me and he could see my frustration in my face. Note: *Please reference the unprofessional workplace conduct and frankly sometimes unbelievable case related discoveries during the course of this investigation.*

Later on, in March of 2016, I had an emotional conversation with a BLM ASAC in which I informed him of my displeasure with many actions (including his) that I believe are unprofessional and to the public would discredit the agency and this investigation as well as make us look bias. Additionally, I was concerned of any crossover with these emails, texts, etc. and impacts with the Discovery Material and the Litigation Hold. I told the BLM ASAC that I don't want to be overly sensitive, but when employees say such degrading things about the subject's appearance, background, and religion, it feels like they are making fun of me and my family. I told the BLM ASAC that I know the individuals who are doing it are good people, but they need some guidance. I told the BLM ASAC that these issues and what I have learned as the case agent for this investigation made me uncomfortable with the BLM as a whole and I would start looking for other positions. The BLM ASAC pleaded with me not look for other employment and told me no one would do as good of a job and no one knew the case like me. I recommended to the BLM ASAC that we talk to or give some additional guidance to the agency as a whole regarding these issues. The BLM ASAC appeared to be concerned and was apologetic, respectful, and polite. The BLM ASAC politely told me that he assumed too much familiarity with me. The BLM ASAC asked me what I would tell people if I did leave. The BLM ASAC also continually asked me not to leave and apologized. Note: *Even currently, the BLM ASAC and Senior BLM Law Enforcement Management apparently haven't offered any guidance to junior staff on these issues. Since then, BLM Law Enforcement Supervisory Staff has had the ability to schedule training or speak to these issues at two annual in-service training sessions, the Introduction to Resource Protection (IRP) training class, and almost anytime through email or conference calls.*

Note: *The BLM ASAC apologized and basically told me it wouldn't happen again. I forgave him.*

Approximately during this timeframe, a BLM ASAC and I were conducting an approximate 5,000 dispatch audio file review as a virtual last-minute assignment from the Nevada U.S. Attorney's Prosecution Team. During this assignment, I noticed that the three key days of dispatch audio files weren't included in these files. On one of the key events, a dispatcher mistakenly (or purposely-directed by a supervisor) directed officers to the non-recorded "Tac" or "Tactical" channel and on the other two key instances simple human error that included a hard drive being "accidently" unplugged from the dispatch computer was suspected (or purposely done or directed). Note: *Although I don't in my heart believe there was any wrong doing, I do believe this instance should be investigated from outside the*

EOR0198

*agency. It should be noted that the three instances described above are the three and only three most key instances in the entire 2014 Gold Butte Trespass Cattle Impound Operation and took place on April 6, 2014 (Arrest of Dave Bundy), April 9, 2014 (Tasing of Ammon Bundy and Throwing/Pushing Down of Margaret Bundy Houston), and April 12, 2014 (Stand-Off and Assault on Federal Officers at the I-15 Bridges).* Additional Note: *During this timeframe, a BLM ASAC became less and less interested in working on the case and gravitated more and more to attending voluntary non-case related meetings and training. This ASAC also told me that back in the summer of 2014, he saw these same audio files while he was at the FBI Office, but it was too much for him to want to do at the time.* Further Note: *Some instances during the Dispatch Audio File Review appeared to indicate that the National Park Service/U.S. Park Police Special Event Tactical Team may have been running some sort of road check point operation on a particular county or state maintained road in the area.*

On or about May 6, 2016, while departing Idaho Falls, Idaho following the required annual in-service law enforcement training, a BLM ASAC spoke poorly of Mormons. He told me to look around at all the agriculture, specifically the barley. The BLM ASAC went on to say that although Mormons believe you shouldn't drink beer, they are selling the barley to Coors (I believe) and they have no problem with that or making money on beer manufacture. The BLM ASAC indicated the Mormons were hypocrites.

On or about May 12, 2016, or May 13, 2016, I received the Department of Interior Honor Award for Superior Service and a $5,000.00 Special Thanks for Achievement Award (STAR) Performance cash award (SF-50 Notification of Personnel Action dated May 27, 2016-award recommended on April 26, 2016) presented by the BLM Director for my role as Case Agent/Lead Investigator. Many times, during this week, a SAC, ASAC, and Director of OLES told me what a great job I was doing. Additionally, the ASAC told me he was going to put me in for Special Agent of the Year for 2016 (which would be awarded in the spring of 2017). Several times throughout the day, the BLM ASAC jokingly told others in the BLM OLES Directors Office (where the Special Agent of the Year plaque was displayed) that they misspelled my name on the plaque. Note: *Additionally, on this day, a BLM ASAC was given what appeared to be the same award for his participation in the investigation as the "co-case agent."* Additional Note: *Please read the award narrative. I would like to speak about this further.* Reference an email titled "Recognition," dated May 18, 2016, at 9:40 a.m., from a BLM SAC to BLM Region 2 Law Enforcement and others.

Enclosed below is the narrative for the DOI Honor Award for Superior Service awarded to me and the BLM ASAC by the BLM Director (copy available):

"In recognition of his outstanding contribution to the Department of the Interior's Bureau of Land Management in defending the rule of law and protecting public lands on behalf of the American people.

On April 12, 2014, gunmen led a massive assault against Federal law enforcement officers near Bunkerville, Nevada in order to thwart a court ordered seizure and removal of trespass cattle from public lands. Outnumbered by more than 4:1 and unwilling to risk the lives of hundreds of children and unarmed bystanders in the gunmen's midst, Federal law enforcement officers exercised heroic restraint by electing to withdraw from the area instead of engaging their assailants. Soon after the events of April 12, 2014, the Bureau of Land Management was asked to assist the United States Attorney's Office (USAO) and the Federal Bureau of Investigation (FBI) in the investigation of the armed assault. Special Agent (SA) XXXXX (or Assistant Special Agent-in-Charge (ASAC) XXXX -can substitute interchangeably in the award narrative) was one of an extremely small contingent of Bureau law enforcement officers asked to support that effort. SA/ASAC XXXX agreed without hesitation, immediately putting his life on hold and traveling to Nevada to begin coordinating with the USAO and the FBI. Within days, SA/ASAC XXXX would assume the role of (lead/co-case agent) for the Bureau component of the case; supporting an investigative effort that would consume his life and the life of his family for the next two years. Over

the course of that time, SA/ASAC XXXX played an instrumental role in critical aspects of the case to include authoring a comprehensive case report containing over 500 exhibits detailing a twenty-year history of trespass; reviewing hundreds of hours of video evidence to identify suspects and build probable cause; and managing a comprehensive collection and review of case-related email and text messages linked to more than 200 Federal personnel involved in the operation. While prosecution of the crimes committed on April 12, 2014 has only begun, the tireless efforts and unwavering commitment of SA/ASAC XXXX ensured those responsible could be apprehended and held accountable for their actions. For these contributions, and with a deep appreciation for the sacrifices he made on behalf of the Bureau, XXXXXX is granted the Superior Service Award of the Department of the Interior."

Note: *On or about May 1, 2017, I photographed the displayed citation of a BLM ASAC. This was the first time I read the BLM ASAC's award citation. I would like to talk about this further.*

Further Note: *During our interaction in Washington DC, the BLM ASAC observed another BLM SSA that is assigned to the Bureau of Reclamation as a Regional Special Agent. This Regional Special Agent (RSA) is of the same pay grade (GS-13) as the BLM ASAC and senior to me and a previous friendly acquaintance of mine from a previous agency. It appeared the BLM ASAC didn't think highly of this RSA and on several occasions the BLM ASAC openly spoke poorly of him even after I told him the RSA and I were friends and I though the RSA had a solid reputation of being a hard worker. This BLM ASAC talked about how the RSA is never happy and he is making people mad and that he consistently seeks to get promoted and jumps agencies and that he always wants the next best thing and is never happy.*

From May 22, 2016, to June 4, 2016, I participated in a saturation patrol operation in Arizona along the Southern border of the United States. (Timeline Talking Point)

In late May of 2016, while in Arizona for a detailed operation, I overheard some unknown BLM Law Enforcement Officers/Agent talk about a BLM SAC. One of the officers stated that he was told to put down less hours than he actually worked in reference to the 2014 Gold Butte Trespass Cattle Impound Operation due to administrative requirements such as work rest guidelines. Another officer stated that while at the Burning Man Event (I believe sometime prior to 2014), he was part of a team that made an arrest and needed to speak with the AUSA and that the AUSA was requested over the radio. The officer said that the BLM SAC got on the radio (sounding impaired) and stated that the AUSA was in no condition to go anywhere. The officer further indicated that the BLM SAC and the AUSA had been drinking. This officer also mentioned something about believing the BLM SAC and the AUSA had sex and that was the reason the BLM SAC/AUSA wasn't available. Additionally, one of the officers said that the BLM SAC told the Las Vegas Metropolitan Police Department/Clark County Sheriff "F-You, we don't need you anyway. I have the FBI" in reference to the 2014 Gold Butte Trespass Cattle Impound. Note: *See the Public version of the Investigative Report of Ethical Violations and Misconduct by Bureau of Land Management Officials posted January 30, 2017, in which a BLM SAC claimed 24 hours of official work time for three days in a row.* Additional Note: *As soon as I returned from Arizona, I reported what I had heard to a BLM ASAC.* Note: *In my opinion, this accusation didn't surprise the ASAC.*

On May 23, 2016, at approximately 11:51 a.m., the BLM Director sent out an email to BLM employees titled "Promoting an Ethical Culture." This email stated: "Please take a few minutes to review the attached memo and materials." This email contained attachments titled "Promoting an Ethical Culture" and "14 General Principles."

On May 23, 2016, at approximately 2:01 p.m., the BLM Duty Officer sent out an email from the BLM OLES Deputy Director that contained an attachment memorandum that was previously dated May 20, 2016, and titled "Promoting an Ethical Culture" and also contained an attachment titled "14 General

51

Principles." The body of the email from the BLM OLES Deputy Director stated the following: "All LEOs, While I realize each of us is already required to review and sign the *Law Enforcement Code of Conduct* annually, we've been asked to ensure all LEOs also receive a copy of Director XXXX XXXXXXX's "Ethical Culture" memo (attached below). Our apologies if you've already received these materials through other channels. Thanks."

Note: *The memorandum titled "Promoting an Ethical Culture" indicated that employees are to treat each other and the public with dignity and respect. The memo also indicated that each employee is expected to be thoroughly familiar with and observe all ethics laws and regulations. The memo stated the BLM Director expected managers and supervisors to provide exemplary leadership in this regard.*

In June of 2016, the BLM stood up the Threat Mitigation Unit (TMU) in response to a rise in threats against public land employees and their resources. The TMU's mission was to provide strategic and operational support to the BLM, to include threat analysis and mitigation strategies for the security and safety of BLM personnel, facilities, resources, visitors, and partners (-Per a BLM SA). A BLM SAC was named to head the TMU. Note: *During follow-on discussion with a BLM ASAC, the BLM ASAC told me that the BLM put the BLM SAC as the head of the TMU to hide him.* Note: *Although I understand why the TMU was created and I understand expectations of privacy for citizens, I am concerned of BLM "mission creep" and the associated perception of the TMU (especially managed by this particular BLM SAC) to the public in reference to intelligence gathering on Constitutionally protected activities.* Additional Note: *I would like to discuss this topic further.* Further Note: *Reference an article titled "BLM agent in charge during 2014 Bundy standoff gets new security job with agency," dated May 25, 2016, by Henry Brean of the Las Vegas Review Journal and an article titled "Widely criticized BLM security agent gets promoted," dated June 10, 2016, by Thomas Mitchell of the Mesquite Local News.* Also Note: *These intelligence type gathering activities were evidently controversial enough to be prohibited by other agencies to include the FBI and the BLM was operating outside of any approved policy on these activities.*

On or about June 10, 2016, at approximately 3:17 p.m., I received a text message by a Senior BLM Supervisory Law Enforcement Officer that contained responses by other Senior BLM Supervisory Law Enforcement Officers. This text contained a photograph of the Constitution and a statement of "WTF?!?! Provided for reading pleasure in my hotel room in UT!" (with a mad face and flame emoji) and the following responses: "Ha! Is that Cliven (Bundy) on the cover?" and "Property clause conveniently omitted" in which I replied, "Please take me off this group chat."

At some point in this timeframe, a DOI Solicitor came by the office and asked about a particular BLM SAC "going native" and "partying with the Burners" at Burning Man. Additionally, during a conversation about BLM Law Enforcement's primary enabling statute (Federal Land Policy and Management Act/43 USC 1733 (c) (1)). The Solicitor told be the law was problematic and confusing.

From June 27, 2016, to July 1, 2016, I attended the BLM's Introduction to Resource Protection (IRP) Class at Gowen Field in Boise, ID. During this training, the instructors completely avoided the Federal Land Policy and Management Act (FLPMA) /43 USC 1733 (c) (1) the "shall" offer and "maximum feasible reliance" language and skipped out of order to 43 USC 1733 (c) (2) to the "may authorize" language of the Act. When I asked a question about the issue and how I should testify in court, the instructor only told me to just not to get into it on the stand. When I asked if the instructor could testify, he jokingly said that he would be on vacation that day.
Note: *This class is a mandatory class for all BLM Law Enforcement new hires and in general is required within the first one or two years of employment, but has been postponed in recent years.* Additional Note: *It is my belief that these instructors are very good officers and generally very proficient in their duties. However, I believe they simply are uncomfortable and unsure about any questions related to FLPMA.*

52

Additional Note: *The other more senior BLM Agents I spoke with about this issue were confused, concerned, and generally they thought the BLM isn't following the law and that the law is worded in a problematic way.*

Further Note: *Talking Points for the "Knowing and Willful" of Class A Misdemeanors and Off-Highway Vehicles.* I would like to talk about this further. My research has indicated that it has likely been condoned or otherwise encouraged by BLM law enforcement management to utilize Off-Highway Vehicle (OHV) designations for traffic citations/violation notices on common road bound passenger vehicles wrote/issued on paved roads (interstates/state highways/county roads) in order to indicate to those officials that review BLM enforcement records that enforcement actions are consistent with BLM's mandate of the protection of Federal Public Lands and resources. Note: *On June 27, 2016, during the Introduction to Resource Protection Training Class, it was reiterated that BLM traffic enforcement ability extends to any motor vehicle "capable" of off-road travel.* Additional Note: *On July 13, 2017, I completed a DOI Learn online training course titled "Overview of Off-Highway Vehicles." This course affirmed part of this guidance, but disputed part of the guidance which made the right of way language important in this assumption. Regardless, the spirit of writing a violation notice to a speeding vehicle on an interstate, state or county highway/road and calling a speeding passenger car a "motor vehicle capable of off road travel" for reporting purposes appears purposely deceptive.*

On July 1, 2016, near the conclusion of IRP, I received a Glock 42 pistol presented by a BLM SAC as appreciation from BLM Officers and Agents for my role as the DOI Case Agent/Lead Investigator for the Gold Butte/Cliven Bundy Nevada Investigation. A BLM ASAC also received a knife in appreciation for his assistance as well. Additionally, an email titled "Re: Thank you R2!!!!" was sent out. This email included the following content: "We presented a Glock 42 .380 to      and a Knives of Alaska knife to XXXX for all the hard work on their current case. They wanted to pass on their appreciation to you all. Thank you and have a safe holiday weekend." (Reference email titled "Re: Thank you R2!!!!," dated July 1, 2016, at 12:23 p.m., from a BLM SAC to BLM Region 2 Law Enforcement and others.)

On July 5, 2016, at approximately 2:13 p.m., I received a reply "cc" to an email titled "RE: Thank you R2," from a BLM ASAC to another BLM Special Agent. In this email, the BLM Special Agent told me and the BLM ASAC the following: "Congrats to you two and thanks for all the hard work on that case!" The BLM ASAC responded with the following: "Thanks XX. I heart U." Note: *I believe once again represents the example of the improper level of familiarity and professionalism the BLM ASAC uses with agency subordinates and others.*

On August 1, 2016, at approximately 2:04 p.m., I received an email titled "Fwd: Presentation – Sovereign Citizens, Militia Extremists & Other Anti-Government Organizations," from a BLM SA. Note: *This email referenced BLM recommended training by JJ MacNab on August 10, 2017, in Worland, WY.* Additional Note: *Later, I was told that JJ MacNab was in some way paid by the BLM. Further Note: JJ MacNab is referenced in numerous official BLM emails from 2013 to 2017.* Also Note: *JJ Macnab was critical and insulting in reference to my disclosure to National Criminal Discovery Coordinator, Associate Deputy Attorney General Andrew Goldsmith and the U.S. Department of Justice Office of Professional Responsibility from November of 2017.* (Timeline Talking Point)

On August 5, 2016, I received an email titled "Re: Thank You" in reference to my email thanks to a BLM SAC for a Letter of Appreciation and a Kershaw Knife. The content of the letter stated "You're most welcome. Thanks for all you do to keep our employees safe." (Reference email titled "Re: Thank You," dated August 5, 2016, at 5:13 a.m.) Note: *This email was in response to a knife and a letter of appreciation I received from the BLM SAC.*

At some point following the IRP Training, a BLM ASAC asked me if IRP cleared up my understanding of our agency and FLPMA. I told the ASAC it didn't.

At some point during this timeframe, I was told (by a BLM ASAC or BLM SA-I think), of a senior BLM law enforcement official that engaged in some sort of ticket/citation competition during the Imperial Sand Dunes/Glamis Off Highway Vehicle (OHV) and All-Terrain Vehicle (ATV) events. This individual told me that over one weekend, this BLM official wrote over 100 tickets. Note: *Generally, BLM Code of Federal Regulations (CFR) regulations are Class A Misdemeanors (unless written under the Taylor Grazing Act) which require a "knowing and willing" frame of mind on behalf of the violator.* Additional Note: *On June 27, 2016, during the Introduction to Resource Protection training class, the instructor stated that BLM law enforcement officers have the duty to use the lowest penalty that will accomplish the mission.* Additional Note: *In the areas that I have worked, the USAOs dissuade mass Federal ticket writing endeavors such as the one described above and in fact dismiss the majority of the tickets. Further Note: The specifics of this allegation should be searchable in the DOI Incident Management and Reporting System (IMARS).*

At some point, a BLM ASAC told me an awkward story about a senior coworker that went to the BLM's Washington DC Office for a special security mobilization following September 11, 2001 (I think). This story included details about this law enforcement officer going into a broom closet at the BLM National Office late at night and m*sterbating while he was on security duty. Note: *I'm not sure what the point of this conversation was, but I am sure it was entirely unprofessional and inappropriate.*

On or about August 25, 2016, at approximately 5:26 p.m., I received an email from a BLM ASAC titled "Quick Question" in reference to an AUSA. This email stated the following: "So classic. I'll ignore your request but answer me right away. Good times." (Timeline Talking Point)

On or about September 30, 2016, at approximately 8:48 a.m., I received an email titled "Prep for EPAPs" from a BLM ASAC. This email stated the following:

"Fellas Please prepare a list of accomplishments from this past fiscal year and email it to me by the end of next week. Thank you.

You all make my job very easy. I appreciate you."

During approximately October of 2016, while eating lunch with other co-workers and BLM supervisors in the office, the subject of a BLM SAC came up. Another BLM SAC stated that the BLM SAC informed all the other senior staff "I'm back bitches" in response to him assuming some sort of duties (believed to be the TMU). Additionally, the BLM SAC indicated that BLM SAC kept a "Kill Book" on his desk that had the information of the individuals that committed suicide in reference to cases that he led (See Operation Cerberus Action out of Blanding, Utah and the death of Dr. Redd Federal Civil Case). The SAC also stated that the BLM SAC kept a "Failure Rock" on his desk to remind him of the times that his subordinates failed him at Burning Man. The SAC continued by indicating that the SAC at one point threatened to fire all his subordinates for disappointing him. The BLM SAC also told me that the other BLM SAC would refer to is Native American Procurement Analyst as his drunk little Indian and that this BLM SAC had some sort of Native American doll hanging up in his office. Note: *In my knowledge of reputations, experience, and limited interaction with the subordinates that the SAC was referring to, all the indications are these employees, agents and officers are very solid performers and among the best in the agency.* Additionally, a BLM ASAC also indicated that during a briefing for Operation Cerberus Action the ASAC attended, the BLM SAC was so arrogant that he told the people that were helping him, that the operation was a once in a career opportunity for them. Also, the BLM ASAC told me the BLM SAC treats his people poorly and works them into the ground, then takes all the glory. At some point

EOR0203

following this conversation, I told the BLM ASAC that the BLM SAC had always been polite and respectful to me on the few occasions that I spoke to him and the ASAC replied "of course he was." Note: *I took this comment to imply that since I am the case agent/lead investigator for the Gold Butte/Cliven Bundy case, this central figure in the case would "of course" be respectful and nice to me.*

Also, during this timeframe, the topic of community outreach and broadcasting the appropriate message on behalf of the BLM and its mission in a timely manner came-up while I was eating lunch with a BLM SAC and BLM ASAC in the BLM Law Enforcement Office portion of the BLM Idaho State Office. The BLM SAC, who played an important role in the 2014 Gold Butte Trespass Cattle Impound openly mentioned something like the public affairs women who were on the ground in Bunkerville, just sat around crying and they were frustrated due to higher level headquarters not being responsive and not allowing them to get out their own public message. Therefore, the Bundy Supporter message was the only message getting out. Therefore, that is what the public likely believed. Note: *Once again, I thought this comment was disrespectful, but didn't think it was on purpose.* Additional Note: *I mentioned the lack of timely and accurate government public affairs/press outreach on a paper called "Lessons Learned." This paper, along with many other items were seized from me on February 18, 2017.*

During this timeframe, a BLM ASAC told me to put together a list of accomplishments for calendar year 2016. Just prior to finishing this list of accomplishments, the BLM ASAC told me not to spend very much time on it and just put together a couple of bullet points. Since I was almost complete with a more comprehensive document, I went ahead and emailed it to the BLM ASAC. Shortly after this, a BLM SA told me something along the lines of thanks, XXXXX (the BLM ASAC) is now making me go back and add some more stuff to my list of accomplishments. Following this, the BLM ASAC came into my office and told me another SA in our area which he supervises wouldn't be getting a performance award. Note: *The BLM ASAC went on to tell me that before I got to the BLM Idaho State Office, he and one of the other two BLM Special Agents that he supervises had to drive to Salt Lake City (I think) for an operation. The BLM ASAC complained to me that after a large lunch, the subordinate BLM SA told the BLM ASAC that he was too tired to drive and just went to sleep in the vehicle and left all the driving to the BLM ASAC. The BLM ASAC went on to further indicate the other subordinate BLM SA was friends with the BLM SAC and long-time hunting buddies and there was nothing the BLM ASAC could do.* Additional Note: *Reference an email titled "EPAP FY 2016 Accomplishments" dated October 4, 2016.*

At some point in this timeframe, a BLM SA told me that he was at an operations briefing for the 2014 Gold Butte Trespass Cattle Impound and while a ASAC was briefing the audience, the BLM SAC basically interrupted him and pushed him aside and said "What XXXXXXX is trying to say is that we are going to go out there and kick Cliven Bundy in the teeth (or mouth) and take his cows." Following the discovery of this exculpatory statement, I informed the BLM ASAC. The BLM ASAC didn't seem surprised or concerned.

At some point, while completing Discovery Review of Instant Chat (real time) Type messages between two likely witnesses. I observed a comment that indicated during the 2014 Gold Butte Trespass Cattle Impound that a BLM Supervisory Officer was going to go "jack up" Hage. Note: *This item is believed to reference Wayne Hage Jr and related to a pending Civil Case between the Hage family and the Federal Government.* Additional Note: *I believed this type of action and documented response could be damaging to the governments civil court case as well as damaging to potential witnesses in the Bundy criminal trial. During this timeframe, I once again asked my supervision to remind and/or offer follow-on training to our officers and agents regarding this sort of damaging and potentially discoverable communication.* Further Note: *I couldn't remember specifics about this instance. I recommend the specific items are pulled up and reviewed.* Also Note: *Some limited open source information with unknown reliability about Wayne Hage and Wayne Hage Jr is available in a Fox News special titled "Enemy of the State" which aired on or about March 7, 2015.*

At some point during this timeframe I was also told of a BLM SAC that had rough, bleeding an*l s*x with a subordinate civilian co-worker, who was evidently not in the BLM SAC's chain of command, but played some sort of role in the Burning Man Event. Note: *More and more, I was told of inappropriate issues with a BLM SAC. Sometimes, the reporting parties seemed to not like the BLM SAC and sometimes the reporting parties seemed like they thought the BLM SAC was cool and his actions were to be celebrated.*

Note: *During this timeframe, I just got tired of being around and eating long lunches with certain BLM Law Enforcement Supervisors due to the content of the discussions, which I thought was inappropriate and disrespectful. Additionally, I was very busy, and I didn't have time to waste or use for office visitation.*

On or about October 13, 2016, during a telephone call with the lead prosecutor between a BLM ASAC and myself (on speaker phone). I came to believe that the prosecution team wasn't aware of the above mentioned potentially exculpatory material and other material that tended to potentially discredit the star witness, (a BLM SAC) and possibly embarrass the BLM as a whole. I believed this information risked tainting the whole case for the jury. I informed the lead prosecutor of the information that I had been told or otherwise overheard regarding the BLM SAC in order for the prosecution team to be able to better prepare for pre-trial witness interviews and follow-up with the BLM SAC and others regarding any potential issues. During and following this conversation, it was clear to me that the BLM ASAC didn't approve of the notification I gave to the lead prosecutor. It also appeared clear to me that the BLM ASAC hadn't informed the prosecutor or kept the prosecutor up to date on these issues. During the conversation, the BLM ASAC acted surprised and as if he hadn't heard of those issues in the past, I informed both the lead prosecutor and the BLM ASAC that if what I heard about the BLM SAC is true, then he is a text book example of how not to lead.

On or about October 14, 2016, during a conference call between myself, the BLM ASAC, the lead prosecutor, another AUSA, and an FBI SA (who was silent during the phone call, but indicated as a participant by _____ I outlined the details regarding the BLM SAC that I was told directly or overheard. Note: *During this conference call, it was my opinion that the BLM ASAC tried to distance himself and seem ignorant of the material that I discussed. It should be noted that I had previously reported each and every issue to the BLM ASAC or in many cases, the BLM ASAC was either with me when I was informed of the incidents or was himself a reporting party to me about the events.* Additional Note: *My notes regarding this conference call were seized from me by the BLM ASAC on February 21, 2017, following my removal from the case.* Further Note: *During this conference call, in an attempt to make light of what I was telling the prosecutors, the BLM ASAC called an Assistant United States Attorney (who is also a wife and a mother), a "Little Hussy."* Also Note: *There should be an FBI 302 Activity/Interview report available for this conference call.*

(Please see the email titled "Information Requested Today," dated October 14, 2016, at approximately 6:15 p.m., from me to a BLM ASAC for some additional follow-up information regarding the above conference call.) Please Note: *I stated in this email to the BLM ASAC the following: "Here is the information they (the USAO's Prosecution Team) requested today. Please send it to them anytime you see fit. Please also do any follow-up you see fit. Additionally, I directed the USAO's attention to a few items that may also be potentially problematic and tend to dispute some previously issued talking points.* Additional Note: *An important bit of information may be if the BLM ASAC ever forwarded this email to the prosecution team.* Further Note: *The BLM ASAC previously wanted the duty of U.S. Attorney's Office, BLM Management, and outside agency coordination. Also Note: During the conversation, the lead prosecutor asked me who told me about the issues (described below). I told the lead prosecutor that I was uncomfortable revealing the sources of the information. (These sources were specifically known*

EOR0205

*and also disclosed to the BLM ASAC, who was physically next to me and participating in the conference call. This BLM ASAC wanted to be the one that directly coordinated with and briefed the U.S. Attorney's Office and BLM Higher Headquarters. It should be noted that these sources were supervisors and senior/seasoned personnel within BLM OLES and one of the key sources was the BLM ASAC's daughter's godfather and close personal friend of the BLM ASAC.) Following this telephone conference call, I had a discussion with the BLM ASAC that indicated I shouldn't be the one to reveal the names of sources to the lead prosecutor. The implication was that the information should most appropriately come from the BLM ASAC. At the end of the conversation, I had the impression that the BLM ASAC would appropriately take care of the disclosures of these more senior agency personnel in a discrete and sensitive way and get the prosecutors the information they needed to know. Additionally, I felt I needed to do some additional back ground research and find out some specifics about the individuals who were likely the direct witnesses to these issues (also see below). It should be noted that once I discovered the additional information, in every case I almost immediately (within 24 hours) notified the BLM ASAC.*

(Please also note that on October 19, 2016, at approximately 2:29 p.m., a BLM ASAC sent the Nevada U.S. Attorney's Office Lead Prosecutor and another AUSA an email titled "Information you requested from _____ regarding Friday's phone call."

**(b) (7)**

This email stated the following: "I finished out _____ to-do list from Friday's phone call. Attached is the information discussed with the attachments you requested. They are already in your discovery information, but they are pulled out separately for your ease of review. Please let me know if you need anything else."

Note: *This email included the email by me to the BLM ASAC titled "Information Requested Today' dated October 14, 2016 at approximately 6:15 p.m. However, the BLM ASAC deleted the following: "Here is the information they requested today. Please send it them anytime you see fit. Please also do any follow-up you see fit."* (I believe this was another deliberate attempt by the BLM ASAC to seem ignorant about the reported and indicated misconduct and was an effort to avoid doing the required follow-up or to avoid instigating the necessary supervisory management notifications and internal investigations.)

Additional Note: *This email contained the following five attachments: Email chain titled "cattle trespass map," from March 29, 2014 (between a BLM SAC, the BLM Nevada State Director, the BLM Southern Nevada District Manager, and the BLM Deputy District Manager and a BLM Public Affairs Specialist), an email titled "Fwd:" which contained attached a pdf titled "Email Correspondence," (sent from a BLM SAC to the BLM Southern Nevada District Chief Ranger, the BLM Utah ASAC, a BLM Associate District Manager for the BLM Southern Nevada District, a NPS Chief Ranger, the BLM ASAC for Nevada and a BLM Field Staff Ranger), an email titled "Re: Impoundment – USAO policy re: arrests and citations," from a BLM SAC to the BLM OLES Director, dated March 26, 2014, at approximately 7:07 p.m., (which contained an imbedded email titled "Impoundment – USAO policy re: arrests and citations (from a Nevada AUSA to a BLM SAC, the BLM Southern Nevada District Chief Ranger, the BLM Nevada ASAC and the BLM Utah ASAC, "cc'd" to the District of Nevada U.S. Attorney, an AUSA (I believe the Nevada Civil Chief) and two other individuals which I believe are Nevada AUSAs), an email titled "Brief back mission 027: sensor redeployment," dated April 8, 2014, at approximately 2:44 a.m. (from a NPS/USPP SETT Team Member to two additional SETT Members and a BLM SA), and an email titled "Re: SETT staying on site LAKE," dated April 13, 2014, at approximately 7:27 p.m., (from a SETT Team Member (I think) to another SETT Team Member), this email mentioned a "very covert mission" to "recover a hard-drive with 'Top Secret' data on it" in Mesquite, NV. )*

(Please further note the following comments regarding a BLM SAC in regards to the large expansive closure that the BLM SAC stated "plays into my bluff" (See Email dated March 29, 2014, at approximately 7:38 p.m., titled "Re: cattle trespass map," and all other emails in this chain between a

BLM SAC, the BLM Nevada State Director and the BLM Southern Nevada District Manager). Note: *This is important because one of the rally cries from the opposition included the idea there was a massive and unnecessary closure of public lands. In fact, this closure was to be a targeted emergency closure of public lands in areas where the actual trespass cattle gather operations were taking place in order to address public safety (aggressive wild cattle, contractor vehicle convoy traffic on narrow roads and low flying aircraft) and security concerns (veiled threats from the Bundys to stop the Federal Court Ordered Trespass Cattle Impound Operations by "whatever means necessary.")*

(Please also see an email from the BLM SAC to the BLM OLES Director, dated March 27, 2014, in response to an AUSA's email titled "USAO policy re: arrests and citations" from the Nevada United States Attorney's Office. In this email, the BLM SAC informs the BLM OLES "an unnecessary show of force or arrogant authority would never be my first play" and "BLM's Agents and Rangers are proficently (sic) trained in law enforcement, and the officers assigned to this operation have been handpicked. I am well are aware of powers of arrest and citation delegated to me, and I'm also aware of the potential consequences if I abuse my authority. Although a passive approach may have the desired effect, it may also be considered a sign of weakness or ordered constraint, which may embolden one or more members of those we are confronting.")

(Please also see an email from an AUSA dated March 26, 2014, to a BLM SAC and others, as well as cc'd to the US Attorney (USA). This email states in part "please keep in mind that the USAO's perspective is that the ultimate goal is a safe and successful impoundment with no arrests or citations arising out of the operation. To that end, the USAO is relying on the BLM to minimize adverse contacts with the public, including Bundy and his family, third party protesters, and any others who happen to be out there in violation of the closure order. To achieve this result, we want BLM officers to understand that they should not issue citations or make arrests as a first recourse. Unless there is an actual serious assault on an officer beyond just physical contact we do not want officers citing or arresting anyone in connection with the impoundment. Absent serious deliberate physical assault or a directed, specific threat with a weapon, we are expecting BLM officers to work around the various difficult situations that may arise whether that means finding alternate routes to avoid protestors, standing down for the rest of the day, stepping back from physical contact, etc., where possible. Consistent with the USAO's current policy, any arrests must be approved by an AUSA prior to the arrest. Additionally, officers should also seek approval prior to issuance of a citation and exercise great restraint in seeking authority to cite." Additionally, the following is also stated: "We are confident that you (BLM SAC) will guide the BLM law enforcement officers to utilize their training to diffuse situations and not resort to criminal processes except sparingly and as a last resort with our approval, and with this direction, we will collectively do our best to contribute to a safe and smooth operation.")

(Please also see emails titled "Re: Impoundment – USAO policy re: arrests and citations" dated March 26, 2014, in which a BLM SAC wrote: "Serious issues…." and it appears that the Director of BLM OLES stated "I assume you will be speaking to XXXXX (The US Attorney for the District of Nevada) about the problems this presents for us. By not taking a strong and affirmative action we will just embolden those who are opposed to our actions and things will likely escalate.")

**Issues discussed in the October 14, 2016 conference call included the following**:

1. The above referenced emails (please request, read and understand them) located by me during the email discovery review process. This is key to understand the claim by the defense that although the Bundys knew there were Federal Court Orders that ordered Cliven Bundy to remove his trespass livestock from Federal Public Lands, authorized the Trespass Cattle Impound Operation, and ordered Bundy not to interfere, the BLM was heavy handed in their enforcement of those court orders due to the BLM SAC. (Discovered during the Discovery Email Review Process-

BLM ASAC Notified.) Note: *A BLM ASAC (my Co-Case Agent and Supervisor) specifically wanted the job of interfacing and coordinating with the U.S. Attorney's Office, cooperating/assisting agencies, and higher level DOI/BLM management. Additionally, this same BLM ASAC specifically also wanted the job of researching and authoring the narrative that described the Discovery email search criteria and procedure.* Additional Note: *This BLM ASAC also specifically wanted the job of the research and memorialization of the government document shredding process at the BLM's Incident Command Post (ICP) on or about April 12, 2014.*

2. In regard to the large expansive closure order, the BLM SAC stated it "plays into my bluff" when questioned about the closure order and what I believe is the reason the public wasn't initially notified that the whole approximate 600,000-acre area wasn't all closed. Instead, there was only a temporary emergency closure in areas where impound operations were actually taking place due to the following hazards: Low Flying Aircraft, Aggressive and Often Wild Cattle, Heavy Convoy Traffic, and the veiled Bundy threats to "do whatever it takes to stop the impound." Note: *The large closure of public lands has been portrayed by the defense as a major reason subjects of this investigation travelled to Nevada.* Additional Note: *During the discovery email review process, I discovered what I believed was a gap in discussion between BLM officials and the DOI Solicitors Office in regard to the closure order and a waiting/public comment and notification period. I never fully understood what happened. It is possible that coordination during this time period was done by telephone. I notified a BLM ASAC of what I thought may have been a gap in discussion and he said not to worry about it because anything as visible as the closure order would have been heavily scrutinized by the solicitor's office.* (Discovered during the Discovery Email Review Process-BLM ASAC Notified.) Reference an email chain titled "Re: cattle trespass map," dated March 29, 2014, at approximately 7:38 p.m., between a BLM SAC, the BLM Nevada State Director, the BLM Southern Nevada District Manager and the BLM Deputy Director.

3. Please especially read and understand the direction given to the BLM SAC by the District of Nevada's United States Attorney's Office through a Special Assistant United States Attorney. It was very clear that the US Attorney's goal was to have an arrest and citation free impoundment. Please see the following portions of quotes: "please keep in mind that the USAO's perspective is that the ultimate goal is a safe and successful impoundment with no arrests or citations arising out of the operation. To that end, the BLM to minimize adverse contacts with the public, including Bundy and his family, third party protesters, and any others who happen to be out there in violation of the closure order. To achieve this result, we want BLM officers to understand that they should not issue citations or make arrests as a first recourse. Unless there is an actual serious assault on an officer beyond just physical contact we do not want officers citing or arresting anyone in connection with the impoundment. Absent serious deliberate physical assault or a directed, specific threat with a weapon, we are expecting BLM officers to work around the various difficult situations that may arise whether that means finding alternate routes to avoid protestors, standing down for the rest of the day, stepping back from physical contact, etc., where possible. Consistent with the USAO's current policy, any arrests must be approved by an AUSA prior to the arrest. Additionally, officers should also seek approval prior to issuance of a citation and exercise great restraint in seeking authority to cite." Also, please note the following quote: "We are confident that you (a BLM SAC) will guide the BLM law enforcement officers to utilize their training to diffuse situations and not resort to criminal processes except sparingly and as a last resort with our approval, and with this direction, we will collectively do our best to contribute to a safe and smooth operation." (Discovered during the Discovery Email Review Process-BLM ASAC Notified.) Reference an email titled "Impoundment – USAO policy re: arrests and citations," dated March 26, 2014, at approximately 6:45 p.m., from _____ to a BLM SAC and others and "cc'd" to the Nevada U.S.

EOR0208

Attorney and other AUSAs.  Also Reference an email titled "Re:  Impoundment – USAO policy re:  arrests and citations," dated March 26, 2014, at approximately 7:07 p.m., from a BLM SAC to the BLM OLES Director and "cc'd" to the BLM Nevada State Director.  Also Reference an email titled "Fwd:" dated March 27, 2014, at approximately 9:43 a.m., from a BLM SAC to the BLM OLES Director, the BLM Southern Nevada District Chief Ranger, the BLM Utah ASAC, a NPS Chief Ranger and the BLM Nevada ASAC.

Please Note:  *On or about January 24, 2017, the lead prosecutor mentioned to me, in the presence of a BLM ASAC that one of the BLM Supervisory Rangers had serious issues, would be a poor witness, and something like he was defective.  I attempted to make it clear that the law enforcement staff knew very little except the Bundy's made it clear that they would stop the impound by "whatever means necessary" and the BLM SAC 's direction was to go out there and "kick Cliven Bundy in the teeth (or mouth) and take his cattle and "not take any crap from anyone."*

Additional Note:  *In January of 2017, following a discussion with a BLM Supervisory Ranger and an AUSA, I received information that indicated the AUSA fussed at the BLM Supervisory Ranger following the arrest of Dave Bundy on April 6, 2014, and told that Supervisory Ranger to never to anything like that again.  Additionally, I received information the AUSA later apologized to that BLM Supervisory Ranger.*

4.  A BLM SAC stated in part: "an unnecessary show of force or arrogant authority would never be my first play."  (Discovered during the Discovery Email Review Process-BLM ASAC Notified.)  Note:  *It should be noted that "an unnecessary show of force and arrogant authority by the BLM SAC is a key defense argument.  Reference an email titled "Fwd:" dated March 27, 2014, at approximately 9:43 a.m., from a BLM SAC to the BLM Southern Nevada District Chief Ranger, the BLM Utah ASAC, the BLM Southern Nevada District Associate Field Manager, a NPS Chief Ranger, the BLM Nevada ASAC and a BLM Field Staff Ranger from Montana.*

5.  The BLM SAC also stated in part: "I'm also aware of the potential consequences if I abuse my authority.  Although a passive approach may have the desired effect, it may also be considered a sign of weakness or ordered constraint, which may embolden one or more members of those we are confronting."  (Discovered during the Discovery Email Review Process-BLM ASAC Notified.)  Note:  *The abuse of authority by the BLM SAC is a key defense argument.  Reference an email titled "Fwd:" dated March 27, 2014, at approximately 9:43 a.m., from a BLM SAC to the BLM Southern Nevada District Chief Ranger, the BLM Utah ASAC, the BLM Southern Nevada District Associate Field Manager, a NPS Chief Ranger, the BLM Nevada ASAC and a BLM Field Staff Ranger from Montana.*

6.  When a male BLM supervisor (believed to be the BLM SAC) stated to a Nevada Brand Inspector "That's not the kind of message we want to send," when the Brand Inspector recommended a "soft impound" with an associated civil property lien on Cliven Bundy's cattle instead of a large operation and heavy show of force.  (Discovered on or about September 18, 2015, during an interview with a Nevada State Brand Inspector-BLM ASAC Notified.)  Note:  *It is my belief that the intent of this operation was no longer the lawful removal of trespass cattle pursuant to a Federal Court Order.  I believe the intent switched to becoming about sending a message and putting together the largest operation possible.  I base that in hindsight on the totality of the information I learned and came to believe since the fall of 2016.*

7.  The BLM SAC 's alleged pre-impound intent and mission statement "We are going to go out there and kick Cliven Bundy in the teeth (or mouth) and take his cows."  (Told to me by a BLM

60

SA that overheard this and confirmed to me by another former BLM ASAC/current BLM SA on October 26, 2016.) Note: *In my opinion, this statement speaks for itself and by default sets forth the BLM SAC's "Commanders Intent" to all impound participants. Therefore, I believe that when a Federal Officers faced uncertain situations, they reverted back to the BLM SAC's briefed intent.* Additional Note: *I also base this belief partly in hindsight based on an approximate October 26, 2016, telephone conversation with a key witness in which this witness, a BLM SA told me that the BLM SAC also told him to "Go out there and get the troops fired up to get Bundy's cows and not to take any crap from anyone."*

8. The "Kill Book" (Reference the Jay Redd Family in regard to Operation Cerberus Action-told to me by a BLM SAC in the presence of a BLM ASAC.) Note: *The death of Southern Utah Independent Reporter Michael Flynn (A potential trial witness and author of "BREAKING NEWS: Bundy calls for supporters to shut down I-15, forcibly release cattle) and another death in which a BLM SAC indicated that another BLM SAC was a contributing factor (see below).* Additional Note: *If this is true as described by the BLM SAC that informed me, I believe this speaks to the defense argument of arrogance and cruelty. Additionally, I believe actions and associated statements may be Discoverable in the associated Federal Civil Trial.*

9. The "Failure Rock" (Reference issues at the Burning Man event-told to me by a BLM SAC in the presence of a BLM ASAC.) Note: *Please reference the "Chaco Taco Incident" which is noted in the following: Email titled "Fwd: Burning Man Law Enforcement," dated August 25, 2015, from the BLM OLES Director to BLM Law Enforcement and Civilian Operations Personnel – Burning Man Event and the attached article titled "BLM top director to run Burning Man law enforcement." Also, please see the email titled "Fwd: Google Alert – BLM Rangers," dated August 20, 2015, from a BLM SAC with the included article titled "Bureaucrats, VIP Boxes at Burning Man," dated August 20, 2015, by Michael Shannon. Please also see a press release titled "BLM director: We are addressing Burning Man issues," published on July 8, 2015, and an article titled "Report: BLM agent broke federal ethics rules at Burning Man by Jenny Kane, updated on February 1, 2017.*

10. "Going native" and "partying with the Burners" at Burning Man (Indicated to me by a DOI Solicitor as well as overheard by two unknown BLM Rangers talking.)

11. Sending photos of his own feces to coworkers. (Told to me by a BLM SAC in the fall of 2014 in the presence of a BLM ASAC and also by former BLM Nevada ASAC/Current U.S. Fish and Wildlife Service (USF&WS) SA on or about January 12, 2017.) Note: *Although it is unknown, it is possible these photographs may be available to the defense or anyone else through a Freedom of Information Act Request and therefore damaging to witnesses and embarrassing to the agency.* Additional Note: *If this is true, it speaks to the ego of the BLM SAC and the apprehension of the SAC's peers and subordinates to report him for such outrageous actions.*

12. Sending photos of his girlfriend's (described as a Salt Lake City Professional TV Weather Person) genitals to co-workers and saying: "there is no way you get more ____ than me." (Told to me by a BLM SAC and a BLM ASAC.) Note: *Although it is unknown, it is possible these photographs may be available to the defense or anyone else through a Freedom of Information Act Request and therefore damaging to witnesses and embarrassing to the agency.* Additional Note: *If this is true, it speaks to the ego of the BLM SAC and the apprehension of the BLM SAC's peers and subordinates to report him for such outrageous actions.*

13. Allegedly telling the Clark County Sheriff "F-You, we (the BLM) don't need you anyway. We have the FBI" in response to the Las Vegas Metropolitan Police Department/Clark County

Sheriff's Office unexpectedly deciding not to assist federal authorities in the trespass cattle impound. (Overheard in the spring of 2016, when two unknown BLM Rangers were talking-BLM ASAC Notified.) Note: *If this is true, I believe this signifies a basic lack of understanding of the necessity of local law enforcement cooperation in any event in which crowd control and traffic control are central missions of an operation or when large protestor groups are present. The federal judicial system simply isn't set up for misdemeanor arrests or even federal citations.* Additional Note: *If this is true, it speaks to the ego of the BLM SAC.*

14. Allegations by a BLM Ranger that one time at the Burning Man Event, the Rangers were in need of supervisory and prosecution attorney assistance and requested help on the radio. The allegation indicated that the BLM SAC got on the radio and stated that the AUSA was in no condition to assist. The implication and belief of that officer appeared to be that the BLM SAC and the AUSA had been drinking and having sex. (Overheard in the spring of 2016, when two unknown BLM Rangers were talking-BLM ASAC Notified.) Note: *I believe this must have been a previous Burning Man Event prior to 2014.* Additional Note: *When I informed the prosecution team of this allegation, a BLM ASAC interrupted me and stated "XXXXXX you little hussy."* Further Note: *The female AUSA that was called a "little hussy" over the phone by the BLM ASAC in front of others is a wife and a mother.*

15. Allegation of a supposed widely held belief in BLM that the BLM SAC works his staff into the ground in order to make himself look good. Note: *It appears that many officers and agents in the agency apparently hold this belief. Additionally, I spoke about this allegation with a BLM ASAC.*

16. Unprofessional and demeaning photographs of a defendant sent to BLM Law Enforcement Federal Court Ordered Trespass Cattle Impound Participants. (Informed by a BLM ASAC as well as overheard another talking about it and told by another BLM SA.) Note: *This photograph was not discovered in the discovery email review that was conducted by the investigative team. Therefore, it is believed that the photograph was sent without any of the keywords that were used to separate the emails for review and eventual discovery turn-over or was deleted. The issue is that the email is likely available through the Freedom of Information Act (FOIA). (Please see the email titled "Email Material that We Might Want to Make the Prosecution Team Aware Of," dated November 17, 2016.)* Additional Note: *I also believe it is possible this email was unlawfully deleted.* Further Note: *This picture was described to me as a photo-shopped picture of Ryan Bundy holding a giant pen\*s in front of "The West Has Now Been Won" sign on April 12, 2014.*

17. Agency Talking Point Issues to include the proximity of officers/agents to the Bundy property and snipers. Note: *I am concerned about AUSA Direct Examination during the week of February 13-16, in which the AUSA asked an "ignorant" witness something like, to your knowledge were there any snipers at the impound.* Further Note: *This investigation indicated there were Federal Agents briefly on the Bundy property as well as other instances where Federal Officers/Agents were very near and likely on the Bundy property during the installation/retrieval of technical investigative equipment/high value item, and foot patrols. Additionally, the investigation indicated that there was at least one school trained Federal Sniper equipped with a scoped/magnified optic bolt action precision rifle, another Federal Officer equipped with a scoped/magnified optic large frame (308 caliber) AR style rifle, and many officers that utilized magnified optics with long range graduated reticles (out to 1,000 meters-approximately 500 meters on issued rifles depending on environmental conditions) on standard law enforcement issued AR (223 caliber/5.56mm) and that often officers were in "over watch" positions. Additionally, the investigation also indicated the possibility that the FBI and the Las*

*Vegas Metropolitan Police Department had law enforcement snipers/designated marksmen on hand for possible deployment.*

18. Bundy Supporter Talking Point Issues to include that the BLM aren't real police officers (see the BLM SAC's dress on April 12, 2014, as opposed to the professional dress of the Las Vegas Metropolitan Police Department and the Nevada Highway Patrol) and that BLM law enforcement doesn't have authority and jurisdiction. Note: *Although my investigation showed these Bundy Supporter talking points weren't correct, the unprofessional dress of the BLM SAC on April 12, 2014, was readily apparent and the issue with the BLM not offering any contracts to local law enforcement officials with the intent of achieving "maximum feasible reliance on those individuals to enforce federal laws on federal public lands" is in my opinion problematic and potentially illegal.*

19. The complicated and confusing issues surrounding the Desert Tortoise and the purchase and the ultimate permanent withdraw of the Bunkerville Allotment from grazing. (I informed a BLM ASAC as each issue in question arose.) Note: *These issues are complicated and appear to indicate a wide variety of possible impropriety to include a shell cattle/grazing business, Desert Tortoise euthanization's, Desert Tortoise survey/population study issues, predation by Ravens (which are protected by the Migratory Bird Treaty Act), Clark County control of the Bunkerville Grazing Allotment, etc. Additional Note: During the course of the investigation, when I discovered these possible issues, I noted them, reported them to my supervisor, and researched them to the point gaining a simple overall understanding of what I believed the history of the area looked like.*

20. Bundy Supporter talking point that the BLM isn't working for the purpose that they were created. Please see the Taylor Grazing Act of 1934 (43 USC 315).

21. Bundy Supporter talking point that the BLM isn't a good steward of the land. Please specifically see the large over population of Wild Burro's in the Gold Butte, Nevada area and the Taylor Grazing Act. (Informed a BLM ASAC after completing the open source internet research.)

22. The BLM SAC allegedly telling co-workers "I'm back b*tches" following some sort of issue in reference to the Burning Man Event. (Told to me by a BLM SAC in the presence of a BLM ASAC.)

23. The BLM SAC allegedly telling the security personnel around the Incident Command Post (ICP) on the night of April 11, 2014, that they were going to be attacked and to be alert. Then the BLM SAC allegedly went to bed without any communication with subordinate commanders and leaving the Rangers and Agents on security to basically stay up all night in a fog of uncertainty, anxiety and fear without any further direction, concept of the night and next day's operations, or intent. Due to this, individual subordinate unit commanders had to take it upon themselves to prepare the officers around them for what they thought was an imminent attack without any command direction. (Told to me by a BLM SAC in the presence of a BLM ASAC.) Note: *This appears also to be related to a key defense argument in trial. That argument is that Federal Officers and Agents in the Toquop Wash near I-15 on April 12, 2014, were exhausted and unduly scared and that led to them pointing weapons at the crowd. Additional Note: In particular, a BLM SAC told me that he and other subordinate unit leaders tried to plan defensive courses of action and a withdrawal, because it appeared the other BLM SAC (the leader of the Gold Butte/Cliven Bundy Trespass Cattle Impound Operation), the BLM OLES Director, and another BLM SA kept everyone in the dark and simply disappeared and were believed to be asleep on the night of April 11, 2014. The BLM SAC also went on to say that later in Las Vegas, he told the*

63

*other BLM SAC something like he "pulled that (the withdrawal) out of his a\*\*." The BLM SAC went on to say something like the other BLM SAC had the nerve and inconsideration to fly his own family into Las Vegas and keep everyone else waiting around on the BLM SAC during this difficult and potentially dangerous time.*

24. Problems with not capturing the most important dispatch audio recordings from the following time periods: April 6, 2014 (Dave Bundy's arrest), April 9, 2014 (Ammon Bundy's tasing, Margaret Bundy Houston being taken to the ground, the impeding and stopping of the BLM convoy, and the BLM Law Enforcement Canine deployments), and the April 12, 2014, "Stand-Off" at the I-15 Bridges. Note: *No malice was indicated on this issue. However, I do recommend an inquiry from outside of my agency due to the three key/most important dispatch audio files not being available. More and more, I believe it is possible these files were unlawfully deleted or not recorded on purpose. It should be noted that even though the BLM SAC basically characterized the impound as a law enforcement operation, it was actually a logistical and administrative court ordered operation which only had a heavy police present as a response for the veiled threats by Bundy and his followers to "do whatever is necessary" to stop the impound operation.*

25. A BLM SAC allegedly being away from his office for an extended amount of time with the belief that he was simply not showing up to work.

26. A BLM SAC allegedly ordering his subordinates to erase and otherwise destroy the records relating to the Burning Man Event in violation of Federal Records Laws in an effort to impede and obstruct the BLM Nevada State Office from being successful at managing the event once the BLM SAC was no longer in charge of it. (Told to me by a BLM SAC in the presence of a BLM ASAC.) Note: *For comparison, also please see a letter from Congressman Jason Chaffetz and Congressman Blake Farenthold to DOI Deputy Inspector General Mary Kendall dated February 14, 2017.*

27. A BLM SAC bragging about the number of internal and Office of Inspector General (OIG) inspections that he has on him. (Told to me by multiple people. Basically, common knowledge within the agency.) Note: *The Public Release Version of the DOI OIG Investigative Report of Ethical Violations and Misconduct by Bureau of Land Management Officials posted to the web on January 30, 2017, in which it is alleged that a BLM Supervisory Agent bragged that "he owned" the BLM OLES Director and that as a result, no action could be taken against him.*

28. The alleged belief in the BLM that the BLM SAC is untouchable and has no oversight. (Told to me by multiple people. Basically, and apparently common knowledge within the agency. Note: *Please interview the BLM Chief of the Office of Professionally Responsibility regarding this issue and please look into the internal investigations in which a BLM SAC was the focus, especially where the BLM OLES Director was the finder of fact.*

*Please re-look into the following:*

*IA 13-066 and OI-HQ-13-0524-R (dated August 28, 2013, in reference to an alleged inappropriate relationship with an employee by a BLM SAC and a hostile work environment with frequently abusing and foul language that allegedly caused a BLM SAC's Investigative Assistant to resign five months before her retirement eligibility in which a reported fact-finding investigation in April 2014 by Lindholm & Associates interviewed 18 employees and indicated the complaint was unsubstantiated.)*

EOR0213

*IA 14-011 and OI-HQ-14-0173-R (dated February 4, 2014, and alleged a BLM SAC committed fraud, waste and abuse and that he allegedly received kickbacks from the Burning Man organization, made unauthorized and wasteful expenditures, traveled unnecessarily and falsified his time and attendance. The complaint also alleged that the BLM SAC sought to abuse employees that do not agree with his actions. This case was assigned to the BLM OLES Director and determined to be unsubstantiated.)*

*IA 14-043 and OI-HQ-14-0426-R (dated August 16, 2014, and indicated an OIG Hotline complaint from a former BLM Nevada State Chief Ranger that claimed a BLM SAC bullied, targeted, marginalized and subjected the former BLM State Chief Ranger to reprisal because of an EEO complaint because of the BLM SAC's alleged inappropriate actions that included sexual comments and innuendos toward a former BLM Nevada ASAC that has since changed agencies. (This former BLM ASAC told me that the BLM SAC even sent photos of his own feces to his employees and that he tried to tell management, but no one would listen.) This complaint also alleged that the BLM SAC told the former BLM State Chief Ranger that he should find another job. This complaint also alleged that on April 18, 2014, he was served with a notice of proposed removal by the BLM SAC and former BLM ASAC and that the notice of proposed removal contained embellished, false and misrepresented facts about the former BLM State Chief Ranger and his actions at the 2013 Burning Man Event. This case is listed as being addressed through an ongoing EEO complaint.* Note: *I was later told that this former BLM State Chief Ranger lost his job.*

*IA 14-059 and OI-HQ-14-0549-R (dated August 13, 2014, and alleged widespread BLM SAC abuse of authority and wasteful spending at the Burning Man Event and the Cliven Bundy/Gold Butte Trespass Cattle Impound and further alleged that the BLM SAC drove his government vehicle to a bar and got into a fight. In this case, the BLM OLES Director determined the allegations to be unsubstantiated.)*

*IA-14-070 and OI-PI-0087-I (dated August 18, 2014, and alleged a waste of government funds and violation of BLM policy when a BLM SAC allegedly exceeded purchase guidelines and spent $16,500 to outfit his government vehicle with aftermarket accessories. This investigation indicated that three separate purchases were made to Premier Vehicle Installation totaling more than $7,200.00. The investigation determined that the BLM OLES Director gave the BLM SAC an exemption. The allegations were determined to be unsubstantiated.*

*IA-15-040 and LM15-035858 (dated September 2, 2015, and alleged that at the 2015 Burning Man Event that a female participant filed a complaint against a BLM SAC for physically intimidating her and grabbing her by the arm/back. This preliminary investigation indicated that the BLM SAC used appropriate force.*

Additional Note: *The Public Release Version of the DOI OIG Investigative Report of Ethical Violations and Misconduct by Bureau of Land Management Officials posted to the web on January 30, 2017, in which it is alleged that a BLM Supervisory Agent bragged that "he owned" the BLM OLES Director and that as a result, no action could be taken against him.*

Further Note: *Please reference a memorandum by the BLM OLES Chief of the Office of Professional Responsibility, dated October 22, 2015, to the Las Vegas, NV, U.S. Attorney's Office. This memorandum was sent to me in an email titled "GB Henthorn Review" as an attachment on October 29, 2015, by a BLM SAC.*

EOR0214

29. Dave Bundy iPad Issues (Told to me by a BLM ASAC) Note: *These issues are very troubling and potentially involve excessive use of force and unprofessional/unethical conduct by Federal Law Enforcement Officers and possibly improper actions by Federal Prosecutors.* Note: *The investigation indicated the iPad was seized and was failed to be returned to Dave Bundy (despite Dave Bundy's request and claims he needed it for work) at least in part due to the likelihood the iPad contained rude comments by officers and despite a decision at the time not to charge Dave Bundy for his actions on April 6, 2014. These comments allegedly consisted of the officers bragging about roughing Dave Bundy up, slamming him to the ground, grinding his face against the pavement, and Dave Bundy having gravel stuck to his face.* Additional Note: *Apparently, these indications were not reported appropriately up the BLM OLES chain of command and appropriate internal investigations initiated. However, a BLM ASAC did inform the U.S. Attorney's Office in my presence.* Further Note: *There was also a U.S. Attorney's Office Prosecution Strategy not to return the iPad even though it was decided that a search (that I authored and a BLM ASAC swore to) was not going to be executed, because the iPad itself was still evidence of crimes. The decision was that if Dave Bundy wanted his iPad back, then he could request it. Otherwise, he wasn't getting it back even though it likely contained exculpatory evidence and indications of police misconduct.* Also Note: *Ultimately, Dave Bundy's iPad was turned over to the FBI and to my knowledge, it is still in the FBI's custody.*

30. A BLM SAC allegedly in an arrogant way telling assisting officers and agents during Operation Cerberus Action that his operation will be the highlight of their career and it will be the biggest operation that they will ever be a part of. (Told to me by a BLM ASAC.)

31. A BLM SAC allegedly making all his subordinates wait on him after the impound operation concluded during the debriefing process as he visited with family. (Told to me by a BLM SAC in the presence of a BLM ASAC.)

32. A BLM SAC making purchases against government purchase rules. In this particular instance, the BLM SAC allegedly made split purchases to outfit his government vehicle with an elaborate emergency light and siren package. Note: *In my experience as a Federal Agent/Officer, I have never observed a Special Agent-in-Charge take a direct enforcement action or utilize their emergency equipment and even I know split purchases aren't allowed.*

On or about October 26, 2016, at approximately 5:37 p.m., I had a telephone conversation with one of the key BLM witnesses in reference to some disturbing information I heard about the case's key witness, a BLM SAC. In the conversation, this individual (who I know to be one of the best performers in the agency) in response to my question, he told me that the BLM SAC is a liability as a witness and in the investigation. In response to my questions, the individual also told me that the BLM SAC did say something like "We're going to go out there and kick Cliven Bundy in the teeth (or mouth) and take his cows." The individual also told me that at some point during the April 2014 Impound Operations, the BLM SAC pulled him aside one morning and told him to "Go out there and get the troops fired up to get Bundy's cows and not to take any crap from anyone." Note: *The next day following this telephone conversation, I informed my supervisor (a BLM ASAC) of my conversation and told my supervisor this bothers me and I am worried about the impact it will have on the case. The BLM ASAC told me that the BLM SAC is the reason that the individual I referred to took a demotion, to get away from the BLM SAC. The BLM ASAC further stated for me not to worry about it. The ASAC stated something like "I wouldn't worry about it, he (XXXXXXXX) is a professional. He would never say anything."* I then asked the BLM ASAC that if all this stuff is true about the BLM SAC, then why is he still around. The supervisor replied with a statement like *"Because he is the director's boy, that's why."* Note: *The Public Release version of the Investigative Report of Ethical Violations and Misconduct by Bureau of Land Management Officials posted January 30, 2017, in which a BLM Supervisory Agent allegedly stated that "he owned" the BLM*

66

*OLES Director and as a result, no action could be taken against him."* Additional Note: *At some point, a BLM ASAC told me about a time in which the BLM SAC and the Chief of the Office of Professional Responsibility (OPR) had some sort of disagreement at the Burning Man Event and the BLM OLES Director sent the chief of OPR home.* Further Note: *By this time, I had become attuned to the disgruntlement of several BLM employees (both inside and outside of supervision) in regard to believing that BLM SAC was protected from the top of BLM Law Enforcement. It became clear to me that the belief that the BLM SAC was protected (true or not) was pervasive in the agency.*

Also Note: *BLM SA XXXX was one of the key agency trial witnesses during the week of February 13-16, 2017. In his trial testimony, SA XXXXX mentioned something like he hopes he would have been able to correct his supervisor (XXXXX) if SAC XXXXX was doing something wrong (to get the exact quote, I would recommend getting a copy of the trial transcript).*

Further Note: *BLM SA XXXX, along with my supervisor's longtime friend and Godfather to his daughter XXXX and my supervisor's decades long friend from the National Park Service XXXX*

*all victims and witnesses in reference to this investigation), were the individuals my supervisor "interviewed" once I was removed from the case or used to "witness" the search of my office and the wholesale seizure of items within my office (please note my supervisors Memorandum of Activity (MOA) following my removal as Cliven Bundy/Gold Butte Case Agent).*

Additional Note: *Additionally, many, many times throughout this investigation I have requested additional assistance from the BLM ASAC. This was due to the forecasted pre-trial and trial workload burden, an extended response time to complete tasks, and pending necessary personal/medical procedures. Additionally, at some point in this timeframe, I received concerning medical news that I believed had the likelihood of causing me to be unavailable for portions of the pending trials.* Additional Note*: These trials were forecasted to last three or four months each, with three or four rotations per trial, with a month in between trials and several hundred miles from my home, family, and doctors. Additionally, when I attempted to speak to the BLM ASAC about my concerns, he just continually told me that no one, not even him could do the case. Furthermore, when a BLM SAC offered assistance, the BLM ASAC told me that he told the SAC that no one is necessary and that it has to be either me or the ASAC that works on the case. The BLM ASAC would then said that although he knows 80% of what I do, no one else could do the case. The BLM ASAC would also state to me (from time to time) that due to other issues, he just doesn't know how much time he can devote to the case.* **I would like to discuss this issue in much greater detail.** Also Note: *During this timeframe and previous, the BLM ASAC would select certain tasks to assign a BLM SAC in reference to the Gold Butte Investigation. The BLM ASAC on a few occasions would state this (unattractive assignments) would be a good job for XXXX.* Note: *I felt the BLM ASAC (who in fact was the co-case agent) was being disrespectful toward the BLM SAC.*

Also, on or about October 26, 2016, a BLM ASAC gave me my FY 2016 Employee Performance Appraisal Plan (Evaluation). In this evaluation, I received a superior rating. The following is a comment from the evaluation: "Agent ⬜ performs as such a high quality as the Gold Butte case agent that BLM's portion of the investigation report would not be as comprehensive as it would be if someone else completed it. He brings a thoughtful approach to this complicated case, and demonstrates his dedication to excellence on a daily basis."

During this time frame the BLM ASAC would also openly speak rudely about several government employees and non-employees. Generally, the comments would be sex or appearance based and/or indicate an employee's poor professional performance (of a confidential personnel nature) and mentioned several issues to include pending vacations and how other people's actions "chaps his aXX." Additionally, this BLM ASAC began to once again more and more treat me disrespectfully, as well as

once again openly speak inappropriately, disrespectfully, and rudely about subjects and associates of the
subjects of this investigation. This BLM ASAC often openly portrayed a disdain of Cliven Bundy's
family, supporters, protestors, ranchers, farmers, Mormons and other highly religious people in general.
Once again, I became concerned that this BLM ASAC's actions, words and open acceptance and even
instigation of degrading unprofessional actions, statements, and inappropriate use of electronic
communications would unacceptably show bias and become a fatal taint in this investigation, embarrass
and discredit our agency, negatively impact our mission and harm the case. In addition, I knew that many
of these open comments, emails and texts were likely subject to the litigation hold, Discovery, Federal
Records Protections, and the FOIA.

Also, at times political topics would come up in the office and Law Enforcement Supervisors would talk
openly about politicians that they don't like. At one point in time (I think during this timeframe), I
noticed on the dry erase board in the supervisor's office that it was listed as almost a critical event that
Las Vegas City Councilwoman-Ward 6/former Clark County Assemblywoman Michele Fiore was going
to be at Hoots Café, located at 125 Hoots Ln, White Bird, ID 83554. Due to Ms. Fiore's public backing
of the Bundy's, she was sometimes a subject of ridicule amongst supervisors. (Reference an email titled
"Fwd: Fiore," dated February 18, 2016, at 4:48 p.m., from a BLM SAC to me and a BLM ASAC. Note:
*This email had the following embedded article: "The IRS had its sights on the gun-toting Nevada
assemblywoman involved in the Bundy standoff(s)."*

Additionally, during this timeframe, questions arose about Operation Cerberus Action and specifics about
the investigation and defendant dispositions. I was told to contact a particular high-quality BLM SA that
had been a former BLM ASAC. This BLM SA was helpful to the best of his ability. However, this BLM
SA made it clear to me that the previous BLM Case Agent for Operation Cerberus Action (a BLM SAC)
failed to complete his reporting requirements in the Incident Management Analysis and Reporting System
(IMARS) and failed to consolidate important case specifics. Note: *This failure to utilize an accessible
reporting system by the BLM SAC complicated and prolonged this research.*

During this timeframe, a BLM ASAC told me of a subordinate BLM civilian employee who he said had
some sort of Post-Traumatic Stress Disorder (PTSD). I felt the way the BLM ASAC made these
comments was derogatory to the employee. Note: *This information, passed by a supervisor is likely
confidential health related information.* Additional Note: *This BLM ASAC also mentioned in what I felt
was a disrespectful way, about the BLM ASAC was making the BLM employee drive him around during a
recent trip to Portland, OR, for the Malheur National Wildlife Refuge Occupation Trial.* Further Note: *I
felt the BLM ASAC was trying to imply some sort of aggravation to the BLM employee's PTSD symptoms.*
Also Note: *Driving in crowds and traffic is considered to be a PTSD "trigger" and is often considered to
be stressful to a post-traumatic stress survivor.*

Sometime during this timeframe during a real busy time, a BLM ASAC came into my office and told me
that he bets it would drive me crazy if he started re-arranging items on my desk when I wasn't looking.
The BLM ASAC then told me that he likes messing with people and that he previously would re-arrange
items on a prosecutor's desk and that drove him crazy. Note: *Very often it appeared to me that my work
papers and office furniture was moved.*

Also, during this timeframe, while inside the BLM law enforcement office of the BLM Idaho State
Office, a BLM SAC and BLM ASAC started talking about a BLM Field Staff Ranger's performance and
personality. One of the members of BLM Law Enforcement Management stated that the Ranger
previously was immature and had a "know it all" attitude, but was doing better now. Additionally, a
member of BLM Law Enforcement Management indicated that another BLM Field Staff Ranger had an
internal investigation on him for a report that he allegedly used his government cameras to scout out
hunting locations. The BLM SAC went on to say that he and the BLM OLES OPR Chief traveled to this

68

Ranger's duty location and interviewed him. The BLM SAC indicated that the BLM Ranger was scared or upset and that although no wrong doing was discovered, this BLM Ranger ultimately took a civilian position within the BLM.

Note: *I felt that again during this timeframe, the personal conduct and wrongful disclosure of private/protected information had once again degraded to the pre-March 2016 levels despite my complaint, continued encouragement, and respect.*

Sometime during this timeframe, a BLM ASAC told me that a civilian BLM Dispatch Lead Employee (who was likely to be a key trial witness) spoke negatively to the Nevada U.S. Attorney about members of the prosecution team and their interview approach with her. The BLM ASAC indicated to me that this disrespectful type conduct was outrageous and something along the lines of he is done with that BLM civilian employee (who is also considered a victim in the events of April 12, 2014). Note: *This civilian employee played a key and very stressful role throughout the Gold Butte Federal Court Ordered Trespass Cattle Impound and especially found herself in a stressful and potentially life-threatening situation on April 12, 2014.* Additional Note: *This employee found herself working next to a BLM SAC in the Gold Butte Impound Operation.* Further Note: *Prior to this, this employee was well liked by the BLM ASAC. On numerous occasions I heard her referred to as "sassy."* Also Note: *I again believed these types of comments about an employee, victim, and witness was unprofessional in a Federal Law Enforcement Office Environment.* Continuing Note: *The BLM ASAC had become irritated at this BLM civilian employee because according to the BLM ASAC, the BLM civilian employee complained to the U.S. Attorney about the Bundy/Gold Butte Prosecution Team.*

Additionally, the office gossip increased with the BLM ASAC speaking poorly and making fun of a National Park Service Supervisory Ranger that during the 2014 Gold Butte Trespass Cattle Impound was a member of the Special Event Tactical Team (SETT). Note: *This was the typical making fun of "tactical" people.* Also, this BLM ASAC made a point to talk about employee "affairs."

During this timeframe, a BLM ASAC told me he would take the lead on a project that detailed the shredding of government documents on or about April 12, 2014, at the Incident Command Post in the Toquop Wash near Bunkerville, Nevada, by BLM employees. Note: *I was pleasantly surprised the BLM ASAC volunteered to take the lead on any administrative and relatively boring project, but at the time, I didn't think anything of it.* Additional Note: *Later, during an evidentiary hearing (in October of 2017), I saw where the BLM ASAC testified to his actions and what he discovered in reference to the mass shredding of government documents that the defense claimed had evidentiary value and was important in the defense's case for dismissal. Accounts of the BLM ASAC's testimony indicated that he never asked who shredded the documents or who ordered/authorized the shredding of the documents.*

On or about October 27, 2016, at approximately 10:28 a.m., a likely key BLM witness called me to talk about a BLM SAC. During this conversation, the potential likely BLM witness told me that they thought the BLM SAC could still potentially be a good witness because of his ability to turn on and off the tears, depending on the situation. The potential BLM witness told me that they had seen him do it, when the situation suited the BLM SAC. This individual went on to say that the BLM SAC is a "cancer" in the agency and had often threated this individual disrespectfully.

On or about October 27, 2016, at approximately 4:26 p.m., I received an email titled "Fwd: witness prep," from a BLM ASAC. Note: *This email was addressed to the BLM OLES Deputy Director and a BLM SAC.* Additional Note: *In part, this email stated the following: "The prosecutors are requesting to start witness prep with XXXXXXX (a BLM SAC) in December.....So at this point I need to know if he is willing or available to come and what his availability is during that month."* Additional Note: *This is the cases key, #1 witness.* Further Note: *Please note the below included comments (from*

69

EOR0218

*around the December 8, 2016, timeframe) from the BLM ASAC about the BLM SAC taking some sort of Family Medical Leave/FMLA (Family Medical Leave Act) Leave to avoid having to testify and how the BLM ASAC thought that was "smart."*

Also, on or about October 27, 2016, Ammon Bundy, Ryan Bundy and five others were found not guilty in a Portland Oregon Federal Court of Conspiring to Impede Federal Workers. Note: *Reference a Seattle Times article dated October 27, 2016, titled "Jury acquits leaders of Malheur Wildlife Refuge standoff," by Hal Bernton.*

On October 28, 2016, at approximately 2:13 p.m., a BLM ASAC sent me an email titled "Re: I Mirrored Our Hard Drives Today." This email stated the following: "Great stuff. Thanks [ ] I'm sure XXXX (a BLM civilian employee) was losing her mind - - all while you're politely trying not to choke her through the phone." Note: *This is one of a few different instances where the BLM ASAC was disrespectful to one of our employees.* Additional Note: *This particular employee was apparently concerned about her safety and what she witnessed and felt as a result of the 2014 Cliven Bundy/Gold Butte Trespass Cattle Impound.* Further Note: *I felt like the least we could do was to take the time to explain as best as possible the situation and the expected future regarding her concerns, as well as let her (and anyone else) simply vent and talk to us.* Also Note: *No disrespect intended, but I simply grew more and more frustrated with this BLM ASAC over these types of issues.* Continuing Note: *The BLM ASAC honed in on this civilian employee and would from time to time when her name came up say that he is done with her, he didn't want to deal with her and insinuate her concerns were ridiculous.*

Sometime in this timeframe, the BLM ASAC spoke on multiple occasions disrespectfully of a deceased BLM Law Enforcement Ranger in another BLM Ranger's relationship with another BLM Ranger. Note: *For the purpose of this narrative, I feel it is inappropriate to go into specifics. I can just say the BLM ASAC's comments about a former subordinate employee and gossip were inappropriate and disrespectful, especially to a subordinate and in the workplace.* (Although previous to this, reference an email titled "XXXX" dated January 14, 2015, at approximately 6:19 a.m., by the BLM ASAC.)

The BLM ASAC also spoke of personal relationships between other BLM law enforcement employees, based on what this BLM ASAC discovered during his duties on the Cliven Bundy/Gold Butte Investigative Team. Note: *I just grew more and more tired of hearing disrespectful, private, and inappropriate workplace gossip from the BLM ASAC.*

At some point in the fall of 2016, the BLM Special Agent in Charge (SAC) told me that he wanted to get me put on the Federal Bureau of Investigation's (FBI) Joint Terrorism Task Force (JTTF) and would talk to the ASAC about coordinating it. Later when I spoke to the ASAC, he said that he spoke to a person that he knew was on the JTTF and that person said that he wasn't aware of any part time JTTF members. Therefore, it doesn't look like it will happen. Note: *The thought of the ASAC speaking to some person on the JTTF and not the JTTF's supervisor is unusual, especially since I am aware the ASAC communicates directly with that supervisor.* Note: *The BLM ASAC has in the past spoke critically of the FBI JTTF supervisor.* Additional Note: *Previous to this, the BLM TMU (the unit which a BLM SAC commanded) had been allegedly conducting sensitive and controversial surveillance on Constitutionally protected activities without any policy safeguards in place. It was apparent that other agencies, to include the FBI weren't simply allowed to conduct this type of intelligence gathering without adhering to their policies.*

On November 3, 2016, at approximately 9:23 a.m., a BLM SAC sent out on article titled "Oregons radical rural right – How the right-wing Patriot movement is organizing throughout Oregon's rural communities," by Joanne Zuhl (originally dated October 11, 2016).

EOR0219

On or about November 9, 2016, I had a conversation with a BLM ASAC, in the presence of another BLM SA in the parking lot of the BLM Idaho State office at approximately 10:15 a.m., in reference to the support provided by other agencies to include the Federal Protective Service (FPS). During this conversation, the BLM ASAC called the supervisor a Pu$$y.

Also, on or about November 9, 2016, in the presence of another BLM SA, I again informed the BLM ASAC that he should identify yet another co-case agent in the investigation regarding Cliven Bundy. The ASAC responded that he wasn't going to talk to me about this. I repeated this notification to the ASAC when I understood the ASAC was dismissive. Note:

. Additionally, as more and more conduct issues were revealed or reported to me and when I in turn spoke with, or reported the conduct to the ASAC, our relationship became more and more stressed. When I spoke to the ASAC about issues I discovered in my investigation, the ASAC was dismissive and our relationship grew more and more stressed. To me, it seemed that the ASAC attempted to bully me into not scheduling medical procedures and keeping my mouth shut about agency and possible exculpatory case issues and to do what he tells me to do without question. Additional Note:

Additionally, I indicated to the BLM ASAC that I was growing more and more uncomfortable with circumstances surrounding this investigation and our agency. Note: *I further informed the BLM ASAC that due to the circumstances of the investigation and continued issues that I believe are not resolved in the agency, I would begin looking for another position.*

Therefore, since the ASAC doesn't feel like he can do it on his own, he needed to identify yet another co-case agent from BLM to assist in any tasks surrounding trial and trial preparation. Note: *This is following many repeated attempts to get assistance in this investigation.* During this conversation, the BLM ASAC seemingly dismissed my requests and ignored my conclusions. Additionally, the ASAC dismissed the idea of the agents and officers that told me were interested and available to help. When assistance was finally authorized (over the past two years and 10 months), I was given an assistant with little experience in the BLM and each time they either quit, left the agency, or simply didn't do their assignments. When I requested specific individual, who had shown an interest in assisting, the BLM ASAC would tell me things like they are too strong willed, or they don't take direction well. Also Note: *The witnessing BLM SA is a fine person. However, it should be noted that he is a very close personal-friend to the BLM ASAC and the godfather to the BLM ASAC's daughter.*

Sometime shortly thereafter (I think around November 10, 2016), a BLM SAC asked me to speak with him in private in his office. During this conversation, the BLM SAC told me it would be "disastrous" for the agency and investigation if I left and asked me to please come and speak with him before I made any decisions like that. The BLM SAC was very polite during this conversation. Additionally, during this conversation I told the BLM SAC that I must do what I think is the right thing and I'm not going to do something that I think is wrong. I told the SAC that I'm not going to be bullied into doing what I believe is wrong.

Around November 15, 2016, I had a discussion with the BLM ASAC in my office in regard to the above issues.
(For specific background on that discussion, please see the email titled "A few important points from our recent conversation," dated November 16, 2016, at approximately 1:18 p.m., and my response email titled "Re: A few important points from our recent conversation," at approximately 6:28 p.m.)

71

On or about November 16, 2016, at approximately 1:18 p.m., I received an email from a BLM ASAC in reference to above mentioned discussion. After I received this email, the BLM ASAC came to see me in my office. The BLM ASAC told me that he needed to "**protect himself**." The BLM ASAC also stated that he spoke to Human Resources (HR) about me and seemed to indicate HR helped him construct the referenced email. (Please see the email titled "A few important points from our recent conversation," dated November 16, 2016, at approximately 1:18 p.m.) Note: *After reading the below email, it was clear to me the BLM ASAC didn't disclose to HR the context or relevant content of our previous discussions, investigative case and agency issues, or my serious medical issues.*

For ease of review, the content (minus the names) is enclosed:

"We recently had a conversation on November 14, 2016, that covered many topics during a two hour period. I don't intend to summarize all the conversation, but some of the topics were:

• We discussed your willingness to complete future job duties related to your role as the case agent on the Gold Butte investigation. You stated that you agreed to continue working in your role as case agent and as the BLM's lead investigator on this case for as long as you are employed in your current position.

• I stated that you don't have the flexibility as an employee to select which job duties you will and will not perform, and you agreed to perform all duties as assigned by me including Gold Butte case agent duties for as long as you work for me.

• You also indicated it is your desire to apply for other jobs within the federal government and that you may proceed with these external job pursuits after a medical procedure that you might schedule in Spring of 2017.

• You expressed your desire to identify another special agent to start learning the Gold Butte case to assist with current trial preparation and to help work this case into the future. I informed you that I had already initiated that process.

Again, this is not intended to summarize everything we talked about. It only captures notes on a few of the important points as a record for both of us.

Thanks, and I appreciate your work"

Also, on or about November 16, 2016, at approximately 6:28 p.m., I replied to the ASAC's above referenced email as well as the discussion the ASAC and I had in my office following the email. Please see my response email titled "Re: A few important points from our recent conversation," dated November 16, 2016. Note: *Following this email, I didn't receive any additional correspondence from the ASAC. The ASAC only politely told me that the email helped him see issues from my point of view.*

For ease of review, the content (minus the names) is enclosed:

"Thank you XXXX. I know you and many others appreciate this work. I wish I could do it even better.

You are right, these are some of the topics we discussed. At this particular meeting we also discussed many other issues that are critical and that I believe should be part of the record for both of our memory's. Did you happen to tape this conversation for the record? (I am okay if you did as it helps prepare notes.) Also in previous conversations, we discussed pertinent issues that are important as background information.

Please note that just for clarification, I can't inclusively say that I will perform all duties given by you my supervisor. Just for clarification, I can't perform immoral, illegal, or actions prohibited by policy. I know you didn't mean that, I just wanted to clarify for the purposes of this documented response.

72

I submit this email as response to your email and conversation with HR.  This situation is very serious to me.  I know it is serious to you as well.

If you haven't already done so, I request you keep XXXXXX and XXXXXX apprised of our conversations.

Please know that I respect you professionally and like you as a person.  I will try to look at issues from your point of view as I hope you will try to look at things from my point of view.  I hope we can move forward, but until we get this off our chests, I feel there will be friction.  If we can't professionally and hopefully friendly move forward, please let me know.  I know it will take some time to digest this lengthy email.

As I discussed with you in our meeting, I request assistance on this very important investigation.  Until this meeting, I had no idea that you had requested additional assistance.  It was something we just briefly talked about on many occasions, but I never understood that you decided to actually request the help for me.  It seemed like every time I brought the issue up you were dismissive.

Had you requested this assistance prior to our discussion the previous week?

If so, when and to who did you request to get us some help?  Was the request confirmed as authorized by higher headquarters?

Just as a talking point, each and every time someone quit the team, it implied to me that we needed a replacement.  I relied on you to get that replacement.  The mere fact that I can keep my head above water doesn't imply that I am excelling or succeeding.  Each and every time someone quit the team, I (mostly) with assistance from you picked up the workload.  We pushed forward, but it could have/should have been better.  Hey, at least we made it happen.  Understand though, it could have been better and more comprehensive from my end.

As you may recall, from BLM Director XXXXXXXXX on down, I have been told many, many times that if I need anything to please let them know.  Well, I have requested assistance from you on many, many occasions over the past two and a half years after our whole investigative team quit (one after another).  I didn't feel it was necessary or right to make those requests over your head, after all it was going okay, right.  (not to me) I know now that I should have been more forceful and more clearly articulated the case's need for additional manpower.  This was clearly a communication failure on my end (one of many).  I know you are supportive during conversations.  You see, if you (or I) wait until you (we) absolutely need help, then you (we) have already failed in your (our) mission.  In order to be successful in an endeavor, you need to "worst case scenario" forecast that potential manpower shortage and plan for it.  Because I could keep my head above water and complete (with some very limited temporary assistance-except with some considerable assistance by you at certain points in major projects) many projects such as the report/supplemental of investigation (330 exhibits-25,182 words), eight search _____ the prosecution teams 90,000,000 email review project, 5,000+ audio file review project, camera footage review project, 222 supplemental item turn in research, documentation, and item capture, schedule Las Vegas interviews, prepare a "one stop shop" comprehensive document as requested by the prosecution team (85,894 words to this point), suspect point/defense point of view/counter-argument research, etc, it doesn't mean that I will be able to keep up tomorrow and I feel like I could have done a better job then.

I need a co-case agent, preferably one that lives less than 700 miles away from the venue as I do.  Once XXXXXXXX left the team (although he was and is very helpful), XXXXXXX quit the team, XXXXXXX left the team, XXXXXXXX (understandable-he had important Oregon duties) left, XXXXXXX left, to XXXXXXX left, I have felt alone with the exception of your help on large projects and external/higher coordination.  The problem is that I need more help than that.  I need a co-case agent.  I feel I am, or soon will behind and loosing my attention to detail which leads to errors.

You have been a great partner as it relates to complex/long-term tasks and significant higher headquarters and partner agency coordination, but I am generally alone in the basic case research, the "good to have" trial prep, and administrative and logistical requirements of this very long term/complex conspiracy investigation.  I don't want issues to fall through the cracks or errors to exist.  I need a dedicated co-case agent that lives near the venue to assist and that can ultimately take over local administrative responsibilities on this investigation.  You see, I am not really a case agent if every time I have a need/request the person that is assigned that tasks just hands me more unanswered questions and problems.  Where is the initiative?

73

EOR0222

{MEDICAL ISSUE DELETED} I am unsure as we speak of what will be necessary and what, if any footprint it would have on this case.  I hope to have a better understanding in a couple of weeks.  We need to keep that in the back of our minds regarding planning.  Since then, other medical issues that need to be checked into have also arose.

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

I have not put in for promotions or other jobs within this agency because I didn't want to risk not being available for this investigation.

I have not put in for temporary promotions and many details because of the negative impact it could have on this case.  Instead, I told you that I am open to going to any details as you see fit if you must fill the slot or a need arises such as Cottonwood Idaho during the 4th of July weekend and ROAM 2016.

Please also keep in mind the circumstances surrounding this very complex, long term complex conspiracy investigation.  This case is the first and by far the largest of its kind undertaken by the Department of Interior and it is the largest case in terms of evidence volume ever undertaken by the FBI.

Back in May of 2014, immediately following my security detail at XXXXXXX house, in a telephone call, XXXXX asked me if I was available to commit for 90 days of intense case work down in Las Vegas.  I gladly said "yes."  In Las Vegas, an area approximately 700 miles from my home, at the request of you and XXXXX, I gladly said I would be the case agent and lead investigator for this complex case for the team even though I was the most junior agent on the team and I was 700 miles from my home and family.  Please keep in mind this requires very considerable travel (in the past and scheduled for the future-more so than other agents) and a scope of duty that is above my pay grade and in line with a job description of senior/lead special agent.  However, that doesn't matter and until now I haven't brought it up, but please keep that in mind.  Please also keep in mind that as the case agent, I had numerous individuals working "for" me that were above my GS level and virtually all my team were above me in pay step.  I only bring that up so you are aware.  I am not complaining or requesting a desk audit of my duties for the past two years+ or my future projected duties.  However, it is of noted importance when combined with the frequent and on call required travel associated with this case.

This past travel, projected future travel (mainly for trials), and work load stress has been harmful to me and my family, but this case is critically important.  Even with all this travel and unprecedented case work load, I volunteered anytime I thought help was needed in other areas, cases and if training was offered I took it so I could be a better asset.  Please note that upon my return from training, I developed professional courses of instruction for our officers/agents.  When I submitted those training packages for review, I couldn't even get any comments, suggestions, or guidance.  Please also note my casework on other events/cases to include my mining related fraud, ARPA, property theft, and armed career criminal investigations.

You told me I offended you in my statements regarding your justifiable distractions.  I am sorry and that certainly wasn't my intention.  I have much professional respect and personal affection for you.  Sometimes I do a poor job of articulating and explaining myself.  I obviously failed in our conversation last week and likely even this email.

I know you have honorable and justifiable distractions.  I am not complaining about those.  I am simply requesting assistance and identifying the need for a more traditional co-case agent, not my boss that has other competing duties.

We have had a few other issues of stress in our relationship such as the ones I have previously explained to you, but I felt like I could talk to you about them.  Those issues do however effect our professional relationship.  I think we can continue to work through them, but they should be addressed, as they are relevant to this topic and I want to eliminate that stress.

I can see that the potential exculpatory material that we discussed with the prosecution team causes you great stress and creates friction in our relationship, as it may be potentially embarrassing to some employees/our agency.  It causes me stress as well.  When we talk about them, I fill you give me the look of "I wish he would just be quite."  XXXXX, I can't not mention those things and pretend they don't exist as they are an unlikely but

74

potential threat to successful prosecution. We have to move forward from that and inform the prosecution team of any potential embarrassing exculpatory issues (true of false) or credibility threat (as we are doing), so they can prepare a rebuttal. As potential witnesses, we (and others) need to prepare a rebuttal. The prosecution team also needs to understand any potential issues during their witness prep sessions and threat of non-verbals by the witnesses during cross examination. It shouldn't cause our relationship stress. It is for the betterment of the case, the right thing to do, and required. We are doing fine on this (I think and hope), but in our telephone conversation with XXXXX, XXXXXX, and XXXXXX when I discussed many of these unvetted matters, I felt abandoned when you (knowingly or unknowingly) gave the impression to me and likely the team that you generally didn't know what I was talking about. You were a part of many of the conversations, told me personally some instances, or had heard many if not all of those same allegations. I felt abandoned by you in this regard.

The discussion about officer safety and investigative tactics as well as an individuals leadership qualities and apparent protected status has brought some stress in my opinion, but I think you agree with me on those.

Additionally, when law enforcement within our agency spoke cruelly and dehumanized some of our subjects, you didn't correct them. They should have enough respect not to talk that way, especially in front of potential witnesses that will need to testify that we and our agency are professional and unbiased. What do we say if that question gets through? Remember the video you showed me. I feel that was bad form. Some of our LE even emailed and texted dumb stuff that could call into question our agencies (and our) personal bias. This is just another hoop that we don't need to jump through at this point and we need to nip this in the bud. These are often great people that just had a small lapse in judgement (as we all do), but as a supervisor please stop those actions when/if encountered in the future (I would like rather testify that you or other stopped those issues rather than nothing additional was said). We as an agency need follow-on training and a reminder to our officers on matters such as these (possibly a good in-service subject).

The individual charges are something I feel strongly about as well. As we spoke before, I feel a better strategy might include a reconsideration and superseding indictment as well as additional consideration for a plea strategy. If you agree, please bring this up as I already have. (Note: *This is in response to a previously briefed prosecution strategy of not giving the jury the ability or option to convict on lesser offenses and acquit on the more serious offenses. Additionally, this was in reference to not offering plea agreements to Bundy family members and also takes into account the Oregon Malheur Trail verdict form October 27, 2016, when occupiers were acquitted.*)

Also when I take leave (use/lose), I perceive that although you are great and super supportive, it makes you nervous. That is why I try to come back early each and every time, call and check in, check messages everyday, even to the point of driving one hour out of my way to participate in team calls (that were rescheduled time, and many times again). This is why it is important for us to get that help. When you tell me that you or no one but me could do this investigation at this point, that is a problem. You never know what the future will hold and either of us through no fault of our own may be unavailable during the most critical times in this investigation/court.

_____ . I just want to mention this as a point.

A couple of months ago you mentioned to me that you have personal issues (we won't get into them here) and that you are unsure of your availability for the case during the trial periods. You even briefly discussed a sort of trial rotation between me and you for trial. That is perfectly understandable, especially after the initial six to eight week trial, but what if I am unavailable then as well. Then we fail as a team. We can't let that happen. That is why we need to identify help early. When you told me that XXXXX said he would get us some help and possibly cover for some trial periods and you told him it had to be either one of us, I couldn't believe it. We need that help and we need it early, even if they are underutilized and bored at first. I should have strongly argued that issue with you at the time but I didn't because I didn't want to creat additional stress in our relationship.

When you told me how you were greatly disappointed in me and lost respect for me, all I could think of is that I was the only and most junior investigator in the agency and I said I would gladly help and at your request take the lead in the most complex, far reaching, and significant case the Department of Interior has ever undertaken, even though it is 700 miles away from my home and family and I have done that for over two and a half years now. How many people much more senior to me and our and other agencies quit or refused? You and I are

75

the only ones that stayed on. I signed up for 90 days and still two years and seven months into this I am going strong every day. Again, this is a great cause of stress for me and my family, but I have been okay with that. We have accepted the likely hood of threats and violence against me and my family (since I authored so many critical documents). I volunteered to go to Las Vegas for extended periods of time and even report to work at the FBI office. I even moved my family from the highly desirable area of XXXXXX to XXXXXXX (a good city in its own regard) for the **primary purpose** of working side by side with you (my co-case agent) so this case can succeed. I failed to sell my house for many months and subjected myself to two mortgages. Why? For this case and because it was the right thing to do. I go to work everyday and give 100% and will keep doing so as long as I live, whether with this agency, another agency, or in another career. I hope you also understand that I am heartbroken over your response, but I do understand that I could have and should have articulated my position better.

When we spoke about my ability to put in for other positions and promotions, you indicated that it would be detrimental to the case and no one else could pick up for me. I then reminded you of all the past BLM Case Agents, the FBI Case Agents and assisting investigators, the prosecution team substitutions, and frankly all those that quit. You told me that is different and that you can't help it if they have weak supervisors. (I won't elaborate on that for the purpose of this document.) Can't you see that I want to help and at much great sacrifice I continue to want to help and solely bear the majority of the burden. When we see that trial will take 3-4 months each rotation and there are at a minimum of three to four rotations of trial in Las Vegas with 1-3 months in between, surely you can agree with our need for help and my concern for my family, my health, and my career. Is this worth impact to such a extent when we have two agents in Las Vegas, many Rangers, and other agents in an easy driving distance? Can you justify that in your heart? You have told me in the past that some agents just aren't up to the task or won't help and that is an issue for their supervisors. So instead of helping them get up to the task, I feel like you are trying to intimidate me into just keeping my mouth shut for the next 2+ years, after I have already worked so hard for the past two years and seven months.

There is also tension in the office because I don't eat a long lunch very often or hang out and talk beyond pleasantries. I am very sorry about that. I know we have a bunch of people here that are great that I would like to get to know them better. I treasure any interaction I have with XXXXX or our of the office. With that and other reasons, I just can't justify that time a this point. I hope you understand.

When I don't go out to eat with the crew in Vegas, it isn't because I don't like them, but when there is so much profanity, drinking, and loud obnoxious talk (even about our case), I find it very challenging to deal with. I know you do as well. Honestly, I have great respect for some of the worst offenders. It is just not my personality.

I hope we can move forward from here. If we can't, we need to come up with another solution with input from our supervisors. Whatever happens, I want you to know that I appreciate you personally and professionally. Now hopefully you see this situation from my point of view.

I will forward this email to my personal account for a record and keep a hard copy. I am not planning on forwarding up the chain of command or to the prosecution team (no BCCs), but please fill free if you desire.

Please think about this and if you see fit, clarify my professional reputation with XXXXXX, XXXXX, and HR if need be.

Being a leader is hard isn't it. There are so many times I wish I could go back and do something/handle something differently as a leader in the Marine Corps or my past LE positions. I think about right now I have what it takes to be a pretty good Marine Private or a junior game warden and very little else. I have a lot to learn. Hey, I guess showing up is the biggest hurdle.

Thank you for your time and sorry for this lengthy email. I felt like I needed to explain some issues and frankly, get them off my chest. Have a good night and rest easy. I hope we can put this behind us. If not, let's come up with a respectful solution and part ways on good terms.

Respectfully,"

On November 17, 2016, at approximately 5:01 p.m., I sent a BLM ASAC an email titled "Email Material that We Might Want to Make The Prosecution Team Aware Of." I reference to the suspected ==very degrading photoshopped photograph of Ryan Bundy holding a giant penis in front of the sign that reads "The West Has Now Been Won," from April 12, 2014.== It came to my attention this photoshopped photograph was likely available on BLM's email system and potentially subject to FOIA, the Litigation Hold, and Discovery. Note: *This degrading email was not located in the pre-Discovery email review. It is possible this email didn't make the word search criteria, or it was erased.* Additional Note: *A BLM SA told me about this email and it was clear to me that my chain of command knew about it.*

Sometime in this timeframe (October, November, or December 2016), I specifically remember a conversation between a BLM SA (who was a reporting party in reference to the BLM OLES supervisory misconduct and cited in my supervisor's follow-up report) and a BLM Information Technology Specialist, in which this SA (a potential Bundy Trial Witness) turned his old government cell phone when he received his new government issued cell phone. This conversation occurred sometime in the late Fall of 2016, in my presence in the office that I shared with the BLM SA. At the time, I thought it was unusual that the BLM SA asked and then confirmed a couple of times with the BLM Information Technology (IT) Specialist that his phone (which would contain any photoshopped text messages that portrayed the Cliven Bundy/Gold Butte Trespass Cattle Impound misconduct would be completely "wiped" (erased) from his old government issued phone).

On or about November 28, 2016, I attended an interview of a XXXXXXX in which members of the prosecution team a BLM ASAC and an FBI SA were present. ==In this interview, the group was notified of what I believe are massive issues regarding a BLM SAC.== Note: *In additional to providing additional information, the subject in the interview alleged the BLM SAC unlawfully removed evidence and threatened serious bodily harm on the ASAC and his family.* Additional Note: *My supervisor was present during this interview and follow-on meeting.* Further Note: *There should be an FBI-302 interview report available.* Also Note: *These issues include in part, the BLM ASAC informing the investigative team and prosecution team that a BLM SAC had basically threatened his life and threatened physical bodily harm on the BLM ASAC and the BLM ASAC's family if or for reporting the BLM SAC's wrongdoing. The BLM ASAC went on to say the BLM SAC told him this situation has caused him to lose his identity as a BLM SAC and has caused the BLM SAC to not be able to see his daughter.* Please Note: *Due to the statements by the BLM ASAC, I left the meeting with the understanding that the BLM ASAC told higher headquarters BLM OLES management, but I am doubtful if these instances were ever reported to the DOI Office of Inspector General or the BLM Office of Professional Responsibility. I base this belief on the fact that well after this disclosure, the lead prosecutor was still strongly considering using this BLM SAC as the star trial witness, I heard the BLM SAC was still employed by BLM, I didn't notice this reported instance in any Henthorn/Giglio review, there was no public disclosure of this instance by DOI OIG on their website, and that BLM OLES members of management seemed very protective of this BLM SAC.*

On or about November 29, 2016, at approximately 9:00 a.m., a BLM ASAC and I had a meeting with staff at the BLM Southern Nevada District Office, located at 4701 N. Torrey Pines Drive, Las Vegas, NV 89130. (Timeline Talking Point) During this meeting, a senior member of BLM civilian management stated that President Obama at the urging of, and as a retirement present to Senator Harry Reid was going to designate the Gold Butte Area as a National Monument as a final finger in the eye and F-you to Bundy.

On December 6, 2016, I received a $1000.00 Performance Cash Award and a Superior Performance Rating (SF-50 Notice of Personnel Action dated November 25, 2016-award recommended by a BLM ASAC on October 19, 2016). During this timeframe, a BLM ASAC told me that he didn't put in another BLM SA for a cash award.

The award justification stated the following: "Special Agent     bears the heavy burden of serving as the case agent for the Gold Butte investigation in Nevada which is now in its third year. Every day     works hard on various tasks and assignments from the attorneys at the Las Vegas U.S. Attorney's Office which are leading up to criminal prosecution of several defendants who assaulted our officers in April 2014. He performs at a very high level and continues to accomplish his case work with speed and excellence. When he has experienced brief periods in between Gold Butte case work he has found time to go on two uniformed details, one national detail and one local detail in Idaho. On several occasions he has supported other BLM agents and law enforcement rangers in their case work which is a great example of teamwork. He has a personal interest in researching active shooter incidents. He developed a thorough training package on active shooter response and delivered it to Idaho BLM officers. He also made these training materials available for other officers to use."

On December 7, 2016, I received an email from a BLM GIS/Mapping Specialist titled "Re: Possible Helpful Information." This email stated the following: "This project is not complicated. It is rudimentary, at best. I am just waiting on information. I will not use any of XXXXXXX XXXXXX information because it is garbage. I will not have my name associated with information that I know is amateurish, incomplete and incorrect. Especially, since there is a good chance, it will be used in a court of law. If XXXXXXX XXXXXX wants so badly to do it, then let her do it." (Timeline Talking Point) Note: *The meeting from January 24, 2017, at the U.S. Attorney's Office in which this individual indicated the prior government surveys of the land in question were "criminal."* Additional Note: *This email is an example of the ever-decreasing cooperation within the agency.*

At some point in this timeframe (I think around December 8, 2016), A BLM ASAC told me that a BLM SAC took some sort of very long-term family leave possibly due to the stress he experienced on April 12, 2014, before he was going to get in some sort of trouble. Therefore, it is unknown if he is willing or available to conduct witness prep or even testify in court. Note: *During a conversation about this issue a BLM ASAC stated "That was smart."* (Reference an email titled Fwd:    witness prep." dated October 27, 2016, at approximately 4:26 p.m., from a BLM ASAC to the BLM OLES Deputy Director and a BLM SAC.) Additional Note: *This SAC is openly known to be "the key" and most important witness in the entire case.* Further Note: *The BLM ASAC went on to say that although the BLM SAC is deemed to be the case's star witness, the BLM OLES Director could testify in place of the BLM SAC. The BLM ASAC told me that the BLM OLES Director was there and participated in all the pre-impoundment planning and was co-located with the BLM SAC during impoundment operations.* Also Note: *I came to believe that the BLM OLES Director likely knew or should have knew about the BLM SAC's misconduct and recklessness.*

December 9, 2016, a series of emails were exchanged with the assigned BLM Gold Butte Co-Case Agent. (Timeline Talking Point)

At approximately 10:17 a.m., in an email titled chain titled "Checking In," this BLM SA wrote in part "Honestly, I haven't read anything yet. I do plan on speaking with XXXXX (his supervisor/a BLM ASAC) in great length about removing me from this assignment as I feel it is not productive to have me working on this case for many reasons.....I know that came off bad as sometimes emails or texts can but please understand my frustrations are not directed at you, just the situation." Note: *This email is an example of the ever-decreasing cooperation within the agency.* Additional Note: *This individual had been assigned to be the BLM Gold Butte Co-Case Agent since November 2016, as arranged by a BLM ASAC. This individual was informed that his only priority was to assist in the Cliven Bundy/Gold Butte Investigation. His only assignment was to read the primary identified casefile documents. However, by December 9, 2016, he hadn't read any of the documentation and instead focused his attention on other issues.* Further Note: *Please also reference the voicemail from my office phone line dated December 9, 2017, at approximately 6:28 p.m., in which this Special Agent indicated the responsibility of being the*

78

*Co-Case Agent kind of "freaked him out."* Also Note: *I have respect for, and like this individual. I think he had the potential to do an outstanding job in a much needed and appreciated role. Additionally, he was physically located in Las Vegas, Nevada, and along with another Special Agent seemed to me to be best options for assistance.*

On or about December 12, 2016, at approximately 9:58 a.m., just before a scheduled conference call (that discussed whether the BLM should turn over the Gold Butte Trespass Cattle Impound Administrative Operations Plan to trial defense teams), prior to other participants joining in, I overheard a BLM SAC tell a BLM ASAC that another BLM employee failed to turn over required discovery material. Note: *Based on what I could understand from overhearing a portion of this conversation, I believe the BLM ASAC was referring to text messages.* Additional Note: *I walked in on this portion of the conversation just after returning to the restroom. I came to believe that I wasn't meant to hear that portion of the conversation between the BLM SAC and BLM ASAC.* Reference an email titled "Re: Call with Steve XXXXX," dated December 12, 2016, at approximately 8:42 a.m., by a BLM SAC. In the email, the BLM SAC stated: "You guys available for a call with XXXXX and XXX? I will set up." Also reference an email invitation from a BLM SAC to the conference call on phone line (877) XXX-XXXX, on December 12, 2016, at 9:03 a.m. Further Note: *This call in was made by a BLM ASAC on 208-373-4023.* Also Note: *Since before the Fall of 2016 (when the severe issues with the BLM SAC became more and more apparent and damaging to the aforementioned case and the BLM), this was the first time I had heard from this particular BLM SAC, even though he was the SAC tasked with overseeing the Cliven Bundy/Gold Butte Nevada Investigation for the DOI and I was the Case Agent/Lead Investigator for the DOI and I specifically requested on November 16, 2016, for the BLM ASAC to keep the BLM SAC up to date on the issues with the problematic BLM SAC. It should also be noted that this BLM SAC was friends with the problematic BLM SAC. To date (as of October 6, 2017), I haven't heard from this particular BLM SAC.*

Additionally, on December 28, 2016, I received an email from a BLM ASAC titled "Re: Statement by the President on the Designation of Bears Ears National Monument and Gold Butte National Monument. The enclosed comment stated: "Not surprised, but there's nothing like dialing up the heat on an already hot situation." Note: *The Timeline Talking Point from November 29, 2016.*

In early January of 2017, I spoke with a former BLM ASAC who recently transferred to the U.S. Fish and Wildlife Service (USF&WS). In the conversation, this individual, now a Special Agent (SA) told me that the BLM SAC was a reason he decided to leave the BLM. This SA also said indicated that the BLM SAC is so arrogant and uncaring that he actually sends photographs of his own feces to his co-workers. This SA further indicated that the BLM SAC has tried to push BLM Law Enforcement to be more militaristic and attempted to put some of his agents through sniper school. This SA finally indicated that he tried to inform his superiors, but they wouldn't listen and eventually his situation became unbearable. Note: *Following this conversation, I informed a BLM ASAC of the individual's comments. The BLM ASAC stated "I bet he did have a lot to say."*
Later in this timeframe, a BLM SAC told me that the BLM ASAC's decision to leave the BLM at this critical time in the agency's history tells a lot about the character of the former BLM ASAC.

In January 2017, a BLM ASAC directed me to type "Attorney Client Privilege" on the Gold Butte Timeline of Events. I informed the ASAC I was uncomfortable with typing that on the document since the document didn't really meet that criteria. Therefore, I typed "Internal Law Enforcement Work Product" instead.

On January 5, 2017, at approximately 10:59 a.m., myself, a BLM ASAC and other members of the Cliven Bundy/Gold Butte Investigation and Prosecution Team received an email from the lead prosecutor titled "Jencks Review." This email contained an attachment titled "Master.Witness.List.1.5.17.pdf." Note: *This attachment was the current Master Witness list for all trials. I was listed as a trial witness.*

Additional Note: *This email also indicated that the lead prosecutor completed the Jencks review and contained direction from the lead prosecutor to let him know if we disagree with any of the decisions/reviews/disclosure or whether we think he missed anything.* Further Note: *Although it was previously clear to me that a BLM ASAC hadn't appropriately made agency issue related disclosures to the prosecution team, I was fairly sure that after our conversations he would start appropriately doing so in the future.*

On January 13, 2017, at approximately 7:38 a.m., an email was sent out by a BLM SAC titled "article." This email contained a link to a Men's Journal article titled, "Neil Kornze the Man Cementing Obamas Public Lands Legacy," by Abraham Streep.

Also, during this timeframe, a BLM ASAC told me about another BLM SA that was giving a formal presentation in Portland, OR, in reference to sovereign citizen and militia ideology (or something along those lines). Note: *The BLM ASAC continually has stated this agent has a high opinion of herself and seemed to have some sort of a personal issue or resentment toward this BLM SA. Ultimately, the BLM ASAC told me the BLM SA was told to not give that presentation and that she was mad (or something like that).*

On or about Tuesday, January 24, 2017, while at the U.S. Attorney's Office, located at 501 S. Las Vegas Blvd., Las Vegas, NV 89101, on the ninth floor in the Gold Butte Investigative Team (GBIT) working room, the lead prosecutor was commenting on the scope and the number of internal investigations and allegations regarding a BLM SAC. During these comments, the lead prosecutor indicated that he didn't see how the case can successfully move forward without the BLM SAC as the star witness. I in a joking way, the lead prosecutor said something like "Sure, we don't need the BLM SAC." Note: *However, it was clear that the BLM SAC was the primary and most important witness.*

Also, during the conversation, the lead prosecutor (now the Acting U.S. Attorney for the District of Nevada) mentioned to me that one of the BLM Supervisory Rangers had serious issues, would be a poor witness, and something like he was "<mark>defective</mark>." Note: *I believe this was in reference to the April 6, 2014, arrest of Dave Bundy and this BLM Supervisory Ranger's subsequent interviews with the Prosecution Team and the FBI.* I attempted to make it clear that the law enforcement staff knew very little except the Bundy's made it clear that they would stop the impound by "whatever means necessary" and BLM SAC 's direction was to go out there and "kick Cliven Bundy in the teeth (or mouth) and take his cattle and "not take any crap from anyone." I told this prosecutor that the BLM SAC's leadership example was literally a textbook example of how not to act and that it was clear to me that the BLM SAC's ego played strongly in the April 12, 2014, "Stand-off."

The lead USAO's Prosecutor asked me if I thought the BLM Director of OLES was involved (criminally) with the BLM SAC's actions. I told him that I don't think so and that I hadn't seen anything to make be believe that.

Additionally, I followed the lead prosecutor to his office to do another task (as I recall I attempted to help him locate some bit of specific information on his DOI/BLM Case Hard Drive). While in the lead prosecutor's office in response to the conversation about a BLM SAC, I told the prosecutor that I am starting to believe that ego did lead to a heavy-handed approach, which in turn contributed to the incident on April 12, 2014. Additionally, we spoke about subjects of the investigation (both suspects and non-suspects). The prosecutor told me that if he told or taught his son to go out and break the law or do something crazy like Cliven Bundy told and taught his children, his son would tell him to "go to hell." I told the prosecutor that from my upbringing, I believed and obeyed my dad (generally) and my children believe and obey (generally) me. In this conversation, I told the prosecutor that I have some compassion for them and that they simply believe what they do, due to the way they were raised. We also spoke

80

about the detention of two of the individuals and I mentioned to the prosecutor that all the information I reviewed, didn't indicate a propensity to violence and that they appeared to be stable members of their community and I indicated to him that I didn't understand their detention. Note: *I have been previously specifically told by this prosecutor that he wants and values my personal opinions, so when appropriate, I respectfully gave them to him as requested.*

Note: Also, *on or about January 24, 2017, while at the U.S. Attorney's Office in the lead prosecutors work space, the lead prosecutor told me that had it not been for the armed stand-off and assault on Federal Officers on April 12, 2014, the only person that would have been charged in this case would have been Ammon Bundy for his actions on April 9, 2014.*

Also, on or about January 24, 2017, a senior staff member and prosecuting attorney at the U.S. Attorney's Office shook the hands of myself, another BLM SA, and a BLM ASAC and stated something along the lines of get these "shall we say Deplorables." Note: *This event took place in the late afternoon of the U.S. Attorney's Office, located at 501 S. Las Vegas Blvd, Las Vegas, NV 89101, in the downstairs lobby.*

At some point during this timeframe I spoke to a law enforcement supervisor that was part of the U.S. Park Police's (USPP) Special Event Tactical Team (SETT). I asked that officer if he ever consulted with a BLM SAC prior to the decision to arrest Dave Bundy on April 6, 2014. I asked that question due to the USAO's previous direction not to make arrests and since Dave Bundy wasn't committing a violent act or in the active process of disrupting operations. Dave Bundy was simply standing on the shoulder of a public road and filming with his iPad. I thought it was unusual to decide to make a federal probable cause arrest under those circumstances. (Especially when the U.S. Attorney's Office had previously time after time directed there to be no arrests (even just before this incident) and even indicated that Federal Employees should seek to diffuse any conflicts, even if that meant shutting down operations for the day or taking alternate routes around protestors). I especially thought it was likely that this Supervisory Officer would have gotten permission or otherwise would have been directed to make the arrest since Dave Bundy was considered a higher profile subject and family member. In response to these questions, the Supervisory Officer told me that although he can't remember, it is unlikely that he would have authorized that arrest without talking to the BLM SAC. Note: *I believe cell phone records could potentially confirm the USPP SETT Sergeant spoke with a BLM SAC (unless the conversation was on an un-recorded or deleted radio transmission).* Additional Note: *My conversation with this USPP Sergeant would be documented in my phone records and the USPP Sergeant's phone records.* Further Note: *Following this conversation, (the next working day-I think), I informed the BLM ASAC of what I learned.*

On or about January 30, 2017, a Public Release version of an Office of Inspector General (OIG) Investigation titled "Investigative Report of Ethical Violations and Misconduct by Bureau of Land Management Officials was posted. Note: *It is recommended that this report be read in full.* Additional Note: *It is my opinion from what I discovered that this report represents merely a small drop in a huge bucket.* Further Note: *This investigation indicated that a BLM SAC violated ethics rules in reference to the Nevada Burning Man Event in 2015 and a hiring process for a friend. The investigation also noted that it was reported that the BLM SAC stated that "he owned" the BLM OLES Director and as a result no action could be taken against him. The investigation further stated that it was reported the BLM SAC said that "You know, if you don't side with me, grenades are going to go off and you'll get hit" and the BLM SAC bragged about ruining the reputation of a subordinate and indicated to another subordinate that the BLM SAC would ruin the career of that subordinate if she did anything against him. Also Note: Please note the following articles: Deseret News Article titled "BLM agent in ethic probe threatened retaliation: 'Grenades will go off'" by Amy Joi O'Donoghue and dated February 1, 2017 and an article for AZ Central.Com, titled "BLM misconduct probe may derail Bundy Ranch Standoff trial," by USA Today Network Reporters Jenny Kane and Robert Anglen, dated February 2, 2017.*

81

Also, time and time again during this investigation, I heard vocal frustrations by BLM Law Enforcement Employees that indicated the BLM SAC just had to make the law enforcement presence at the "Burning Man" Event bigger and bigger each year. Note: *There as an open assumption and speculation by BLM Law Enforcement Employees was this was simply to feed the BLM SAC's ego.*

During this timeframe, I received a call from a former member of BLM Law Enforcement supervisory staff. This member knew that I was the Gold Butte/Cliven Bundy Nevada Case Agent. This individual told me that he had previously spoke with BLM Law Enforcement Senior Staff and that everyone knew what kind of person the BLM SAC was, yet they kept letting him get away with things and promoting him.

On February 2, 2017, at approximately 1:45 p.m., I received an email titled "HR 621 and 622" from a BLM SAC. (See Email titled "HR 621 and 622," dated February 2, 2017, my associated responses, and the follow-on text message received after the email exchange.) This email included an article titled "Following Pressure from Sportsmen, Bad Public Lands Bill Abandoned" and also indicated that Utah Congressman Jason Chaffetz announced the decision to abandon H.R. 621.

I decided this was a good time (due to the rapidly approaching trial) to request my management go on the record (through email) with a stance on why BLM Law Enforcement is not following the letter or the intent of the Federal Land Policy Management Act of 1976/43 United States Code (USC) 1733 (c) (1). I had requested this clarification many times from my supervision, two times from the U.S. Attorney's Office and once from a DOI Solicitor. Note: *It was exceeding clear to me that no one was willing to give me a defendable reason and every BLM Law Enforcement Management Official I asked felt uncomfortable and talked around the answer.* Additional Note: *My impression was that the BLM Law Enforcement Supervisory Staff had no idea why the BLM wasn't following the law, didn't want to have to answer that question themselves under oath, and were hoping that myself or any other BLM witness would simply "wing" an answer on the stand.* Since I was the DOI Case Agent and likely a trial witness, I felt it was my duty to get a justifiable answer (that was hopefully vetting by the U.S. Attorney's Office and/or the DOI Solicitor's Office) that I can use to help prepare myself and the other BLM witnesses for trial testimony. Note: *It is my belief that the U.S. Department of Interior (Secretary/Deputy Secretary of Interior) aren't aware of, and haven't authorized the BLM to not follow the letter and the intent of the Federal Land Policy Management Act of 1976/43 USC 1733 (c) (1).*

For ease of discussion, the following portions of emails are included below:

**From Me: February 2, 2017, at 2:49 p.m.**

I know this issue can weigh in our minds and influence future plans.
Hopefully cooler heads will always prevail and we will keep those lands public and always open to activities such as hunting, fishing, and other sustainable activities. I am glad to see that organizations such as the BH&A and others understand that need. Outreach to groups and individuals like these is a great idea.
When it comes to BLM law enforcement authority (and that proposed legislation) and our primary enabling law (FLPMA), I am very, very concerned that as an agency we are not following the letter or the intent of the law. The arguments that I have heard on why as an agency we don't, and haven't followed the law just don't hold up.
Is this concerning to you, or do you think I am wrong?
Do you know of any effort or plans to bring us into compliance after all these years?
I believe this is BLM law enforcement's Achilles heel.
If you haven't heard of any coordinated effort to address this pending future issue, I ask that you bring it up at the next appropriate time to the leadership team. I know it is an unpleasant topic and it's mere mention leads people to believe you are disloyal, but in my humble opinion, to not follow the law and its intent isn't the right thing to do. I believe it is actually simple.

EOR0231

Since I discovered this issue as the Bundy case agent, it has bothered me. Once I finished the Report of Investigation (ROI) and Supplemental Report of Investigation and completed the necessary follow on tasks, I literally took potential defendant arguments and sought to disprove them. This was one of those issues that I uncovered.

I am also concerned about our law enforcement program moving further and further from its mandate. I understand why we are doing it, but I believe we must be careful and it must be temporary.

I don't want to portray or pretend that I am educated or smart enough to know and fully appreciate the big picture, but I am concerned that every BLM LEO may lose their job due to this and that our natural resources will lose one of their primary protectors. I understand this issue is ammunition to BLM law enforcement's adversaries. When it comes to this, I believe, that unfortunately they have a point.

Sorry about the long email. I just wanted to offer you some food for thought from the perspective I gained as the Bundy/Gold Butte case agent/lead investigator. Since taking this role, I have appreciated it's great importance, but at the same time learned that as a law enforcement program, we can literally be our worse enemy.

Thanks for your time. I hope this email doesn't come across like I am trying to lecture. I feel that as a leader you will at a minimum appreciate my view point and knowledge I gained in this case, even if you happen to disagree.

If you ever want to talk about this or anything else, I am willing and available.
_____. I should also be in all next week and then starting a rotation to Las Vegas after that.

Thanks again and have a good evening and rest of your week.

**From a BLM SAC: February 2, 2017, at 4:14 p.m.**

When you are feeling better please take the opportunity to review the attached Deputy Solicitor's Opinion dated July 31, 2012. I've also attached a powerpoint produced by United States Attorney John Huber for your reference. You've raised some additional concerns and I'd be happy to discuss them when you are back from leave. Please coordinate a good time with ASAC XXXXXX and we'll get together and have a productive discussion.

Talk to you soon,

Note: *The Deputy Solicitor's Opinion dated July 31, 2012 and the presentation by U.S. Attorney John Huber didn't address my concerns and I had previously reviewed them. It was only through my participation as the Case Agent/Lead Investigator for the Cliven Bundy/Gold Butte Nevada Investigation that I found out that there are no contracts that are required in 43 USC 1733 (c) (1) in Nevada, Utah, Alaska, Washington, Oregon, or Idaho, as well as likely nationwide. Additionally, I came to believe this non-adherence to the law wasn't authorized by the Department of Interior.*

**From Me: February 2, 2017, at 5:01 p.m.**

Thank you. I look forward to talking and visiting with you.

I sure hope those opinions hold water. As soon as I can, I will read up on them.

Maybe their opinions will justify what appears to the layperson (like me) to be in conflict with both the letter and stated intent of the law (FLPMA). The apparent differences in the law and our general LE structure/practices have been brought up as a concern by several senior individuals in our agency when I asked their opinion. I'm not saying I'm correct, I hope I am not. I am just saying I'm concerned and just in case, the worse case scenario (for our officers and program) turns out to be correct, my concern is that there is a contigency plan moving forward.

Please don't think the purpose of my email was to be argumentative or disrespectful. I feel that by the unusual formality (_____ ASAC XXXXXX) in your email, you may be irritated. I hope that isn't the case. I just thought you may value my perspective as the Bundy Case Agent. I know you have encouraged us to speak freely and thus offer our perspective in the past. Anyway, thank you for keeping the team up to date as to the potential litigation out of Utah. I wanted to offer some thinking points to you from my perspective. Have a good evening. I look forward to talking with you soon.

EOR0232

Note: *The email reply from the BLM SAC was unusually very formal. Previously, I was advised by a BLM ASAC that my respectful nature and formality with those in positions of authority over me made them uncomfortable and they were trying to nurture a more open environment. As a matter of fact, prior to this I can't remember ever being referred to as SA or _____ or hearing the BLM ASAC ever being referred to as ASAC or Assistant Special Agent-in-Charge XXXXXX by this BLM SAC.*

Also Note: *Following this email exchange, the BLM SAC replied back to me by text message instead of email.* (Please also see the Text Message dated February 2, 2017.) Further Note: *Prior to this, we were informed that after two days, Verizon text messages were no longer available or subject to recall on the Verizon server and after that, the only record exists on the sender/receiver's mobile device.* Additional Note: *I believe this may have been an attempt to avoid a response that could be considered "on the record."*

On February 2, 2017, at approximately 5:14 p.m., I received a text message from the BLM SAC as a reply to our previous email exchange. This text message stated in part the following: "Don't over analyze the email. I value your opinion and look forward to a discussion."

On February 2, 2017, at approximately 5:46 p.m., I replied to this BLM SAC's text message, by follow-up text message with the following: "Thanks for the text. I have a bad habit of over analyzing texts and emails. Additionally, I hoped not to appear to be disrespectful or argumentative. I am one of the world's worst at thinking I explained myself clearly only to find out I didn't. I just wanted to be sure you didn't take it the wrong way. Thanks"

On or about February 3, 2017, at approximately 10:15 a.m., I met with the BLM SAC and BLM ASAC in the BLM SAC's Office (located in the BLM Idaho State Office) in order to further prepare for the pending trial and elevate and document my concerns that the BLM's Law Enforcement Office is violating both the letter and intent of what is considered the BLM's primary enabling statute, the Federal Land Management Policy Act (FLPMA)/43 United States Code (USC) 1733 (c) (1), and issues I have learned as the Gold Butte Lead Investigator and Case Agent.

During this meeting, I laid out the reasons that I believe the BLM wasn't following the letter or intent of the law and other severe issues that I discovered as my role as the Case Agent/Lead Investigator for the Gold Butte/Cliven Bundy Investigation. I attempted to explain to the BLM Supervisory Agents that the justifications offered to me on why the BLM had the latitude to not follow the letter and intent of the law and why in my opinion those justifications wouldn't stand up in court. I also attempted to explain to the BLM Supervisory Agents that DOI Deputy Solicitors Opinion (dated July 31, 2012) and United States Attorney John Huber's Power Point Slides didn't address the concerns that I am informing them about. During my explanation of my concerns, I was politely cut off several times as I tried to explain myself. Note: *The BLM SAC told me if the DOI Deputy Solicitor's Opinion and U.S. Attorney John Huber's Power Point Slides didn't answer questions then he "can't help me." I told the BLM SAC that the opinion and in the Power Point Slides didn't address my concerns and that they aren't talking about same issue.*

One of the Supervisory Agents told me had had somewhere he needed to be and that he didn't "want to get into a big thing" with me about this. One of the Supervisory Agents told me that he thought that I was trying to get him on the record for Freedom of Information Act (FOIA) requests due to the content of my emails words. I indicated back to the Supervisory Agent that I did want to document the response, because I haven't been provided what I think is a satisfactory answer. Note: *I believe that simply not "getting into" direct questions under oath and on the witness' stand as well as joking told that individuals with more experience in the agency and an expert in the field "are on vacation that day," "fake a stroke and fall over," or "the law just isn't well written" aren't real answers.*

84

Additionally, since I had previously spoke to the BLM ASAC on several additional occasions about these concerns, felt I had to now include the BLM SAC (see above). I also requested additional training and guidance for our employees in regard to potential discovery and the litigation hold in reference to the greatly damaging and widespread unprofessional/unethical actions I had noticed time after time in reference to the investigation.

During this conversation, I was politely told by a BLM SAC "stay in your swim lane," "your choices are to continue on or to find another job," and "it appears you are running some sort of internal investigation." In reference to these supervisory comments, I responded to supervision that I have additional choices besides (keeping quiet) continuing on with the case or finding another job. I politely told the BLM SAC and BLM ASAC that I have the additional choices of initiating an Office of Inspector General (OIG) investigation or contacting my congressman. I then told the BLM Supervisory Agents that I didn't want to do that. The BLM SAC in the presence of the BLM ASAC sharply asked "is that a threat." I then told the BLM Supervisory Agents that I don't want to get anyone in trouble or "win a battle only to lose the war." I told them that I simply want a justification as an official talking point on why the BLM isn't offering any law enforcement contracts to local officers to enforce Federal Laws and Regulations on Federal Public Lands as it states in FLPMA "shall" be done with the intent of "maximum feasible reliance" on those local officers (not Federal Officers/Agents) to enforce Federal Laws and Regulations on Federal Public Lands. Following this, the BLM SAC asked the BLM ASAC was comfortable with the law and his authority and jurisdiction. The BLM ASAC replied that he was "comfortable." I then was prompted to go through specific answers to case and FLPMA related questions as if I was asked these questions under oath at trial. I came to believe that the BLM Supervisory Agents weren't happy with my answers. At some point in this meeting, the BLM SAC told me I should have done more research before I took a job with BLM.

When I told the BLM SAC about my previous conversation with one of BLM          former ASAC's and about the potential gross supervisory misconduct that the former BLM ASAC said that          was involved with and the former BLM ASAC's statement that he tried to correct the misconduct, but no one would listen, the BLM SAC simply indicated that the former BLM ASAC quit and that he abandoned the BLM during a rough time in our history. Note: *It was clear to me that the BLM SAC (WG) in essence said that the BLM ASAC was a traitor and a quitter.* Additional Note: *It was clear to me that the meeting was over at this point. Before leaving, I asked the BLM SAC to please elevate my concerns to the BLM OLES Director and that I would like to talk to him about the issues.* Further Note: *Had I not been the Case Agent and Lead Investigator for the Cliven Bundy/Gold Butte Nevada Case, I would likely have never discovered the BLM's lack of adherence to the FLPMA/43 USC 1733 (c) (1) and it is very doubtful that I would have discovered and otherwise been exposed to the other misconduct related issues.*

Note: *I my supervision failed to give me any guidance or alleviate any of my concerns about what I believe is a knowing and willful violation of both the letter and intent of our primary enabling law. Additionally, I needed to personally prepare to testify under oath about the BLM's authority and jurisdiction as well as dispute claims that the BLM is not following the law itself. I also anticipated the need to prepare other BLM law Enforcement Officers and Agents to testify as well.*

Additional Note: *On **many** occasions, I have requested clarification and specific testimonial guidance and talking points from my supervision, senior level Bureau law enforcement officials, and other more experienced officers/agents in regards to my apparent discovery and belief that the Bureau's Law Enforcement Office is violating both the letter and intent of FLPMA by not offering or negotiating **any** contracts to local law enforcement officials and thus failing to meet the letter of the law and view and intent of achieving "maximum feasible reliance upon local law enforcement officials in enforcing such*

EOR0234

*(Federal) laws and regulations." I perceived all of the reasons that were given to me by my supervision
on why the BLM decided not to follow the letter and intent of the law didn't in my opinion hold up.*

Those reasons were the following:

Local Law Enforcement (generally speaking, sheriff's offices, but would also include state law
enforcement officials such as game wardens) wouldn't even want the ability to enforce federal laws and
regulations on federal public lands even if it was offered due to the politically charged nature of some of
the federal laws and regulations. [I believe the law is clear and that the Secretary of Interior, through the
authority and responsibility delegated to the BLM Director and then to the BLM Director of the Office of
Law Enforcement and Security is required to specifically offer contracts to local law enforcement
officials the view and intent of achieving "maximum feasible relience" upon local law enforcement
officials to enforce federal laws and regulations relating to federal public lands. Additionally, a major
factor in any law enforcement program is individual officer and prosecutor discretion depending on the
circumstances around the alleged violation.]  Note: *My research indicated that **the BLM doesn't offer
any contracts to local law enforcement officials** to enforce federal laws and regulations on federal
public lands.*

I was also told that neither the BLM nor the individual local and state departments would send their
officers to a long and expensive training course at the Federal Law Enforcement Training Center
(FLETC) in Georgia and that in order to be empowered to enforce federal law that is what would need to
happen. [**My experience indicated this was a false assumption.** In my experience as a State Game
Warden, most of us were Deputized U.S. Fish and Wildlife Agents for the U.S. Department of Interior,
we didn't undergo any additional training at FLETC. Additionally, as a Special Agent for the U.S.
Department of Justice (DOJ), Drug Enforcement Administration (DEA), I worked daily with federally
deputized Task Force Officers (TFOs) that enforced federal laws without attending specialized training at
the federal training academies at FLETC or Quantico.]

When I asked supervisors and senior agents for advice regarding this issue, I was "don't get into that on
the stand," "stay in my swim lane," "the law (FLPMA) is written poorly," "I'm not available to testify
that day," "I'm on vacation that day," and "You should have did more research before you took this job."

Note: *I did significant research before taking this position. The only way I found out about this issue was
when I began the background research into the apparent friction that a BLM SAC experienced when he,
without notice apparently withdrew law enforcement cooperative agreements for search and rescue and
other functions from all the sheriff's offices in the whole state of Utah due to some sort of personality
dispute. Although it sounds similar, even these former contracts weren't for the enforcement of federal
laws and regulations on federal public lands as FLPMA requires and therefore doesn't speak to FLPMA
requirements. Additionally, in general a person would need to be an employee in an agency and for a
specific reason, such as trial preparation, thoroughly research the particulars of an enabling statute.
Basically, if I didn't work at BLM and had not conducted thorough research as part of my testimony and
trial preparation, I wouldn't have never known that as an agency, we aren't offering any contracts for the
enforcement of federal laws and regulations on federal public lands as required by FLPMA.*

Additionally, I asked specifically to speak with the Director about this and was turned down. I was also
aggressively questioned by a BLM SAC and ASAC on what I would personally say on the stand if I was
specifically asked about my concerns. Following this questioning, the BLM ASAC stated he was
comfortable that the BLM is following FLPMA and that he didn't want to get into another long
discussion about it.  Note: *In the above-mentioned discussions, the issue I brought up about the BLM not
offering local law enforcement contracts to enforce federal law on federal public lands with the view of
achieving "maximum feasible reliance" were talked around and never addressed.* Additional Note: *It*

86

*wasn't the SAC or ASAC that had previously testified in Federal Grand Jury (FGJ) and it was very
unlikely that they would be called to testify in any portion of the trial.*

Furthermore, when I attended the required Introduction to Resource Protection (IRP) Training Class in
Boise, Idaho from June 27, 2016, to July 1, 2016, the instructors completely avoided the Federal Land
Policy and Management Act/43 USC 1733 (c) (1) the "shall" offer and "maximum feasible reliance"
language and skipped out of order to 43 USC 1733 (c) (2) to the "may authorize" language of the Act.

Also, I asked for clarification and an opinion from the lead prosecutor around approximately the summer
of 2015, and on October 14, 2016, and never received a response.

In my opinion, it was a given that our officers would be on the stand at trial and asked these questions.
However, I was unable to get any appropriate talking points or reasonable answers from my supervision
regarding this topic. My supervision generally refused to get into a productive discussion and attempted
to avoid going on the record with a specific answer. My immediate supervision also apparently didn't
forward my requests for clarification up the chain of command or the higher-level supervisors refused to
go on the record about the issue. Instead, I was simply given pre-existing presentations and opinions that
didn't address the issue that the BLM doesn't offer **any** contracts to local law enforcement officials to
enforce federal laws and regulations on federal public lands with the view of "maximum feasible
reliance" on those individuals to enforce federal laws and regulations on federal public lands.

Note: *This issue was troubling to me. My research, as a matter of my trial preparation indicated that the
Office of Law Enforcement and Security within my agency is simply failing to follow the letter and intent
or "spirit" of our agency's law enforcement enabling statute the FLPMA/43 USC 1733 (c) (1). I also
came to believe that our parent department, the U.S. Department of Interior was likely unaware of this
non-adherence to the law by BLM Law Enforcement Management. I also noted that many others within
my agency shared the same concern and that higher-level BLM Law Enforcement Management didn't or
couldn't provide answers when they were politely and respectfully asked. Instead, they tried (knowingly
or unknowingly) to confuse the question, dismiss the concern, simply choose not to answer the question or
go "on the record," or simply became defensive or indicate that we shouldn't worry about it. My
research further indicated that this matter was likely to come up in court through testimony under oath.
In an effort, (with due diligence) to prepare myself and other BLM Law Enforcement likely witnesses, I
attempted to get an agency approved and DOI Solicitor vetted and accurate talking point so that if we
were questioned under oath, we could truthfully answer any questions. Simply put, I felt Law
Enforcement Management within our agency owed us a better answer than besides "just don't get into
it," "on vacation that day," "not available that day," "fake a stroke and fall over," "stay in your swim
lane," "the law just isn't well written," or "the law is problematic."*

*Additionally, during this same time-period, there was a Congressional movement to significantly curtail
or take away my agency's role in land management/resource protection law enforcement through
Congressional Resolutions.*

Additional Note: *To get an idea of how these questions weighed on the minds of our officers and the
ever-increasing tensions, you may want to reference the following emails as an example: Email titled
"Fwd: From Greenwire—INTERIOR: Agency 'strongly opposes' GOP bid to disarm federal agents,"
dated June 21, 2016, at approximately 12:42 p.m., by a BLM SAC, Email titled "Re: FW: Chaffetz
Introduces Land Management Bills| U.S. House of Representatives," dated January 25, 2017, at
approximately 1:38 p.m., by a BLM ASAC, Email titled "FW: Utah Congressman proposed legislation,"
dated March 8, 2016, by a U.S. Forest Service Special Agent, Email titled "Fwd: House Bill HR 622:
Termination of Law Enforcement on Fed Lands," dated February 10, 2017, at approximately 3:02 p.m.,
by a BLM Water Rights Clerk, Email titled "article and audio link," dated February 8, 2017, at 3:32*

EOR0236

*p.m., (in reference to eliminating Fed LE on Fed public lands) by a BLM SAC, Email titled "article," dated February 8, 2017, at 11:37 a.m., by a BLM SAC (included an article link titled "Sportsmen aim to derail Chaffetz bill to cut police units," by Jennifer Yachman.*

Also Note: *Please read and understand the associated and relevant code separately. However, for ease of discussion the following is provided:*

On October 21, 1976, President Gerald Ford signed the Federal Land Management Policy Act (FLPMA) into law. **Note:** ***This legislation enabled the Secretary of the Interior to authorize Federal personnel (BLM Agents and Rangers) to carry out law enforcement responsibilities with respect to public lands and their resources. The authority of BLM to enforce Federal Law and Regulations on the public lands originate in the Property Clause of the U.S. Constitution.*** Note: *43 USC 1733 (c) (1) states in part, "When the Secretary (Secretary of the Interior) determines that assistance (from the FBI) is necessary in enforcing Federal laws and regulations relating to the public lands or their resources he shall offer a contract to appropriate local officials having law enforcement authority within their respective jurisdictions with the view of achieving maximum feasible reliance upon local law enforcement officials in enforcing such laws and regulations." "The Secretary shall negotiate on reasonable terms with such officials who have the authority to enter into such contracts to enforce such Federal laws and regulations." "In the performance of their duties under such contracts such officials and their agents are authorized to carry firearms; execute and serve any _____ or other process issued by a court or officer of competent jurisdiction; make arrests _____ or process for a misdemeanor he has reasonable grounds to believe that the person to be arrested has committed or is committing such felony; search without _____ or process any person, place, or conveyance according to any Federal law or rule of law; and seize without _____ or process any evidentiary item as provided by Federal law." 43 USC 1733 (c) (2) states in part "The Secretary (Secretary of the Interior) may authorize Federal personnel or appropriate local officials to carry out his law enforcement responsibilities with respect to the public lands and their resources. Such designated personnel shall receive the training and have the responsibilities and authority provided for in paragraph one of this subsection.*

Note: *Separately in 43 USC 1733 (d), the Secretary of Interior is authorized to cooperate with regulatory and law enforcement officials in any State or political subdivision and that cooperation may include reimbursement for expenditures incurred in connection with activities which assist in the administration and regulation of use and occupancy of the public lands. This is in reference to the co-operative deputy program in which local law enforcement is contracted with to enforce state and local laws on Federal Public Lands, search and rescue contracts, and dispatch service contracts.*

43 USC 1733 (d): "In connection with the administration and regulation of the use and occupancy of the public lands, the Secretary (of Interior) is authorized to cooperate with the regulatory and law enforcement officials of any State or political subdivision thereof in the enforcement of the laws or ordinances of such State or subdivision. Such cooperation may include reimbursement to a State or its subdivision for expenditures incurred by it in connection with activities which assist in the administration and regulation of use and occupancy of the public lands."

**Additional Note**: *My research and training at the BLM's Introduction to Resource Protection Class indicated that the language "When the Secretary determines that assistance is necessary"-see below, refers to assistance by the Federal Bureau of Investigation (FBI). This is in reference to a March of 1974 event in which BLM Director Curt Berkland contacted FBI Director Clarence Kelley to request assistance in the enforcement of the Wild Horse and Burro Act. During this discussion, FBI Director Kelley informed BLM Director Berkland that the BLM needed its own enforcement personnel. Thus, BLM Director Berkland saw the need to establish a BLM law enforcement program and after that, the*

88

*Federal Land Policy Management Act of 1976/43 United States Code (USC) 1733 became
law. (Reference the article titled "A Long Tradition of Federal Resource Protection" by Steven Martin
located at www.blm.gov/wo/st/en/info/history/sidebars/law_tradition_of.print.html*
**Further Note:** *My research has indicated that in regards to the Federal Land Policy Management Act of
1976/43 United States Code (USC) 1733 (c) (1), the Secretary of Interior has delegated the authority and
responsibility to negotiate such contracts to the Director of the BLM, who then delegated it to the
Director of BLM OLES, and so on.*

Also Note: *The article "A Long Tradition of Federal Resource Protection" by Steven Martin previously
located the BLM.gov website was no longer available on the BLM website as of October 3, 2017.
Additionally, information corroborating this was seized from me on February 18, 2017 (see the 2014
Gold Butte Trial Prep Timeline and circumstances surrounding the search of my office and seizure of
items from me on February 18, 2017, located in this document for more information).*

The Federal Land Policy Management Act of 1976/43 United States Code (USC) 1733 (c) (1) states in
part "When the Secretary (of Interior) determines that assistance is necessary in enforcing Federal laws
and regulations relating to the public lands or their resources he (Secretary of Interior) **shall offer** a
contract to appropriate local officials having law enforcement authority within their respective
jurisdictions with the **view of achieving maximum feasible reliance upon local law enforcement
officials** in enforcing such laws and regulations. The Secretary (of Interior) **shall negotiate** on reasonable
terms with such officials who have authority to enter into such contracts to enforce such Federal laws and
regulations."

I believe that due to the perceived failure of current BLM management to comply with both the letter and
the intent of the Federal Land Policy Management Act of 1976/43 United States Code (USC) 1733 (c)
(1), the local law enforcement jurisdictions (specifically Sheriff's Departments) are being denied funding
through the lack of contracts to enforce Federal laws and regulations and response times to calls for
service or crimes in progress are slowed simply due to a numbers and coverage issue. For instance, a
typical deputy or game warden makes approximately $30,000.00 to $50,000.00 per year, when a typical
full performance BLM Law Enforcement Ranger or Special Agent often makes more than $100,000.00
per year. That means you can fund 2-3 local law enforcement officers for the price of one BLM Ranger
or Special Agent.

During this timeframe, the BLM ASAC again seemed to virtually quit working. It seemed that he was
trying to overload me on trial prep to the point of making me fail. I believe this was indicative of
whistleblower retaliation. Note: *I would be happy to elaborate on this point further. Email coordination
traffic should give evidence of this point. Please note the following: Long lunches, long workouts,
Federal Fridays, "You can love your job, but it won't love you back," "Family First," "Work from
home," "I'm not working any LEAP (law enforcement availability pay) today," etc.* Additional Note:
*For corroboration please reference email traffic during this timeframe. Please specifically reference the
following email: Email titled "Re: Subpoena Served," dated February 8, 2017, at approximately 3:53
p.m.* Further Note: *Please also reference the scribbled, messy note on yellow paper the BLM ASAC gave
me to document his case activities (believed seized). It should be noted that the BLM ASAC was my co-
case agent and received a large award for his activities in the co-case agent position (I would like to
address this further). It should also be noted that the BLM ASAC specifically wanted the assignment of
liaison and coordination with outside agencies and higher level DOI supervision.*

Also, during this timeframe, it seemed the BLM ASAC was more freely talking in a very unprofessional
and non-flattering way about subordinate BLM employees and more and more seeming to talk down to

EOR0238

me. This included speaking derogatory about a particular victim that was frightened by the encounter he or she had in reference to the 2014 Gold Butte Trespass Cattle Impound.

Additionally, I noticed that two BLM SACs failed to respond to emails regarding hard-drives I prepared for them.

On February 3, 2017, at approximately 3:36 p.m., a BLM SAC, a BLM ASAC, and I received an email titled "Trial Team Security" that indicated the BLM OLES Deputy Director has requested a morning and evening text message security and safety check-in. At some point following the receipt of this email, the BLM ASAC told me that he wasn't going to check in and out with anyone and although he sees some value in an evening check out, he wasn't going to let the author dictate what he will do. One of the things the BLM ASAC kept mentioning was that "You won't be able to swing a dead cat without hitting a TMU agent. (Timeline Talking Point) Note: *I decided that I would gladly check in with the Trial Team Security Supervisor for both me and the BLM ASAC (when we were together) as directed in the email.* Additional Note: *I know from experience that when anyone, including higher-ranking individuals fail to check in as directed on higher risk operations, it requires the security supervisor to attempt to contact each individual person that failed to check in and worse-case scenario, initiates emergency procedures to physically verify the safety of the individual.*

On February 7, 2017, at 1:38 p.m., a BLM ASAC sent me and cc'd a BLM SAC an email titled: "RE: HR 621 and 622." The talking points of this email did not address my concerns. **My concern is that my investigation indicated that** <mark>BLM OLES isn't offering any contracts to local law enforcement to enforce Federal Laws and Regulations on Federal Public Lands as required by FLPMA.</mark> The "maximum feasible reliance" part is a separate issue. **My contention is that BLM Law Enforcement is knowingly and willingly seeking to circumvent the law in order to not contract for Federal Law Enforcement with local law enforcement, specifically Sheriff's Departments.** Additionally, in this email the ASAC referenced a retired BLM Deputy Chief's opinion from his book titled "Seldom Was Heard an Encouraging Word" (Available-which also mentions the same issues). Note: *Please note the final sentence in the below email* "As always, SAC XXXXX XXXX remains committed to continuing a successful law enforcement service contract program with sheriff's offices throughout Region 2." (This is not the issue in question and specifically does not address the required "maximum feasible reliance" contracts as referenced in 43 USC 1733 (c) (1) to enforce Federal Laws and Regulations with respect to Federal Public Lands by local law enforcement officials as required by law.) Additional Note: *This email did however attempt to specifically reference the "maximum feasible reliance" language that indicated that local law enforcement officials should be used to the greatest extent possible to enforce Federal Laws and Regulations with respect to Federal Public Lands and an attempt by the state of Utah to hold the Department of Interior to that intent through HB 155.*

<mark>My investigation has indicated the law enforcement service contracts are a "Trojan Horse." The contracts are not for the enforcement of Federal Laws and Regulations on Federal Public Lands as required by FLPMA/43 USC 1733 (c) (1). Instead they are for the enforcement of state laws and regulations on Federal Public Lands as well as search and rescue operations.</mark>

For ease of discussion, the following portions of the emails are included below:

**From a BLM ASAC: February 7, 2017, at 1:38 p.m.**

As a supplement to the materials XXXXX provided you, please see the attached documents regarding the State of Utah's challenge to DOI/BLM LE authority in 2013 through HB 155. In summary, the legislators in Utah contended that DOI officers have no authority and that they should be arrested if they perform

law enforcement functions within Utah.  There was a specific proposal in the Utah bill *denying federal LE authority to DOI officers prior to a time when the Secretary of Interior achieved maximum feasible reliance on county LE officials.*  The federal government sued Utah and won, and the state passed a HB 1004 which repealed all provisions HB 155.

I also included a copy of the chapter on FLPMA law enforcement authority legislative history from Dennis McLane's book "Seldom Was Heard a Discouraging (sic:  Encouraging) Word" as an additional reference.  Dennis is a retired Deputy Chief of BLM Law Enforcement and a historian of the early days of FLPMA development as it related to law enforcement.  He has done extensive research into the origination of our law enforcement authority.

Since you stated the issue of the Secretary of Interior's maximum feasible reliance on sheriff's contracts is at the root of your concern, hopefully these reference documents help to alleviate your worries.  Perhaps we can keep these and other references handy as the Bundy/Gold Butte trials progress should some challenge to our authority arise.

As always, SAC XXXXX XXXX remains committed to continuing a successful law enforcement service contract program with sheriff's offices throughout Region 2.

Note: *The information regarding Utah and the "maximum feasible reliance" language didn't address my concern.  Again, my concern was that the BLM wasn't offering any law enforcement contracts to local law enforcement officials in reference to the enforcement of Federal Laws and Regulations in reference to Federal Public Lands and their Resources.  The maximum feasible reliance language is important, but separate and should be understood to be the intent or "spirit" of the law.*

During this timeframe, a member of our civilian staff told me that when members of our law enforcement supervision get to talking and acting obnoxious, she just leaves the room.

On February 8, 2017, at approximately 4:38 p.m., I sent an email titled "GBIT Attorney-Investigative Team Working Documents" to two BLM SACs, a BLM ASAC, and a BLM SA.  This email contained two attachments.  One attachment was titled "2014 Gold Butte Trial Prep Timeline" (which was basically a comprehensive word and timeframe searchable narrative that referenced the approximate 570 exhibits/relevant items, explained the noted chain of events and identified potential relevant witnesses or points of contact).  The other attachment was titled "Witness-Victim List as of 1-20-2017" (which contained up to date contact information for approximately 507 relevant individuals).  Note: *These work products represented basically my last known and implied tasks prior to beginning the first of a series of multiple expected trials.  Although trial preparation is never really complete, at this point I felt that I had completed all my known and implied tasks as the Cliven Bundy/Gold Butte Case Agent and Lead Investigator.*

On February 8, 2017, at approximately 6:07 p.m., I received an email from a USPP Sergeant in reference to Cliven Bundy's claim that he had aiming type lasers pointed at his chest while Bundy was at his ranch.  In reference to a question I asked the USPP Sergeant, the USPP Sergeant informed me that the SETTs are issued TLR-2s for their rifles that had a visible laser capability, but that to his knowledge no SETT member employed the lasers.  The USPP Sergeant also informed me that to his knowledge, the SETT didn't have or employ infrared aiming devices or laser pointers.  Note: *I asked this question in order to provide rebuttal evidence in the event Cliven Bundy makes the above claim under oath in Federal Court. Previous to this, I wasn't aware of any DOI Law enforcement employee being issued or even allowed to utilize laser aiming devices.  My intent was to have the equipment issue documentation available in court*

91

EOR0240

*of each officer that participated in the 2014 Gold Butte Federal Court Ordered Trespass Cattle Impound
to dispute this claim. I believed this was especially important for the SETT due to their close-proximity
operations near the Bundy private property.* Additional Note: *Following receiving this information, I
informed the BLM ASAC, I believe on the next day. The BLM ASAC told me he wasn't worried about it.*

On February 9, 2017, at approximately 4:44 a.m., the Acting BLM Deputy Director sent me and a BLM
ASAC an email titled "Contact Information-XXXXXXXX." This email requested that the BLM ASAC
or I keep one of the Public Information Officers (PIO) up to date on the daily trial highlights, decisions,
key witnesses, and etc., so the PIO can put together a daily briefing paper in order to keep the BLM
Executives informed. (Timeline Talking Point) Note: *Before I received this email, a BLM ASAC told me
that the Acting Deputy Director wanted us to brief the PIO daily, but the BLM ASAC doesn't want to and
the PIO would be better off just keeping up to date with local news outlets.*

On Monday, February 13, 2017, at the United States Courthouse in Las Vegas, a BLM ASAC stated to
me "I want you to know what a good job you are doing." Prior to this, the BLM ASAC told members of
the Prosecution Team "we are just here to help the ball club." Additionally, on Wednesday, February 15,
2017, in the evening, the same Assistant Special Agent-in-Charge indicated to me to not do such a
thorough job because other individuals will come to expect it. Note: *During this timeframe the BLM
ASAC kept thorough notes of the trial, but seemed generally uninterested in doing any other activities to
facilitate the successful prosecution of the case.*

On or about February 13, 2017, a BLM ASAC again told me that although he sees some value in a
nightly check in with a BLM Special Agent charged with a witness security detail, he isn't willing to text
or send them an email in the morning or in the evening as directed because he doesn't feel he should
check in and out with them. (See email titled "Trial Team Security," dated February 3, 2017.) The BLM
ASAC continually stated "You won't be able to sling a dead cat without hitting a TMU Agent."
(Reference emails to the BLM Special Agent charged with the witness security detail dated February 12,
2017, February 13, 2017, February 14, 2017, February 15, 2017, February 16, 2017, and February 17,
2017.) Note: *As a comparison, please check and see what daily (morning and evening) status checks, the
BLM ASAC provided to the BLM Special Agent charged with a witness security detail.* Additional Note:
*It has been my professional experience when someone sees themselves as above personal safety directives
such as this, the only person it hurts is the one officer assigned to get accountability because they can't
end their day until they have 100% accountability. Additionally, in the event that an officer's status can't
be verified, an emergency situation may evolve until that officer has been accounted for.*
Additionally, the BLM ASAC went on to speak in a belittling manner about a BLM civilian employee
(and subordinate). The BLM ASAC indicated that the employee had a huge previous overreaction to the
threat situation in which she insisted a secure workspace be provided for her and others at a hotel near
downtown Las Vegas.

On or about February 14, 2017, Congressman Jason Chaffetz and Congressman Blake Farenthold sent the
U.S. Department of Interior's Deputy Inspector General, Ms. Mary L. Kendall a letter regarding a BLM
SAC allegedly directing the deletion of official documents. (Timeline Talking Point) Note: *In hindsight,
I believe a BLM SAC and a BLM ASAC believed I was providing information to members of Congress
about the BLM and this was a contributing factor that I was removed from my duties as the Case
Agent/Lead Investigator.*

On or about February 14, 2017, at approximately 7:00 a.m., in the front parking lot of the Embassy
Suites, located at 3600 Paradise Road, Las Vegas, NV 89169, I provided a lady that identified herself as
homeless some money. Following this, a BLM ASAC asked me something like "did you make a new
friend." Note: *I took this comment to be unprofessional, rude and condescending toward the lady.*
Additional Note: *However, this same BLM ASAC was the only one that helped me pay for a meal for*

92

*approximately five other individuals that identified themselves as homeless and hungry on or about May 5, 2014, at Famous Dave's Barbeque Restaurant. Therefore, I gave the BLM ASAC the benefit of the doubt that he didn't mean it in the condescending way it came out.*

On Wednesday, February 15, 2017, at the United States Courthouse in Las Vegas, the lead prosecutor (currently the acting United States Attorney for the District of Nevada) initiated a conversation with me by saying "they (the Bundy's and their followers) are like a cult (note their Mormon faith and the multiple questions to me to determine if I was a Mormon – possible religious test), no better than drunks or drug dealers, they're a bunch of racists." The lead prosecutor then specifically asked me "Don't you agree?" I replied that I didn't think so and that in my experience drunks and drug dealers don't often have such a family support network and that I can tell the defendants love their family and their families love them. Note: *This statement was made by the lead prosecutor to me in the court preparation group of rooms in the Federal Courthouse, located at 333 Las Vegas Blvd., Las Vegas, NV 89101, in room 5070 (the first smaller room on your right when you enter room 5070).*

Additional Note and Talking Point: *Reference body camera issues and deactivation.*

Additionally, on or about February 15, 2017, an Assistant United States Attorney (AUSA) questioned a BLM Supervisory District Ranger during trial. In the AUSA's questioning, the AUSA asked the Ranger if to his knowledge, were there any government snipers present during the 2014 Gold Butte Trespass Cattle Impound. The BLM Supervisory District Ranger stated no. Note: *I am making this statement off memory. Please review the court transcript.* Additional Note: *The investigation indicated that there was at least one school trained Federal Sniper equipped with a scoped/magnified optic, bolt action precision rifle, another Federal Officer equipped with a scoped/magnified optic large frame (308 caliber) AR style rifle, and many officers that utilized magnified optics with long range graduated reticles (out to 1,000 meters-approximately 500 meters on issued rifles depending on environmental conditions) on standard law enforcement issued AR type rifles (223 caliber/5.56mm) and that often officers were in "over watch" positions. Additionally, the investigation also indicated the possibility that the FBI and the Las Vegas Metropolitan Police Department had law enforcement snipers/designated marksmen on hand for possible deployment or actually deployed.* Further Note: *I personally previously (over a year ago) briefed the prosecution team regarding this.* Continuing Note: *Per a former BLM ASAC that transferred to the U.S. Fish and Wildlife Service, the BLM SAC has tried to push BLM Law Enforcement to be more militaristic and attempted to put some of his agents through sniper school.* Also Note: *My concern is the possibility that the prosecution utilized an "ignorant" witness to pass the narrative to the jury there were no government snipers present at the 2014 Gold Butte Trespass Cattle Impound. However, I believe it is likely this is a simple mistake and in reference to a Defense assertion that around the time of the Dave Bundy arrest on April 6, 2014, there were government snipers in over watch (which my investigation indicated as false). I can talk more about this later.*

Also, on or about February 15, 2017, a BLM ASAC specifically directed me by telephone to not type out anything for a BLM Supervisory Public Affairs Specialist because too many people will come to expect such an update. (See email titled "Contact Information XXXXXX," dated February 9, 2017, from the BLM Acting Deputy director.) Note: *Prior to receiving this email, the BLM ASAC told me that he didn't think that he or I should have to put together any daily talking point for the Supervisory Public Affairs Specialist and the BLM Senior leadership would be better served to read the daily updates from the Las Vegas Review Journal.* (Reference emails to the Supervisory Public Affairs Specialist on February 13, 2017, February 14, 2017, and February 15, 2017.) Note: *As a comparison, please check and see what emails the BLM ASAC provided when I wasn't at court and interview the BLM Supervisory Public Affairs Specialist in reference to the support provided by me and the BLM ASAC.* Further Note: *The direction to update the BLM Supervisory Public Affairs Specialist was made by the BLM OLES Acting Deputy Director (who is now the BLM OLES Deputy Director). Previously, the BLM ASAC told me the BLM*

93

*OLES Acting Deputy Director was strange and that he just wasn't about fulfilling this directive.* Also Note: *By this time in the investigation, the BLM ASAC had almost completely withdrawn from casework. I came to believe that the BLM ASAC didn't want the precedent set to such a high and thorough standard that he would be held to when I wasn't there to do it for him due to our trial rotation plan.* Please Also Note: *The previous condescending remarks about the BLM Public Affairs ladies that sat around crying during the 2014 Gold Butte Trespass Impound should also be noted.*

Additionally, on Wednesday, February 15, 2017, at approximately 7:00 p.m., inside the lead prosecutor's office at the United States Attorney's Office in Las Vegas, located at 501 S. Las Vegas Blvd., Las Vegas, NV 89101, the lead prosecutor commented to me that still more investigations into a BLM SAC are likely going to come out. Note: *I believe this was in reference to the November 28, 2016, instance when a BLM ASAC informed members of the investigative and prosecution team that a BLM SAC had unlawfully removed evidence and threatened physical bodily harm on employees.*

Later in the evening on Wednesday, February 15, 2017, at the United States Attorney's Office in Las Vegas, located at 501 S. Las Vegas Blvd., Las Vegas, NV 89101, at approximately 8:00 p.m., in the elevator on the way to the lobby and while in the lobby, I had a discussion with the lead prosecutor. The lead prosecutor asked me if I thought he should call a BLM SAC to testify. I told him that I didn't know and that with the BLM SAC's testimony also brings many issues. The prosecutor then asked me what I personally thought about the BLM SAC. I told him that I thought the BLM SAC was a "dirt bag." I told him that I thought BLM SAC 's actions were a text book example of how not to act as a leader. **Note:** *I base this perception on the following allegations allegedly committed by BLM SAC : Sent Photographs of his own Feces to Peers and Subordinates, Sent Photographs of his Sexual Conquest's genitals to peers, the "Kill Book" proudly displayed in reference to people who have committed suicide as a result of a BLM SAC's investigations (see Operation Cerberus Action out of Blanding, Utah and the death of Dr. Redd), the "Failure Rock," Directing Subordinates to Erase Official Government Files in order to impede the efforts of rival civilian BLM employees in preparation for the "Burning Man" Special Event, unlawfully removing evidence, threats of physical harm to employees and family members, possible remarks about sending a message to the Bundy's, remarks about the large Emergency Temporary Closure Area playing into his bluff, Bragging about the number of OIG and internal investigations on him and indicating that he is untouchable, encouraging subordinates not to cooperate with internal and OIG investigations, the reckless manner in which the Gold Butte Federal Court Ordered Trespass Cattle Impound was conducted, egotistical comments about his expertise in running large operations, a reputation of perceived entitlement, and the general way he works and treats his subordinates).*

Additionally, I reiterated to the lead prosecutor that the BLM SAC basically gave his intent to his troops by saying at a briefing "Go out there and kick Cliven Bundy in the mouth (or teeth) and take his cattle" and in private to a subordinate supervisor (a BLM ASAC) a BLM SAC allegedly stated, "I need you to get the troops fired up so go get those cows and not take any crap from anyone." Additionally, in a telephone conversation with Nevada Brand Inspector Flint Wright, a male BLM supervisor and apparent manager (believed to be a BLM SAC) allegedly told Mr. Wright "That's not the message we want to send" when Mr. Wright recommended a soft impound and a civil lien on Bundy's cattle instead of a full blown large scale, confrontational impound. Also, in reference to the massive administrative closure area in Gold Butte, a BLM SAC in an email indicated that the lack of public notification that the area was going to be part of a limited/roving closure for safety reasons, a large closure "plays into my bluff." I told the lead prosecutor those statements speak directly to the defenses' argument that although there were court orders, the BLM was heavy handed due to SAC 's arrogance. I further told the lead prosecutor that I think there is still hope for the BLM SAC and that he is well spoken and a natural leader.

On Thursday, February 16, 2017, in the afternoon at the U.S. Attorney's Office, located at 501 S. Las Vegas Blvd., Las Vegas, NV 89101, in the Bundy Investigation Team Room (I think located on the ninth

94

floor), I was part of a conversation that talked about the benefits versus the risks of calling certain agents and officers to testify. During this conversation, the events of April 6, 2014, in reference to the arrest of Dave Bundy were brought up. I told the lead prosecutor and two assistant prosecutors that I believe based on my research this arrest was likely directed by a BLM SAC in response to problematic email direction that one of the assistant prosecutors gave to a BLM SAC that directed that no arrests be made without prior authorization by that assistant prosecutor and that there was an intent from the U.S. Attorney's Office that no arrests were to be made and no tickets issued. I further told the prosecution team that I base that belief on the emails that I read in the discovery material that indicated irritation by the BLM SAC at the direction not to make any arrests without prior approval from the assistant prosecutor and the intent of having an arrest and ticket free impound operation. Note: *I believe this BLM SAC purposely chose to ignore the direction of the U.S. Attorney's Office (USAO) and decided to order/authorize the arrest of Dave Bundy on April 6, 2014, to specifically force the USAO into action. I base that belief on the combined reading of the associated Discovery emails of this BLM SAC, a discussion with a U.S. Park Police Sergeant, and available audio/video of a prior contact on April 6, 2014, with Stetsy Bundy Cox and others for the exact same issue, in which the U.S. Attorney apparently denied arrest authority to BLM officers.*

Additionally, my review of other evidence indicated that just prior to the Dave Bundy arrest, the assistant prosecutor denied the arrest of Stetsy Bundy Cox and Clance Cox (and officers on the scene in some ways appeared to indicate that it might be okay to stand on the shoulder of the road and film as long as impound operations weren't actually physically impeded). Also, I had heard that the assistant prosecutor was at one point furious at the arresting officer for making the arrest without permission. Furthermore, after the arrest, Dave Bundy was taken to the BLM's Incident Command Post (ICP) and then to Las Vegas to be booked into jail. After some time, Dave Bundy was released with Federal Violation Notices (tickets) and even those tickets were later dismissed.

At some point following this conversation, I asked the lead prosecutor a simple question pertaining to discovery and exculpatory material. I asked the lead prosecutor if it is required to release mere verbal statements made by potential witnesses such as the "Go out there and kick Cliven Bundy in the mouth (or teeth) and take his cattle" and "I need you to get the troops fired up to go get those cows and not take any crap from anyone" to the defense. The prosecutor stated, "it is now" or "we do now." As I looked around the room I noticed two additional prosecutors that weren't generally around when I spoke of these issues with the lead prosecutor. The lead prosecutor stated that he thought those were just rumors. I told him no, they weren't. A key witness confirmed them. Note: *This is an issue that I have kept my supervision up to date on. The lead prosecutor acted as if a BLM ASAC didn't inform him of these discoveries.*

Additionally, just after this meeting, I spoke with a BLM SA (who was present during the meeting) in regard to a BLM SAC (who is the key witness). The BLM SA asked me if the BLM SACs issues were in regard to the prostitutes. I told the BLM SA that I had no idea about that and that prostitutes have never came up before. This BLM SA went on to say that he and the BLM SAC attended the Criminal Investigations Training Program (CITP) at the Federal Law Enforcement Training Center (FLETC) together. This SA told me that while they were in training together, the BLM SAC (who was a SA at the time) bragged about getting to take over a large Archaeological Resources Protection Act (ARPA) case (later known as Operation Cerberus Action-out of Utah). During this conversation, this SA basically indicated that the BLM SAC was promoted way too fast and that the BLM SAC used people to get what he wanted and then discarded them once the BLM SAC had no use for them. This SA specifically referenced several previous BLM supervisors and member of management the BLM SAC allegedly used to gain promotions and influence.

On February 17, 2017, there was a going away party (which included children and non-agency individuals) for a much liked and respected Special Agent in the BLM Idaho State Office in which a BLM

95

ASAC was a speaker. During this party, the BLM ASAC posted photographs of a subject of a previous investigation, identified the subject by name to the audience and made fun of his appearance. Additionally, this individual was openly called something like a "big eared, Dumbo looking, son of a b*tch. (Timeline Talking Point) Please note slide 15 and slide 16 of a Power Point Presentation titled "XXXX going away 2017," dated February 17, 2017, located within the BLM Idaho State Office's "Q" Drive under so-loc-law enforcement-presentations.

Additionally, during this party, the BLM ASAC spoke of a previous time during an attempted arrest operation in a high-risk marijuana grow when he and the BLM SA was attempting to corner a fleeing felon which they believed was likely armed. The ASAC told the audience that he saw the SA walking with his weapon at the ready toward where they believed the suspect was hiding, when the BLM ASAC just couldn't help himself, so he threw an object (I believe he said a large tomato that the ASAC picked out of the garden on site) at the SA and hit him in the side of the face to be funny. Note: *These are other instances of extremely bad judgement by this BLM ASAC and a critical and serious officer and public safety violation.* Please note slide 25 of a Power Point Presentation titled "XXXX going away 2017," dated February 17, 2017, located within the BLM Idaho State Office's "Q" Drive under so-loc-law enforcement-presentations. Additional Note: *This type of inappropriate, unprofessional, and unsafe "horseplay" is addressed in BLM's firearms safety rules. Rule Number 2 states that LEOs (law enforcement officers) will demonstrate good judgement at all times and that undisciplined, careless, or unsafe behavior will not be tolerated. Reference H-9260-3 Law Enforcement Firearms.*

On Saturday, February 18, 2017, at approximately 1:30 a.m., I received an email from the lead AUSA on the Gold Butte Prosecution Team. The email was titled "Re: Retired AUSA XXXXXX XXX says Hi." This email stated the following: "Thanks ⬚⬚ Say hello to XXXXX for me the next tine (sic) you see him. We miss him in the Department. He ⬚⬚ good man. Great picture! S/F XXXXX" Note: *This was the last contact I had with any member of the Gold Butte Prosecution Team. To me, this email contact with the lead prosecutor seemed normal.* Additional Note: *At no time in the course of my duties as the Case Agent/Lead Investigator for the DOI/BLM for the Cliven Bundy/Gold Butte Nevada Investigation did anyone in my management or on the prosecution team ever question or offer any criticism on my professionalism, dedication, or performance. Instead, I was often thanked and a subject of praise and appreciation in reference to my performance and conduct. As a matter of fact, my immediate supervisor, a BLM ASAC would often publicly refer to me, or introduce me as the upcoming or new Special Agent of the Year and the best agent in the BLM.*

On Saturday, February 18, 2017, at approximately 10:40 a.m., I received an email from a BLM ASAC titled "Can you meet later this afternoon?" The email stated: "I need to meet with you today. Can you meet at the office at 4:00 this afternoon?" (See email titled "Can you meet later this afternoon?" dated February 18, 2017, at approximately 10:40 a.m.)

Following the receipt of this email, I called the BLM Assistant Special Agent-in-Charge to see what was going on. He told me that he needed to meet with me and that I needed to be at the office at 4:00 p.m., and that I needed to bring all my Bundy case related material. I again asked why (since this was a day off and I had just returned from Las Vegas the day before and was hoping to spend time with my family). He simply told me that I needed to be at the office and that I needed to bring all my case material. The BLM Assistant Special Agent-in-Charge wouldn't elaborate any further or answer any additional questions.

At approximately 3:45 p.m., I arrived at the office and went into my workspace (a secured office in the building in which I am the only occupant) and I discovered that items were missing from the secured safe and from under and on my desk. I confirmed that at least three hard drives and several notebooks and folders and a box that contained case related materials were missing. It is unknown what unrelated case materials, notes, and personal documents were taken. Note: *These items were taken in an intrusive*

EOR0245

*search from a secured area without my consent and outside of my presence.* Additional Note: *I asked the BLM Assistant Special Agent-in-Charge that if he finds any personal paperwork to include my medical records that he returns them. The BLM Assistant Special Agent-in-Charge told me that he didn't want any of my personal stuff or medical records.* Further Note: *I still haven't heard back if any of my personal items were in the seized materials and I don't know where the seized materials are being stored.* Also Note: *No chain of custody documentation or inventory such as a DI-105 or Form 9260-43 was provided to me to document this seizure.* Please also Note: *I believe this intrusive search and subsequent seizure had nothing to do with simply retrieving the casefiles for future investigative or court preparation use or investigating any suspected wrongdoing on my part. Instead, I believe the purpose of this search and seizure was to take away my ability to specifically reference the discovered alleged wrongdoing in reference to a BLM SAC and the discovered issues within circumstances around Cliven Bundy/Gold Butte Nevada Investigation as well as to remove the emails of that particular BLM SAC that may be of interest to Congress or any internal type investigation. I believe at this point my chain of command believed that I may be a "whistleblower" as well as providing information to Congress. I also believe the seizure didn't use any sort of chain of custody forms, documentation, or receipts of property so there is no official record of what exactly was seized. In short, I believe the purpose of this search and seizure as well as my removal from the Cliven Bundy/Gold Butte Nevada case was an effort to prevent the public discovery and reporting of serious alleged misconduct issues that mostly revolve around a particular BLM SAC and how other management within BLM OLES didn't correct or report the misconduct as required.*

When I went into the BLM ASAC's work space, I was met by the BLM ASAC and the BLM SAC and I was directed to sit down at a table inside the larger portion of the office. When I sat down, the BLM Assistant Special Agent-in-Charge asked for the back-up case related hard drive that I kept in the safe at my residence. I turned over this hard drive to him as ordered. Note: *With supervisory approval, I kept a back-up hard drive secured in a separate area from the original hard drive due to the volume of important files and as a protection in case there was a fire or another situation that made the original hard drive unusable.* Additionally, the Assistant Special Agent-in-Charge stated the following: The acting BLM Law Enforcement Deputy Director (now the permanent BLM OLES Deputy Director) received a telephone call from the Lead Prosecutor (now the Acting U.S. Attorney for Nevada) that "furiously demanded that you (me) be removed from the investigative team" and mentioned something about discovery and exculpatory material and issues that I apparently had with a BLM SAC and the BLM's law enforcement authority (FLPMA/43 USC 1733 (c) (1)). The Assistant Special Agent-in-Charge then told me I was removed from the case. I told the BLM ASAC that I/we should contact the lead prosecutor and get this cleared up. The BLM ASAC declined to contact the lead prosecutor. I further told the BLM ASAC that I had a normal email exchange with the lead prosecutor the night before. The BLM ASAC appeared to be surprised at this statement.

The BLM Assistant Special Agent-in-Charge, then told me my new work starting time was 8:00 a.m. I asked the BLM ASAC if that was to be at my desk or for staring physical training (PT). The BLM ASAC said that was for starting PT. Note: *Prior to this, I had a flexible start time generally of 9:00 a.m. Additionally, although I rarely utilized the "Telework" Option, (which I was signed up and approved for), this direction seemed to indicate that was no longer available.* Additional Note: *A later and more flexible start time was desirable for family and health reasons as well as needing privacy to conduct the vast amount of research on this independent and confidential investigation.* Further Note: *The confidential and private portion of this investigation is something that I would like to talk about in more depth. Specifically, I was directed to conduct an independent and confidential investigation on sensitive subjects. In many cases, it was almost impossible to do that in an office environment with others present. Good people were interested in what I was doing, but they didn't have a "need to know" or they were potential trial witnesses. One common occurrence was to have a civilian contractor (who is very likable and nice) to come into my office and start a conversation to see what I was doing and make small talk. The issue was that I often had case related documents on my desk and that the contractor would walk*

97

behind my desk where he could see my computer screen. When I mentioned this to the BLM ASAC, the BLM ASAC only told me not to worry about it and that the contractor had a "man crush" on a co-worker and did that sort of thing all the time. Additionally, I would find my co-workers and even the BLM SAC (who are potential trial witnesses) had a natural interest in the case progression, but I had a duty to keep case related matters as confidential as possible. This made for some uncomfortable situations. Also Note: I can further explain this if there are any questions.

The BLM Assistant Special Agent-in-Charge then directed me to turn in all my case related notes that were contained in my personal calendar. Note: I kept notes in my personal daily planner because I routinely kept it with me when I was away from my desk. When I received a case related call or given a task when I was away from my desk (which happened routinely), I simply wrote it down as a "to do" item or wrote myself an important note. Additionally, I kept talking point material within easy and quick access if I thought I was going to be asked about a particular item on short notice. I kept these notes with full knowledge and acceptance of my supervision. Additional Note: I don't believe these notes weren't turned over as part of a judicial discovery procedure, but only at the insistence of the Assistant Special Agent-in-Charge. The BLM Assistant Special Agent-in-Charge then questioned me as he took notes. Note: In front of the BLM SAC, the BLM ASAC questioned me on statements in reference to the BLM SAC that I had previously briefed him on in depth. As the BLM ASAC asked the questions, he appeared to act like this information was new to him.

The BLM ASAC also wanted me to confirm that I would turn in all case related notes and materials and aggressively questioned me to find out if I had ever audio recorded him or the BLM Special Agent-in-Charge during discussions. I replied that I hadn't. The BLM Assistant Special Agent in Charge then asked about two specific occasions, one from around November 16, 2016, and one from around February 3, 2017 (see above). The BLM Assistant Special Agent-in-Charge stated that I had leaned in close during the discussions and he believed I may have audio recorded him. The BLM ASAC also questioned me on if I had ever talked to the media about anything I learned in the investigation. (I also believe the ASAC specifically questioned me to see if I had spoken with any members of Congress, but I just can't swear to it.) The BLM Assistant Special Agent-in-Charge then asked me what went on in Las Vegas at the courthouse and the U.S. Attorney's Office on the afternoon of Wednesday, February 15, 2017, and Thursday, February 16, 2017 (previously described above). The BLM Assistant Special Agent-in-Charge stated that he can tell that I am visibly disturbed when a BLM SAC is mentioned. I then told the BLM Assistant Special Agent-in-Charge that this is because of the suspected level of arrogance, corruption, and the apparent lack of concern that the BLM SAC has for his employees. The BLM SAC then told me that no one he has ever met has caused such a great amount of problems and to trust him (the BLM Special Agent-in-Charge) that the problem is being dealt with and that the BLM SAC's actions have likely contributed to the firing, death (to include a BLM Law Enforcement Officer), and quitting of several individuals. Note: It seemed to me that the whole plan of this BLM SAC was to rely on Karma to ensure justice is served in reference to another BLM SAC. Additional Note: It also seemed to me that since I completed the last big case related projects (the updated comprehensive Gold Butte Investigative Timeline and the updated Witness-Victim List), it was easy for my supervision to simply get rid of me. I believe they thought I was a "kill joy," not "one of the guys," possibly a tattle-tell, and that in addition to the Whistleblower Retaliation, they believed that I may be reporting the misconduct and audio recording them. I believe they were also simply were tired of me talking to them about grossly inappropriate and unprofessional behavior. When I previously objected and spoke to my supervisor (a BLM ASAC) about this misconduct, I believe he felt "who am I" to talk to him about his and other supervisor's inappropriate actions and comments.

At this point the BLM SAC asked if there is anything they could do for me. I told him that I wanted to talk to the lead prosecutor and get this cleared up. The SAC indicated that he didn't think that was a good idea. I asked the BLM SAC if this was punitive in nature. The BLM SAC told me that I wouldn't lose

98

my job over it. Following this discussion between myself, the BLM Special Agent in Charge, and the BLM Assistant Special Agent-in-Charge, I left the office. Note: *During this discussion, the BLM Assistant Special Agent-in-Charge took notes. Additionally, both the BLM Special Agent-in-Charge and BLM Assistant Special Agent-in-Charge seemed genuinely concerned for my welfare and appreciative of all my efforts related to the investigation and trial preparation.*

Note: On or about January 7, 2018, I located a Memorandum of Activity (MOA) titled "Collection and review of _____ Gold Butte Investigative case materials." This document was apparently authored by a BLM ASAC on February 18, 2017, and was an attempt to justify the above events. This document is available at https://redoubtnews.com/wp-content/uploads/2017/12/ Communication_786p.pdf.                                                        (7)(C)

This MOA by the BLM ASAC (a chief subject of my complaint) stated the following:

"On February 17, 2017, BLM Special Agent (SA) Larry "_____ was removed from the Bundy investigative team at the request of lead prosecutor First Assistant U.S. Attorney Steve _____ stated that _____ had made recent statements that _____ believes that the BLM lack law enforcement authority. Additionally, _____ recently stated to Bundy case prosecutors that in _____ opinion the government withheld exculpatory evidence involving Special Agent-in-Charge (_____ requested that I collect and review _____ case materials to identify any previously undisclosed (7)(C) information. _____ specifically requested that I review _____ "rumor log" that _____ implied to the prosecutors contained this withheld exculpatory information. _____ also requested that I review any material related to _____ claim that _____ ordered BLM officers to "rough up" Bundy family members or to "kick Cliven Bundy in the teeth" that _____ said BLM _____ knew about.

On February 18, 2017, SAC _____ and I collected _____ electronic and hand-written case materials. I asked about this "rumor log," and _____ said it was a list of talking points for a conference call with prosecutors in 2016. He said these notes were in his daily calendar which he had at his residence. He agreed to provide those notes after the weekend on February 21, 2017.

At the conclusion of this February 18, 2017, meeting. I told _____ that he has insider knowledge about an ongoing criminal investigation and that he is now removed from the case. I stated to him that from this point forward he is not to have any contact with any outside party about the Bundy case and that he cannot represent the BLM on the case by responding to any inquiries he receives regarding the case. I said the only person he can discuss the Bundy case with is me, and I told him that any messages or inquires he receives must be immediately forwarded to me to handle. He said he understood and that he would not have any contact with anyone about the case. He stated that he has not given case information to any outside party.

On February 21, 2017, _____ turned in several loose pages of hand written notes he removed from his calendars. He said the rest of his calendars contained personal medical information. With that hand-over of materials, _____ said that he had now turned in to me 100% of his Gold Butte investigative materials.

Starting on February 21, 2017, I began a review of all _____ case materials. The notes from _____ calendar contained a page written in preparation for a conference call with prosecutors on October 14, 2016. The heading on the page read "Potential Issues/Critical Vulnerabilities." The sub-headings under these "Critical Vulnerabilities: read:

1. BLM was heavy handed even cruel in the enforcement of the court order.
2. BLM lacked law enforcement authority in their case.
3. BLM is a poor manager of the resources such as grazing.

99

4.  DL (          had a personal agenda and is immoral (jury appeal).

I found similar material that          hand-wrote in preparation for a February 3, 2017, conversation          had with me and          about how          believes that the BLM is in violation of the law regarding its law enforcement authority. There is a specific section in those notes with the heading "BLM didn't turn over required exculpatory material/destroyed evidence." The supporting notes below that heading state that the government didn't turn in exculpatory information, but the topics listed under that heading (shredded documents at dispatch, texts and emails that make officers look unprofessional, gaps in the dispatch audio recordings, etc.) were all made know to the prosecution and the defense. This "exculpatory evidence" section in his notes didn't contain any previously undisclosed information.

I then asked          about his claim that the government didn't turn over all its exculpatory material.          stated that the government actually turned in 100% of all investigative findings and material during the discovery process, but there were just some things that made the BLM look bad or couldn't be obtained because they don't exist.

I then asked          about the "kick Cliven Bundy in the teeth" comment. He said that BLM SAs          and          would have information about this statement. I then called          and, Stover separately.
(b)
(7)(C)

I called SA Stover to discuss this statement          claims Stover heard          state about kicking Bundy in the teeth. Stover said that he never heard          say that specific statement, but he told          when asked in the past that a statement like that would be typical of something          would say. Stover remembers that near the start of the cattle impound in 2014.          told him that he had to get the officers motivated for the impound during a briefing.          told him that they were going to go to the heart of the issue or into the belly of the beast and gather the cattle in the wide open rather than doing it in secret. Stover said that he remembered          brought up this "kick Cliven in the teeth" statement with him during a conversation sometime in the past when          called him and asked if          would make a good witness for the government's case.

          shared an office with          for at least the last year, and          was also one of the participant officers at the 2014 cattle impound.          said          often brings up the topics of the Bundy cattle impound.          said          often brings up the topics of the Bundy cattle impound, Dave Bundy's arrest on April 6, 2014, and          leadership failings.          said that one time he relayed to          that he heard          deliver a speech meant to be motivational to all the officers at the first briefing of the impound on the morning of April 5, 2014.          said that Stover was speaking to all the officers at the briefing, and Stover's personality is very measured, calm and deliberate. Apparently          wanted more passion behind the message, so          deliberately interrupted Stover in front of everyone and delivered this message to the officers.          couldn't recall to          the exact language          said, but he told          that          told the officers that they weren't going to gather cattle on the fringes, but that they were going to do it right in front of Cliven Bundy to let him know they were serious about it.
(F)

          said          speech was like a halftime pep talk delivered by a coach to motivate his players.          said that he told          during this conversation that it was like          was saying to the officers that they were not going to take any interference from Bundy and that they were going to kick him in the mouth, but          told          that exact phrase was not used by          was just trying to conceive of a phrase to tell          that meant          didn't want the officers to shy away from any opposition from the Bundys and that they were serious about gathering the cattle in the wide open light of day rather than hiding in the shadows to conduct the impound.

100

told me that at the time he was relaying this story to _____ that _____ was taking a lot of notes. _____ at the time told _____ not to write those exact statements down because that is not what _____ said, but he saw that he continued to take notes. _____ never heard _____ say any statement that _____ wanted the officers to specifically "kick Cliven in the teeth" or "kick Cliven in the mouth" or that **(F)** ever ordered the officers to rough up the Bundys.                                **(F)**

**(b)(7)**
Upon completing my review of _____ hand-written notes and case materials, I determined that there is no new exculpatory information contained within them.  There are also several sections within the notes that contain opinion statements as opposed to factual information. _____ also detailed how he explored possible defense theories.  I asked _____ whether he turned in all investigative findings to federal prosecutors, he stated that he turned over 100% of his case information to the prosecutors during the discovery process."

Note:  *I believe this MOA by the BLM ASAC (a chief subject of my complaint) is purposely misleading.  I would like to address this in the future.  Please note an email titled "RE:  Your work status," that I sent to him on December 19, 2017 at approximately 11:04 a.m.  A portion of my email response to a BLM ASAC stated the following:*

"Also, I read your response to my reports.

I am disappointed in you.

When did you author that report?

You know my issue with BLM was the agency's (specifically our Region and Utah/Nevada) non-adherence to the Federal Land Policy and Management Act of 1976 (FLPMA)/43 USC 1733 (c)(1).  We are violating both the letter and intent of the law.  Additionally, the "assistance is necessary" portion referred to the FBI and was on our own website.

In short, there is not a choice in the matter.

When the Secretary of Interior determines that assistance is necessary (besides the FBI), the Secretary shall offer a contract to the appropriate local officials having law enforcement authority within their respective jurisdictions with the view of achieving maximum feasible reliance upon local law enforcement officials in enforcing such laws and regulations.

The BLM isn't offering contacts to any local officials nationwide to enforce Federal Laws and Regulations with respect to Federal Public Lands and their resources.  This creates a large coverage gap and increase response times to crimes in progress.  That is because the average BLM Ranger/Agent makes around $100,000.00+ per year and the average local law enforcement officer makes about $30,000.00-$50,000.00 per year.  This also denies funding to local law enforcement and decreases their voice in matters relating to Federal Public Land management.

I believe that our agency is now is trying to come up with a reason why they think they don't have to follow the letter and intent of our own enabling statute.

You misrepresented my concerns in your report.

When I respectfully asked for an answer to this and other damaging issues, I was simply told that you didn't want to get into a big thing with me, not to get into it on the stand, to fake a stroke and fall over,

101