1
2
3
4
5
6
7
8            UNITED STATES DISTRICT COURT
9                 DISTRICT OF NEVADA
10

11  TODD C. ENGEL,                          Case No.:  2:22-cv-01040-WQH-EJY
12                          Plaintiff,       **ORDER**
13  v.
14  UNITED STATES OF
15  AMERICA; DOES 1 through 100;
    and ROES 1 through 100,
16  inclusive,
17                          Defendants.

18
19  HAYES, Judge:
20        The matter before the Court is the Motion to Dismiss filed by Defendant United
21  States of America ("Defendant"). (ECF No. 19.)
22  **I.   PROCEDURAL BACKGROUND**
23        On June 30, 2023, Plaintiff initiated this action by filing a Complaint pursuant to the
24  Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.* (ECF No. 1.)
25  / / /
26  / / /
27  / / /
28  / / /

On November 21, 2022, Defendant filed the Motion to Dismiss. (ECF No. 19.) On March 27, 2023, Plaintiff filed a Response in opposition to the Motion to Dismiss.[1] (ECF No. 28.) On July 12, 2023, Defendant filed a Reply. (ECF No. 39.)

On October 25, 2023, the Court conducted oral argument on the Motion to Dismiss. (ECF No. 41.)

## II.   ALLEGATIONS IN THE COMPLAINT

### A.   Background

Plaintiff was a defendant in a criminal action brought by Defendant United States in the District of Nevada titled *United States v. Bundy et al.*, Case No. 2:16-cr-00046-GMN-PAL (the "Underlying Action"). "In the Underlying Action, [the defendants] were separated into three (3) distinct trial groups; namely, the 'Tier 1' (the alleged 'leadership' defendants); 'Tier 2' (the claimed 'mid-level leadership' defendants); and 'Tier 3' (the alleged 'gunmen') groups." (ECF No. 1 ¶ 3 n.1.) Plaintiff was a member of the Tier 3 trial group.

The Bundy family owns land in the "Gold Butte area" in Clark County, Nevada, upon which it "formed the Bundy Ranch." *Id.* ¶¶ 8–9. "Over the generations, the Bundy family … improve[d] the Bundy Ranch" by "developing numerous artesian springs/aquifers" and "securing title … to the accompanying water rights." *Id.* ¶ 10. The

---

[1] Plaintiff also filed a Motion to File Plaintiffs' Consolidated Opposition to Defendant's Motion to Dismiss (O'Shaughnessy, Dkt. 26; Engel, Dkt. 19) that Exceeds Page Limits Pursuant to LR7-3(c) ("Motion to File Excess Pages"). (ECF No. 30.) The Court grants Plaintiff's Motion to File Excess Pages. To the extent that Plaintiff intends for the legal arguments contained within his counsel's forty-seven-page Declaration to be considered a supplemental brief in Response to the Motion to Dismiss, such legal arguments should have been contained within the brief itself rather than in a Declaration from counsel. *See, e.g.*, *King County v. Rasmussen*, 299 F.3d 1077, 1082 (9th Cir. 2002) ("Declarations, which are supposed to set forth facts as would be admissible in evidence, should not be used to make an end-run around the page limitations of [Local] Rule 7 by including legal arguments outside of the briefs."); *Laurent v. JP Morgan Chase, N.A.*, No. 2:14-cv-00080-APG-VCF, 2016 WL 1270992, at *4 n.1 (D. Nev. Mar. 31, 2016) ("Because these statements [in an affidavit] constitute legal arguments and conclusions, rather than declarations of fact, I will not consider them."). As such, the Court does not consider any legal arguments raised in any Declaration attached to Plaintiff's Response.

Bundy family has used those springs to provide water for its cattle, which "were lawfully grazing on the Bundy Ranch and its surrounding lands." *Id.* ¶ 11.

"[A]s part of an egregious plan to eliminate ranching operations within the region, divest or otherwise acquire the private water rights held by those ranchers…, and to sell-off or otherwise lease those rights for commercial development or other land-use purposes," the United States Department of Interior and Bureau of Land Management ("BLM") began "imposing restrictive grazing permits and fees, and limiting the number of cattle that could graze upon those lands." *Id.* ¶ 12. "To that end," Defendant, through the United States Department of Justice ("DOJ") and Assistant United States Attorneys ("AUSAs") Nadia Ahmed and Daniel Bogden, obtained a $1 million judgment against non-party Cliven Bundy in a 1998 civil lawsuit "for [Cliven Bundy's] refusal to obtain BLM grazing permits and pay the corresponding fees." *Id.* ¶ 13.

## B. 2014 Cattle Impoundment Operation and Standoff

After obtaining the judgment, AUSAs Ahmed, Bogden, and Steven Myhre; Federal Bureau of Investigation ("FBI") Special Agent Joel Willis; BLM Special Agent in Charge ("SAC") Daniel Love; and BLM Officers Rand Stover and Mark Brunk (collectively, the "Government Employees") "conspired together and orchestrated a fraudulent scheme to entice Cliven Bundy and his supporters, including … Plaintiff Engel into an armed confrontation in April 2014" (the "Operation" or "Cattle Impoundment Operation").[2] *Id.* ¶ 14. The Operation was "cloaked" as "merely an effort to enforce a 2013 civil court order obtained by AUSA[s] Ahmed and Bogden." *Id.* ¶ 33. "In reality, however, the primary purpose behind the operation was to frame and entrap Cliven Bundy" and other supporters, including Plaintiff, by enticing them "into an armed confrontation" so as to "'justify' the [Government Employees'] planned 'use of force' and their fabrication of criminal charges against them." *Id.* ¶¶ 14, 33.

---

[2] The Complaint alleges that at all relevant times the Government Employees were acting in their official capacity and within the scope of their employment. (*See* ECF No. 1 ¶¶ 1, 111.)

Leading up to April 2014, "DOJ representatives, including… [AUSAs] Ahmed, Myhre and Bogden … modified, revised and supplemented [an] operational plan proposed by [ ] SAC Love and Officer Stover to ensure that the final Cattle Impoundment Operation would … outrage the ranching community" and "provoke a confrontation." *Id.* ¶ 37. A March 27, 2014, e-mail authored by an unknown BLM agent to his superiors stated: "[I]t appears the NV USA is directing tactical decisions, something I've never seen in 19 years of law enforcement.... [I]'m in a unique situation in which I must work with a prosecution agency that is attempt[ing] to direct my enforcement efforts." *Id.* (emphasis omitted).

On March 28, 2014, "SAC Love and Officer Stover coordinated, timed and orchestrated the arrival of the BLM-hired 'contract cowboys' and their corresponding equipment to coincide with a pre-arranged television interview between Cliven Bundy and his sons … at that same location." *Id.* ¶ 34. Love and Stover "secretly filmed the encounter … with the intent of provoking violence…—conduct which, in turn, would prompt law enforcement intervention and the planned arrests of Cliven Bundy and his supporters." *Id.* ¶ 35. However, the Bundys and their supporters did not respond and instead "peacefully photographed the 'contract cowboys' to memorialize the incident." *Id.*

In the ensuing Cattle Impoundment Operation, the Government Employees and others "seized cattle belonging to Cliven Bundy and the Bundy Ranch"; transported the seized cattle to a "staging area"; shot other cattle "from helicopters"; "destroyed several thousands of dollars worth of the Bundy family's water right improvements and artesian springs / aquifers"; and "purposefully parad[ed] a convoy of DOI / BLM vehicles and other construction demolition equipment before the Bundys, [ ] Tier 2 Plaintiffs and their supporters to provoke them into resisting or otherwise defying the [Government Employees'] efforts." *Id.* ¶ 39.

During the Cattle Impoundment Operation, the Government Employees closed "nearly six hundred thousand (600,000) acres of land" to the public. *Id.* ¶¶ 38, 61. This forced the "[h]undreds of Americans, including … Plaintiff Engel [who] traveled to the … area to protest" Defendant's actions to protest at one of two small "First Amendment

Zones" "located a considerable distance away from the [ ] Cattle Impoundment Operation." *Id.* ¶¶ 38, 62. These zones were "purposefully selected" by AUSAs Ahmed, Myhre, and Bogden, BLM SAC Love, Officers Stover and Brunk, and others, "to maximize the impairment of any protestor's First Amendment rights." *Id.* ¶ 38. The Operation was carried out at the Government Employees' direction, and "BLM SAC Love and Officer Stover determined that violent, aggressive, excessive and authoritarian tactics would force Cliven Bundy and his supporters (including Plaintiff Engel) to react or otherwise respond physically, and thereby 'justify' the [Government Employees'] planned use of force in the [Operation]." *Id.* ¶¶ 15–16. "[A] whistleblower memorandum authored by BLM Special Agent Larry Wooten in November 2017 expressly documented and memorialized … Love's stated intention to violently kick Cliven Bundy in the mouth as other BLM agents arrested him and took him to the ground." *Id.* ¶ 17. The Cattle Impoundment Operation and "resulting 'standoff'" led to "hundreds of protestors, including, … Plaintiff Engel, to c[o]me out and support the Bundy family." *Id.* ¶ 18.

On April 6, 2014, Plaintiff was watching the news and observed a news report about "the existence of helicopters and heavily-armed federal BLM officers around a cattle-rancher's property in Mesquite, Nevada." *Id.* ¶ 19. Plaintiff began to monitor social media and other news outlets to gather more information. Plaintiff became concerned about the situation and, "desirous of showing his support for the Bundy family and to hopefully de-escalate the matter, made the decision to travel from Idaho to Bunkerville, Nevada on April 10, 2014." *Id.* ¶ 20.

On April 12, 2014, Plaintiff arrived in Bunkerville, Nevada. Upon his arrival, Plaintiff "learned that Cliven Bundy and others had gathered at a stage to protest the Government's taking of the Bundy Family's cattle." *Id.* ¶ 21. There, Plaintiff "learned that the State of Nevada had intervened and directed the BLM to stand-down on their Cattle Impoundment Operation" such that "the BLM would be leaving the area, removing their assets and that the Bundy Family's cattle were going to be released." *Id.* With this information, Plaintiff, along with others, "traveled to the Toquop Wash to observe the

release of the Bundy Family's cattle from the BLM impoundment area." *Id.* ¶ 22. Once at the Toquop Wash parking area, Plaintiff learned that "the Government had not yet dispersed and that there were federal law enforcement officers aiming assault weapons at protestors that had gathered under the Toquop Wash bridge." *Id.* Plaintiff, along with others, walked to the top of the bridge and "observed federal officers pointing high-powered assault rifles at him and others on and underneath the bridge." *Id.* Roughly thirteen minutes later, Plaintiff moved from the bridge toward the parking area "to locate State or local law enforcement officers who might be able to render assistance." *Id.* ¶ 23. Plaintiff approached "Highway Patrol Sergeant Shannon Serena and Trooper Clay Madsen and asked for their assistance in de-escalating the matter." *Id.* Plaintiff and the two officers went back to the bridge, and Plaintiff identified where he had observed the federal officers pointing the sniper and rifles at him and others. "Sergeant Serena immediately telephoned the Las Vegas Metropolitan Police Department and spoke with a high-ranking Officer who was already on-scene." *Id.* The police officer "approached several federal law enforcement officers and directed that they immediately lower their rifles and holster their weapons"; the federal officers complied, and all federal officers left the scene. *Id.*

AUSAs Ahmed, Myhre, and Bogden, and Special Agent Willis also directed an undercover FBI operation named "Longbow Productions," in which "masqueraded FBI undercover agents falsely posed as a film crew making a documentary" and "entice[d]" Plaintiff Engel and others "with alcohol, money and other goods and favors to exaggerate their" involvement in the standoff to increase the likelihood of securing convictions in the Underlying Action. *Id.* ¶¶ 50–52. The undercover operation "successfully deceived" various individuals into participating in "staged" interviews, which were "selectively edited and later used" in the Underlying Action. *Id.* ¶ 53.

"Recognizing that the unlawful and unconstitutional powder-keg lit by [Defendant] was rapidly escalating out of control," Nevada state officials "intervened to de-escalate the matter" by directing "the BLM and Government Employees to wind-down their operation and to release the Bundy family's cows." *Id.* ¶¶ 55, 56. In implementing these orders,

AUSA Bogden and SAC Love "directed federal and state officers to ensure that 'a Bundy'… would pull the pins from the cattle pens so that the DOJ could use that affirmative act to establish [ ] fabricated [charges]" against the defendants in the Underlying Action. *Id.* ¶ 57. "In accordance with the State orders and at the direction of the [Government Employees], Margaret Houston, a sister of Cliven Bundy, ultimately 'pulled the pin' on the cattle pen and released the cattle." *Id.* ¶ 58.

### C.  Grand Jury Proceedings and Indictment

In 2015, AUSAs Ahmed, Myhre, and Bogden "sought to obtain a grand jury indictment against the Bundy defendants, including Plaintiff Engel." *Id.* ¶ 54. To obtain indictments, SAC Love, Officers Stover and Brunk, and others "fabricated, shaped and 'clarified' evidence and testimony, altered records, withheld evidence, and gave false testimony" before the grand jury, "[u]nder the direction, guidance and control" of AUSAs Ahmed, Myhre, and Bogden. *Id.* ¶¶ 29–30.

On February 24, 2015, Special Agent Willis "attempted to 'correct'" Officer Brunk's prior statement by having him "clarify" that he had not been a spotter/observer for a BLM sniper, despite knowing that Officer Brunk's "prior witness statement was true and correct." *Id.* ¶¶ 31–32. This attempt to "conceal [the] truth and shroud [Government Employees'] own misconduct" was done at the direction of AUSAs Ahmed, Myhre, and Bogden to "ensure that the [Government Employees'] 'version of events' matched the fabricated record … presented to the grand jury" that Defendant "did not deploy snipers." *Id.*

On September 16, 2015, AUSA Ahmed "elicited false and misleading testimony from Officer Stover … regarding the BLM's threat assessments of Plaintiff Engel" while "well-aware that the BLM assessments actually established that the Bundys and Plaintiff Engel would not engage in potential acts of violence." *Id.* ¶ 58 (emphasis omitted). AUSA Ahmed and Officer Stover also "elicited and provided false and misleading testimony regarding the [United States'] use of snipers," claiming that the operational plan did not

include sniper use and Plaintiff Engel and others had "concocted" the purported use of snipers. *Id.* ¶ 59 (emphasis omitted).

On October 14, 2015, "AUSA Myhre purposefully avoided a Grand Juror's question directed at [Defendant's] involvement in the pin removal action and purposefully proffered evasive testimony to avert [ ] SAC Love from disclosing the truth regarding that incident." *Id.* ¶ 56.

AUSA Ahmed and Officer Stover "also materially misled the Grand Jury regarding [Defendant's]" use of the "First Amendment Zones" by falsely stating that the zones allowed people to view the Cattle Impoundment Operation, were not mandatory, and were as close as possible to the operational area. *Id.* ¶¶ 60, 65. During the Tier 3 defendants' trial, Officer Stover admitted that the zones "'were not areas that were appropriate' for citizens to exercise their First Amendment rights." *Id.* ¶ 66. Defendant also used video from the March 28, 2014, "contract cowboy" incident "to intentionally mislead [the] grand jury" by "spinning [the] incident as an example of the Bundys' provocation of the BLM" and "violent response." *Id.* ¶ 46.

"On March 2, 2016, after several months of presenting fabricated, misleading and perjured evidence and testimony to the Grand Jury," Defendant "obtained an indictment against Plaintiff Engel." *Id.* ¶ 67. The indictment contained "eleven (11) felony counts, including, without limitation, conspiracy, conspiracy to impede federal officers, assaulting, threatening, extorting, and obstructing federal officers, and four (4) counts of using firearms in crimes of violence resulting from [the] 'standoff' with [federal] agents … in connection with [Defendant's] Cattle Impoundment Operation." *Id.* ¶ 45. The indictment "was silent as to any basis or probable cause to detain, arrest or otherwise prosecute" Plaintiff and "deceptively described" Plaintiff's actual conduct. *Id.* ¶¶ 71–72.

Specifically, the indictment "deceptively described" Plaintiff's conduct "as threatening, assaulting and extorting federal officers, obstructing justice, and conspiring to violate federal laws or impede federal officers." *Id.* ¶ 72. "The indictment also baldly asserted that Plaintiff Engel had used firearms in several serious crimes of violence,"

despite the fact that Plaintiff's rifle "was maintained in a safe, proper and lawful manner – at no time did he display, use, or threaten to use his firearm." *Id.* ¶ 77.

### D.  Arrest and Litigation of the Underlying Action

On March 3, 2016, Plaintiff was arrested in the absence of probable cause pursuant to a warrant issued based on "false, fabricated and manufactured evidence" and without consideration of "withheld exculpatory evidence." *Id.* ¶ 69. After Plaintiff's arrest, a confidential informant/federal agent, who had befriended Plaintiff during the two years between the Toquop Wash incident and Plaintiff's arrest, "entered onto Mr. Engel's property (without permission) and removed various items of Mr. Engel's personal property with the government's knowledge and/or consent." *Id.* ¶ 115. The items included Engel's 2007 Dodge Ram 3500 customized pick-up truck, his Suzuki 750 ATV, a Yamaha customized motorcycle, a metal detector, various rifles and firearms, ammunition, rifle scopes, laser guides/sites, and over $30,000 in silver coins.

Despite knowing that the charges against Plaintiff were false, the Government Employees "attempted to strong-arm Plaintiff Engel into accepting a plea," "directed that informants be planted among the Plaintiff Engel during his incarceration," offered "immediate release from custody" for other inmates to testify falsely against Plaintiff and the other Bundy defendants, and "prepared, instructed, and directed others to prepare fabricated investigative documents for those inmates to sign." *Id.* ¶¶ 43–45.

"In furtherance of [the] conspiracy to keep the Plaintiff Engel falsely imprisoned," AUSAs Ahmed, Myhre, and Bogden argued to the court in the Underlying Action that Plaintiff Engel and the other defendants "were the most dangerous, violent criminals in the history of Nevada" despite their own internal threat assessments demonstrating that Plaintiff Engel and the other defendants were not dangerous or violent. *Id.* ¶¶ 81–82. AUSAs Ahmed, Myhre, and Bogden, "in furtherance of the [Government Employees']" conspiracy … misled the [c]ourt" by representing that the FBI was not involved in the matter despite knowing of the FBI's active involvement, which included the FBI's "extensive exculpatory photographic and video-surveillance documentation—none of

which was ever produced, disclosed or otherwise identified by the [Government Employees]" and "the existence of which was revealed for the first time during trial proceedings involving the Tier 3 group." *Id.* ¶¶ 84–85.

The Government Employees also "conspired with one another to conceal" and damage or destroy exculpatory evidence from the defendants in the Underlying Action, including "the BLM threat assessments, the [Government Employees'] use of snipers," and photographic and video-surveillance. *Id.* ¶¶ 73, 85.

Starting February 6, 2017, through April 24, 2017, Plaintiff and the Tier 3 defendants were "forced to endure a trial," whereby Plaintiff was convicted on two charges of obstruction of justice and interstate travel in aid of extortion. *Id.* ¶¶ 3 n.1, 24. Plaintiff appealed his conviction, claiming "that because his Sixth Amendment rights were violated, his conviction was improper as a matter of law." *Id.* ¶ 98.

"[D]uring the first trial of the Tier 3 defendants," BLM Special Agent Larry Wooten confronted AUSAs Ahmed, Myhre, and Bogden with concerns that they had not properly disclosed exculpatory evidence to the defendants. *Id.* ¶¶ 86–87. "Fearing that [Wooten] would reveal the nature and extent of the … conspiracy …, AUSA Myhre retaliated by abruptly removing [ ] Wooten from … any further involvement in the case" and by raiding his office and seizing his papers and files. *Id.* ¶¶ 88–89. After conferring with his superiors and ethics officials and offices—"each of whom ignored [ ] Wooten's concerns"—Wooten "submitted a whistleblower complaint to the DOJ Associate Deputy Attorney General and National Criminal Discovery Coordinator … to expose the [Government Employees'] egregious conduct, including … the non-disclosure of exculpatory evidence and other *Brady* violations."[3] *Id.* ¶ 91.

---

[3] The contents of the whistleblower complaint are alleged at length in the Complaint. (*See* ECF No. 1 ¶ 93.)

In October 2017, defense lawyers for the Tier 1 defendants expressed concern to the court "regarding missing documents and other evidence that had not been produced or otherwise disclosed" by Defendant, but "were known to exist." *Id.* ¶ 94. At a subsequent evidentiary hearing on January 8, 2018, "numerous *Brady* violations were discovered," including the intentional withholding of exculpatory evidence regarding Plaintiff.[4] *Id.* ¶ 95. "Due to prosecutorial misconduct, including … the intentional suppression of exculpatory evidence confirming … the innocence of the Plaintiff, along with [Defendant's] knowing and intentional use of fabricated evidence to secure indictments against him," the case against the Tier 1 defendants was dismissed. *Id.* ¶ 3 n.1. On February 7, 2018, all charges against the Tier 2 group were likewise dismissed on Defendant's own motion. *Id.* ¶ 97.

On August 6, 2020, the Court of Appeals for the Ninth Circuit issued an order "holding that [Plaintiff Engel's] Sixth Amendment right to self-representation had been violated and, as a result, vacated his conviction and remanded the matter for a new trial." *Id.* ¶ 98.

On September 8, 2020, Defendant moved to dismiss the claims against Plaintiff, and the trial court granted the unopposed motion that same day. On September 10, 2020, Plaintiff was released from custody. During the prosecution of the Underlying Action, Plaintiff was incarcerated for fifty-four (54) months; "wrongfully separated from his families, friends and loved ones"; "forced to endure [Defendant's] rogue prosecution based upon [] fabricated charges"; and unconstitutionally placed on mandatory screening processes prior to flying and prohibited from purchasing firearms based on his designation as a "domestic terrorist." *Id.* ¶¶ 3, 24, 100, 102.

/ / /

/ / /

---

[4] Numerous excerpts from the transcript of the evidentiary hearing are alleged in the Complaint. (ECF No. 1 ¶ 96.)

### E.   Exhaustion of Administrative Remedies and Claims

Plaintiff submitted his federal tort claims to Defendant and its agencies, including the DOJ FTCA Section, on or about August 28, 2021. The FTCA Section acknowledged receipt but did not act on Plaintiff's claims within six months.

### F.   Claims Alleged

Plaintiff brings claims against Defendant pursuant to the Federal Tort Claims Act. The Complaint also names as Defendants Does 1-100 and Roes 1-100, unknown entities—"whether individual, corporate, associate, governmental or otherwise"—that "caused acts and events to occur within this forum from which Plaintiff's claims arose." *Id.* ¶ 6. Plaintiff alleges that Defendant is liable for the following torts under Nevada law: (1) false arrest; (2) false imprisonment; (3) malicious prosecution; (4) intentional infliction of emotional distress ("IIED"); and (5) theft/conversion. Plaintiff requests damages, attorneys' fees and costs, interest, and all further relief "the Court may deem just and equitable." *Id.* at 39–40.

## III.  CONTENTIONS

In its Motion to Dismiss, Defendant requests dismissal of Plaintiff's claims for lack of subject matter jurisdiction and/or failure to state a claim on the following grounds. First, Defendant contends that the claims arising out of the torts of false arrest, false imprisonment, and malicious prosecution should be dismissed because the Complaint fails to adequately allege a lack of probable cause. Second, Defendant contends that the claims arising out of the torts of false arrest, false imprisonment, and malicious prosecution should be dismissed to the extent that they are based on the conduct of AUSAs Ahmed, Myhre, and Bogden because they are statutorily barred. Third, Defendant contends that the claim arising out of the IIED tort should be dismissed because Plaintiff fails to allege a lack of probable cause. Fourth, Defendant contends the theft/conversion claim should be dismissed because it is barred by the FTCA and statute of limitations.

In his Response,[5] Plaintiff requests that the Court permit "considerable discovery" before ruling on the Motion to Dismiss because "Plaintiff[] [is] unable to fully respond thereto" until "the entire record from the Underlying Action is produced and Plaintiff[] ha[s] the opportunity" to complete the requested discovery. (ECF No. 28 at 3.) In the alternative, Plaintiff contends: (1) the conduct of the AUSAs can form the basis for Plaintiff's claims because their tactics had no legitimate policy rationale and they assumed the role of investigators; (2) Defendant's jurisdictional challenge concerning probable cause is "inextricably intertwined with, and dependent upon, a resolution of the merits of Plaintiff['s] FTCA claims," *id.* at 8; (3) the Complaint adequately alleges facts to support the absence of probable cause; and (4) Plaintiff's theft/conversion claim is not barred by the applicable statute of limitations or the FTCA.[6]

In its Reply, Defendant contends that discovery is inappropriate for a number of reasons, including that: (1) Plaintiff already possesses an "extensive, detailed factual record" (ECF No. 39 at 2); (2) "[t]he bulk of [Defendant's] motion[] is premised on [Federal Rule of Civil Procedure] 12(b)(6), for which [Defendant] assumed the truth of Plaintiff['s] factual allegations" (ECF No. 39 at 2); (3) Plaintiff has not identified any prejudice; (4) Plaintiff holds the burden of establishing jurisdiction; (5) the secret grand

---

[5] Plaintiff's Response and Defendant's Reply address Defendant's Motions to Dismiss in this action and a related action, *O'Shaughnessy v. United States*, 22-cv-1039-WQH-EJY. These cases have not been consolidated and remain separate actions. In this Order, the Court only addresses the arguments relevant to this action.

[6] Plaintiff requests judicial notice of "various publicly-filed documents in the Underlying Action and related appeals before the Ninth Circuit Court of Appeals," which are "referenced in or otherwise attached to the supporting Declarations of [Craig A. Marquiz] and Warren Markowitz, Esq." (ECF No. 28 at 3.) However, Plaintiff does not specify the documents for which he requests judicial notice, nor does he state the grounds upon which his requests are based. *See* Fed. R. Evid. 20(c)(2) (stating that judicial notice is appropriate upon such a request and the Court "is supplied with the necessary information"). Additionally, the Court declines to take judicial notice of all documents attached to Plaintiff's Response because the Court need not consider these documents at this time given the rulings stated herein. *See Asvesta v. Petroutsas*, 580 F.3d 1000, 1010 n. 12 (9th Cir. 2009) (denying request for judicial notice where judicial notice would be "unnecessary").

jury materials are not relevant to Defendant's Motion; (6) the legal authority cited by Plaintiff for permitting discovery does not apply to motions to dismiss; and (7) Plaintiff does not provide the Court with the specific facts he is deprived of that prevents him from responding to the Motion to Dismiss. Defendant contends that Plaintiff conflates the issue of whether AUSAs are considered investigative or law enforcement officers—a "simple issue of statutory interpretation"—with the constitutional doctrine of prosecutorial immunity. *Id.* at 11. Defendant contends that its challenge to the Complaint on the basis of Plaintiff's failure to adequately allege a lack of probable cause is a challenge "directly on the merits" and thus does not implicate Plaintiff's jurisdictional arguments. *Id.* at 10.

## IV.   LEGAL STANDARD

### A.   Dismissal for Lack of Jurisdiction

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to move for dismissal on the basis that the court lacks jurisdiction over the subject matter of the action. The burden is on the plaintiff to establish that the court has subject matter jurisdiction over the action. *Assoc. of Med. Colls. v. United States*, 217 F.3d 770, 778–79 (9th Cir. 2000). Rule 12(b)(1) is a "proper vehicle for invoking sovereign immunity from suit." *Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015).

A Rule 12(b)(1) jurisdictional attack may be facial or factual. "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment" and "need not presume the truthfulness of the plaintiff's allegations." *Id.*

### B.   Dismissal for Failure to State a Claim

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In order to state

a claim for relief, a pleading "must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal under Rule 12(b)(6) "is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (quoting Fed. R. Civ. P. 8(a)). A court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

## V.   DISCUSSION

### A.   Request for Discovery

Plaintiff requests that the Court permit him to engage in discovery prior to ruling on Defendant's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 56(d). Rule 56(d) provides: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

1
2
3
4
5
6
7
8
9

However, as a threshold matter, Plaintiff has not identified any legal authority supporting the proposition that Rule 56(d) applies to parties requesting discovery prior to consideration of a motion to dismiss. District courts in this Circuit to have considered this issue have concluded that Rule 56(d) does not apply to motions to dismiss. *See, e.g.*, *Wood v. Panther*, No. 1:15-cv-00092-DCN, 2021 WL 851651, at *2 (D. Idaho Mar. 4, 2021) ("This provision does not apply when a plaintiff does not even state a viable claim in the first place. Indeed, such a claim does not make it to discovery, let alone provide a basis for more time to engage in discovery."); *Martin v. James River Ins. Co.*, 366 F. Supp. 3d 1186, 1189 (D. Nev. 2019) ("Rule 56(d) applies to summary judgment, not dismissal.").

10
11
12
13
14
15
16
17
18
19
20
21

While Rule 56(d) does not apply to motions to dismiss, "[a] motion to dismiss made under Federal Rule of Civil Procedure 12(b)(6) must be treated as a motion for summary judgment under Federal Rule of Civil Procedure 56 if either party to the motion to dismiss submits materials outside the pleadings in support or opposition to the motion, and if the district court relies on those materials." *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996); *see also* Fed. R. Civ. P. 12(d). However, conversion of Defendant's Motion to Dismiss into a motion for summary judgment is not appropriate in this case because the parties do not submit, and the Court does not consider, any extrinsic evidence that is not properly subject to judicial notice.[7] *See* Fed. R. Civ. P. 12(d); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("A court may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment." (quoting *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986))).

22
23
24
25

Discovery may alternatively be permissible to rebut a factual attack on jurisdiction. *See St. Clair v. City of Chico*, 880 F.2d 199, 201–02 (9th Cir. 1989). However, the Court concludes that Defendant's jurisdictional challenges are properly considered facial

26
27
28

---

[7] Neither party has requested that the Court convert the Motion to Dismiss into a motion for summary judgment.

challenges rather than factual challenges because Defendant does not rely on any non-judicially noticeable extrinsic evidence to demonstrate the absence of jurisdiction.[8] *See Hyatt v. Yee*, 871 F.3d 1067, 1071 n.15 (9th Cir. 2017) (stating that a court may take judicial notice of matters of public record in reviewing a facial attack on jurisdiction); *Safe Air for Everyone*, 373 F.3d at 1039 (stating that a moving party can convert a facial attack into a factual attack "by presenting affidavits or other evidence"). Further, even if Defendant had raised a factual challenge to jurisdiction, the discovery requested by Plaintiff concerns Defendant's alleged lack of probable cause to indict, arrest, and prosecute Plaintiff. Because the issue of whether Defendant lacked probable cause is an element of Plaintiff's false arrest, false imprisonment, and malicious prosecution claims rather than a jurisdictional prerequisite under the FTCA,[9] *see Leeson v. Transamerica Disability Income Plan*, 671 F.3d 969, 971 (9th Cir. 2012) (distinguishing between substantive elements of a claim and prerequisites for subject matter jurisdiction), this discovery would not be relevant to resolving Defendant's jurisdictional challenges, *see St. Clair*, 880 F.2d at 202 (rejecting request for jurisdictional discovery that "would be useless"). Plaintiff's request for discovery prior to the Court's consideration of Defendant's Motion to Dismiss is denied.

**B.   Investigative or Law Enforcement Officer Exception**

In its Motion to Dismiss, Defendant contends that Plaintiff's FTCA claims arising out of the torts of false arrest, false imprisonment, and malicious prosecution should be dismissed to the extent that they are based on the conduct of AUSAs Ahmed, Myhre, and

---

[8] Defendant describes its jurisdictional challenges as, at least in part, factual, but the Court does not find this characterization to be controlling. (*See* ECF No. 19 at 4 ("The United States asserts a lack of jurisdiction here on a factual basis, not solely a facial one.").)

[9] Defendant's briefing makes clear that the probable cause issue is intended to be raised pursuant to Rule 12(b)(6), not Rule 12(b)(1). (*See, e.g.*, ECF No. 39 at 10 ("The United States' primary argument in its Motions to Dismiss relies on Rule 12(b)(6) and the *Iqbal* standard…. Plaintiff['s] theories for false arrest, false imprisonment, and malicious prosecution fail because [he] ha[s] failed to articulate a plausible factual scenario where the Government wholly lacked probable cause or any legal justification to arrest and indict the indicted Plaintiffs…. This challenge by the United States is directly on the merits of Plaintiff['s] claims….").)

Bogden because the FTCA only permits these three torts to be brought against the United States if "they were committed by an 'investigative or law enforcement officer.'" (ECF No. 19 at 14 (quoting 28 U.S.C. § 2680(h)).) Defendant contends the claims relying on the conduct of AUSAs are barred. In his Response, Plaintiff contends that liability for false arrest, false imprisonment, and malicious prosecution can be premised on the conduct of the AUSAs because the tactics employed by the AUSAs had "no legitimate policy rationale" and the AUSAs each "assumed the role of an investigator." (ECF No. 28 at 22–23.) In its Reply, Defendant contends that "Plaintiff conflates this simple issue of statutory interpretation with the constitutional doctrine of absolute immunity against state and local prosecutors." (ECF No. 39 at 11.)

28 U.S.C. § 2680 bars FTCA claims "arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights" unless such claims are "with regard to acts or omissions of investigative or law enforcement officers of the United States Government." 28 U.S.C. § 2680(h). The statute further defines "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.*

Federal courts interpreting this provision have universally concluded that federal prosecutors are not "investigative or law enforcement officers" because they are not empowered to execute searches, seize evidence, or make arrests. *See* 28 U.S.C. § 547 (setting out the duties of United States Attorneys); *see Manansingh v. United States*, No. 21-16192, 2023 WL 2658753, at *2 (9th Cir. Mar. 28, 2023) ("For purposes of this provision, the term 'investigative or law enforcement officer' means 'any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.' Federal prosecutors do not qualify as investigative or law enforcement officers here." (citations omitted) (quoting *Wright v. United States*, 719 F.2d 1032, 1034 (9th Cir. 1983))); *Lozada-Manzano v. United States*, 75 F.4th 31, 38 (1st Cir. 2023) ("Federal prosecutors do not fall within this definition, and so their actions

cannot provide the basis for malicious prosecution actions under the FTCA."); *Moore v. United States*, 213 F.3d 705, 710 (D.C. Cir. 2000) (concluding that an AUSA's conduct could not "be the basis for a malicious prosecution claim against the government because [the AUSA was] not an investigative or law enforcement officer"); *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994) ("The FTCA authorizes suits for abuse of process based only on the actions of federal investigative or law enforcement officers, not on the actions of government prosecutors."); *Cox v. United States*, No. SACV 16-01222-CJC (KES), 2016 WL 11518805, at *6 n.17 (C.D. Cal. Aug. 16, 2016) ("An AUSA is not an investigative or law enforcement officer under this subsection."). Further, expanding the definition of "investigative or law enforcement officers" to include any prosecutors who exceeded their lawful authority by assuming the role of investigators is not supported by the statutory language in § 2680, which is squarely focused on the legal powers possessed by the individuals at issue rather than such individuals' alleged conduct. *See Vander Zee v. Reno*, No. 95-50482, 1996 WL 625346, at *4 n.2 (5th Cir. 1996) ("Vander Zee suggests in his First Amended Complaint that the United States Attorneys should be considered 'law enforcement officers' by virtue of the control which they exercised over the actions of agents of the FBI. However, those courts that have considered the question have concluded that prosecuting attorneys are not 'law enforcement officers' within the meaning of [§ 2680(h)].… We agree." (citations omitted)); *see also Lane v. Pena*, 518 U.S. 187, 192 (1996) ("[A] waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." (citing *United States v. Williams*, 514 U.S. 527 (1995) (when confronted with a purported waiver of the Federal Government's sovereign immunity, the Court will "constru[e] ambiguities in favor of immunity"))).

In support of his contrary position, Plaintiff primarily relies on *Myles v. United States*, 47 F.4th 1005 (9th Cir. 2022). *Myles* held that the discretionary function exception did not shield the government from liability for a malicious prosecution claim based on the conduct of a Department of Homeland Security ("DHS") agent tasked with investigating workplace misconduct who allegedly lied under oath, tampered with witnesses, and

fabricated evidence. In support of this conclusion, the court noted that applying the discretionary function exception in the case "would thereby render … section 2680(h) meaningless" because "it is hard to imagine any malicious prosecution action covered by the section 2680(h) carve-out" for liability based on the actions of investigative or law enforcement officers "that would survive application of the discretionary function exception." *Id.* at 1013.

Because it was undisputed that the DHS investigator at issue in *Myles* was an "investigative or law enforcement officer," *Myles* did not have occasion to address the interpretation of that term or the applicability of § 2680(h) as applied to AUSAs or other prosecuting attorneys. *Myles* instead assumed that the DHS investigator was an "investigative or law enforcement officer" and held that the government's liability for his misconduct under § 2680 could not be obviated through reliance on the discretionary function exception. *See id.* at 1014 ("In sum, we conclude that in malicious prosecution cases in which the plaintiff alleges that an investigative or law enforcement official fabricated evidence, tampered with witnesses, lied under oath, or otherwise knowingly offered false testimony to induce criminal charges against the plaintiff, the discretionary function exception does not shield the United States government from liability…."). *Myles'* analysis concerning the discretionary function exception is inapplicable in this case because, as a threshold matter, the AUSAs at issue are not "investigative or law enforcement officers" like the DHS investigator. *See id.* at 1013 (noting that the discretionary function exception and § 2680 "should not be read as coextensive"). Similarly, while absolute immunity does not protect a prosecutor who assumes the role of an investigator under the common law, *see Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976), the absence of general common-law prosecutorial immunity does not negate the specific exception to FTCA liability provided by § 2680.

At oral argument, Plaintiff cited to two cases, *Cao v. United States*, 156 Fed. App'x 48 (2005), and *Gonzalez v. United States*, No. CV-12-01912 DMG (DTBx), 2013 WL

942363 (C.D. Cal. Mar. 11, 2013). Neither case supports Plaintiff's position. In *Cao*, the Court of Appeals stated:

> [Cao] sued the INS attorneys prosecuting his case for failing to move to dismiss the removal proceedings in the face of Cao's fervent claims of entitlement to citizenship. Both of these claims fail at the outset because Cao has not established that either the immigration judge or the INS attorneys are investigative or law enforcement officers under § 2680(h)…. Thus, the actions of the IJ and INS attorneys in this case cannot from the basis of United States' tort liability.

*Cao*, 156 Fed. App'x at 50 (citations omitted). Similarly, in *Gonzalez*, the court stated: "Plaintiff's claims relate exclusively to the decisions to prolong immigration custody, to administratively close removal proceedings, and to continue removal hearings, all of which are reserved for Immigration Judges and DHS attorneys who are not 'law enforcement officers' within the meaning of Section 2680(h)." *Gonzalez*, 2013 WL 942363, at *5.

The Court concludes that it lacks jurisdiction over Plaintiff's FTCA claims arising out of the torts of false arrest, false imprisonment, and malicious prosecution to the extent that such torts are based on the actions of AUSAs Ahmed, Myhre, and Bogden because Plaintiff has failed to show or adequately allege that the AUSAs were "investigative or law enforcement officers." 28 U.S.C. § 2680(h).

Accordingly, to the extent the Complaint alleges FTCA claims arising out of the torts of false arrest, false imprisonment, and malicious prosecution based on the actions of AUSAs, the Motion to Dismiss is granted pursuant to Federal Rule of Civil Procedure 12(b)(1).

## C. Lack of Probable Cause – False Arrest, False Imprisonment, and Malicious Prosecution Claims

Defendant contends that with respect to the false arrest, false imprisonment, and malicious prosecution claims, Plaintiff fails to allege a lack of probable cause, which is a required element for all three causes of action under Nevada law. Defendant contends that in his Complaint, Plaintiff never "assert[s] the plausible factual scenario for the

Government lacking probable cause that he brandished an assault rifle, adorned himself with camouflaged military attire, and drove to Nevada with the intention of putting federal employees in fear for their lives." (ECF No. 19 at 12.) Defendant contends that Plaintiff's allegations that various federal employees lied and fabricated evidence, records, and documents "fail to inform the Court how they tie to the specific charges against Plaintiff." *Id.* at 13. Defendant contends that the Grand Jury and *Brady* issues from the criminal cases are not connected to Plaintiff's charges. *Id.* at 14.

Plaintiff contends that the required elements to validly state cause of actions for false arrest, false imprisonment, and malicious prosecution "have been irrefutably identified, along with factual averments." (ECF No. 28 at 15–16.) With respect to the false arrest and false imprisonment claims, Plaintiff does not specifically address probable cause. *See id.* at 15–16 nn.14, 15. In addressing the requirements for a malicious prosecution claim, Plaintiff contends he alleges in the Complaint that "the Government Defendants' fabrication of evidence, elicitation and providing of perjurious testimony, along with the egregious withholding and destruction of exculpatory evidence so that they could wrongfully secure Grand Jury Indictments and arrest warrants against Joseph O'Shaughnessy, Jason Woods, Mel Bundy, Dave Bundy and Todd Engel establishes the absence of probable cause," in addition to "the malicious intent of said Government Employees' conduct." *Id.* at 16 n.16. Plaintiff contends the presumption of probable cause by a grand jury indictment can be rebutted by a showing that the criminal prosecution was induced by fraud, perjury, fabricated evidence, or bad faith, wrongful conduct. *Id.* at 20. Plaintiff contends that this issue should not be resolved at this stage of the proceedings and is best left for resolution at the summary judgment stage after discovery.

Under Nevada law,[10] claims for malicious prosecution, false arrest, and false imprisonment require the plaintiff to show that the defendants lacked probable cause. *See*

---

[10] The parties agree that the substantive law of Nevada applies to causes of action in this case. (*See* ECF No. 19 at 11; ECF No. 28 15–16 & nn.14–16.)

*Jordan v. State ex rel. Dep't of Motor Vehicles & Pub. Safety*, 121 Nev. 44, 69 (2005), *abrogated on other grounds by Buzz Stew, LLC v. City of N. Las Vegas*, 124 Nev. 227 (2008); *LaMantia v. Redisi*, 118 Nev. 27, 30 (2002); *see also Fayer v. Vaughan*, 649 F.3d 1061, 1064 (9th Cir. 2011). A grand jury indictment creates a rebuttable presumption of probable cause, which can be overcome by allegations of "false testimony or suppressed facts." *Jordan*, 121 Nev. at 70 n.65 (quoting *Ricord v. Cent. Pac. RR. Co.*, 15 Nev. 167, 180 (1880); *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004)); *see also Awabdy*, 368 F.3d at 1067 ("Among the ways that a plaintiff can rebut a *prima facie* finding of probable cause is by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith."); *Manansingh*, 2023 WL 2658753, at *3 (reversing district court's dismissal of the plaintiffs' malicious prosecution claim because the plaintiffs "alleged that Manasingh's prosecution rested on fabricated evidence and that the prosecution withheld exculpatory evidence, which rebuts a finding of probable cause" (citing *Awabdy*, 368 F.3d at 1066–68)).

In the present case, Plaintiff has alleged that Defendant Employees[11] intentionally fabricated evidence and testimony, altered records, purposefully excluded or suppressed exculpatory evidence, and gave false testimony to obtain grand jury indictments to prosecute and convict Plaintiff. (*See, e.g.*, ECF No. 1 ¶¶ 14, 24, 25, 29– 31, 45, 50, 51, 53, 54, 58, 59, 64, 65, 67, 69.) In accepting the allegations as true, Plaintiff alleges that fabricated evidence and testimony and suppression of exculpatory evidence was used during the prosecution of his criminal case. Based upon the allegations in the Complaint, it can be inferred that the alleged wrongful conduct is tied to Plaintiff's criminal prosecution. At this stage in the proceedings, the Court finds that Plaintiff's Complaint

---

[11] As the Court finds above, only the allegations related to non-AUSA federal employee conduct may form the basis of the false arrest, false imprisonment, and malicious prosecution claims.

adequately alleges the lack of probable cause element for his malicious prosecution, false arrest, and false imprisonment claims. *See Awabdy*, 368 F.3d at 1067; *see also Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002) (stating that the Court of Appeals for the Ninth Circuit has "explained that the presumption of independent prosecutorial judgment in the charging decision is an evidentiary presumption applicable at the summary judgment stage...; it is not a pleading requirement to be applied to a motion to dismiss"). The Court denies Defendant's Motion to Dismiss the false arrest, false imprisonment, and malicious prosecution claims based on pleading the element of a lack of probable cause.

### D. Intentional Infliction of Emotional Distress Claim

Defendant contends that Plaintiff's IIED claim fails because "he fails to specifically point to a lack of probable cause." (ECF No. 19 at 15.) Defendant contends that the IIED claim fails because the Complaint states that Plaintiff "believes that FBI employees, BLM employees, or AUSAs engaged in unspecified 'fabrications' and these fabrications automatically support a legal claim for 'extreme and outrageous conduct.'" *Id.* at 16; *see also* ECF No. 39 at 11.

Plaintiff contends that additional discovery is necessary in order to respond to Defendant's Motion and states that he "ha[s] affirmatively alleged that the Government Employee's conduct … [was] extreme and outrageous and accomplished with the intent, or reckless disregard for, causing Plaintiff['s] emotional distress." (ECF No. 28 at 14 n.18.) Plaintiff contends that "the District Court [in the criminal case] has already determined that the Government's conduct was 'outrageous,' willful and intentional." *Id.*

In order to establish a cause of action for IIED under Nevada law, a plaintiff must show: "(1) extreme and outrageous conduct on the part of the defendant; (2) intent to cause emotional distress or reckless disregard for causing emotional distress; (3) that the plaintiff actually suffered extreme or severe emotional distress; and (4) causation." *Miller v. Jones*, 114 Nev. 1291, 1299–1300 (1998). "[E]xtreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized

24

community." *Maduike v. Agency Rent-A-Car*, 114 Nev. 1, 4 (1998) (quotations and citation omitted). "Extreme and outrageous conduct also may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." *Chehade Refai v. Lazaro*, 614 F. Supp. 1103, 1122 (D. Nev. 2009) (quotation omitted) (quoting restatement).

In this case, to the extent that Defendant moves to dismiss the IIED claim based upon its argument regarding lack of probable cause, the Court finds above that the Complaint plausibly alleges a lack of probable cause. The Court denies Defendant's Motion to Dismiss on this basis. In the Complaint, Plaintiff alleges that Defendant Employees' conduct—which Plaintiff alleges throughout the Complaint includes fabrication of evidence, perjured testimony, altered records, and purposefully excluded evidence to obtain grand jury indictments—was "extreme and outrageous." The Court finds that Plaintiff has plausibly alleged claims for IIED at this stage of the proceedings. *See, e.g.*, *Lobato v. Las Vegas Metro. Police Dep't*, No. 2:19-cv-01273-RFB-EJY, 2022 WL 4017055, at *15 (D. Nev. Sept. 1, 2022) (denying summary judgment on an IIED claim when a triable issue of fact existed concerning alleged fabricated evidence the defendants used against the plaintiff), *reversed and remanded in part on other grounds*, No. 22-16440, 2023 WL 6620306 (9th Cir. Oct. 11, 2023); *Woods v. City of Reno*, No. 3:16-cv-00494-MMD-DJA, 2020 WL 4194844, at *15 (D. Nev. July 21, 2020) (same). Defendant's Motion to Dismiss Plaintiff's IIED claim is denied.

### E.   Conversion/Theft Claim

Defendant moves to dismiss the conversion/theft claim on the grounds that the FTCA bars acts of misrepresentation and deceit under 28 U.S.C. § 2680(h). (ECF No. 19 at 16.) Defendant contends that "to the extent Plaintiff seeks to pursue a claim that some federal agent stole, defrauded, or engaged in an act of conversion, that claim is statutorily barred." *Id.* at 17. Defendant also contends that the conversion/theft claim is time barred

because the fraud scheme occurred in 2016, which is outside the applicable statute of limitations.[12] *Id.*

Plaintiff contends the conversion/theft claim "do[es] not accrue until after a criminal defendant is released from custody or otherwise acquitted in a criminal trial." (ECF No. 28 at 14.) Plaintiff contends that his claim was equitably tolled "[d]uring the pendency of the prior action and during his exhaustion of administrative remedies." *Id.* at 15. Plaintiff contends that the conversion/theft claim is not time barred because Idaho law provides a statute of limitations period of three years for this type of claim, and "the claim did not accrue until he was released from custody on September 10, 2020." *Id.* at 24.

### 1. Statute of Limitations

"A claim may be dismissed [for failure to state a claim] on the ground that it is barred by the applicable statute of limitations only when 'the running of the statute is apparent on the face of the complaint.'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (quoting *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006)). "A complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Id.* (quoting *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995)).

The FTCA's statute of limitations provides: "A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues...." 28 U.S.C. § 2401(b).[13] This provision is "a

---

[12] Unlike in the *O'Shaughnessy v. United States*, 22-cv-1039-WQH-EJY, motion to dismiss, the Motion to Dismiss in this case does not raise the statute of limitations issue as to any claim other than the conversion/theft claim. As such, the Court does not consider the statute of limitations as to any other claim in the Complaint. The Court also notes that unlike in the *O'Shaughnessy v. United States* motion to dismiss, the Motion to Dismiss in this case does not request dismissal of the Doe and Roe Defendants or allegations that sound in slander or libel. Accordingly, the Court does not address these issues in this Order.

[13] Both parties cite state law statute of limitations. However, "the FTCA's timing provisions act as a statute of limitations that supersedes any state statute of limitations." *Bennett v. United States*, 44 F.4th 929, 931 (9th Cir. 2022).

nonjurisdictional claim-processing rule subject to the presumption in favor of equitable tolling." *Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1047 (9th Cir. 2013). Because § 2401(b) is not jurisdictional, the Court must analyze this issue under the standards applicable to motions under Rule 12(b)(6).

The Complaint alleges that Plaintiff submitted his federal tort claims to Defendant and its agencies on or about August 28, 2021. Accordingly, in the absence of tolling, if Plaintiff's conversion/theft claim accrued prior to August 28, 2019, it is subject to dismissal.

In the Complaint, Plaintiff does not allege that equitable tolling applies to his conversion/theft claim and raises an equitable tolling argument for the first time in his Response. In discussing equitable tolling in his Response, Plaintiff only contends that the statute of limitations period is equitably tolled during the pendency of the prior action and period of administrative remedies exhaustion, which all occurred after August 28, 2019— the date of the filing of the administrative claims. Plaintiff has not adequately alleged in the Complaint or argued in Response a plausible basis to equitably toll a claim having accrued prior to August 28, 2019. Thus, whether the statute of limitations bars Plaintiff's conversion/theft claim must be based upon the dates in which Plaintiff's claim accrued.

An FTCA claim accrues when the plaintiff has a complete cause of action and "knows or has reason to know of the injury which is the basis of his action." *Hensley v. United States*, 531 F.3d 1052, 1056 (9th Cir. 2008); *see also Wallace v. Kato*, 549 U.S. 384, 388 (2007); *Bartleson v. United States*, 96 F.3d 1270, 1276 (9th Cir. 1996) ("The date on which an FTCA claim accrues is determined by federal law."). Plaintiff does not state in the Complaint when he became aware that his belongings had been converted. Thus, it is not apparent based upon the allegations in the Complaint when Plaintiff's conversion/theft claim accrued, and as such, the Court cannot determine at this stage in the proceedings whether the claim accrued within two years of Plaintiff's filing of the administrative claim. Defendant's Motion to Dismiss the conversion/theft claim as untimely is denied.

### 2.   Misrepresentation and Deceit Exception

Defendant contends that Plaintiff's conversion/theft claim is based upon "acts of misrepresentation and deceit" and is barred under 28 U.S.C. § 2680(h). Plaintiff alleges in the Complaint that a confidential informant befriended him and after Plaintiff's arrest, removed Plaintiff's personal property without permission from Plaintiff's property. It does not appear based upon the allegations in the Complaint that Plaintiff intended to bring a claim for misrepresentation, or even for fraudulent concealment. Notably, Plaintiff does not allege he relied upon any communication or misinformation in connection with the removal of his property. *See Esquivel v. United States*, 21 F.4th 565, 577 (9th Cir. 2021) ("[T]he essence of an action for misrepresentation, whether negligent or intentional, is the communication of misinformation on which the recipient relies.").

Section 2680(h) bars "[a]ny claim arising out of misrepresentation[ or] deceit." 28 U.S.C. § 2680(h). In support of its argument, Defendant cites to *Kim v. United States*, 940 F.3d 484, 492 (9th Cir. 2019), which involved a fraudulent concealment claim the plaintiffs brought "against federal officials for the failure to prevent the deaths of two boys who were killed when a tree limb fell onto their tent in Yosemite National Park." *Id.* at 486. The Court of Appeals held that the fraudulent concealment claim was barred under § 2680(h) because the claim "that the families detrimentally relied on the government's fraudulent misrepresentation in a commercial transaction [] bears on the traditional misrepresentation claims." *Id.* at 493. Defendant also relies on *Esquivel*, 21 F.4th at 577, that involved a claim for damages under the FTCA arising from the plaintiffs' "rel[iance] on promises by the fire crew to use certain precautionary measures while performing the burnout, and the negligent failure by the crew to employ such measures caused unnecessary additional acreage to be destroyed by the fire." *Id.* at 569. The Court of Appeals found that the plaintiffs' claim fell within the "essence of an action for misrepresentation" because they "framed their theory as one where they suffered a loss (the burning of 15 acres) as a result of [the plaintiff]'s decision to leave the property, made in reliance on [BLM Division Supervisor] McKibbin's intentionally false statement that he would use foam to control the burnout." *Id.* at 577. The

Court of Appeals held that "the alleged misrepresentations are 'within the chain of causative events upon which plaintiffs' claim is founded, and thus within the misrepresentation exception.'" *Id.* at 578 (quoting *Leaf v. United States*, 661 F.2d 740, 742 (9th Cir. 1981)).

In this case, Plaintiff does not make allegations that sound in misrepresentation in a manner similar to the two cases Defendant cites. Defendant has not otherwise elaborated on how the § 2680(h) exception applies to this case, and, notably, § 2680(h) does not reference "conversion." The Supreme Court in *Levin v. United States*, 568 U.S. 503 (2013), stated that "Section 2680(h) does not remove from the FTCA's waiver all intentional torts, *e.g.*, conversion and trespass, and it encompasses certain torts, *e.g.*, misrepresentation, that may arise out of negligent conduct." *Id.* at 507 n.1; *see also ChoPP Computer Corp. v. United States*, 5 F.3d 1344, 1347 (9th Cir. 1993) (holding that "ChoPP's conversion claim can be brought under the FTCA."). Accordingly, the Motion to Dismiss the conversion claim is denied.

## VI. CONCLUSION

IT IS HEREBY ORDERED that Defendant's Motion to Dismiss (ECF No. 19) is granted in part and denied in part. Plaintiff's FTCA claims arising out of the torts of false arrest, false imprisonment, and malicious prosecution are dismissed without prejudice to the extent that such torts are based on the actions of AUSAs Ahmed, Myhre, and Bogden. The remainder of the Motion to Dismiss is denied. The Complaint's claims that remain pending are the malicious prosecution, false arrest, false imprisonment, conversion/theft, and IIED claims with respect to only the alleged actions of the FBI agents and BLM agents and officers.

/ / /

/ / /

/ / /

/ / /

Defendant shall file an answer to the FAC pursuant to Federal Rule of Civil Procedure 12(a). The parties must comply with the Court's January 18, 2023, Order (ECF No. 23) requiring the filing of a status report, if applicable.

IT IS FURTHER ORDERED that the Motion to File Excess Pages (ECF No. 30) is granted.

Dated:  November 20, 2023

Hon. William Q. Hayes
United States District Court